# EXHIBIT C

## AMERICAN ARBITRATION ASSOCIATION

SUSANA LUCIO,

                Claimant,

v.

         **AAA CASE NO. 01-18-0006-6169**

PARTS AUTHORITY, LLC,

                Respondent.

## <u>CLAIMANT'S PRE-HEARING BRIEF</u>

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................. v

I.      Introduction ................................................................................................ 1

II.     Parts Authority Employed Ms. Lucio. ....................................................... 6

      A.      Employee Status Under The FLSA Is
            Determined By The Economic Reality Of The
            Relationship Between The Parties, UnderThe Totality Of The Circumstances. .... 6

      B.      Parts Authority And Diligent Improperly
            Classified Claimant As An Independent Contractor ................................................ 9

            1.      Respondent Exercised Significant Control
                  Over Claimant's Performance Of Her Work. ........................................... 14

            2.      Claimant's Lack Of Opportunity For Profit Or
                  Loss Weighs In Favor Of Her Employee Status. ...................................... 21

            3.      Claimant's Lack Of Investment In
                    Specialized Equipment Or Materials Required
                    For Her Work Weighs In Favor Of Her Employee Status. ....................... 25

            4.      Claimant Did Not Employ Other Workers,
                  Weighing In Favor Of Her Employee Status. .......................................... 26

            5.      Claimant's Work For
                    Respondent Did Not Require Special Skills,
                  Weighing In Favor Of Her Employee Status. .......................................... 27

            6.      The Degree Of Permanency And
                  The Duration Of The Working Relationship
                  Between The Parties Weighs In Favor Of Claimant's Employee Status.. 29

            7.      Claimant's Work For Respondent
                  Was An Integral Part Of Its Business,
                  Weighing In Favor Of Her Employee Status. .......................................... 30

      C.      Diligent's Relationship With Claimant
             Does Not Shield Parts Authority From Liability. .................................................. 31

            1.      Parts Authority Employed
                  Claimant Under The Economic Reality Test. ........................................... 35

                    i.       Parts Authority Directly Controlled Claimant's Work. ............... 36

ii.     Parts Authority Closely Supervised Claimant's Work. ............... 37

iii.    Parts Authority Effectively Determined
        The Pay Claimant Received And Effectively Fired Her.............. 39

iv.     Parts Authority Owned The Facility Where Claimant Worked.... 40

v.      Claimant's Job Was Integral To Parts Authority's Business........ 40

vi.     The Relative Investments In Equipment And Facilities
        Indicate That Claimant Was An Employee Of Parts Authority.... 41

III.    Respondent Did Not Produce Adequate Documentation Of
        Claimant's Employment, Requiring Claimant To Supplement
        Respondent's Documents With Her Recollection Of Her Employment. ........................ 42

IV.     Parts Authority Failed To Pay Ms. Lucio Wages Required By The FLSA. ..................... 44

        A.      The FLSA Requires Employers To Pay
                Employees At Least $7.25 Per Hour For The First
                40 Hours Per Week And At Least $10.875 Per Hour For Overtime. ................... 45

        B.      Un-Reimbursed Vehicle Expenses Are Considered Kickbacks
                To Respondent And Count Against Claimant's Effective Wages. ....................... 47

                1.      Claimant Was Required To Provide Her Own Vehicle And Pay For
                        Her OwnVehicle-Related Expenses When Driving For Respondent. ...... 48

                2.      Respondent Was Required To Either Track
                        Claimant's Actual Expenses, Or Reimburse Her At The IRS Rate.......... 48

                3.      Respondent Did Not Track Claimant's Actual Expenses. ........................ 48

                4.      Under The IRS Rate, Claimant Incurred At Least
                        $132.23 To $386.62 In Vehicle-Related Expenses Each Week. ............. 52

        C.      Claimant Regularly Worked For Respondent From 8:00a.m. To 6:00p.m.
                Or Later Monday Through Friday, And 8:00a.m. To 5:00p.m. On Saturdays. .... 55

        D.      Claimant Worked 60.5 Hours Per Week For
                14 Of The 24 Weeks She Worked For Parts Authority. ........................................ 57

                1.      Claimant Should Have Been Paid At Least $512.94, And Been
                        Reimbursed For All Expenses, For Each 60.5-Hour Workweek.............. 58

                2.      After Expenses, Claimant Was Only Paid
                        $97.11 to $354.52 For Her 60.5-Hour Workweeks. ................................. 58

E.     Claimant Worked 51.5 Hours Per Week  For
       Four Of The 24 Weeks She Worked For Parts Authority.................................... 60

       1.     Claimant Should Have Been Paid At Least $417.78, And Been
              Reimbursed For All Expenses, For Each 51.75-Hour Workweek............ 60

       2.     After Expenses, Claimant Was Only Paid
              $120.91 To $244.00 For Her 51.5-Hour Workweeks.............................. 61

F.     Claimant Worked 50.25 Hours Per Week For
       Three Of The 24 Weeks She Worked For Parts Authority................................... 62

       1.     Claimant Should Have Been Paid At Least $401.47, And Been
              Reimbursed For All Expenses, For Each 50.25-Hour Workweek............ 62

       2.     After expenses, Claimant Was Only Paid
              $126.18 To $288.97 For Her 50.25-Hour Workweeks............................ 63

G.     Claimant Worked 50 Hours For One Of
       The 24 Weeks She Worked For Parts Authority ................................................ 64

       1.     Claimant Should Have Been Paid At Least $398.75, And
              Been Reimbursed For All Expenses, For Her 50-Hour Workweek.......... 64

       2.     After Expenses, Claimant Was Only
              Paid $208.44 For Her 50-Hour Workweek............................................... 64

H.     Claimant Worked 41.5 Hours For One Of
        The 24 Weeks She Worked For Parts Authority ............................................... 65

       1.     Claimant Should Have Been Paid
              At Least $300.88, And  Been Reimbursed
              For All Expenses, For Her 41-Hour Workweek. ..................................... 66

       2.     After Expenses, Claimant Ended Up
              Paying $17.75 For Her 41.5-Hour Workweek......................................... 66

I.      Claimant Worked 31 Hours For One Of
       The 24 Weeks She Worked For Parts Authority. ............................................... 67

       1.     Claimant Should Have Been Paid At Least $224.75, And
              Been Reimbursed For All Expenses, For Her 31-Hour Workweek.......... 67

       2.     After Expenses, Claimant Was Only
              Paid $76.15 For Her 31-Hour Workweek................................................. 68

J.      Claimant Was Underpaid By $6,257.04 For
       The 24 Weeks She Worked For Respondent. ..................................................... 69

V.     Respondent Had No Good Faith Justification For Underpaying Claimant. ..................... 70

VI.    Claimant Is Entitled To An Award Of $12,514.08 And Attorneys' Fees And Costs....... 72

VII.   Conclusion ..................................................................................................................... 73

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Directone Logistics, Inc.*,
  No. 13-190, 2013 WL 12156682 n.4 (M.D. Fl. Oct. 22, 2013) ........................................ passim

*Aimable v. Long and Scott Farms*,
  20 F.3d 434 (11th Cir.1994) ........................................................................................ 36

*Alexander v. FedEx Ground Package System, Inc.*,
  765 F.3d 981 (9th Cir. 2014) ....................................................................................... 28

*Allen v. Bd. of Pub. Educ. for Bibb Cnty.*,
  495 F.3d 1306 (11th Cir. 2007) .................................................................................... 44

*Alvarez v. IBP, Inc.*,
  339 F.3d 894 (9th Cir. 2003, aff'd ................................................................................ 71

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) .................................................................................................... 43

*Ansoumana v. Gristede's Operating Corp.*,
  255 F. Supp. 2d 184 (S.D.N.Y. 2003) ........................................................................... 31

*Antenor v. D & S Farms*,
  88 F.3d 925 (11th Cir. 1996) .......................................................................... 8, 40, 41, 42

*Arena v. Plandome Taxi, Inc.*,
  No. 12-1078, 2014 WL 1427907 (S.D.N.Y. Apr. 14, 2014) .......................................... 16, 20

*Baker v. Flint Eng'g. & Constr. Co.*,
  137 F.3d 1436 (10th Cir. 1998) ..................................................................... 12, 25, 29

*Barfield v. New York City Health & Hosps. Corp.*,
  537 F.3d 132 (2d Cir. 2008) .......................................................................... 10, 34

*Bartels v. Birmingham*,
  332 U.S. 126 (1947) ..................................................................................................... 7

*Bellaspica v. PJPA, LLC*,
  3 F. Supp. 3d 257 (E.D. Pa. 2014) ............................................................................... 48

*Bingham v. Airport Limousine Service*,
  314 F. Supp. 565 (W. D. Ark. 1970) ............................................................................. 43

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ...................................................................................... 7

*Brandenburg v. Cousin Vinny's Pizza, LLC,*
  No. 16-516, 2018 WL 5800594 (W.D. Ohio Nov. 6, 2018) .................................................... 51

*Brennan v. Partida,*
  492 F.2d 707 (5th Cir. 1974) ........................................................................................ 10

*Brennan v. Zager,*
  No. 6973, 1975 WL 1071 (M.D. Tenn. Mar. 12, 1975) ......................................................... 43

*Brock v. Mr. W Fireworks, Inc.,*
  814 F.2d 1042 (5th Cir. 1987) ...................................................................................... 23

*Brock v. Superior Care, Inc.,*
  840 F.2d 1054 (2d Cir. 1988) ................................................................................. passim

*Butler v. Drive Auto. Indus. Of Am., Inc.,*
  793 F.3d 404 (4th Cir. 2015) ....................................................................................... 34

*Campos v. Zopounidis,*
  No. 09-1138, 2011 WL 2971298 (D. Conn. July 20, 2011) ............................................... passim

*Chan v. Sung Yue Yung Corp.,*
  No. 03-6048, 2007 WL 313483 (S.D.N.Y. Feb. 1, 2007) ....................................................... 42

*Charles v. Burton,*
  169 F.3d 1322 (11th Cir.1999) ..................................................................................... 36

*Chasteen v. Rock Fin.,*
  No. 07-10558, 2012 WL 8705090 n.6 (E.D. Mich. Jan. 31, 2012) ........................................... 46

*Clincy v. Galardi South Enters., Inc.,*
  808 F. Supp. 2d 1326 (N.D. Ga. 2011) ............................................................................. 6

*Collinge v. IntelliQuick Delivery, Inc.,*
  No. 12-00824, 2015 WL 1299369 (D. Ariz. Mar. 23, 2015) ............................................. passim

*Cooper v. Cavalry Staffing, LLC,*
  132 F. Supp. 3d 460 (E.D.N.Y. 2015) .............................................................................. 34

*Darrow v. WKRP Mgmt. LLC,*
  No. 09–01613, 2011 WL 2174496 (D. Colo. June 3, 2011) .................................................... 49

*Dewitt v. Daley,*
  336 B.R. 552 (S.D. Fla. Jan. 12, 2006) ............................................................................. 4

*Dewitt v. Daley,*
  336 B.R. 556 (S.D. Fla. Jan. 12, 2006) ............................................................................ 32

*Dole v. Snell*,
875 F.2d 802 (10th Cir. 1989)........................................................................ 16, 29

*Donovan v. Tehco, Inc.*,
642 F.2d 141 (5th Cir.1981)................................................................................ 7

*Dunlop v. Zager*,
529 F.2d 524 (6th Cir. 1975)............................................................................. 43

*Eberline v. Media Net LLC*,
68 F. Supp. 3d 619 (S.D. Miss. 2014).............................................................. 21

*Edwards v. Cmty. Enterprises, Inc.*,
251 F. Supp. 2d 1089 (D. Conn. 2003)............................................................ 28

*Estrada v. FedEx Ground Package System, Inc.*,
64 Cal.Rptr.3d 327 (2007)................................................................................ 29

*Fast v. Applebee's Int'l, Inc.*,
638 F.3d 872 (8th Cir. 2011)............................................................................. 50

*Flores v. Velocity Express, LLC*,
250 F. Supp. 3d 468 (N.D. Cal. Apr. 24, 2017) ......................................... passim

*Gattuso* v. Harte-Hanks Shoppers, Inc.,
42 Cal. 4th 554 (2007)...................................................................................... 49

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991)............................................................................................ 72

*Graham v. Word Enters. Perry, LLC*,
No. 18-167, 2018 WL 3036313 (E.D. Mich. June 19, 2018)............................ 32

*Griffith v. Exel, Inc.*,
No. 14-1754, 2016 WL 8938585 (N.D. Ga. Feb. 5, 2016) .............................. 34

*Guyden v. Aetna, Inc.*,
544 F.3d 376 (2d Cir. 2008).............................................................................. 42

*Harris v. Med. Transp. Mgmt., Inc.*,
300 F. Supp. 3d 234 (D.D.C. 2018) ................................................................. 31

*Hart v. Rick's Cabaret Int'l., Inc.*,
No. 09-3043, 2013 WL 4822199 (S.D.N.Y. Sept. 10, 2013)............................ 16

*Heidtman v. Cnty. of El Paso*,
171 F.3d 1038 (5th Cir. 1999)........................................................................... 72

*Herman v. RSR Sec. Servs. Ltd.*,
  172 F.3d 132 (2d Cir.1999) ................................................................... 46

*Herold v. Benevis, LLC*,
  No. 14-771, 2016 WL 7177600 (E.D. Va. Jan. 8, 2016) ......................... 47

*Holick v. Cellular Sales of New York, LLC*,
  802 F.3d 391 (2d Cir. 2015) ..................................................................... 9

*Hughes v. Family Life Care, Inc.*,
  117 F. Supp. 3d 1365 (N.D. Fla. 2015) .................................................. 24

*In the Matter of the Arbitration Between Claimant and Respondent*,
  2015 WL 8682313 (Aug. 13, 2015) ........................................................ 49

*In the Matter of the Arbitration Between Claimant and Respondent*,
  2015 WL 8682319 (Aug. 13, 2015) ........................................................ 49

*Ingram v. Passmore*,
  175 F. Supp. 3d 1328 (N.D. Ala. Mar. 29, 2016) ........................... passim

*Irizarry v. Catsimatidis*,
  722 F.3d 99 (2d Cir. 2013) ...................................................................... 46

*Jackson v. Fed. Nat'l Mortg. Ass'n*,
  181 F. Supp. 3d 1044 (N.D. Ga. 2016) .......................................... passim

*Jacobs v. New York Foundling Hosp.*,
  483 F. Supp. 2d 251 (E.D.N.Y. 2007) .................................................... 50

*Joiner v. City of Macon*,
  814 F.2d 1537 (11th Cir. 1987) ............................................................... 70

*Kinney v. Dist. of Columbia*,
  994 F.2d 6 (D.C. Cir. 1993) .................................................................... 71

*Kis v. Covelli Enters., Inc.*,
  Nos. 18-54 / 18-434, 2018 WL 2227782 (N.D. Ohio May 16, 2018) ...... 32

*Klinedinst v. Swift Invest Inc.*,
  260 F.3d 1251 (11th Cir. 2001) ............................................................... 50

*Kreager v. Solomon & Flanagan, P.A.*,
  775 F.2d 1541 (11th Cir.1985) ................................................................ 72

*Kubiak v. S.W. Cowboy, Inc.*,
  No. 312-1306, 2014 WL 2625181 (M.D. Fla. June 12, 2014) ................. 50

*Secretary of Labor, U.S. Dept. of Labor v. Lauritzen,*
   835 F.2d 1529 (1987) .................................................................................... 29

*Layton v. DHL Exp. (USA), Inc.,*
   686 F.3d 1172 (11th Cir. 2012) ............................................................... 35, 37

*LeMaster v. Alt. Healthcare Sols., Inc.,*
   726 F. Supp. 2d 854 (M.D. Tenn. 2010) ....................................................... 32

*Lima v. Addeco*,
   634 F. Supp. 2d 394 (S.D.N.Y. 2009) ........................................................... 34

*Lyles v. Burt's Butcher Shoppe and Eatery Inc.,*
   No. 10-53, 2011 WL 4915484 (M.D. Ga. Oct. 17, 2011) .............................. 46

*Martinez-Mendoza v. Champion Intern. Corp.,*
   340 F.3d 1200 (11th Cir. 2003) ..................................................................... 36

*Mathis v. Hous. Auth. of Umatilla Cty.,*
   242 F. Supp. 2d 777 (D. Or. 2002) ................................................................ 19

*McLaughlin v Morgantown Yellow Cab Co.,*
   706 F. Supp. 448 (N.D. W. Va. 1988) .............................................. 13, 17, 20

*Mednick v. Albert Enters., Inc.,*
   508 F.2d 297 (5th Cir. 1975) ........................................................................... 8

*Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.,*
   536 F.3d 640 (7th Cir. 2008) .......................................................................... 34

*Molina v. South Fla. Exp. Bankserv, Inc.,*
   420 F. Supp. 2d 1276 (M.D.Fla. 2006) ..................................................... 21, 22

*Moon v. Kwon,*
   248 F. Supp. 2d 201 (S.D.N.Y. 2002) ........................................................... 43

Morales-Arcadio v. Shannon Produce Farms, Inc.,
   No. 05-062, 2007 WL 2106188 (S.D. Ga. Jul. 18, 2007) .............................. 70

*Morgan v. Kalka & Baer LLC,*
   No. 16-16032, 2018 WL 4275867 (11th Cir. Sept. 7, 2018) ......................... 44

*Morgan v. Family Dollar Stores, Inc.,*
   551 F.3d 1244 (11th Cir. 2008) ..................................................................... 50

Nicholson v. UTi Worldwide, Inc.,
   No. 09-722, 2011 WL 250563 ........................................................................ 10

*NLRB v. Browning-Ferris Indus. Of Pa., Inc.*,
   691 F.2 1117 (3d Cir. 1982) ............................................................ 36, 38

*Olson v. Star Lift Inc.*,
   709 F. Supp. 2d 1351 (S.D. Fla., 2010) ............................................ 20

*Olson v. Superior Pontiac-GMC, Inc.*,
   765 F.2d 1570 (11th Cir. 1985) ........................................................ 70

*Paduano v. Express Scripts, Inc.*,
   55 F. Supp. 3d 400 (E.D.N.Y. 2014) ................................................ 43

*Parks v. MRB, Inc.*,
   No. 14-1996, 2015 WL 13298573  (N.D. Ga. Nov. 16, 2015) ............ 72

*Parrish v. Premier Directional Drilling, L.P.*,
   280 F. Supp. 3d 954 (W.D. Tex. 2017) ............................................ 29

*Perez v. Super Maid, LLC*,
   55 F. Supp. 3d 1065 (N.D. Ill. 2014) .............................................. 14, 27

*Posner v. Showroom, Inc.*,
   762 F.2d 1010 (6th Cir. 1985) .......................................................... 72

*Promega Corp. v. Life Techs. Corp.*,
   674 F.3d 1352 (Fed. Cir. 2012) ........................................................ 43

*Rahman v. Shiv Darshan, Inc.*,
   No. 12-3457, 2013 WL 654189 (E.D.N.Y. Feb. 22, 2013) ................ 5, 32

*Ramirez v. Northeast Logistics, Inc.*,
   No. 18-8192, 2018 WL 4739745 (S.D.N.Y. Sep. 7, 2018) ................ 34

*Ramos-Barrientos v. Bland*,
   661 F.3d 587 (11th Cir. 2011) .......................................................... 47

*Real v. Driscoll Strawberry Associates, Inc.*,
   603 F.2d 748 (9th Cir. 1979) ...................................................... passim

*Reich v. Circle C. Investments, Inc.*,
   998 F.2d 324 (5th Cir. 1993) ............................................................ 16

*Reyes v. Aqua Life Corp.*,
   632 Fed. Appx. 552 (11th Cir. 2015) ................................................ 70

*Reynolds v. Pronto Corp.*,
   No. 08-81241, 2009 WL 10667071 (S.D. Fla. July 10, 2009) .......... 22, 30

*Roberts v. Gordy,*
  877 F.3d 1024 (11th Cir. 2017)..................................................................... 70

*Rutherford Food Corp. v. McComb,*
  331 U.S. 722 (1947) ............................................................................. passim

*Sakasci v. Quicksilver Delivery Sys., Inc.,*
  No. 06-1287, 2007 WL 4218984 (M. D. Fla. 2007) ................................. 22

*Saleem v. Corp. Transportation Grp., Ltd.,*
  854 F.3d 131 (2d Cir. 2017)......................................................................... 23

*Salinas v. Commercial Interiors, Inc.,*
  848 F.3d 125 (4th Cir. 2017).................................................................. 21, 32

*Satterfield v. CFI Sales & Mktg., Inc.,*
  No. 09-1827, 2013 WL 2455961 (M.D. Fla. June 6, 2013)....................... 72

*Scantland v. Jeffry Knight, Inc.,*
  721 F.3d 1308 (11th Cir. 2013).............................................................. passim

*Solis v. A+ Nursetemps, Inc.,*
  No. 07-182, 2013 WL 1395863 (M.D. Fl. Apr. 5, 2013)........................... 24

*Southward v. Tonerrefillkits.com, LLC,*
  No. 13-168, 2014 WL 268443 (M.D. Fla. Jan. 16, 2014).......................... 72

Talbott v. Lakeview Ctr., Inc.,
  No. 06-378, 2010 WL 11557948 (N.D. Fla. Feb. 2, 2010)........................ 71

*Tony & Susan Alamo Found. v. Sec'y of Labor,*
  471 U.S. 290, (1985) .................................................................................... 46

*Torres-Lopez v. May,*
  111 F.3d 633 (9th Cir. 1997)................................................................... 39, 40

*United States v. Rosenwasser,*
  323 U.S. 360 (1945) ................................................................................. 7, 32

*United States v. Silk,*
  331 U.S. 704 (1947) ...................................................................................... 7

*Usery v. Pilgrim Equipment Co., Inc.,*
  527 F.2d 1308 (5th Cir. 1976)................................................................ passim

*Villarreal v. Woodham,*
  113 F.3d 202 (11th Cir 1997)....................................................................... 35

*Wirtz v. Miss. Publishers Corp.*,
    364 F.2d 603 (5th Cir. 1966) ............................................................... 43

*Young v. Act Fast Delivery of W. Va., Inc.*,
    No. 16-09788, 2018 WL 279996 (S.D. W. Va. Jan. 3, 2018) .................................. 41

*Zellagui v. MCD Pizza, Inc.*,
    59 F. Supp. 3d 712 (E.D. Pa. 2014) ............................................... passim

*Zheng v. Liberty Apparel Co. Inc.*,
    355 F.3d 61 (2d Cir. 2003) ........................................................ passim

**Statutes**

29 U.S.C. § 201 .................................................................................. 1

29 U.S.C. § 203 ........................................................................ 6, 31, 34

29 U.S.C.A. § 206(a)(1) ....................................................... passim

29 U.S.C.A. § 207(a)(2) .............................................. 46, 58, 61

29 U.S.C. § 211(c) ....................................................................... 42

29 U.S.C. § 216(b) ....................................................................... 70

29 U.S.C. §§ 258 .......................................................................... 70

29 U.S.C. § 260 ................................................................ 70, 71, 72

**Regulations**

29 C.F.R. § 531.35 .......................................................... 47, 48, 50

29 C.F.R. § 791.2 ........................................................................ 32

29 C.F.R. § 791.2(a) .................................................................... 32

29 C.F.R. § 825.106 .................................................................... 34

**Other Authorities**

Commercial Arbitration § 10:12 (3d ed. 2004) ...................................... 43

## I.     Introduction

Respondent Parts Authority, LLC ("Parts Authority" or "Respondent"), an auto parts distributor and retailer, buttressed its profits by improperly classifying Claimant Susana Lucio ("Ms. Lucio" or "Claimant") and numerous other delivery drivers as independent contractors.  By doing so, Parts Authority denied Ms. Lucio legally required overtime pay and expense reimbursements, causing her to be paid wages far below the minimum set by the Fair Labor Standards Act, 29 U.S.C.§ 201, *et seq.* ("FLSA").

Yaron Rosenthal, Parts Authority's Vice President and former Chairman, testified that Parts Authority employs two types of delivery drivers:  W-2 employees and "temps," like Ms. Lucio, that it obtains with the assistance of Northeast Logistics, Inc. d/b/a Diligent Delivery Systems ("Diligent").  Rosenthal Depo. Day One 19:19-22.  As Mr. Rosenthal admitted at his deposition, and as Renan Oliveira, a Parts Authority delivery driver who worked both as a W-2 employee and as a temp driver, will testify, Parts Authority's W-2 drivers and temp drivers have the same job duties and responsibilities.  The only significant difference is that the temp drivers are paid wages far below the legal minimum.  As Mr. Rosenthal further admitted, besides the difference in how they are paid -- with temps not appearing directly on Parts Authority's payroll -- there is not "any other reason to say Ms. Lucio was not an employee of Part Authority." Rosenthal Depo. Day One 20:1-22; *see also id.* at 21:14-25.

Parts Authority justifies paying temp drivers differently by relying on a self-serving fiction that its temp employees are "independent contractors," as if each driver was a separate business in her or his own right rather than a normal employee who accepted a job delivering for Parts Authority.  In fact, Diligent and Parts Authority take unfair advantage of their superior bargaining and economic position by requiring, as a condition of being hired, that Ms. Lucio and other low-income temp drivers sign identical form contracts that describe each temp driver them as an

"independent contractor," and supports that description with various assertions of fact. Because that document is signed pre-hire, workers like Ms. Lucio are required to agree to descriptions of their work environment which they are unable to verify at that time to be either true or untrue. After beginning employment, Ms. Lucio encountered a day-to-day working reality that was materially different than described in the pre-hire paperwork. Thus, it is not surprising that courts routinely hold that contracts labeling workers as independent contractors are not controlling when the worker actually functions as an employee in the day-to-day reality of their job. *See, e.g.*, *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013) ("This inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.' '[P]utting on an 'independent contractor' label does not take the worker from the protection of the [FLSA].'". (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947); first alteration in original).[1] That is the case here, as Mr. Rosenthal conceded. *See* Rosenthal Depo. Day One 20:1-22 (Q. Okay. Does Parts Authority have any delivery drivers that are independent contractors? A. No.).

---

[1] *See also, e.g.*, *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988) ("[A]n employer's self-serving label of workers as independent contractors is not controlling[.]"); *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979); ("The Agreement labels the appellants as "independent contractors" and employs language, purporting to describe the appellants' relationship to Driscoll and DSA, that parrots language in cases distinguishing independent contractors from employees. That contractual language, however, is not conclusive in the circumstances presented here. Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."); *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d 1308, 1311-12 (5th Cir. 1976) ("We reject both the declaration in the lease agreement that the operators are 'independent contractors' and the uncontradicted testimony that the operators believed they were, in fact, in business for themselves as controlling FLSA employee status. Neither contractual recitations nor subjective intent can mandate the outcome in these cases. Broader economic realities are determinative.") (internal footnotes omitted).

In practice, Ms. Lucio was not allowed to set her own hours; she was simply directed to report to the Parts Authority location in Roswell, Georgia from 8:00a.m. to at least 6:00p.m. each weekday and from 8:00a.m. to 5:00p.m. on Saturdays (Parts Authority often required Ms. Lucio to work beyond the stated end of her shift). At that location, Ms. Lucio checked in with Tammy Jaswa, the Parts Authority manager who recorded Ms. Lucio's hours,[2] dictated the addresses to which she would make deliveries, set the times at which she would make deliveries, and decided whether and when Ms. Lucio could have a break.

As Ms. Lucio testified, and will testify again, she arrived at the Parts Authority store each morning for the start of her daily shift, as scheduled by Parts Authority. *See* Claimant's Exhibit C-1, Deposition of Susana Lucio Transcript ("Lucio Depo.") at 88:19-89:3. She waited in the employee break room until Parts Authority assigned her a delivery order to take (*see id.* at 86:7-12), checked the order against Parts Authority's documents for accuracy, loaded the order into her vehicle, made the delivery, and then returned to the store to wait until Parts Authority gave her the next "run." *See id.* at 85:8-86:3. In direct contravention of the so-called independent contractor agreement, Ms. Lucio did not make deliveries for other companies during the down time between runs (and was effectively precluded from doing so because Parts Authority consumed all of her available work time) (*see id.* at 63:13-17), and she did not set her own schedule (*see id.* at 90:15-91:12) or subcontract her responsibilities. *See id.* at 63:3-12. In fact, Ms. Lucio was required to call in to specifically request days off whenever she could not work -- requests that were sometimes flatly denied. *See id.* at 90:15-17. Mr. Oliveira will corroborate that Parts Authority micromanaged its temp delivery drivers in this way, and that it is the same way it micromanaged

---

[2] Despite Claimant's requests, Parts Authority has not produced Ms. Jaswa's records, nor have they produced numerous other responsive documents that are central to this arbitration. *See infra* at § III.

its W-2 employee drivers.  The only difference between Ms. Lucio and the average employee delivery driver is that Parts Authority and Diligent constructed a fiction, on paper, that she was an independent contractor, and then paid her thousands of dollars less than she was owed in minimum wage and overtime pay under the FLSA.

Ms. Lucio's status as an employee is underscored by how her employment ended.  Ms. Lucio's young daughter developed significant medical issues and, after staying in the hospital with her overnight, Ms. Lucio needed to take time off to be with her and provide treatment at four-hour intervals.  Ms. Lucio asked Ms. Jaswa for time off to take care of her sick daughter.  Ms. Jaswa told Ms. Lucio that Parts Authority needed workers who showed up every day and that Ms. Lucio would have to choose between her family or her job.  When Ms. Lucio told Fred Rosenau, the Diligent employee with whom she signed the contract, that Ms. Jaswa's decisions were unfair, Mr. Rosenau told Ms. Lucio that "Tammy is your boss" and "you have to do whatever Tammy says." In choosing her family, Ms. Lucio had to end her employment with Parts Authority.  Ms. Lucio's termination further demonstrates that she was not free to set her own hours as an independent contractor would be, but that, instead she was an employee whose hours were dictated by her employer, Parts Authority.

At the hearing, Ms. Lucio will prove (1) that she was an employee and not an independent contractor; (2) that Parts Authority employed her (whether or not Diligent, which functioned as a staffing agency for Parts Authority, is also a joint employer is irrelevant to Parts Authority's liability)[3]; and (3) the amount she is owed in damages.

---

[3] Regardless of whether Diligent, in addition to Parts Authority, qualifies as an "employer" under the FLSA, Ms. Lucio need not assert or prove claims against Diligent. *See, e.g., Dewitt v. Daley,* 336 B.R. 552, 556 (S.D. Fla. Jan. 12, 2006) (all statutory employers are neither necessary nor

Claimant will prove her case via three witnesses:  herself, Mr. Oliveira, and Michael Earner.  Ms. Lucio will describe her experiences at Parts Authority, the hours she worked, and the unreimbursed expenses she incurred.  Mr. Oliveira will describe his experiences as a Parts Authority contract worker and as a temp worker like Ms. Lucio -- illustrating that, aside from cosmetic differences, W-2 employees and temp workers had the same jobs rather than temp drivers being treated as true independent contractors.  Mr. Earner is an experienced trial assistant who reviewed and summarized all paystubs, invoices, and delivery addresses produced in this arbitration.  Mr. Earner will testify as to his summary of that data, which reflects that Ms. Lucio was paid $6,257.04 less than the minimum required by the FLSA's minimum wage and overtime provisions.

The FLSA provides that liquidated damages doubling the amount of the original damages must be awarded unless the employer can plead and prove that it operated in good faith and with reasonable belief that it was in compliance with the FLSA.  Parts Authority has alleged no such good faith defense -- and, indeed, acted willfully in its violations of the FLSA -- because, contrary to its obligations, it mischaracterized Ms. Lucio as an "independent contractor" in gross disregard of the actual facts.  Further, Parts Authority acted willfully in that it made no attempt to ensure that Ms. Lucio received wages equal to or above the minimum.  Instead, to pad its profits at the direct expense of low-paid workers like Ms. Lucio, Parts Authority used Diligent to procure temp workers, relying on Diligent to indemnify it whenever an exploited worker sued, and relying on arbitration agreements to deny workers their right to access the courts and pursue class actions.  Parts Authority saved many millions of dollars by this scheme, and was well aware of its

---

indispensable parties under the FLSA) (citing cases); *see also, e.g., Rahman v. Shiv Darshan, Inc.,* No. 12-3457, 2013 WL 654189 *15-17 (E.D.N.Y. Feb. 22, 2013) (similar).

culpability throughout, as it has been sued for this precise behavior many times. Ms. Lucio respectfully requests that, to compensate her for the underpayments she received as a result of this scheme, this tribunal award her $6,257.04 in compensatory damages and $6,257.04 in liquidated damages -- for a total of $12,514.08 -- plus attorneys' fees and costs.

## II.    Parts Authority Employed Ms. Lucio.

Sections II(A) below describes the analysis courts use in determining whether someone is an employee under the FLSA. Section II(B) and all of its subparts demonstrate that Ms. Lucio was an employee, not an independent contractor, by demonstrating that her work was controlled by others rather than her having the independence and autonomy that are touchstones of a genuine independent contractor. Section II(C) and all of its subparts demonstrate that Parts Authority employed Ms. Lucio because it exercised significant control over the work she performed on its behalf and the conditions of her employment (as an employer, Parts Authority cannot evade liability by showing that Diligent, which functions as Parts Authority's staffing agency, may also be an employer).

### A.    Employee Status Under The FLSA Is Determined By The Economic Reality Of The Relationship Between The Parties, Under The Totality Of The Circumstances.

Whether Ms. Lucio is an "employee" for purposes of the FLSA is determined by the economic reality of her relationship to Parts Authority under the totality of the circumstances. *See, e.g., Clincy v. Galardi South Enters., Inc.*, 808 F. Supp. 2d 1326, 1338 (N.D. Ga. 2011) (applying economic reality test and finding dancers were employees of the nightclub where they worked despite being labeled as independent contractors in their employment documentation). The FLSA defines "employee" as "any individual employed by an employer," and to "employ" as including "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), 203(g) (1982 & Supp. III 1985). "The definition is necessarily a broad one in accordance with the remedial purpose of the Act." *Brock*

*v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945); *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979)).

Courts have found several factors relevant to a determination of whether an individual is an "employee" or independent contractor for purposes of the FLSA.  The most commonly-referenced factors, derived from *United States v. Silk*, 331 U.S. 704 (1947), and "known as the 'economic reality test,' include: (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Brock*, 840 F.2d at 1058-59.  "No one of these factors is dispositive; rather, the test is based on a totality of the circumstances." *Id.* at 1059 (citing *Rutherford Food Corp.*, 331 U.S. at 730; *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d 1308, 1311 (5th Cir. 1976)[4]). "The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock,* 840 F.2d at 1059 (citing *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) (Social Security Act); *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir.1981)).

"Since the test concerns the totality of the circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided." *Brock*, 840 F.2d at 1059. Accordingly, "[t]he factors that have been identified by various courts in applying the economic reality test are not exclusive." *Id.*  For example, some courts also consider "the relative degree of

---

[4] The Eleventh Circuit, sitting *en banc*, adopted all Fifth Circuit decisions issued prior to September 30, 1981, the date of the circuit split, as "binding precedent." *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

investment in equipment and facilities by the independent contractor on the one hand, and the putative employer on the other." *Antenor v. D & S Farms,* 88 F.3d 925, 937 (11th Cir. 1996). "While these factors serve as guides, the overarching focus of the inquiry is economic dependence." *Scantland*, 721 F.3d at 1312; *see also Antenor,* 88 F.3d at 937 ("It is <u>dependence</u> that indicates employee status.") (internal quotation omitted; emphasis in original). "[T]he final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit." *Scantland*, 721 F.3d at 1312 (quoting *Usery*, 527 F.2d at 1311-12). Thus, in considering economic dependence, the court ultimately focuses on whether an individual is "in business for himself" or is "dependent upon finding employment in the business of others." *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301-02 (5th Cir. 1975).

Here, the reality is that Ms. Lucio was not in business for herself during the time she worked for Parts Authority. Rather, she was a person looking for work, who was told by Mr. Oliveira that Mr. Rosenau could get her a job making deliveries for Parts Authority. *See* Lucio Depo. at 9:13-21. Ms. Lucio met Mr. Rosenau, who gave her a stack of paperwork to sign and, because she felt pressured and rushed to sign immediately, she did so without fully reading nor understanding the mass of legalese it contained. *See id*. at 59:5-60:6. The purpose of the paperwork was to allow Ms. Lucio to take the job as a Parts Authority delivery driver. After signing the required papers, Ms. Lucio was told to show up to work at Parts Authority that day. *See id*. at 84:22-85:1. From that point forward, Ms. Lucio proceeded to typically work a regular shift six days a week as instructed by Parts Authority (*see id*. at 98:9-14), with her Parts Authority supervisor controlling her breaks and micromanaging her work performance, including the time

and length of her deliveries. *See id.* at 111:6-9.  As Mr. Oliveira will testify, this was Parts Authority's standard operating procedure.

  **B. Parts Authority And Diligent Improperly Classified Claimant As An Independent Contractor.**

  Even though Ms. Lucio was described as an "Owner Operator" or "independent contractor" in the agreements she signed (but did not fully read nor understand), "an employer's self-serving label of workers as independent contractors is not controlling." *Brock*, 840 F.2d at 1059; *see also Usery*, 527 F.2d at 1315 ("We reject both the declaration in the lease agreement that the operators are 'independent contractors' and the uncontradicted testimony that the operators believed they were, in fact, in business for themselves as controlling FLSA employee status.  Neither contractual recitations nor subjective intent can mandate the outcome in these cases.  Broader economic realities are determinative."); *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 399 (2d Cir. 2015) ("For purposes of the FLSA, a company's decision to label a worker as an independent contractor or a non-employee will not carry the day."); *Real*, 603 F.2d at 755 ("The Agreement labels the appellants as "independent contractors" and employs language, purporting to describe the appellants' relationship to Driscoll and DSA, that parrots language in cases distinguishing independent contractors from employees.  That contractual language, however, is not conclusive in the circumstances presented here.  Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."); *Campos v. Zopounidis,* No. 09-1138, 2011 WL 2971298, at *4 (D. Conn. July 20, 2011) ("Zopoundis's self-serving statements in her affidavit that Campos dictated his rate of pay and work schedule and that she simply acquiesced do not create a genuine issue of material fact for trial").

  "Similarly, the subjective intent of the parties to a labor contract cannot override the economic realities reflected in the factors described above."  *Real*, 603 F.2d at 755 (citing *Usery*,

527 F.2d at 1315; *Brennan v. Partida*, 492 F.2d 707, 709 (5th Cir. 1974)).  Here, however, it is relevant to note that the subjective intent of Respondent was for delivery drivers -- like Claimant -- that were hired in conjunction with Diligent to be essentially indistinguishable from delivery drivers directly employed by Parts Authority, except to the extent that delivery drivers hired in conjunction with Diligent were called "temps".  Indeed, Yaron Rosenthal, Vice President and former Chairman of Parts Authority, testified that Ms. Lucio was <u>not</u> an independent contractor. *See* Rosenthal Depo. Day One 20:1-22 ("Q. Okay. Does Parts Authority have any delivery drivers that are independent contractors?  A. No.").

Mr. Rosenthal further testified that, other than her not being on the Parts Authority payroll, there was not "any other reason to say Ms. Lucio was not an employee of Part Authority."  *See* Rosenthal Depo. Day One 20:1-22; *see also id.* at 21:14-25.  Mr. Rosenthal explained that "I consider them temps," when asking how he could categorize Ms. Lucio and other drivers who signed up with Diligent and performed work for Parts Authority.  Rosenthal Depo. Day Two 22:20-24.  "Temp" employees, however, are still employees under the FLSA, and enjoy the same statutory protections against abusive wage theft by their employer.  *See, e.g.*, *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 137 (2d Cir. 2008) (finding temp nurse was employee of both referral agency and hospital where she was placed and that hospital was liable under FLSA for her wages); *Nicholson v. UTi Worldwide, Inc.*, No. 09-722, 2011 WL 250563*2-5 (S.D. Ill. Apr. 18, 2011) (including workers classified as both "employees" and "temporary workers" in same FLSA collective action).

Mr. Rosenthal's admissions are consistent with Ms. Lucio's testimony and with the testimony of Mr. Oliveira.  Mr. Oliveira worked for Parts Authority in two capacities:  first, in exactly the same position as Ms. Lucio, a "temp" delivery driver through Diligent; and, second, as

a W-2 employee delivery driver.  Mr. Oliveira will testify that his job responsibilities as a Parts Authority W-2 employee delivery driver and as a "temp" driver through Diligent were exactly the same, as was the oversight of these responsibilities that Parts Authority exercised.  This strongly favors a finding that "temp" delivery drivers, including Ms. Lucio, are not independent contractors. *See Jackson v. Fed. Nat'l Mortg. Ass'n*, 181 F. Supp. 3d 1044, 1048 (N.D. Ga. 2016) (Plaintiff plausibly alleged workers misclassified as independent contractors and referred by staffing agency were employees of bank when "they performed the same duties as W-2 [employees,]" "worked in close proximity to one another, attended work meetings together, and reported to the same supervisors").

Indeed, the totality of circumstances indicate that Claimant was an employee of Respondent, rather than an independent contractor.  Respondent exercised significant control over the performance of her work, dictating the dates and times she worked (*see* Lucio Depo. at 15:15-16:1), the amount she was paid (*see id*. at 37:22-38:22), which deliveries she would make (*see id*. at 85:8-86:3), when she would make them (*see id*. at 108:14-24), the length of time the delivery would take (*see id*. at 15:21-24), her appearance (*see id*. at 77:3-12), and the means of logging the deliveries she made.  *See id.* at 85:8-86:3.

Parts Authority will be hard pressed to identify any aspect of Ms. Lucio's delivery job that she controlled in practice, as the fictions expressed in her pre-hire contract bore no resemblance to the actual conditions of her employment.  Nor did Claimant have an opportunity to experience profit or loss due to her work -- she was paid a flat wage without opportunity to earn profits by working harder, smarter, or more skillfully, and she was not at risk for any losses (other than the fact that she was deprived of a minimum wage).  Claimant did not invest in specialized equipment or materials or employ other workers, and her work did not require special skills.  All told, the

relative value of investments between Ms. Lucio and Parts Authority shows that Ms. Lucio was an employee. *See, e.g., Baker v. Flint Eng'g. & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (finding that a rig welders' investments in equipped trucks costing between $35,000.00 and $40,000.00 did not indicate that the rig welders were independent contractors when compared to the employer's investment in its business). Moreover, her work for Parts Authority, for whom Ms. Lucio worked exclusively, was for an indefinite duration -- only ending because Ms. Jaswa, a Parts Authority manager, forced her to choose between (1) keeping her job and not being able to care for her sick daughter or (2) losing her job but caring for her daughter. Finally, the work she performed for Parts Authority was an integral part of its business.

In such circumstances, numerous courts have found that drivers -- whether delivering passengers, goods, or services -- were employees of their respective employers for purposes of the FLSA, rather than independent contractors. For example, in *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468 (N.D. Cal. Apr. 24, 2017), the district court considered whether delivery drivers working for a ground shipping provider were misclassified as independent contractors under the FLSA. The court found that, under the totality of circumstances, the drivers were employees of the delivery business because (i) the business had the right to control key aspects of the manner and details of its drivers' work, such as lunch breaks and vacation time; (ii) the drivers did not obtain profit or suffer loss based on their own managerial skills; (iii) the drivers made minimal investments in equipment relative to the business's significant capital investments; (iv) the business had ultimate discretion to approve or reject helpers; (v) the drivers' work did not require any special skill; and (vi) the drivers' services played an integral role in the business's regular business. *See id*. at 480-94 (analyzing factors and finding, under totality of circumstances, that, because "the overwhelming uncontroverted evidence shows that each of the Plaintiffs were

dependent upon Velocity as a matter of economic reality, no jury could reasonably conclude that the Plaintiffs were independent contractors under the FLSA").[5]  Those factors are the same or even more strongly favor employee status in this case:  (i) Parts Authority, like the *Flores* employer, controlled key details of Ms. Lucio's work, such as her break time and ability to take time off; (ii) Ms. Lucio, like the *Flores* drivers, was not able to obtain profit or loss based on her managerial skills; (iii) Ms. Lucio made no investment in equipment other than her car, which is the same investment the *Flores* drivers made and the *Flores* court held to be "minimal when compared to the total capital investment necessary to operate [the employer's] business" (*id*. at 488-89); (iv)

---

[5] *See also, e.g.*, *Ingram v. Passmore*, 175 F. Supp. 3d 1328 (N.D. Ala. Mar. 29, 2016) (FLSA action by tow truck drivers against a tow truck company finding that the drivers were employees because, *inter alia*, the tow truck company hired the drivers, set their commission, disciplined them, paid their wages, and hired managers to supervise their work; drivers' weekly pay was dependent upon the number of jobs company assigned them; and towing vehicles was an integral part of company's business); *Collinge v. IntelliQuick Delivery, Inc.*, No. 12-00824, 2015 WL 1299369, *2-6 (D. Ariz. Mar. 23, 2015) (FLSA action by delivery drivers against delivery service where defendants conceded that the drivers' work did not require a special skill, that there was a significant degree of permanence in the drivers' working relationship with defendants, and that the drivers' work was an integral part of the business, finding that drivers also established that defendants' policies and procedures allowed them to exercise a great deal of control over the manner in which drivers performed their jobs, drivers had few opportunities for profit or loss that depend upon their managerial skill, and drivers did not make significant investments in equipment or materials, nor do they employ helpers, and thus drivers were employees under the FLSA) ("IntelliQuick exercises a great deal of control over the manner in which its drivers perform their work.  The details of its drivers' jobs do not display the hallmarks of independent contractor status, such as significant capital investments, the employment of helpers, or opportunities for profit or loss based on the drivers' industry or judgment.  Further, as plaintiffs observe, all of the delivery work available to the drivers is routed to them by IntelliQuick -- there is no independent market for their services.  Ultimately, as a matter of economic reality, the drivers are dependent upon IntelliQuick.  They have been misclassified as independent contractors for purposes of the FLSA."); *McLaughlin v Morgantown Yellow Cab Co.*, 706 F. Supp. 448 (N.D. W. Va. 1988) (Action by Secretary of Labor to enjoin violations of FLSA by taxicab company, finding that, as matter of economic reality, taxi cab drivers were employees of taxi cab company where drivers obtained approximately 95% of their fares from company radio dispatchers, drivers' work schedule were set by company, drivers could not alter work schedules without obtaining dispatcher's prior approval and drivers were required to report to dispatchers the location of where they were operating the cabs).

Ms. Lucio, unlike the *Flores* drivers, did not hire any helpers; (v) Ms. Lucio, like the *Flores* drivers, had no special skills; and (vi) Ms. Lucio and other Parts Authority temp drivers played an integral role in Parts Authority's business.

Indeed, an analysis of the relevant factors here establishes that, under the totality of the circumstances, the economic reality of their relationship was likewise one where Claimant was economically dependent on Respondent and thus was its employee under the FLSA.

### 1. Respondent Exercised Significant Control Over Claimant's Performance Of Her Work.

The nature and degree of the control that Respondent exercised over Claimant's work weighs in favor of finding that she was an employee rather than an independent contractor. "Evidence displaying an employer's dominance over the manner and method of how work is performed suggests control by an employer." *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1076 (N.D. Ill. 2014) (finding that maids were employed by the maid service and not independent contracts based on the amount of control the maid service exercised). Parts Authority exercised significant control over the work Ms. Lucio performed on its behalf, such that she did not stand as a "separate economic entity" in business for herself. "In sum, [her employer(s)] controlled what jobs [Ms. Lucio] did, how much [she was] paid, how many hours [she] worked, how many days [she] worked, [her] daily work schedule, whether [she] could work for others, whether [she] could earn additional income from customers, and closely monitored the quality of [her] work. [Ms. Lucio] could not bid for jobs or negotiate the prices for jobs. [Her] ability to hire and manage others was illusory. This alleged control strongly suggests that the [Ms. Lucio was] economically dependent upon [her employer(s)]." *Scantland*, 721 F.3d at 1308.

First, Claimant lacked independent control over the amount of work she performed or the amount she earned. From the beginning of her relationship with Respondent, she was told that she

would make a flat $2,300 for every month of making deliveries for Parts Authority, working Monday to Friday from 8:00a.m. to 6:00p.m. and Saturday from 8:00a.m. to 5:00p.m. Ms. Lucio's pay was determined entirely by the number of days she drove for Parts Authority. *See* Lucio Depo. 38:5-8 ("Q. Okay. And in those pay periods when you missed a day of driving, you would receive less money; right? A. Yes.").

Indeed, Respondent exercised control over Claimant's ability to take breaks during her shift, punitively taking breaks away if Claimant was running even five minutes late to work at the start of her shift. *See id.* at 39:6-23 (""A. Because if we -- if I was late like five minutes, she would take my break away. She did that time. Q. How many times did that happen? A. Well, she -- maybe twice, like two times a week. Q. Two times a week you were late? A. Yes. Like five minutes. Q. And she took away your break? A. Yes."). And Ms. Lucio was unable even to control her ability to take a day off from work. She would ask both Ms. Jaswa of Parts Authority and Mr. Rosenau of Diligent about taking days off, with Mr. Rosenau telling Ms. Lucio that she had to work the hours set by Ms. Jaswa because "She's your boss." *See id.* at 111:7-23.

Ms. Lucio was obliged to remain at Parts Authority until the end of her shift, regardless of whether there were deliveries to be made. *See id.* at 87:11-14 ("Q. So at the conclusion of each day, would you just leave? A. No. We wait for like 6:00 until it was time to go."); *see also* Rosenthal Depo. Day One 96:10-15 ("Q. Are there occasions where there's a lull and temp delivery drivers have to wait around for deliveries to be made ready for pickup or groups of deliveries have to be made ready for pickup? A. It's possible."). Moreover, Parts Authority routinely required Ms. Lucio to work well past the stated end of her shift. *See* Lucio Depo. at 87:17-24.

This lack of control over when and how many hours she worked strongly indicates Ms. Lucio's employee status. *See Campos,* 2011 WL 2971298, at *4 (finding employment relationship

in part because delivery driver had to inform employer when he would be late and had to request time off); *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 327 (5th Cir. 1993) (finding employment relationship in part because the employer "exercise[d] a great deal of control over the [plaintiffs]," who were "required to comply with weekly work schedules"); *Dole v. Snell*, 875 F.2d 802, 806 (10th Cir. 1989) (reversing district court and finding employment relationship in part because the plaintiff cake-decorators' schedules were "totally controlled" by their employer – e.g., they were expected to arrive at the premises at a particular hour, prevented from leaving until they had decorated all the cakes to their bosses' satisfaction, and required to seek their employer's approval for vacation -- and thus, "[t]he demands of the business controlled the [workers' schedule]"); *Brock*, 840 F.2d at 1060 (finding employment relationship in part because the employer "limited working hours to 40 per week where nurses claimed they were owed overtime"); *Hart v. Rick's Cabaret Int'l., Inc.*, No. 09-3043, 2013 WL 4822199, at *18 (S.D.N.Y. Sept. 10, 2013) (finding the fact that "dancers were required to perform a minimum number of days per week," and "were required to get permission for not appearing as required or scheduled" indicated an employer/employee relationship instead of independent contractor status).

Courts have repeatedly found that circumstances similar to Claimant's weigh heavily in favor of an employee/employer relationship. *See Arena v. Plandome Taxi, Inc.*, No. 12-1078, 2014 WL 1427907, at *5 (S.D.N.Y. Apr. 14, 2014) (noting the fact that transportation company "dictated the hours the drivers worked" supported employee status), *Flores*, 250 F. Supp. 3d at 483 (finding employer relationship when company "could and did control when drivers can work"); *Ingram*, 175 F. Supp. 3d. at 1335 (finding "sufficient evidence to establish that [employer] has control over the drivers" where, among other factors, "[t]o take time off, drivers must provide either 48 hours' notice or a doctor's note"); *Collinge v. IntelliQuick Delivery, Inc.*, No. 12-00824,

2015 WL 1299369, *3-4 (D. Ariz. Mar. 23, 2015) (company setting "within which 'time frame'" delivery drivers must perform their work, including "the time that [drivers] must start their work" indicated control); *McLaughlin v. Morgantown Yellow Cab Co.*, 706 F. Supp. 448 (N.D. W. Va. 1988) (finding employer/employee relationship where employer's control included "that any requested schedule change was to be made at least 24 hours in advance").

Second, Parts Authority dictated the deliveries that Claimant made during her working hours, the order of the deliveries, and the expected amount of time for the deliveries to take. *See* Rosenthal Depo. Day One 29:15-20 ("Q. Do dispatchers tell the temp delivery drivers which routes to take or which deliveries to make?  A. Well, they usually take the next route that's scheduled to go out."), 30:9-25 ("Q. What is a hot shot delivery?  A. It's usually same day, you know, within an hour or so from the time the order is placed.  That's what we – that's what we – that's a service we try to provide.  . . . Q. Do temp delivery drivers take hot shot deliveries?  A. Yes."), 34:13-18 ("Q. . . . Who prepares the routes that the temp delivery drivers take?  A. Dispatchers.  Q. All right. Those are Parts Authority dispatchers?  A. Correct."), 60:25-61:10 ("Does Parts Authority determine the order of deliveries for a temp delivery driver's routes?  A. No.  I mean, we try to give all the routes out in a logical way.  I'd say, you know, they're all in a certain direction.  So we try to group them together so that they're, you know, reasonable.  Q. Is that for both temp and employee delivery drivers?  A. That's correct."), 92:15-93:7 ("Q. So there are some standards on when temp delivery drivers need to complete their deliveries; is that correct?  A. We expect deliveries done the same day.  Q. Okay.  A. In a reasonable amount of time.  It says here, free delivery, prompt and accurate same day."); *see also* Lucio Depo. 15:15-16:1 ("Q. And how many times did [Parts Authority manager] Tammy text you?  A. We communicate almost every day.  Q. By text message?  A. Yes.  Q. What were the subject matter of those text messages?  A. Like by

the time -- what time, you know, are you coming to work or where are you -- are you -- what's

time you going to be in.  Or how long that the run is going to take you.  You supposed to be here

by now.  Stuff like that.").[6]

As Ms. Lucio explained in her deposition:

I show up and they have runs, parts that we need to take to the shops.  And whoever
get there first, they'll take the runs.  We get in the cars.  They say as long as we
took the parts in the car, and then we just drove to the shops and drop it off.  We
ask for returns.  If they have returns, we have to write it, do in the handwriting, and
then give the copy to the customer and we keep a copy for our book, because it was
a booklet.  And we give the other one to Tammy.  Like this is a return.  It's defect.
And just, you know, they issue a credit to the customer.  And that's -- and then we
get another run.  We pick it up.  We take it.  It was just go back and forth.  Back
and forth to the store from Parts Authorities to the shops.

Lucio Depo. 85:13-86:3.

Moreover, Parts Authority monitored and supervised Ms. Lucio's work.  *See* Lucio Depo.

107:14-18 ("Q: . . . how did Parts Authority monitor your work?  A. By calling you and, basically,

like where are you; what are you doing; why are you not here?  You're supposed to be here five

minutes ago.  Why are you late, or I need you to do this right now.").  Ms. Jaswa routinely called

Ms. Lucio and other temp (and W-2) drivers throughout the day to check on route timing and other

job performance issues.  If Ms. Lucio was even a few minutes late to work, she was subject to

criticism from her manager at Parts Authority.  *See* Lucio Depo 79:12-14 ("[I]f I was ten minutes

late, [my manager] would be like, [']You're supposed to be here at 8[.']").  If Ms. Lucio took

longer than expected (or desired) on a delivery route, she was subject to criticism from her manager

at Parts Authority.  *See* Lucio Depo 79:19-22. ("[I]f I take longer time in my -- in my deliveries,

as soon as I get there, [my manager is] like, Why did it take you so long, stuff like that.").  Indeed,

---

[6] Ms. Lucio produced all text messages she was able to retrieve.  However, not all relevant texts
were saved on her phone.  Parts Authority, in contrast, refused to produce any text messages
even after Claimant filed a motion to compel.  *See infra.* fn.13.

Parts Authority told Ms. Lucio to "rush all [her] runs." *Id.* at 106:4-8. Parts Authority thus "controlled" the method and manner of Ms. Lucio's work because she lacked the independence indicative of an independent contractor relationship.

> The "right to control" does not require continuous monitoring of employees. Instead, control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control "do[ ] not diminish the significance of its existence." "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity."

*Mathis v. Hous. Auth. of Umatilla Cty.*, 242 F. Supp. 2d 777, 783 (D. Or. 2002) (internal citations omitted).

Parts Authority also imposed rules governing the manner in which Ms. Lucio could perform her job. *See* Lucio Depo. 80: 7-9 ("Q. Did anyone from Parts Authority ever give you a set of rules? A. Yes."). For example, Ms. Lucio was required to inform dispatchers when she arrived at a delivery site or when customers had questions or complaints. *See* Lucio Depo. 110:14-17 ("Q: . . . you were required to call dispatchers when you arrived at a customer. Is that accurate? A. Yes."). Indeed, when she started working for Parts Authority, she was given two days of "training" by another "temp" driver for Parts Authority. *See* Lucio 70:22-71:10. Claimant was also informed that she "[had] to listen to" her manager at Parts Authority, Ms. Jaswa, who "was [her] boss." *See* Lucio Depo. 80:18-81:17.[7]

In addition, Ms. Jaswa instructed Ms. Lucio to wear a uniform shirt while working for Respondent. *See* Lucio Depo. 77:2-12 ("Q. Okay. Did Diligent supply with you any kind of uniform? A. Yes. Q. What did you have to wear? A. A blue shirt. Q. And did it say anything on

---

[7] To the extent Parts Authority did not map every specific route, street-by-street, for Ms. Lucio to take on deliveries, this is of no moment, as "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Usery,* 527 F.2d at 1312.

it?  A. I don't remember.  Q. Do you still have it?  A. No.  Q. Did it say Diligent owner/operator on it?  A. I believe so, yes.").  Such a uniform requirement weighs in favor of finding an employee relationship.  *See, e.g.*, *Olson v. Star Lift Inc.*, 709 F. Supp. 2d 1351, 1356 (S.D. Fla., 2010) (holding that a worker wearing a uniform "weigh[s] in favor of finding that Plaintiff was an employee").

Altogether, regardless of the cargo involved, human or otherwise, courts have routinely found that delivery drivers facing similar levels of control over the performance of their work are employees under the FLSA.  *See Flores*, 250 F. Supp. 3d at 482-84 (finding employer/employee relationship where employer "could and did exercise significant control over how drivers performed their work" including "control[ing] the appearance of its drivers"); *Ingram*, 175 F. Supp. 3d. at 1335-36 (finding employer/employee relationship where employer "utilizes its policies . . . to control the manner in which the drivers do their jobs"); *Collinge*, 2015 WL 1299369 at *2-3 (training, dispatching, required uniforms, and monitoring of drivers' performance indicated control and employer/employee relationship); *Arena*, 2014 WL 1427907 at *5 (finding driver was employee rather than independent contractor where "drivers were not permitted to choose their own passengers or to drive to destinations without Plandome's prior approval" and "were not permitted to take unauthorized breaks or go home without Plandome's permission"); *McLaughlin*, 706 F Supp 448 at *51 (holding that "as a matter of economic reality, taxicab drivers are employees of the Cab Company within the definition in the FLSA, and not independent contractors" based on the "degree of control" exercised by company, including drivers being required to report their location and company's "setting of work schedules").

## 2.    Claimant's Lack Of Opportunity For Profit
## Or Loss Weighs In Favor Of Her Employee Status.

The second factor -- the alleged employee's opportunity for profit or loss -- weighs in favor of finding that Ms. Lucio was an employee rather than an independent contractor.

"When a worker is economically dependent on a putative employer, or his putative joint employers in the event two or more entities codetermine the essential terms and conditions of the worker's employment, he qualifies as an employee protected by the FLSA; by contrast, a worker whose profit or loss depends upon his own creativity, ingenuity, and skill is an independent contractor outside of the FLSA's scope." *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017). In analyzing the degree to which a worker's opportunity for profit or loss is determined by an alleged employer, a court should analyze whether the worker or employer controlled the major determinants of the amount of profit which the worker could make. *Eberline v. Media Net LLC*, 68 F. Supp. 3d 619 (S.D. Miss. 2014); *Molina v. South Fla. Exp. Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1286 (M.D.Fla. 2006) (stating that when a business controls the primary factors governing its workers' earnings, employee status is suggested).

Ms. Lucio earned a flat amount per work day, regardless of how many deliveries she made or the efficiency of her routes. *See* Lucio Depo. 104:10 ("I would get paid by the day."). Accordingly -- the net earnings of any shift, given that she was not reimbursed for expenses (*see* Lucio Depo. 72:12-73:1; Respondent's Response to Interrogatory No. 17) -- depended entirely on how much she drove. However, Parts Authority dictated how much she drove in any given shift, as Ms. Lucio depended entirely on Parts Authority to provide her with delivery assignments. *See* Lucio Depo. 85:8-86:12; Rosenthal Depo. 29:8-20; *see also* Rosenthal Depo. 57:23-25 (Q. Can Parts Authority's temp delivery drivers earn profits? A. I don't know.). No amount of hard work, ingenuity, hustle, or careful planning would have a meaningful impact on Ms. Lucio's income

from her work for Parts Authority, because she was not an independent entity in business for herself, but rather a laborer putting in her daily hours for her employer.

In analogous situations, courts have repeatedly found an employee relationship. *See, e.g.*, *Flores*, 250 F. Supp. 3d at 486-87 (drivers were unable to obtain profit or suffer loss based on their own managerial skills); *Reynolds v. Pronto Corp.*, No. 08-81241, 2009 WL 10667071, at *3 (S.D. Fla. July 10, 2009) (FLSA action by drivers against a taxi and paratransit service, finding drivers were employees, noting that "[e]ach driver was paid a flat amount weekly, and not per project or task, or in any way that would tend to suggest that the drivers were independent contractors rather than [the defendant's] employees."); *Sakasci v. Quicksilver Delivery Sys., Inc.*, No. 06-1287, 2007 WL 4218984 (M. D. Fla. 2007) (finding drivers for a pharmaceutical-delivery business "employees") ("The most determinative factors of a driver's profit or loss are route pay rate and route assignment, both of which are under QDS' control and not the control of the drivers. Any money drivers could theoretically save by using a more fuel-efficient car, for instance, must be considered *de minimus* to these factors. Additionally, the Court is not persuaded by the fact that drivers could ask for more work or attempt to negotiate better pay rates. . . . The Court concludes that because QDS controlled the factors primarily responsible for determining its drivers' earnings, this factor weighs in favor of finding an employment relationship." (internal citations omitted)); *Molina*, 420 F. Supp. 2d at 1286 ("In contrast, the evidence from the Plaintiffs suggests that the Plaintiffs actually were unable to request additional work in order to make more money, and instead additional work was assigned to them and they often had to wait for more than a week to discover how much additional money they made as a result. SFEBI argues that the Plaintiffs had the ability to lower their costs, such as by decreasing the gas they used by purchasing a more fuel-efficient car. While theoretically possible, there is little to no evidence demonstrating that the

Plaintiffs actually were able to (or in fact did) reduce their costs through any means.  Moreover, any such cost reduction would likely be *de minimus* in relation to the overall "cost" of providing the service.  Finally, the fact that an individual could request more work or re-negotiate his or her compensation is not indicative of independent contractor status, because any employee can do those things as well."); *Brock*, 840 F.2d at 1060 (finding that plaintiff nurses "depended entirely on referrals to find job assignments, and [the alleged employer] in turn controlled the terms and conditions of the employment relationship"); *Ingram*, 175 F. Supp. 3d. at 1336 (finding drivers were employees where they "profited from Passmore's managerial skill rather than their own skills" and "their weekly pay is on a commission system that is dependent upon the number of jobs Passmore assigns them"); *Collinge*, 2015 WL 1299369 at *4 ("It appears that the drivers' opportunity for profit or loss depends more upon the jobs to which IntelliQuick assigns them than on their own judgment and industry.  This weighs in favor of economic dependence.").

Although, prior to her employment, Diligent required Ms. Lucio to sign an operator agreement that provided that she was free to refuse to take delivery assignments (*see* Joint Exhibit J-7, Diligent Owner Operator Agreement ("Owner Operator Agreement") at §§ 3-4), the reality turned out to be different.[8]  "To be clear, pursuant to the economic reality test, 'it is not what [Plaintiffs] could have done that counts, but as a matter of economic reality what they actually do that is dispositive.'"  *Saleem v. Corp. Transportation Grp., Ltd.,* 854 F.3d 131, 142 (2d Cir. 2017) (quoting *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987)).

---

[8] Ms. Lucio did not read the agreement as she was signing it. *See* Lucio Depo 60:7-16 ("Q. Paragraph 1 of Respondents' Exhibit E, the owner/operator agreement.  It says that operator, being you, shall, in no way and for no purpose hereunder, be considered an agent, servant, employee, partner, or co-venture of Diligent, or be deemed to hold any relationship with Diligent, other than that of owner/operator.  Did you read that when you were given the contract?  A. No.").

Ms. Jaswa told Ms. Lucio she would not be brought back as a delivery driver if she refused a delivery assignment, even though the delivery run came in at the very end of the work day.  *See, e.g.*, Lucio Depo. 108:10-109:11 ("Q: . . . Who warned and disciplined you?  A. Tammy.  Q. And what did she discipline you about?  A. Like, at one point, I was -- I was there, and then she was like -- she got mad at me, because I was, like, basically not listening to her.  Like -- because sometimes I say I'm not taking this run, because it's 6:00.  And by the time I get there, you know, I can't -- well, you're going to have to take it.  Otherwise, we won't need you anymore.  So I'm like, I don't want to lose my job.  So I'm like, okay, I'll take it.  And then -- and what time you want me to be here the next day, and like 8:00.  Q. So you considered that discipline?  A. Yes.  Because I mean, basically, she wanted to -- she wanted me to do whatever she wanted me to do, you know.  Q. And what she wanted you to do was deliver parts?  A. Like basically, like I didn't want to deliver the parts so she got -- you know, she was like, [']No, you have to do it.['] Q. Okay.  And you did it?  A. I did.").  Mr. Rosenau, likely acting at Parts Authority's direction, supported and reiterated Ms. Jaswa's threats.  Indeed, when Ms. Lucio complained to Mr. Rosenau, he told her that "you have to listen to Tammy.  She's your boss."  Lucio Depo., 111:16-23.

Ms. Lucio's inability to control her schedule and net pay militates against finding an independent contractor relationship because courts find an employment relationship when employees designated as independent contractors have minimal control over their hours.  *See, e.g.*, *Hughes v. Family Life Care, Inc*., 117 F. Supp. 3d 1365, 1372 (N.D. Fla. 2015) ("FLC pays Ms. Hughes hourly for shift work.  Under those circumstances, '[t]here is no opportunity for additional income or profit through the exercise of managerial skill or increased efficiency in the manner or means of accomplishing the work.'") (quoting *Solis v. A+ Nursetemps, Inc*., No. 07-182, 2013 WL 1395863 at *7 (M.D. Fl. Apr. 5, 2013)); *Campos*, 2011 WL 2971298, at *5 (finding that since a

delivery driver had no control over the customer volume or delivery area, he was "totally dependent" on his alleged employer for work and had no control over the work he performed).

      **3.**      **Claimant's Lack Of Investment In
Specialized Equipment Or Materials Required
For Her Work Weighs In Favor Of Her Employee Status.**

Ms. Lucio's lack of investment in specialized equipment or materials required for her labor weighs in favor of finding that she was an employee rather than an independent contractor.

Ms. Lucio's ability to qualify for the work offered by Parts Authority depended on nothing more than her ability to provide her own car and a phone. *See* Lucio Depo. 75:24-76:17 ("Q. Okay. The proposal says that you would provide, at your own cost, all tools and equipment and all labor needed to complete the engagement that you accept. Did you provide your own equipment as a Diligent owner/operator? A. Just the car. Q. Just the car? A. To work for Parts Authorities. Q. Okay. Did you need a phone to work? A. Yes. Q. Did you provide your own phone? A. Yes. Q. So you provided your phone and your car and anything else? A. No."); Respondent's Response to Interrogatory No. 8. Respondent did not even require Claimant to invest in a specialized vehicle in order to be a delivery driver. Indeed, on Ms. Lucio's first day, her vehicle was not inspected by Parts Authority or Diligent in any way. *See* Lucio Depo. 34:9-22.

In analogous circumstances, courts find an employee relationship. *See, e.g.*, *Baker*, 137 F.3d at 1442 (finding that a rig welders' investments in equipped trucks costing between $35,000.00 and $40,000.00 did not indicate that the rig welders were independent contractors when compared to the employer's investment in its business); *Campos*, 2011 WL 2971298, at *5 (finding that a driver's investment in a vehicle and automotive expenses was nominal compared to the other more substantial expenses of the business, such as rent, utilities, supplies, vehicle signage, payroll, tax or other business expenses); *Flores*, 250 F. Supp. 3d at 488-89 (drivers' investments in personal

vehicle and equipment "are insignificant when compared to the total capital investment necessary to operate" delivery business) (internal quotation omitted); *Collinge*, 2015 WL 1299369 at *5 (same).

### 4.   Claimant Did Not Employ Other Workers, Weighing In Favor Of Her Employee Status.

Claimant's dependency on Respondent for her employment is further highlighted by the fact that Claimant, when she was unable or unwilling to perform all the work assigned to her (i.e., a standard shift), did not provide her own replacement by hiring someone to work in her stead, despite any empty claims in her contract that she could do so.  Rather, Diligent found Ms. Lucio's replacements whenever she could not work.  *See* Lucio Depo 91:18-91:21 ("Q. Did he [Fred Roseneu] tell you you could get your own replacement?  A. No.  His job is to put somebody else and replace.").  Although the language of the agreement provides that Ms. Lucio had the ability to hire her own replacement, the reality was that Ms. Lucio was not expected to hire a replacement and she never hired anyone to do so.  *See* Lucio Depo. 62:20-63:2 ("Q. Okay.  Number 2 says, "You can engage or hire others to complete an engagement."  Did anybody tell you you couldn't do that? A. No. Q. Did you ever hire someone to complete your engagement?  A. No.  Q. Did you ever have anyone do it for you, volunteer?  A. No."), 91:18-92:4 ("Q. Your contract allowed you to get your own replacement; did you ever try to exercise that right?  A. That was not my job.  That was -- Q. Sorry.  Your contract says you could do that.  Did you ever try to do that?  A. No.").  Ms. Lucio will testify that she believes the words in the agreement purportedly allowing her to hire others to do her work are legal fiction, as she believes she would have gotten in trouble if she had attempted to hire someone else to do her work for her (moreover, as Ms. Lucio was paid below the minimum wage, she could not practically hire assistants or replacements).   Mr. Oliveira will likewise testify that, during his time as a temp driver, he never hired others for his shifts, was never

informed he could do so, and does not believe this was ever a legitimate option available to temp drivers.   Underscoring that Parts Authority temporary drivers had no real ability to hire replacements, Mr. Rosenthal testified that he was unaware of a single instance where any driver like Ms. Lucio actually hired another driver to perform their work.  *See* Rosenthal Depo. Day One 58:16-24 ("Q. Do you have any knowledge of any temp delivery driver hiring assistance or workers to perform their Parts Authority deliveries for them?  A. Not to my knowledge.").

In analogous situations, courts find an employee relationship.  *See Collinge*, 2015 WL 1299369 at *5 ("Further, although defendants correctly observe that the drivers may hire helpers, this 'does not prevent a finding that they are employees.'  This holds true here in light of defendants' inability to point to any driver who has actually employed a helper.") (quoting *Real*, 603 F.2d at 755); *cf. Flores*, 250 F. Supp. 3d at 489-90 ("[T]he Eleventh Circuit has noted that a worker's ability to hire helpers is 'illusory' for purposes of the FLSA if helpers are also subject to the control of the alleged employer.") (quoting *Scantland*, 721 F.3d at 1317).

### 5.   Claimant's Work For Respondent Did Not Require Special Skills, Weighing In Favor Of Her Employee Status.

Analyzing whether the work performed by Ms. Lucio required a special skill or training also weighs in favor of finding that she was an employee rather than an independent contractor.

"Routine work which requires industry and efficiency is not indicative of independence and nonemployee status."  *Usery*, 527 F2d at 1308 (in holding that operators of laundry pickup stations were employees for purposes of the FLSA, noting that the operators did not need long training or highly developed skills); *Perez*, 55 F. Supp. 3d 1065 (holding that, under economic realities test, maids' tasks in cleaning homes and businesses, including vacuuming, dusting, cleaning floors, making beds, and taking out trash, although perhaps difficult and demanding, did not require special skill, as weighed in favor of finding that maids were employees, rather than

independent contractors, under FLSA's wage and overtime provisions); *Campos*, 2011 WL 2971298, at *6 (finding that although delivery driver's need a driver's license in order to legally drive, "the possession of a driver's license and the ability to drive an automobile is properly characterized as a "routine life skill" that other courts have found to be indicative of employment status rather than independent contractor status".) *(*citing *Edwards v. Cmty. Enterprises, Inc.*, 251 F. Supp. 2d 1089 (D. Conn. 2003))  Ms. Lucio has testified that her "work didn't require any special skill."  Lucio Depo. 105:14-16.

Respondent produced no documents responsive to Claimant's request for all documents reflecting any special skills required of Claimant or her fellow drivers.  *See* Claimant's Exhibit C-4, Respondent's Responses to Claimant's First Request for Production of Documents at Response No. 31.  Given that Claimant moved to compel responses and Respondent still insisted it had no responsive documents reflecting any delivery driver special skills, Respondent should not now be heard to claim that Ms. Lucio's job required a special skill.  In fact, Claimant's work for Parts Authority entailed no true skills, other than the common ability of adults to drive a car and the ability to follow Parts Authority's instructions.

Thus, it is not surprising that courts considering similar misclassification claims under the FLSA hold that the mere act of driving from one location to another does not require special skill. *See, e.g.*, *Flores*, 250 F. Supp. 3d at 490 ("An individual does not need to have any particular level of education, specialized training, or special license to be a driver"); *Ingram*, 175 F. Supp. 3d. at 1336 ("Driving a Passmore truck does not require special skill or prior experience."); *Collinge*, 2015 WL 1299369 at *2 (drivers' work does not require a special skill); *cf. Alexander v. FedEx Ground Package System, Inc.*, 765 F.3d 981, 995 (9th Cir. 2014) (finding that the skill factor favored plaintiffs' classification as employees because "FedEx drivers 'need no experience to get

the job in the first place and [the] only required skill is the ability to drive'") (quoting *Estrada v. FedEx Ground Package System, Inc.*, 64 Cal.Rptr.3d 327, 337 (2007)).

> **6.    The Degree Of Permanency And The
> Duration Of The Working Relationship Between
> The Parties Weighs In Favor Of Claimant's Employee Status.**

The "permanency of the relationship" factor for determining whether a worker is an employee or an independent contractor under the FLSA considers the length of time the alleged employee worked for the employer, the basis on which the worker is hired, and the exclusivity of the work. *See Parrish v. Premier Directional Drilling, L.P.*, 280 F. Supp. 3d 954 (W.D. Tex. 2017).

> Generally speaking, "'independent contractors' often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration." *Dole*, 875 F.2d at 811.  However, "[m]any seasonal businesses necessarily hire only seasonal employees, [and] that fact alone does not convert seasonal employees into seasonal independent contractors." *Secretary of Labor, U.S. Dept. of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (1987).

*Baker*, 137 F.3d at 1442.

Ms. Lucio was hired by Parts Authority to serve as a driver for an indeterminate length of time.  Indeed, she was told to return to Parts Authority at 8:00a.m. every day, except Sunday.  *See* Lucio Depo at 84:22-85:7 ("Q. When you talked to Fred about going to Parts Authority, did he say go there now and then go tomorrow morning at 8:00?  A. Yes.  Q. And he said go every day -- A. Yes.  Q. -- Monday through Saturday?  A. Yes.  Q. You never worked Sunday; correct?  A. No.").  Her employment only ended because Ms. Lucio was forced to choose between her family and her job, effectively resulting in Ms. Lucio being fired for having a sick daughter. *See id.* at 43:6-17.

Furthermore, Claimant, regardless of her ostensible ability to do so, worked only for Parts Authority throughout the period that she worked there.  *See* Lucio Depo. 45:15-46:7.  Her standard

workweek at Parts Authority, totaling approximately 60-hours a week (*see* infra. § IV(C)), effectively precluded any opportunity for to work for any other company.

Courts find that similar circumstances indicate an employee status. *See, e.g.*, *Reynolds*, 2009 WL 10667071, at *3 (holding that taxi drivers were employees and noting that "[n]one of the drivers performed transportation services for any other individuals or companies, or earned income from any other source while employed by Pronto"); *Flores*, 250 F. Supp. 3d at 491 (finding employer/employee relationship where relationship "does not include a fixed employment period" and driver worked over 60 hours a week, making it "'hard' to enter into a contract with another company").

### 7. Claimant's Work For Respondent Was An Integral Part Of Its Business, Weighing In Favor Of Her Employee Status.

Finally, the FLSA's economic reality test considers "whether the service rendered is an integral part of the alleged employer's business." *Real*, 603 F.2d at 754. If the workers play an integral role in the alleged employer's business, this "shows that the arrangement follows more closely that of an employer-employee relationship than an independent contractor dynamic." *Scantland*, 721 F.3d at 1319.

The evidence indisputably establishes that the delivery of auto parts from central distribution points or stores to customer's locations, such as automotive service centers, is an integral part of the Parts Authority's business. *See* Rosenthal Depo. Day One 42:11-13 ("Q: Is delivery of auto parts a major part of the business of Parts Authority? A. It's an important part."); 42:22-43:1 (admitting that about 90% of Parts Authority's deliveries are delivered to customers), 43:5-10 ("Q: About what percentage of the deliveries from Parts Authority are made by delivery drivers, either employee delivery drivers or temp delivery drivers. A. I could take a guess and say

about 60 percent."); *see also* Lucio Depo. 102:1-7 (noting that making deliveries to customers was an integral part of Parts Authority's business).

In similar circumstances, courts have found that drivers' services played an integral role in business's regular business. *Flores,* 250 F. Supp. 3d at 492-93 ("The work that Plaintiffs performed for Velocity is undoubtedly an integral part of Velocity's regular business.  In its standard services proposal to its customers, Velocity describes itself as 'America's largest national ground shipping provider dedicated exclusively to regional delivery.'  And Velocity's managerial employees similarly characterized Velocity as a delivery business.  Therefore, . . . the work that Plaintiffs perform for Velocity is essential to [its] core business." (citations and quotations omitted)); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 191-92 (S.D.N.Y. 2003) (FLSA action by delivery driver against Gristede's Operating Corp., finding that the drivers were employees in part because "the extent to which the work is integral to the business . . . weighs heavily in favor of an employment relationship," noting that "defendants concede that they are engaged primarily in the business of providing delivery services to retail establishments and that plaintiffs perform the actual delivery work" and that "[t]hus, plaintiffs' services constitute an integral part of the Hudson/Chelsea defendants' business").

**C.    Diligent's Relationship With Claimant
        Does Not Shield Parts Authority From Liability.**

When determining whether a company is an employer -- including a joint-employer -- "the relevant provision of the FLSA, 29 U.S.C. § 203(g), defines 'employ' as including 'to suffer or permit to work.'  This is the broadest definition of 'employ' that has ever been included in any one act, and it encompasses working relationships, which prior to the FLSA, were not deemed to fall within an employer-employee category." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 69 (2d Cir. 2003) (internal quotations, alterations, and footnote omitted*); see also Harris v. Med. Transp.*

*Mgmt., Inc*., 300 F. Supp. 3d 234, 245 (D.D.C. 2018) ("Congress intentionally drew the definition of "employer" under the FLSA to have a broad sweep") (citing *United States v. Rosenwasser*, 323 U.S. 360, 362–63 (1945)); *Salinas*, 848 F.3d at 140 ("[W]e are guided by the Supreme Court's direction that the FLSA must not be interpreted or applied in a narrow, grudging manner.  Rather, because the Act is remedial and humanitarian in purpose, it should be broadly interpreted and applied to effectuate its goals.") (internal quotations omitted).  "The regulations promulgated under the FLSA expressly recognize that a worker may be employed by more than one entity at the same time." *Id.* at 66 (citing 29 C.F.R. § 791.2).  In such instances where there are joint employers, each employer is individually liable for FLSA wage violations.  *See* 29 C.F.R. § 791.2(a) (stating that "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA], including the overtime provisions, with respect to the entire employment for the particular workweek."); *Graham v. Word Enters. Perry, LLC*, No. 18-167, 2018 WL 3036313 (E.D. Mich. June 19, 2018) ("[A]s joint employers, Defendant stores would be jointly and severally liable for FLSA violations."); *Kis v. Covelli Enters., Inc.*, Nos. 18-54 / 18-434, 2018 WL 2227782, at *2 (N.D. Ohio May 16, 2018) (stating that "joint employers are usually jointly and severally liable for FLSA violations"); *LeMaster v. Alt. Healthcare Sols., Inc.*, 726 F. Supp. 2d 854, 864 (M.D. Tenn. 2010) (holding that joint employers were jointly and severally liable for FLSA violations).  As stated above, even if Diligent is a statutory "employer," Claimant has no duty to pursue claims against all statutory "employers."  *Dewitt v. Daley*, 336 B.R. 556 (S.D. Fla. Jan. 12, 2006); *Rahman v. Shiv Darshan, Inc.*, No. 12-3457, 2013 WL 654189 at *15-17 (E.D.N.Y. Feb. 22, 2013).

Parts Authority attempts to distance itself from Ms. Lucio -- and avoid its FLSA obligations to her -- through its relationship with Diligent, the entity with which Ms. Lucio signed her employment paperwork and which directly paid her for her work at Parts Authority.  However:

> the definition of 'employ' in the FLSA cannot be reduced to formal control over the physical performance of another's work. In *Rutherford* [*Food Corp. v. McComb*, 331 U.S. 722 (1947)], the Supreme Court held that a slaughterhouse jointly employed workers who de-boned meat on its premises, despite the fact that a boning supervisor -- with whom the slaughterhouse had entered into a contract -- directly controlled the terms and conditions of the meat boners' employment.  Specifically, the supervisor, <u>rather than the slaughterhouse</u>, (i) hired and fired the boners, (ii) set their hours, and, (iii) after being paid a set amount by the slaughterhouse for each one hundred pounds of de-boned meat, paid the boners for their work."  . . . .  *Rutherford* thus held that, in certain circumstances, an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them."

*Zheng*, 355 F.3d at 68-70 (citing *Rutherford,* 331 U.S. at 730)(emphasis in original)

Parts Authority's witness conceded that there is no reason other than the method for Ms. Lucio's payments to distinguish her from other Parts Authority employees.  *See* Rosenthal Depo. Day One 20:1-22 (A: [Ms. Lucio] was not an employee . . . [o]f Parts Authority.  Q: How do you know that?  A: She's not in our -- not in our payroll.  Q: Do you have any other reason to say Ms. Lucio was not an employee of Parts Authority other than that she is not on your payroll?  A: No.").

Parts Authority clearly employed Ms. Lucio -- with Diligent functioning as a staffing agency that provided Parts Authority with "temp" workers such as Claimant.  *See* Rosenthal Depo. Day One 32:16-33:20 (referring to Diligent as "[t]he temp agency").  Courts regularly find that, in such arrangements, both the staffing agency and the supervising company are joint employers of

the temporary or contingent workers the agency provides.[9]  *See Barfield*, 537 F.3d 132 (hospital was joint employer of nurse supplied by referral agency in FLSA case); *Cooper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460 (E.D.N.Y. 2015) (denying motion to dismiss car rental company as joint employer with staffing agency in FLSA and NYLL case); *Butler v. Drive Auto. Indus. Of Am., Inc.*, 793 F.3d 404, 410 (4th Cir. 2015) ("[T]he joint employment doctrine also recognizes the reality of changes in modern employment, in which increasing numbers of workers are employed by temporary staffing companies that exercise little control over their day to day activities"); *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) ("The joint employer doctrine has been applied to temporary employment or staffing agencies and their client entities[.]");[10] *c.f.* 29 C.F.R. § 825.106 (under the Family and Medical Leave Act ("FMLA"), "joint employment will ordinarily be found to exist when a temporary placement agency supplies employees to a second employer").[11]  Based on Respondent's supervision and control over Claimant, her involvement in an integral part of Respondent's business, Respondent's provision of and investment in the

---

[9] In *Ramirez v. Northeast Logistics, Inc.*, No. 18-8192, 2018 WL 4739745 (S.D.N.Y. Sep. 7, 2018) (Arbitration Award for AAA Case 01-17-0000-3508), Arbitrator Feliu held that a delivery driver in a similar arrangement who sued Diligent only was not a Diligent employee.  Arbitrator Feliu held that "[t]he record clearly demonstrates that it was Parts Authority, and not Diligent that exerted greater control over [the delivery driver's] day to day activities," but that "[n]otably, there is no claim in this case that Parts Authority was a joint employer" (emphasis added).  Here, unlike in *Ramirez*, Claimant has properly sued Parts Authority.  Claimant will also put forth substantially more evidence than the Claimant in Ramirez.

[10] *Butler* and *Lima* are Title VII cases, but "[t]he standard for determining whether two separate entities may be considered 'joint employers' under Title VII is based on the standard for joint employment promulgated by the [National Labor Relations Board] in interpreting the [FLSA], 29 U.S.C. § 203."  *Griffith v. Exel, Inc*., No. 14-1754, 2016 WL 8938585 at *35 (N.D. Ga. Feb. 5, 2016).

[11] "The joint-employer regulation in the FLSA mirrors that in the FMLA.*"  Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008).

facilities, and Claimant's economic dependence on Respondent, the same outcome is appropriate here.

>    1.    **Parts Authority Employed**
>          **Claimant Under The Economic Reality Test.**

As with determining whether a worker is an employee or an independent contractor, determining whether a business is a joint employer under the FLSA requires "examin[ing] the facts 'in light of the 'economic reality' of the relationship between the parties.'" *Jackson*, 181 F. Supp. 3d at 1053-54 (quoting *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir 1997)).  Factors courts consider under the economic-reality test include "(1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power of the joint employer to determine the pay rates or the methods of payment of the workers; (4) the right of the employer, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; (5) whether the entity was involved in the preparation of payroll and the payment of wages; (6) ownership of the facilities where work occurred, (7) whether the employee performed a specialty job integral to the business for the alleged employer, and (8) investment in equipment and facilities."[12] *Id*. at 1054 (citing *Layton v. DHL Exp. (USA), Inc*., 686 F.3d 1172, 1176 (11th Cir. 2012)).  As with the independent contractor analysis, "[n]o single factor is determinative [and] [t]he weight of each factor depends on the facts of the case." *Id*. (internal citations omitted).

---

[12] Of this litany of factors, the only one that Parts Authority did not demonstrate was involvement in the preparation of payroll and direct payment of wages.  But this is of little importance in the overall analysis of the factors, as "an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them.'" *Zheng*, 355 F.3d at 70 (citing *Rutherford,* 331 U.S. at 730; emphasis added).

### i.      Parts Authority Directly Controlled Claimant's Work.

As described above in § II(B)(1), Parts Authority exercised considerable control over not just the objectives of Ms. Lucio's work, but also over the manner and means by which she performed her work.  *See Martinez-Mendoza v. Champion Intern. Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003) ("[W]e have observed that control arises when the alleged employer 'goes beyond general instructions . . . and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work.'") (quoting *Aimable v. Long and Scott Farms*, 20 F.3d 434, 441 (11th Cir.1994)).  This control included setting her start and stop times for every shift, dictating if and when she could take any breaks, and disciplining her by, for example, taking away her breaks.  *See id.* at 1209-10 ("An alleged employer takes an 'overly active' role when it decides such things as . . . when work begins each day;[] when the laborers shall start and stop their work throughout the day; and[] whether a laborer should be disciplined or retained.") (citing *Charles v. Burton*, 169 F.3d 1322, 1329 (11th Cir.1999); *NLRB v. Browning-Ferris Indus. Of Pa., Inc.*, 691 F.2 1117, 1120 (3d Cir. 1982) ("*Browning-Ferris*") (finding joint employer relationship under the National Labor Relations Act where company's control included "establish[ing] the starting times for work" and "managers also criticiz[ing] drivers who arrive late . . . or leave early"); Lucio Depo 39:6-23 (""A. Because if we -- if I was late like five minutes, she would take my break away. She did that time. Q. How many times did that happen? A. Well, she -- maybe twice, like two times a week. Q. Two times a week you were late? A. Yes. Like five minutes. Q. And she took away your break? A. Yes."); 88:19-89:3 ("Q: How were you told whether you had an engagement the following day?  A: I have to show up at 8:00 the next day.  Q: Which is what [Diligent employee] Fred told you; right?  A: [Parts Authority Manager] Tammy.  Q:  Tammy told you?  A: Yes.  Q: What did she say?  A: You have to be here [at] 8."), 108:10-109:11 ("Q: . . .

Who warned and disciplined you?  A. Tammy.  Q. And what did she discipline you about?  A. Like, at one point, I was -- I was there, and then she was like -- she got mad at me, because I was, like, basically not listening to her.  Like -- because sometimes I say I'm not taking this run, because it's 6:00.  And by the time I get there, you know, I can't -- well, you're going to have to take it. Otherwise, we won't need you anymore.  So I'm like, I don't want to lose my job.  So I'm like, okay, I'll take it.  And then -- and what time you want me to be here the next day, and like 8:00. Q. So you considered that discipline?  A. Yes.  Because I mean, basically, she wanted to -- she wanted me to do whatever she wanted me to do, you know.  Q. And what she wanted you to do was deliver parts?  A. Like basically, like I didn't want to deliver the parts so she got -- you know, she was like, [']No, you have to do it.[']  Q. Okay.  And you did it?  A. I did.").  Parts Authority also assigned specific runs to specific drivers, including Ms. Lucio, and controlled whether she could use her phone while at its facility.  *See* Lucio Depo. 107:19-23 (describing how deliveries of large or bulky items were specifically assigned to Ms. Lucio), 109:17-24 ("Q:  [Claimant's Arbitration Statement] Paragraph P, Roman ten, says you were instructed not to talk on your phone while in the parts Authority facilities. . . . So who told you not to do that?  A: [Parts Authority manager] Tammy."); Rosenthal Depo. 34:12-18 ("Q: . . . Who prepares the routes that the temp delivery drivers take?  A: Dispatchers.  Q: All right.  Those are Parts Authority dispatchers?  A: Correct"); *contra Layton*, 686 F.3d at 1178 (finding alleged employer did not exercise control when it "did not involve itself with the specifics of how [business] goals would be reached" including that "it did not apportion tasks to individuals").

## ii.    Parts Authority Closely Supervised Claimant's Work.

Parts Authority, through the manager at the location where Ms. Lucio worked, closely supervised her work.  This supervision included contacting Ms. Lucio to get her location, asking how long a specific run would take her, and rushing her to complete her tasks.  *See Rutherford*,

331 U.S. at 730 (finding joint employer status where "[t]he managing official of the plant kept close touch on the operation"); *Jackson*, 181 F. Supp. 3d at 1055 (degree of supervision indicated joint employer relationship where employer "directly supervised [employees'] work"); *Browning-Ferris*, 691 F.2d at 1125 (finding joint employment status where company "shared in the day to day supervision of the drivers"); Lucio Depo. 15:10-16:1 ("Q. And how many times did [Parts Authority manager] Tammy text you?   A. We communicate almost every day.   Q. By text message?  A. Yes.  Q. What were the subject matter of those text messages?  A. Like by the time -- what time, you know, are you coming to work or where are you -- are you -- what's time you going to be in.  Or how long that the run is going to take you.  You supposed to be here by now. Stuff like that."),[13] 107:12-18 ("Q: . . . how did Parts Authority monitor your work?  A. By calling you and, basically, like where are you; what are you doing; why are you not here?  You're supposed to be here five minutes ago.  Why are you late, or I need you to do this right now."); 79:19-22. ("[I]f I take longer time in my -- in my deliveries, as soon as I get there, [my manager is] like, Why did it take you so long, stuff like that."); 106:5-6 ("[Parts Authority] told me to rush all my runs, like do it quickly").

Ms. Lucio was also required to return to the Parts Authority facility between deliveries and remain there until another run was available or until the end of her shift.  *See* Lucio Depo. at 86:7-17 ("Q: Was there an area where you would stay while you were waiting to be given a delivery? A: No.  We just park our cars . . . we went inside, and they had like a small break room inside, in Parts Authority, and we stayed there and waited for a run."), 87:11-88:18 ("Q. So at the conclusion of each day, would you just leave?  A. No.  We wait for like 6:00 until it was time to go."); *Jackson*,

---

[13] Ms. Lucio will testify that the majority of her communications with Ms. Jaswa were verbal -- either by cell phone or in-person.

181 F. Supp. 3d at 1055 (degree of supervision indicated joint employer relationship where "the employees were directly located in [employer's] office").  Courts routinely find this level of supervision demonstrates an employment relationship.  *See, e.g.*, *Torres-Lopez v. May*, 111 F.3d 633, 642 (9th Cir. 1997) ("substantial degree of supervision" including "daily presence" of supervisor supported finding joint employer status as a matter of law).

### iii.   Parts Authority Effectively Determined The Pay Claimant Received And Effectively Fired Her.

Even when a company does not directly issue payments to an employee, it may indirectly influence the pay the employee receives, weighting in favor of a joint employer classification.  *See Jackson*, 181 F. Supp. 3d at 1055 (company's "power to influence payment of its staffing agency workers" by directing staffing agency in assigning hours favored a finding of joint employer relationship).  While Ms. Lucio was paid by checks from Diligent, the amount of pay she received was dictated by Parts Authority's records, including when those records were inaccurate.  *See* Lucio Depo. 38:5-39:12 ("Q. Okay. And in those pay periods when you missed a day of driving, you would receive less money; right?  A. Yes.  Q: Did you ever make a complaint to Diligent about the amount of your pay?  A: Yes. . . . That [] I wasn't [being paid] enough, you know, the days that I work.  I told him it was really little money I was missing one day.  Q: What did he say?  A: He say that Tammy has the record.  The Parts Authority manager, that's the record that she gave him.  Q:  Did you say that the record was wrong, that you'd actually worked more days than had been reported?  A: Yes.  Q: And was there any investigation done by [Diligent] into that?  A: No.").

Likewise, even though Parts Authority did not formally fire her, it was a Parts Authority manager, Ms. Jaswa, who informed her that Parts Authority needed a driver who would be available every day, when Ms. Lucio requested time off to care for her sick daughter.  By forcing

her to choose between her family and her job, Parts Authority effectively terminated her employment -- indirectly exercising its ability to fire her -- with Mr. Rosenau reiterating that she would have to make this non-choice because Ms. Jaswa was her boss. *See e.g., Torres-Lopez*, 111 F.3d at 640 ("The right, directly <u>or indirectly</u>, to hire [or] fire . . . workers" weighs in favor of joint employer status).

### iv.    Parts Authority Owned The Facility Where Claimant Worked.

Ms. Lucio worked exclusively from a facility that Parts Authority owned in Roswell, Georgia. *See* Lucio Depo. 18:15-23.  She reported to this same facility every workday at 8:00a.m. *See id.* at 88:19-89:3.  She remained at this Parts Authority-owned store until the end of every shift, even when there were no deliveries to make. *See id.* at 87:11-16.  She made all her deliveries from its facility, dropped off all returns that she picked up at it, and spent her downtime between runs there. *See id.* at 85:8-86:17.  As such, Ms. Lucio "was basically living in Part[s] Authority" while working as its delivery driver. *Id*. at 41:23.  Parts Authority's ownership and control of this facility from which Ms. Lucio exclusively worked is relevant "because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors."  *Antenor*, 88 F.3d at 937 (finding joint employer status under FLSA and Migrant and Seasonal Agricultural Worker Protection Act). Given its ownership of this worksite and its close supervision of Ms. Lucio's work there, this factor clearly favors finding that Parts Authority is a joint employer. *See Jackson*, 181 F. Supp. 3d at 1056 (company's ownership of facility where employee worked favored joint employer status in FLSA case).

### v.    Claimant's Job Was Integral To Parts Authority's Business.

An analysis of whether an employee worked in a position integral to the putative employer's overall business "is probative of joint employment because a worker who performs a

routine task that is a normal and integral phase of the [employer's] production is likely to be dependent on the [employer's] overall production process." *Antenor*, 88 F.3d at 936-37.  As described in depth above, *supra* § II(B)(7), the work Ms. Lucio and her fellow drivers performed delivering auto parts from Parts Authority stores to customers is an integral part of the Parts Authority's business, and that work was completely dependent on Parts Authority's overarching process.  *See* Rosenthal Depo. Day One 42:11-13 ("Q: Is delivery of auto parts a major part of the business of Parts Authority?  A. It's an important part."); *see also* Lucio Depo. 102:1-7 (noting that making deliveries to customers was an integral part of Parts Authority's business).  In such circumstances, courts have found that delivery drivers' services played an integral role in a joint-employer's regular business.  *See Young v. Act Fast Delivery of W. Va., Inc.*, No. 16-09788, 2018 WL 279996 at *6 (S.D. W. Va. Jan. 3, 2018) (delivery driver was integral part of business for determining employee status and business's role as joint employer where pharmaceutical business involved delivering products directly to its clients).

###### vi.   The Relative Investments In Equipment And Facilities Indicate That Claimant Was An Employee Of Parts Authority.

Parts Authority supplied the overwhelming investment in equipment and facilities related to the performance of Ms. Lucio's work -- she simply provided her own car and a phone.  *See* Lucio Depo. 75:24-76:17 ("Q. Okay.  The proposal says that you would provide, at your own cost, all tools and equipment and all labor needed to complete the engagement that you accept.  Did you provide your own equipment as a Diligent owner/operator?  A. Just the car.  Q. Just the car?  A. To work for Parts Authorities.  Q. Okay.  Did you need a phone to work?  A. Yes.  Q. Did you provide your own phone?  A. Yes.  Q. So you provided your phone and your car and anything else?  A. No.  Q. Did Diligent supply you with any equipment or tools?  A. No."); Respondent's Response to Interrogatory No. 8.  Parts Authority did not require her to invest in a specialized

vehicle in order to be a delivery driver and did not even inspect her vehicle at the outset.  *See* Lucio Depo. 34:9-22.

On the other hand, Parts Authority supplied the facility, and broader network of facilities, where the parts that Ms. Lucio delivered were stored.  *See* supra § II(D)(4). It likewise supplied all technology and equipment for the processing of the orders, including the dispatching of these orders.  This "relative degree of investment in equipment and facilities by the [worker] on the one hand, and the putative employer on the other . . . is probative because of the workers' economic dependence on the person who supplies the equipment or facilities." *Antenor*, 88 F.3d at 937.  Ms. Lucio was dependent on Parts Authority for the infrastructure required to process all orders, supply all of the inventory, and schedule and perform the deliveries.

### III.    Respondent Did Not Produce Adequate Documentation Of Claimant's Employment, Requiring Claimant To Supplement Respondent's Documents With Her Recollection Of Her Employment.

Parts Authority was obligated to track the wages and reimbursements it paid to its workers, and to track the vehicle expenses incurred by its (below) minimum wage workers.  *See, e.g., Chan v. Sung Yue Yung Corp.*, No. 03-6048, 2007 WL 313483, at *23 (S.D.N.Y. Feb. 1, 2007) ("Under federal and state law, employers are responsible for keeping detailed records of wages, hours, tips, and other employment information.") (citing 29 U.S.C. § 211(c)) (abrogated on other grounds).  However, Parts Authority has failed to produce contemporaneously-kept records of Ms. Lucio's hours or her vehicle expenses and has produced what appear to be only incomplete records of the deliveries she performed on its behalf.[14]

---

[14] Claimant was previously forced to request the Arbitrator's intervention to secure any substantive document production from Respondent,.  However even after this motion to compel was granted in part, Respondent's production remained anemic.  Claimant objects to Respondent's deficient production, which prejudices Claimant by denying her the right to present pertinent and material evidence in support of her claims.  *See, e.g.*, *Guyden v. Aetna, Inc.*, 544 F.3d 376, 386-87 (2d Cir. 2008) (recognizing that insufficient opportunity to conduct

"These requirements [to keep detailed records of wages, hours and other employment information] are not mere technicalities, but substantive obligations that are 'fundamental underpinnings' of the FLSA and critical to ensure the statute's effectiveness, for an employer's '[f]ailure to keep accurate records can obscure a multitude of minimum wage and overtime violations.'" *Id.* (quoting *Moon v. Kwon*, 248 F. Supp. 2d 201, 218 (S.D.N.Y. 2002); *Wirtz v. Miss. Publishers Corp.*, 364 F.2d 603, 607 (5th Cir. 1966)). "Even if defendants 'did not anticipate the need of accurate record keeping . . . the penalty for such an omission must fall upon the employer and not upon his employee.'" *Brennan v. Zager*, No. 6973, 1975 WL 1071, at *5 (M.D. Tenn. Mar. 12, 1975) (quoting *Bingham v. Airport Limousine Service*, 314 F. Supp. 565 (W. D. Ark. 1970)) (granting summary judgment to employees in FLSA case where employer failed to keep accurate records), *aff'd sub nom.*, *Dunlop v. Zager*, 529 F.2d 524 (6th Cir. 1975).

Citing Supreme Court authority, the Eleventh Circuit has explained:

> It is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment. [*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)]. The employer is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed and "[e]mployees seldom keep such records themselves." *Id.*
>
> In *Anderson*, the [Supreme] Court noted that if an employer has failed to keep proper and accurate records and the employee cannot offer convincing substitutes,

---

discovery to obtain evidence needed to prove claims may render arbitration unconscionable); *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 418-19 (E.D.N.Y. 2014) (finding that insufficient opportunity for discovery renders arbitration provision's limitation on discovery substantively unconscionable); *Promega Corp. v. Life Techs. Corp.*, 674 F.3d 1352, 1358 (Fed. Cir. 2012) (arbitration agreement is unconscionable unless "there is sufficient discovery available to those who enjoy statutory rights to vindicate their claims in arbitration.") (citing 1 Thomas H. Oehmke, Commercial Arbitration § 10:12 (3d ed. 2004)).  Nonetheless, as described infra., despite the paucity of documents the that Respondent and Diligent produced, Claimant has been able to reconstruct enough data to establish the hours she worked and the mileage she drove on Parts Authority's behalf, once combined with her own recollections.

> [t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.  Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.

*Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315-16 (11th Cir. 2007) (alterations (except for citation) in original).

Simply put, Parts Authority was obligated to keep accurate records and cannot avoid liability for damages through its own insufficient recordkeeping.  Parts Authority failed in this obligation.  It did not track Ms. Lucio's expenses, nor did it produce documents accurately reflecting all the hours Ms. Lucio's worked or miles she drove.

The consequence for an employer which fails to keep full or accurate records of work time is that an employee may simply prove the amount of work time "as a matter of just and reasonable inference."  *Morgan v. Kalka & Baer LLC,* No. 16-16032, 2018 WL 4275867, *4 (11th Cir. Sept. 7, 2018) (citing *Allen,* 495 F.3d at 1315).  In the absence of complete and accurate records, Claimant has supplied reasonable and conservative assumptions related to her hours and mileage to facilitate the calculations of her vehicle-related expenses and hours for each workweek.  *See* Claimant's Exhibit C-1, Summary and Calculations Spreadsheet of Ms. Lucio's Hours, Mileage, and Pay ("Claimant's Calculations Spreadsheet").  Those assumptions and Claimant's damage calculations are explained in detail in Section IV, *infra*.

## IV.    Parts Authority Failed To Pay Ms. Lucio Wages Required By The FLSA.

As Respondent's employee, Claimant was entitled to all straight-time and overtime wages, paid free and clear, required by the FLSA.  Claimant preformed a rigorous analysis off the scant documents on her employment that Respondent has provided, supplemented those documents with

her own recollection of her employment, and assembled that combined data into a conservative calculation of her damages.

By using invoice records of deliveries she performed for Parts Authority, Ms. Lucio has identified the days on which she worked.  Although Ms. Jaswa kept written records of the hours Ms. Lucio worked each day, Parts Authority has not produced those records.  Therefore, based on Ms. Lucio's own recollection and Defendants' delivery records, Mr. Earner has summarized the hours worked for these days and thus the total hours for each workweek Ms. Lucio was employed by Parts Authority and the wages she was legally owed for these workweeks under the FLSA's minimum wage and overtime provisions.  Based on the payment checks she received, Mr. Earner has calculated how much she was actually paid for each of these workweeks.  Based on the invoice records (Parts Authority failed to produce invoices reflecting all deliveries made by Ms. Lucio, *see infra* § III), Mr. Earner has calculated the miles she drove for the benefit of Parts Authority's business and, by applying the standard IRS mileage rate for the relevant time period, the vehicle-related expenses for which she is owed reimbursement.  By calculating the difference between her actual pay for each workweek and the legal minimum she was owed, including reimbursement for her driving expenses, Ms. Lucio has determined that she suffered $6,257.04 in direct damages from Parts Authority's violations of the FLSA.  Under the requirements of the FLSA, Claimant is also entitled to an additional $6,257.04 in liquidated damages, as well as all attorneys' fees and costs associated with bringing this action to make her whole.  The following sections explain how these damages are calculated in more detail.

> **A.  The FLSA Requires Employers To Pay Employees At Least $7.25 Per Hour For The First 40 Hours Per Week And At Least $10.875 Per Hour For Overtime.**

Ms. Lucio is entitled to the full protections of the FLSA.  "The FLSA is a remedial statute setting the floor for minimum wage and overtime pay.  It was intended to protect the

most vulnerable workers, who lacked the bargaining power to negotiate a fair wage or reasonable work hours with their employers." *Chasteen v. Rock Fin*., No. 07-10558, 2012 WL 8705090, at *4 n.6 (E.D. Mich. Jan. 31, 2012) (internal quotation omitted).   "The Supreme Court has recognized 'that broad coverage [under the FLSA] is essential to accomplish the [statute's] goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency.'   Accordingly, the Court 'has consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction.'" *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013) (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296, (1985); alterations in original).   "[M]oreover, the remedial nature of the FLSA warrants an expansive interpretation of its provisions so that they will have the widest possible impact in the national economy." *Lyles v. Burt's Butcher Shoppe and Eatery Inc*., No. 10-53, 2011 WL 4915484 at *8 (M.D. Ga. Oct. 17, 2011) (quoting *Herman v. RSR Sec. Servs. Ltd*., 172 F.3d 132, 139 (2d Cir.1999)).

To protect vulnerable and unskilled workers, the FLSA establishes a nationwide minimum wage.  29 U.S.C.A. § 206(a)(1).  In 2015, when Ms. Lucio was working for Parts Authority, (and to this day) that minimum wage was $7.25 per hour.  *Id*. at § 206(a)(1)(C).  The FLSA also requires overtime pay for all time worked beyond the first 40 hours in a week.  29 U.S.C.A. § 207(a)(2). This overtime pay must be at least one-and-a-half time the worker's "regular rate."  *Id*.  Thus, for an employee making the minimum wage allowed under the FLSA, $7.25 per hour, the minimum legal overtime wage is at least $10.875 per hour.

Respondent conceded that no FLSA overtime exemptions apply to Claimant's work as a delivery driver.  *See* Joint Exhibit J-14, Respondent's Responses to Claimant's First Interrogatories at Response No. 14.  As such, Ms. Lucio was entitled to at least $7.25 per hour in straight-time

wages for the first 40 hours she worked for Parts Authority each week, and at least $10.875 per hour in overtime wages for each hour thereafter.

### B. Un-Reimbursed Vehicle Expenses Are Considered Kickbacks To Respondent And Count Against Claimant's Effective Wages.

An employer cannot avoid its wage obligations under the FLSA by off-loading costs related to its business onto employees, as such expenses incurred by an employee for the benefit of the employer are counted against their effective wages when determining whether the employer is violating the FLSA's minimum wage provisions. *See, e.g., Ramos-Barrientos v. Bland*, 661 F.3d 587, 594 (11th Cir. 2011) ("Wages cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.' This rule prohibits any arrangement that tends to shift part of the employer's business expense to the employees to the extent that it reduces an employee's wage below the statutory minimum.") (internal quotations, alterations, and ellipses omitted). "Under Department of Labor regulations, '[t]he wage requirements of the [FLSA] will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee.'" *Herold v. Benevis, LLC*, No. 14-771, 2016 WL 7177600 (E.D. Va. Jan. 8, 2016) (quoting 29 C.F.R. § 531.35; first alteration in original).

Such "kickbacks" include instances where an employer shifts the costs of making deliveries onto delivery driver employees by requiring them to use their own vehicles for such deliveries, provide their own fuel, and pay for their own insurance, maintenance, and upkeep for the vehicles, thereby relieving the employer of directly paying such costs for its deliveries. *See Zellagui v. MCD Pizza, Inc.*, 59 F. Supp. 3d 712, 715-16 (E.D. Pa. 2014) (collecting cases). Thus, "[u]nder the FLSA, employees who use their personal vehicles for work must be reimbursed for vehicle-related costs if not doing so would cause their net earnings to drop below the minimum

wage." *Bellaspica v. PJPA, LLC*, 3 F. Supp. 3d 257, 259 (E.D. Pa. 2014) (citing 29 C.F.R. § 531.35).

### 1. Claimant Was Required To Provide Her Own Vehicle And Pay For Her Own Vehicle-Related Expenses When Driving For Respondent.

Respondent did not provide the vehicle Claimant used to make deliveries on its behalf. *See* Respondent's Response to Interrogatory No. 9.  Instead, it offloaded the vehicle-related costs for such deliveries onto Ms. Lucio and other driver employees by requiring them to provide and use their own vehicles. *See* Owner Operator Agreement § 8; Lucio Depo. 34:9-16, 40:20-23, 84:4-8. Ms. Lucio was required to pay all the costs and fees associated with the vehicle she used for making deliveries, including all maintenance, repairs, parts, fuel, other fluids, and insurance expenses. *See* Lucio Depo. 55:13-56:21; Owner Operator Agreement § 8(c)-(d).  She also suffered vehicle depreciation.  Courts routinely find such expenses compensable under the FLSA. *See, e.g.,* *Zellagui*, 59 F. Supp. 3d at 717 (finding that delivery drivers "incurred out-of-pocket costs and expenses" by using their personal vehicles for deliveries and calculating these expenses by using the IRS Rate for damages in FLSA action).  Those under-reimbursements resulted in Ms. Lucio receiving net wages less than the federal minimum wage (nominal wages – unreimbursed vehicle costs = subminimum net wages).

### 2. Respondent Was Required To Either Track Claimant's Actual Expenses, Or Reimburse Her At The IRS Rate.

Parts Authority had two legal options for how to reimburse Ms. Lucio for the vehicle-related expenses that she incurred on its behalf: it could have calculated her actual expenses based on her vehicle and mileage, or it could have reimbursed her based on the standard rate published by the Internal Revenue Service ("IRS") and her mileage -- however, it did neither.  As Judge Slomsky held in a pizza delivery driver under-reimbursement case:

> When minimum wage law requires an employer to reimburse an employee for using the employee's vehicle for the employer's benefit, the employer should reimburse the employee at the IRS per mile rate or keep detailed records of the employees' expenses to justify another reimbursement rate. *See* Department of Labor Field Operations Handbook, § 30c15(a) (issued June 30, 2000) (for minimum wage purposes, employer may either reimburse employees who drive a personal vehicle for business use at the IRS rate or keep accurate, contemporaneous expense records and reimburse the employee accordingly); *Gattuso* [*v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 556 (2007)] ("If an employer wants to pay less than the established IRS rate, it bears the cost of proving the employee's cost of operating the vehicle for work is actually less."); *Darrow* [*v. WKRP Mgmt. LLC*, No. 09–01613, 2011 WL 2174496, at * 4 (D. Colo. June 3, 2011)] (holding the IRS rate to be a reasonable approximation of a pizza delivery driver's mileage expense).

*Zellagui*, 59 F. Supp. 3d at 716.

Judge Slomsky explained that "[t]he IRS figure is a national average of the cost of operating a motor vehicle." *Id.* (quoting *Gattuso*, 42 Cal. 4th at 565). Thus, he held that "[b]ecause [the employer] failed to keep detailed contemporaneous records of its delivery drivers' actual expenses, Plaintiff and the Class members are entitled to be reimbursed at the IRS rate." *Id.* *Zellagui* is on all fours and Claimant, like other delivery drivers whose employers did not document driving expenses, is entitled to be reimbursed at the IRS rate. *See In the Matter of the Arbitration Between Claimant and Respondent,* American Arbitration Association, 2015 WL 8682313 (Aug. 13, 2015) (applying IRS rate to calculate damages in delivery driver under-reimbursement arbitration); *In the Matter of the Arbitration Between Claimant and Respondent,* American Arbitration Association, 2015 WL 8682319 (Aug. 13, 2015) (same).[15]

---

[15] As Judge Slomsky noted, the Department of Labor's ("DOL") Field Operations Handbook explains how employers should reimburse employees for driving expenses in a section entitled: "**Car expenses – employee's use personal car on employer's business**." Field Operations Handbook, § 30c15 (emphasis in original) (issued June 30, 2000). The DOL Field Operations Handbook states that "[i]n some cases it is necessary to determine the costs involved when

Recently, another federal court reinforced the same binary choice by employers who require delivery drivers to supply their own delivery vehicles:

> Because the vehicles owned by the delivery drivers are considered "tools of the trade," 29 C.F.R. § 531.35, and required by Cousin Vinny's as a condition of being hired as a delivery driver, there needed to be an adequate reimbursement rate, using either the IRS mileage rate or actual reimbursement of cost, in order to avoid a decrease in the minimum wage and overtime paid.

---

employees use their cars on their employer's business in order to determine MW [minimum wage] compliance.  For example, car expenses are frequently an issue for delivery drivers employed by pizza or other carry-out type restaurants."  Field Operations Handbook, § 30c15.  The DOL further explains that:

> As an enforcement policy, the Internal Revenue Service (IRS) **standard business mileage rate** found in IRS Publication 917, "Business Use of a Car" may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes.  The IRS standard business mileage rate (28 cents per mile [in the year 2000]) represents depreciation, maintenance and repairs, gasoline (including taxes), oil, insurance, and vehicle registration fees.

Field Operations Handbook, § 30c15(a) (emphasis in original).  Thus, under the DOL's Field Operations Handbook, an employer has the option of either reimbursing an employee who drives her personal vehicle for business at the IRS rate or keeping accurate records of the employee's driving actual costs and reimbursing her accordingly.

For FLSA claims, like Ms. Lucio's, the Eleventh Circuit and other courts "[have] noted that the DOL's Field Operations Handbook is persuasive, even though it is not entitled to *Chevron* deference."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1244, 1274 n.65 (11th Cir. 2008) (citing *Klinedinst v. Swift Invest., Inc.*, 260 F.3d 1251, 1255 (11th Cir. 2001)); *see, e.g.*, *Jacobs v. New York Foundling Hosp.*, 483 F. Supp. 2d 251, 260 (E.D.N.Y. 2007) *aff'd*, 577 F.3d 93 (2d Cir. 2009) ("The Labor Department Wage and Hour Division is the primary federal authority that determines the FLSA's scope."); *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 874 (8th Cir. 2011) (affirming that the DOL's Field Operations Handbook is "reasonable, persuasive, and entitled to deference").  As the Eleventh Circuit explained, *Chevron* deference applies when the statute at issue is "ambiguous."  *Klinedinst*, 260 F.3d at 1255 n.3.  The FLSA and the FMWA are not facially ambiguous.  *See Morgan*, 551 F.3d at 1274.  However, to the extent that there is any controversy over whether the IRS rate applies to reimbursement in this context, that controversy creates ambiguity requiring *Chevron* deference.  In line with the Eleventh Circuit's holding, more than twenty district courts within Florida have accorded deference to the DOL's Field Operations Handbook.  *See, e.g.*, *See, e.g.*, *Kubiak v. S.W. Cowboy, Inc.*, No. 312-1306, 2014 WL 2625181, at *2 (M.D. Fla. June 12, 2014) (quoting DOL Handbook and following DOL Handbook's guidance).

*Brandenburg v. Cousin Vinny's Pizza, LLC,* No. 16-516, 2018 WL 5800594, *4 (W.D. Ohio Nov. 6, 2018).

### 3.      Respondent Did Not Track Claimant's Actual Expenses.

As Ms. Lucio and others will testify, neither Parts Authority nor Diligent ever requested or required her to provide any accounting of her vehicle-related expenses, or to submit any receipts or reimbursement requests.  Respondent concedes that it "did not track or record the mileage driven by [C]laimant" and "did not track or record the automobile expenses incurred by [C]laimant."  *See* Response to Interrogatory No. 15; Response to Interrogatory No. 16.  At no point was Ms. Lucio provided with any reimbursement based on her mileage to compensate her for the expenses she incurred driving her own vehicle and providing her own fuel when making deliveries for Respondent.  *See* Lucio Depo. 72:12-73:1; Respondent's Response to Interrogatory No. 17.

It is an employer's responsibility to track actual expenses if it intends to avoid reimbursing at the IRS rate.  *See Zellagui*, 59 F. Supp. 3d at 716 (holding that "the employer" must reimburse at IRS rate "or keep detailed records of the employees' expenses to justify another reimbursement rate"); *Brandenburg,* 2018 WL 5800594, at *4; DOL Field Operations Handbook § 30c15(a). Having failed to do so, Respondent was obligated to reimburse Claimant at the IRS rate or provide a wage sufficient to cover expenses incurred under that rate without dropping below the legal minimum.  *Id.*  It did neither, instead providing no expense reimbursements whatsoever. *See* Respondent's Response to Interrogatory No. 17; Lucio Depo. 72:12-73:1. Thus, all of the driving expenses Ms. Lucio incurred for Parts Authority's benefit must be deducted from her wages to account for these kickbacks, contributing to the FLSA violations at issue in this matter.  *See, e.g., Zellagui*, 59 F. Supp. 3d at 717.

**4.  Under The IRS Rate, Claimant Incurred At Least
$132.23 To $386.62 In Vehicle-Related Expenses Each Week.**

Determining the effective wages Claimant received, requires the calculation of the kickbacks Claimant paid to Respondent when Respondent offloaded the costs of making deliveries -- i.e. the vehicle expenses -- onto Claimant by making her use her own vehicle.  While Respondent did not track Claimant's vehicle-related expenses, including her mileage, Mr. Earner has calculated her driving expenses under the IRS rate based on invoice documents reflecting the addresses to which she made 986 deliveries on Respondent's behalf.  Joint Exhibit J-1, Parts Authority Invoice Reprints ("Parts Authority Invoices"); Claimant's Calculations Spreadsheet at Lucio_Data Tab. As an example, the invoice slip below identifies the shipping address for a delivery Ms. Lucio made to 1320 Union Hill Rd., Alpharetta, Georgia on May 11, 2015, her first day of work for Parts Authority:



Parts Authority Invoices at 4.

By using one of Google's online map services, Google Routes API, Mr. Earner has calculated the mileage for each of these individual deliveries that she made for Parts Authority. For example, Google identifies that the one-way trip to the above address from the Parts Authority

location at 200 Hembree Park Dr., Roswell, Georgia -- the store from which Ms. Lucio exclusively made deliveries -- was 16.3 kilometers:

```
▼<DistanceMatrixResponse>
    <status>OK</status>
    <origin_address>200 Hembree Park Dr, Roswell, GA 30076, USA</origin_address>
    <destination_address>1320 Union Hill Rd, Alpharetta, GA 30004, USA</destination_address>
  ▼<row>
    ▼<element>
        <status>OK</status>
      ▼<duration>
          <value>1002</value>
          <text>17 mins</text>
        </duration>
      ▼<distance>
          <value>16262</value>
          <text>16.3 km</text>
        </distance>
      </element>
    </row>
  </DistanceMatrixResponse>
```

Claimant's   Exhibit   C-2,   Google   Routes   API   Webpage   Output,   *available    at* https://maps.googleapis.com/maps/api/distancematrix/xml?origins=200+Hembree+ Park+Drive,+Roswell,+GA+30075&destinations=1320+Union+Hill+Road,+Alpharetta,+GA+30 004&mode=Driving&key=AIzaSyCqR7jdQ6bDvqh59igzgcXMWT8UjGrH2Do   (last   accessed Dec. 28, 2018).  Converted to miles (1.60934 kilometers equals 1 mile), this exemplar delivery was 10.13 miles one-way and 20.26 miles round-trip ([16.3 / 1.60934] x 2 = 20.26):

| Record No. | Address | Distance Calc | Mileage Conversion | Round Trip | Formatted Date | Week |
|---|---|---|---|---|---|---|
| 1 | 1320 Union Hill Road, Alpharetta, GA 30004 | 16.3 km | 10.13 | 20.26 | 05/11/2015 | 1 |

Claimant's Calculations Spreadsheet at Lucio_Calculations (original) Tab.

Mr. Earner ran these calculations for all 986 deliveries for which Respondent provided shipping addresses, identifying her total mileage for every delivery.  *See id.*  However, the 986 invoice records produced by Respondent appear to be an incomplete record of her actual deliveries, and the thus the miles she drove.

As Claimant will testify, she never performed fewer than six deliveries in any given work day.  However, Respondent's production included 40 days that contained only between one and five deliveries ("Undercounted Days").  *See id.*  To account for this discrepancy, Mr. Earner identified the average distance of all recorded deliveries, 9.52 miles round-trip, and added additional deliveries with that average distance for all Undercounted Days so as to bring their number of deliveries up to six.  *See id.* at Lucio_Calculations (true up) Tab.  It is unlikely that the only missing delivery records are those that brought these specific days below this threshold.  But rather than calculate an across-the-board deficiency in the number of deliveries, in the interest of providing a conservative calculation of her damages Claimant has only added these assumed average-distance deliveries to the 40 Undercounted Days.

Claimant then totaled the miles she drove making all of these deliveries for each workweek, which ranged from 258.73 miles for the week of September 7, 2015 to 672.38 miles for the week of June 22, 2015, and multiplied that total by the relevant IRS rate for 2015, $0.575 per mile. Claimant's Exhibit C-3, IRS "New Standard Mileage Rates Now Available; Business Rate to Rise in 2015" Release, *available at* https://www.irs.gov/newsroom/new-standard-mileage-rates-now-available-business-rate-to-rise-in-2015.  These calculations identified her total mileage expenses for each of the 24 weeks that she worked for Parts Authority, ranging from $148.77 for the week of September 7, 2015 to $386.62 for the week of June 22, 2015, as shown below:

| | | Mileage Calculations | | |
| Week Start | Week | Miles | Mileage Rate | Mileage Value |
|---|---|---|---|---|
| 5/11/2015 | 1 | 378.36 | $ 0.575 | $ 217.56 |
| 5/18/2015 | 2 | 509.69 | $ 0.575 | $ 293.07 |
| 5/25/2015 | 3 | 354.22 | $ 0.575 | $ 203.68 |
| 6/1/2015 | 4 | 382.70 | $ 0.575 | $ 220.05 |
| 6/8/2015 | 5 | 528.35 | $ 0.575 | $ 303.80 |
| 6/15/2015 | 6 | 472.08 | $ 0.575 | $ 271.45 |
| 6/22/2015 | 7 | 672.38 | $ 0.575 | $ 386.62 |
| 6/29/2015 | 8 | 450.81 | $ 0.575 | $ 259.22 |
| 7/6/2015 | 9 | 349.10 | $ 0.575 | $ 200.73 |
| 7/13/2015 | 10 | 306.49 | $ 0.575 | $ 176.23 |
| 7/20/2015 | 11 | 579.46 | $ 0.575 | $ 333.19 |
| 7/27/2015 | 12 | 511.27 | $ 0.575 | $ 293.98 |
| 8/3/2015 | 13 | 571.92 | $ 0.575 | $ 328.85 |
| 8/10/2015 | 14 | 449.80 | $ 0.575 | $ 258.64 |
| 8/17/2015 | 15 | 353.26 | $ 0.575 | $ 203.12 |
| 8/24/2015 | 16 | 365.05 | $ 0.575 | $ 209.90 |
| 8/31/2015 | 17 | 464.74 | $ 0.575 | $ 267.23 |
| 9/7/2015 | 18 | 258.73 | $ 0.575 | $ 148.77 |
| 9/14/2015 | 19 | 393.72 | $ 0.575 | $ 226.39 |
| 9/21/2015 | 20 | 382.77 | $ 0.575 | $ 220.09 |
| 9/28/2015 | 21 | 496.73 | $ 0.575 | $ 285.62 |
| 10/5/2015 | 22 | 394.51 | $ 0.575 | $ 226.84 |
| 10/12/2015 | 23 | 421.66 | $ 0.575 | $ 242.45 |
| 10/19/2015 | 24 | 389.94 | $ 0.575 | $ 224.22 |

Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.  These expenses must count against her effective weekly wages, which, as detailed below, Mr. Earner also calculated.

**C.    Claimant Regularly Worked For Respondent From 8:00a.m. To 6:00p.m.
Or Later Monday Through Friday, And 8:00a.m. To 5:00p.m. On Saturdays.**

Because Respondent failed to produce accurate records of the hours Claimant worked, Claimant has been forced to reconstruct this data as a necessary element of calculating the straight-time and overtime wages she was due under the FLSA.  Claimant will testify that her regular work schedule for Respondent ran six days a week, from 8:00a.m. to 6:00p.m. on Mondays through Fridays (10 hours) and 8:00a.m. to 5:00p.m. on Saturdays (nine hours).  *See* Lucio Depo Trans. at

33:2-34:8.  Approximately four days each week, Claimant's final delivery of the day would be dispatched at or near the end of her shift, extending the time she worked to approximately 6:45p.m. or 7:00 p.m. on weekdays.  *Id*. at 87:17-88:21.  To account for these routine end-of-day runs, Claimant's Calculations Spreadsheet includes an additional 45 minutes, or .75 hours, for two days each week, assigned to Mondays and Tuesdays, and an additional hour for two days each week, assigned to Wednesdays and Thursdays.

While Claimant was nominally allowed a 30-minute break each work day, her Parts Authority manager would regularly tell her that she was not allowed to take this break if, for example, she was five minutes late to her shift.  *Id*. at 39:13-40:1. As a result, Ms. Lucio would normally only get this half-hour break on four of her work days in a given workweek.  *Id*. at 40:2-4.  To account for these breaks, Claimant's Calculations Spreadsheet deducted 30 minutes, or .5 hours, from her calculated hours for four days each week, assigned to Mondays through Thursdays.

As Respondent failed to keep adequate records of Ms. Lucio's hours, Claimant has incorporated all of these factors into her calculations of the hours she worked for Respondent.  For each Monday and Tuesday, Claimant's Calculations Spreadsheet reflects that she worked 10.25 hours, reflecting a start time of 8:00a.m. and an effective end time of 6:45p.m. for when she completed her last delivery and was allowed to head home for the day, minus 30 minutes for her break (10 hours scheduled + .75 hours for final run - .5 hours for break = 10.25 hours total).  For each Wednesday and Thursday, she is calculated to have worked 10.5 hours, reflecting a start time of 8:00a.m. and an effective end time of 7:00p.m. for when she completed her last delivery, minus 30 minutes for her break (10 hours scheduled + 1 hour for final run - .5 hours for break = 10.5 hours total).  For Fridays she is calculated to have worked 10 hours, reflecting a start time of 8:00a.m. and an end time of 6:00p.m. with no end-of-day deliveries extending her hours and no

breaks reducing them.  For Saturday, the Claimant's Calculations Spreadsheet calculates that she worked nine hours, likewise reflecting her normal 8:00a.m. to 5:00 p.m. work shift.  *See* Claimant's Calculations Spreadsheet at Lucio_Hours Table Tab.

The 986 invoice documents produced by Respondent identify 131 days on which Claimant made deliveries.   *See* Parts Authority Invoices; Claimant's Calculations Spreadsheet at Lucio_Calculations (true up) Tab.[16]  To accurately calculate the wages she was owed, including overtime, Claimant's total hours for each workweek were calculated by adding together the daily hours, described above, for the each of the dates she worked during that week according to the invoice documents.  Claimant's Calculations Spreadsheet at Lucio_Hours Table.  Each workweek was set as running Monday through Saturday, because her first work day was Monday, May 11, 2015.

> **D.    Claimant Worked 60.5 Hours Per Week For 14 Of The 24 Weeks She Worked For Parts Authority.**

During the majority of the workweeks when Ms. Lucio was employed by Parts Authority -- 14 of the 24 total weeks, according to available records produced in this Arbitration -- Claimant worked a full six-day week.  *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.   Based on the calculations of 10.25 hours for Mondays and Tuesdays, 10.5 hours for Wednesdays and Thursdays, 10 hours for Fridays, and nine hours for Saturday, these full weeks totaled 60.5 working hours for which she was entitled to wages under the FLSA.  *See id.*

---

[16] Diligent also produced a list of dates on which it claims Ms. Lucio worked during the 24 weeks she was employed by Parts Authority.  Joint Exhibit J-11.  However, this list is plainly incomplete, as there are multiple dates for which Parts Authority produced delivery invoices attributed to Ms. Lucio that do not appear on the Diligent list.  *See, e.g.*, Parts Authority Invoices at 119 (reflecting May 29, 2015 delivery).  Ms. Lucio has previously testified that Respondent and Diligent failed to keep accurate records of the days she worked, and that she had complained of this inadequate record-keeping, which contributed to her being underpaid, to both Diligent and Parts Authority. *See* Lucio Depo. 38:9-39:10.

1. **Claimant Should Have Been Paid At Least $512.94, And Been Reimbursed For All Expenses, For Each 60.5-Hour Workweek.**

Under the requirements of the FLSA, Parts Authority was required to provide Ms. Lucio with a wage of at least $7.25 for the first 40 of the hours she worked each week. 29 U.S.C.A. § 206(a)(1)(C). This totaled $290.00 in wages owed for the first 40 hours. For the remaining 20.5 hours that Ms. Lucio worked during her 60.5-hour workweeks, she was entitled to time-and-a-half her normal wage. 29 U.S.C.A. § 207(a)(2). Assuming the lowest legal wage permitted under the FLSA, this overtime rate was $10.875 ($7.25 x 1.5 = $10.875). This totaled $222.94 in overtime wages owed for the remainder of each 60.5-hour workweek.

Thus, for each 60.5-hour workweek, Claimant was entitled to a total of $512.94 in wages after being fully reimbursed for all driving expenses she incurred on Respondent's behalf. *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab; *see also, e.g., Adams v. Directone Logistics, Inc*., No. 13-190, 2013 WL 12156682 at *4 n.4 (M.D. Fl. Oct. 22, 2013) (calculating damages under the FLSA for minimum wage and overtime violations at $7.25 per hour for the first 40 hours and $10.875 for all additional hours during a workweek).

2. **After Expenses, Claimant Was Only Paid $97.11 to $354.52 For Her 60.5-Hour Workweeks.**

Parts Authority failed to pay Ms. Lucio the legally-required minimum wage for even one of the 14 weeks that she worked 60.5 hours as its employee. Ms. Lucio was paid twice a month, with checks totaling between $402.31 to $1,041.68. Apportioning these checks among the corresponding weeks that she worked, Claimant's Calculations Spreadsheet reflects that, without reimbursement for her driving expenses, Claimant was paid between $421.45 to $573.48 for these 60.5-hour workweeks, and that for ten of these workweeks she was paid less than the minimum wage, even before calculating in the driving expenses for which she must be reimbursed:

| Week Start | Week | Total Hours Worked | Actual Pay |
|---|---|---|---|
| 5/11/2015 | 1 | 60.50 | 572.08 |
| 5/18/2015 | 2 | 60.50 | 421.45 |
| 6/8/2015 | 5 | 60.50 | 573.48 |
| 6/15/2015 | 6 | 60.50 | 483.73 |
| 6/22/2015 | 7 | 60.50 | 483.73 |
| 7/6/2015 | 9 | 60.50 | 486.72 |
| 7/20/2015 | 11 | 60.50 | 499.65 |
| 7/27/2015 | 12 | 60.50 | 487.32 |
| 8/3/2015 | 13 | 60.50 | 469.05 |
| 8/31/2015 | 17 | 60.50 | 538.27 |
| 9/14/2015 | 19 | 60.50 | 491.63 |
| 9/21/2015 | 20 | 60.50 | 483.73 |
| 9/28/2015 | 21 | 60.50 | 516.60 |
| 10/12/2015 | 23 | 60.50 | 426.48 |

*See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

But, as described above, under the FLSA Claimant's driving expenses must be accounted for in determining the effective wage that she was paid.  Factoring in the $200.73 to $386.62 in expenses that Ms. Lucio accrued under the IRS Rate while making deliveries for Parts Authority, her effective wage was only $97.11 to $354.52 for her 60.5-hour workweeks:

| Week Start | Week | Total Hours Worked | Actual Pay | Mileage Calculations | | | Effective Earnings | |
|---|---|---|---|---|---|---|---|---|
| | | | | Miles | Mileage Rate | Mileage Value | Effective Pay (Actual Pay minus Mileage Value) | Effective Hourly Wage (Effective Pay Divided by Regular Hours plus Overtime Hours @ 1.5) |
| 5/11/2015 | 1 | 60.50 | 572.08 | 378.36 | $ 0.575 | $217.56 | $354.52 | $5.01 |
| 5/18/2015 | 2 | 60.50 | 421.45 | 509.69 | $ 0.575 | $293.07 | $128.38 | $1.81 |
| 6/8/2015 | 5 | 60.50 | 573.48 | 528.35 | $ 0.575 | $303.80 | $269.68 | $3.81 |
| 6/15/2015 | 6 | 60.50 | 483.73 | 472.08 | $ 0.575 | $271.45 | $212.28 | $3.00 |
| 6/22/2015 | 7 | 60.50 | 483.73 | 672.38 | $ 0.575 | $386.62 | $97.11 | $1.37 |
| 7/6/2015 | 9 | 60.50 | 486.72 | 349.10 | $ 0.575 | $200.73 | $285.99 | $4.04 |
| 7/20/2015 | 11 | 60.50 | 499.65 | 579.46 | $ 0.575 | $333.19 | $166.46 | $2.35 |
| 7/27/2015 | 12 | 60.50 | 487.32 | 511.27 | $ 0.575 | $293.98 | $193.34 | $2.73 |
| 8/3/2015 | 13 | 60.50 | 469.05 | 571.92 | $ 0.575 | $328.85 | $140.19 | $1.98 |
| 8/31/2015 | 17 | 60.50 | 538.27 | 464.74 | $ 0.575 | $267.23 | $271.04 | $3.83 |
| 9/14/2015 | 19 | 60.50 | 491.63 | 393.72 | $ 0.575 | $226.39 | $265.24 | $3.75 |
| 9/21/2015 | 20 | 60.50 | 483.73 | 382.77 | $ 0.575 | $220.09 | $263.64 | $3.73 |
| 9/28/2015 | 21 | 60.50 | 516.60 | 496.73 | $ 0.575 | $285.62 | $230.98 | $3.26 |
| 10/12/2015 | 23 | 60.50 | 426.48 | 421.66 | $ 0.575 | $242.45 | $184.02 | $2.60 |

*See id.* While the legal minimum wage under the FLSA was $7.25 per hour during all of these 14 weeks, Claimant was paid an effective wage rate as low as $1.37 per hour, and never more than $5.01 per hour, presenting a clear violation of the FLSA. *See id.*

### E.   Claimant Worked 51.5 Hours Per Week For Four Of The 24 Weeks She Worked For Parts Authority.

According to available records, during four of the workweeks when Claimant was employed by Parts Authority, she did not work a normal Saturday shift. *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab. Based on the calculations of 10.25 hours for Mondays and Tuesdays, 10.5 hours for Wednesdays and Thursdays, and 10 hours for Fridays, these Monday-through-Friday weeks totaled 51.5 working hours for which Ms. Lucio was entitled to wages under the FLSA. *See id.*

### 1.   Claimant Should Have Been Paid At Least $417.78, And Been Reimbursed For All Expenses, For Each 51.75-Hour Workweek.

As described above, under the FLSA, Ms. Lucio was entitled to at least $7.25 in wages for each of the first 40 of the hours she worked during the week, totaling $290.00 for her straight-time

hours.  29 U.S.C.A. § 206(a)(1)(C).  For the remaining 11.5 hours that Ms. Lucio worked during her 51.5-hour workweeks, she was entitled to time-and-a-half her normal wage, which at the lowest legal wage was $10.875 per hour, totaling $125.06 in overtime pay.  29 U.S.C.A. § 207(a)(2). Thus, for each 51.5-hour workweek, Claimant was entitled to a total of $415.06 in wages after being fully reimbursed for all driving expenses she incurred on her employer's behalf.  *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

### 2. After Expenses, Claimant Was Only Paid $120.91 To $244.00 For Her 51.5-Hour Workweeks.

As with the full six-day workweeks, Parts Authority failed to pay Ms. Lucio the legally-required minimum wage for any of the weeks when she worked 51.5 hours as its employee. Apportioning the payments Diligent disbursed to the corresponding weeks that she worked, Claimant's Calculations Spreadsheet reflects that, without reimbursement for her driving expenses, she was paid between $379.55 to $464.06 for these 51.5-hour workweeks, and that for half of these workweeks she was paid less than the minimum wage, even before calculating in the driving expenses for which she must be reimbursed:

| Week Start | Week | Total Hours Worked | Actual Pay |
|---|---|---|---|
| 6/1/2015 | 4 | 51.50 | 464.06 |
| 6/29/2015 | 8 | 51.50 | 393.41 |
| 8/10/2015 | 14 | 51.50 | 379.55 |
| 10/5/2015 | 22 | 51.50 | 428.87 |

*See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

Accounting for Claimant's driving expenses, as is required under the FLSA, all four of these Monday-Friday workweeks resulted in significant minimum wage violations.  Factoring in the $220.05 to $259.22 in expenses that Ms. Lucio accrued under the IRS Rate while making

deliveries for Parts Authority, her effective wages totaled only $120.91 to $244.00 for her 51.5-hour workweeks:

| Week Start | Week | Total Hours Worked | Actual Pay | Mileage Calculations | | | Effective Earnings | |
|---|---|---|---|---|---|---|---|---|
| | | | | Miles | Mileage Rate | Mileage Value | Effective Pay (Actual Pay minus Mileage Value) | Effective Hourly Wage (Effective Pay Divided by Regular Hours plus Overtime Hours @ 1.5) |
| 6/1/2015 | 4 | 51.50 | 464.06 | 382.70 | $ 0.575 | $220.05 | $244.00 | $4.26 |
| 6/29/2015 | 8 | 51.50 | 393.41 | 450.81 | $ 0.575 | $259.22 | $134.20 | $2.34 |
| 8/10/2015 | 14 | 51.50 | 379.55 | 449.80 | $ 0.575 | $258.64 | $120.91 | $2.11 |
| 10/5/2015 | 22 | 51.50 | 428.87 | 394.51 | $ 0.575 | $226.84 | $202.03 | $3.53 |

*See id.* While the legal minimum wage under the FLSA was $7.25 per hour during all of these four weeks, Claimant was paid an effective wage as low as $2.11 per hour, and never more than $4.26 per hour, again presenting a clear violation of the FLSA each week. *See id.*

### F. Claimant Worked 50.25 Hours Per Week For Three Of The 24 Weeks She Worked For Parts Authority.

According to available records, during three of the workweeks when Claimant was employed by Parts Authority, she did not work a normal Monday shift. *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab. Based on the calculations of 10.25 hours for Tuesdays, 10.5 hours for Wednesdays and Thursdays, 10 hours for Fridays, and nine hours for Saturdays, these workweeks totaled 50.25 working hours for which Ms. Lucio was entitled to wages under the FLSA. *See id.*

### 1. Claimant Should Have Been Paid At Least $401.47, And Been Reimbursed For All Expenses, For Each 50.25-Hour Workweek.

As described above, under the FLSA, Ms. Lucio was entitled to at least $7.25 in wages for each of the first 40 of the hours she worked during the week, totaling $290.00 for her straight-time hours. *See* 29 U.S.C.A. § 206(a)(1). For the remaining 10.25 hours that Ms. Lucio worked during her 50.25-hour workweeks, she was entitled to time-and-a-half her normal wage, which at the lowest legal wage was $10.875 per hour, totaling $111.47 in overtime pay. Thus, for each 50.25-

hour workweek, Claimant was entitled to a total of $401.47 in wages after being fully reimbursed for all driving expenses she incurred on her employer's behalf.  *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

**2.     After expenses, Claimant Was Only Paid
$126.18 To $288.97 For Her 50.25-Hour Workweeks.**

As with the above-described workweeks, Parts Authority failed to pay Ms. Lucio the legally-required minimum wage for any of the weeks when she worked 50.25 hours as its employee.  Apportioning the payments Diligent disbursed to the corresponding weeks that she worked, Claimant calculates that, without reimbursement for her driving expenses, she was paid between $329.86 to $498.87 for these 50.25-hour workweeks.  *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

Accounting for Claimant's driving expenses, as is required under the FLSA, all three of these Tuesday-through-Saturday workweeks resulted in significant minimum wage violations. Factoring in the $148.77 to $209.68 in expenses that Ms. Lucio accrued under the IRS Rate while making deliveries for Parts Authority, her effective wages totaled only $126.18 to $288.97 for her 50.25-hour workweeks:

| Week Start | Week | Total Hours Worked | Actual Pay | Miles | Mileage Rate | Mileage Value | Effective Pay (Actual Pay minus Mileage Value) | Effective Hourly Wage (*Effective Pay Divided by Regular Hours plus Overtime Hours @ 1.5*) |
|---|---|---|---|---|---|---|---|---|
| | | | | **Mileage Calculations** | | | **Effective Earnings** | |
| 5/25/2015 | 3 | 50.25 | 329.86 | 354.22 | $ 0.575 | $203.68 | $126.18 | $2.28 |
| 8/24/2015 | 16 | 50.25 | 498.87 | 365.05 | $ 0.575 | $209.90 | $288.97 | $5.22 |
| 9/7/2015 | 18 | 50.25 | 421.29 | 258.73 | $ 0.575 | $148.77 | $272.52 | $4.92 |

*See id.*  While the legal minimum wage under the FLSA was $7.25 per hour during all of these four weeks, Claimant was paid an effective wage as low as $2.28 per hour, and never more than $5.22 per hour, again presenting a clear violation of the FLSA each week.  *See id.*

### G. Claimant Worked 50 Hours For One Of The 24 Weeks She Worked For Parts Authority

According to available records, during the tenth workweek that Claimant was employed by Parts Authority, she worked did not work a Wednesday shift. *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab. Based on the calculations of 10.25 hours for the Monday and Tuesday of that week, 10.5 hours for the Thursday, 10 hours for the Friday, and nine hours for the Saturday, this workweek totaled 50 working hours for which Ms. Lucio was entitled to wages under the FLSA. *See id*.

#### 1. Claimant Should Have Been Paid At Least $398.75, And Been Reimbursed For All Expenses, For Her 50-Hour Workweek.

As described above, under the FLSA, Ms. Lucio was entitled to at least $7.25 in wages for each of the first 40 of the hours she worked during the week, totaling $290.00 for her straight-time hours. *See* 29 U.S.C.A. § 206(a)(1). For the remaining 10 hours that Ms. Lucio worked during her tenth workweek, she was entitled to time-and-a-half her normal wage, which at the lowest legal wage was $10.875, totaling $108.75 in overtime pay. Thus, for her 50-hour workweek, Claimant was entitled to a total of $398.75 in wages after full reimbursement for all driving expenses she incurred on her employer's behalf. *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

#### 2. After Expenses, Claimant Was Only Paid $208.44 For Her 50-Hour Workweek.

As with all previously-described workweeks, Parts Authority failed to pay Ms. Lucio the legally-required minimum wage for her tenth, 50-hour workweek as its employee. Apportioning the payments Diligent disbursed to the corresponding weeks that she worked, Claimant calculates that, without reimbursement for her driving expenses, she was paid only $384.68 for this 50-hour

workweek, presenting a minimum wage violation even before calculating the driving expenses for which she must be reimbursed:

| Week Start | Week | Total Hours Worked | Actual Pay |
|---|---|---|---|
| 7/13/2015 | 10 | 50.00 | 384.68 |

*See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

Accounting for Claimant's driving expenses, as is required under the FLSA, this tenth workweek resulted in an even more significant minimum wage violation.  Factoring in the $176.23 in expenses that Ms. Lucio accrued under the IRS Rate while making deliveries for Parts Authority, her effective wage for this 50-hour workweek was only $208.44:

| Week Start | Week | Total Hours Worked | Actual Pay | Mileage Calculations | | | Effective Earnings | |
|---|---|---|---|---|---|---|---|---|
| | | | | Miles | Mileage Rate | Mileage Value | Effective Pay (Actual Pay minus Mileage Value) | Effective Hourly Wage (*Effective Pay Divided by Regular Hours plus Overtime Hours @ 1.5*) |
| 7/13/2015 | 10 | 50.00 | 384.68 | 306.49 | $ 0.575 | $176.23 | $208.44 | $3.79 |

*See id*.  While the legal minimum wage under the FLSA was $7.25 per hour during the week of July 13, 2015, Claimant was effectively paid only $3.79 per hour for this week, again presenting a clear violation of the FLSA each week.  *See id*.

### H.   Claimant Worked 41.5 Hours For One Of The 24 Weeks She Worked For Parts Authority

According to available records, during the last workweek that Claimant was employed by Parts Authority, she worked from Monday through Thursday.  *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.  Based on the calculations of 10.25 hours for the Monday and Tuesday of this week, and 10.5 for the Wednesday and Thursday, this workweek totaled 41.5 working hours for which Ms. Lucio was entitled to wages under the FLSA.  *See id*.

1.      **Claimant Should Have Been Paid At Least $300.88, And**
        **Been Reimbursed For All Expenses, For Her 41-Hour Workweek.**

As described above, under the FLSA, Ms. Lucio was entitled to at least $7.25 in wages for each of the first 40 of the hours she worked during the week, totaling $290.00 for her straight-time hours. *See* 29 U.S.C.A. § 206(a)(1). For the remaining 1.5 hours that Ms. Lucio worked during her final workweek, she was entitled to time-and-a-half her normal wage, which at the lowest legal wage was $10.875, totaling $16.31 in overtime pay. Thus, for her 41.5-hour workweek, Claimant was entitled to a total of $306.31 in wages after full reimbursement for all driving expenses she incurred on her employer's behalf. *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

2.      **After Expenses, Claimant Ended Up**
        **Paying $17.75 For Her 41.5-Hour Workweek.**

As with all previously-described workweeks, Parts Authority failed to pay Ms. Lucio the legally-required minimum wage for her final, 41-hour workweek as its employee. Apportioning the payments Diligent disbursed to the corresponding weeks that she worked, Claimant calculates that, without reimbursement for her driving expenses, she was paid only $206.46 for this 41.5-hour workweek, presenting a minimum wage violation even before calculating the driving expenses for which she must be reimbursed:

| Week Start | Week | Total Hours Worked | Actual Pay |
|---|---|---|---|
| 10/19/2015 | 24 | 41.50 | 206.46 |

*See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

Accounting for Claimant's driving expenses, as is required under the FLSA, this final workweek resulted in an even more significant minimum wage violation. Factoring in the $224.22

in expenses that Ms. Lucio accrued under the IRS Rate while making deliveries for Parts Authority, her effective wage for this 41-hour workweek was <u>negative</u> $17.75, as her unreimbursed expenses were greater than her wages:

| Week Start | Week | Total Hours Worked | Actual Pay | Mileage Calculations | | | Effective Earnings | |
|---|---|---|---|---|---|---|---|---|
| | | | | Miles | Mileage Rate | Mileage Value | Effective Pay (Actual Pay minus Mileage Value) | Effective Hourly Wage (*Effective Pay Divided by Regular Hours plus Overtime Hours @ 1.5*) |
| 10/19/2015 | 24 | 41.50 | 206.46 | 389.94 | $ 0.575 | $224.22 | -$17.75 | -$0.42 |

*See id.* While the legal minimum wage under the FLSA was $7.25 per hour during the week of October 19, 2015, Claimant was effectively paying $0.42 per hour in kickbacks to Parts Authority for this week, again presenting a clear violation of the FLSA each week. *See id.*

**I.      Claimant Worked 31 Hours For One Of
The 24 Weeks She Worked For Parts Authority.**

According to available records, during the 15th workweek that Claimant was employed by Parts Authority, she worked on the Monday, Tuesday, and Thursday. *See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab. Based on the calculations of 10.25 hours for this Monday and Tuesday, and 10.5 hours for the Thursday, this workweek totaled 31 working hours for which Ms. Lucio was entitled to wages under the FLSA. *See id.*

**1.      Claimant Should Have Been Paid At Least $224.75, And
Been Reimbursed For All Expenses, For Her 31-Hour Workweek.**

As described above, under the FLSA, Ms. Lucio was entitled to at least $7.25 in wages for each of the 30.75 of the hours she worked during the week, totaling $224.75 for her straight-time hours. *See* 29 U.S.C.A. § 206(a)(1); Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

2. **After Expenses, Claimant Was Only
Paid $76.15 For Her 31-Hour Workweek.**

As with all other workweeks, Parts Authority failed to pay Ms. Lucio the legally-required minimum wage for her 31-hour workweek as its employee.  Apportioning the payments Diligent disbursed to the corresponding weeks that she worked, Claimant calculates that, without reimbursement for her driving expenses, she was paid $279.28 for this 31-hour workweek:

| Week Start | Week | Total Hours Worked | Actual Pay |
|---|---|---|---|
| 8/17/2015 | 15 | 31.00 | 279.28 |

*See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

Accounting for Claimant's driving expenses, as is required under the FLSA, this three-day workweek resulted in a significant minimum wage violation.  Factoring in the $203.12 in expenses that Ms. Lucio accrued under the IRS Rate while making deliveries for Parts Authority, her effective wage totaled only $76.15 for her 30.75-hour workweek:

| Week Start | Week | Total Hours Worked | Actual Pay | Miles | Mileage Rate | Mileage Value | Effective Pay (Actual Pay minus Mileage Value) | Effective Hourly Wage (*Effective Pay Divided by Regular Hours plus Overtime Hours @ 1.5*) |
|---|---|---|---|---|---|---|---|---|
| | | | | **Mileage Calculations** | | | **Effective Earnings** | |
| 8/17/2015 | 15 | 31.00 | 279.28 | 353.26 | $ 0.575 | $203.12 | $76.15 | $2.46 |

*See id*.  While the legal minimum wage under the FLSA was $7.25 per hour during the week of August 17, 2015, Claimant was effectively paid only $2.46 per hour for this week, again presenting a clear violation of the FLSA each week.  *See id*.

{00298220 }

**J.      Claimant Was Underpaid By $6,257.04 For
The 24 Weeks She Worked For Respondent.**

Once Claimant's vehicle-related expenses are accounted for, as required under the FLSA,

Ms. Lucio was underpaid for every single week that she worked for Parts Authority by $112.50 to

$384.56.  In total, Claimant suffered $6,257.04 in direct damages for the 24 weeks that she was

employed by Respondent, due to Parts Authority's continuous violation of the FLSA minimum

wage laws:

| Week Start | Week | Total Hours Worked | Actual Pay | Mileage Value | Effective Pay (Actual Pay minus Mileage Value) | Federal Min Wage Total | Variance (Federal Min Wage Total minus Effective Pay) |
|---|---|---|---|---|---|---|---|
| 5/11/2015 | 1 | 60.50 | 572.08 | $217.56 | $354.52 | 512.94 | -$158.41 |
| 5/18/2015 | 2 | 60.50 | 421.45 | $293.07 | $128.38 | 512.94 | -$384.56 |
| 5/25/2015 | 3 | 50.25 | 329.86 | $203.68 | $126.18 | 401.47 | -$275.28 |
| 6/1/2015 | 4 | 51.50 | 464.06 | $220.05 | $244.00 | 415.06 | -$171.06 |
| 6/8/2015 | 5 | 60.50 | 573.48 | $303.80 | $269.68 | 512.94 | -$243.25 |
| 6/15/2015 | 6 | 60.50 | 483.73 | $271.45 | $212.28 | 512.94 | -$300.65 |
| 6/22/2015 | 7 | 60.50 | 483.73 | $386.62 | $97.11 | 512.94 | -$415.83 |
| 6/29/2015 | 8 | 51.50 | 393.41 | $259.22 | $134.20 | 415.06 | -$280.86 |
| 7/6/2015 | 9 | 60.50 | 486.72 | $200.73 | $285.99 | 512.94 | -$226.95 |
| 7/13/2015 | 10 | 50.00 | 384.68 | $176.23 | $208.44 | 398.75 | -$190.31 |
| 7/20/2015 | 11 | 60.50 | 499.65 | $333.19 | $166.46 | 512.94 | -$346.47 |
| 7/27/2015 | 12 | 60.50 | 487.32 | $293.98 | $193.34 | 512.94 | -$319.59 |
| 8/3/2015 | 13 | 60.50 | 469.05 | $328.85 | $140.19 | 512.94 | -$372.74 |
| 8/10/2015 | 14 | 51.50 | 379.55 | $258.64 | $120.91 | 415.06 | -$294.15 |
| 8/17/2015 | 15 | 31.00 | 279.28 | $203.12 | $76.15 | 224.75 | -$148.60 |
| 8/24/2015 | 16 | 50.25 | 498.87 | $209.90 | $288.97 | 401.47 | -$112.50 |
| 8/31/2015 | 17 | 60.50 | 538.27 | $267.23 | $271.04 | 512.94 | -$241.90 |
| 9/7/2015 | 18 | 50.25 | 421.29 | $148.77 | $272.52 | 401.47 | -$128.95 |
| 9/14/2015 | 19 | 60.50 | 491.63 | $226.39 | $265.24 | 512.94 | -$247.70 |
| 9/21/2015 | 20 | 60.50 | 483.73 | $220.09 | $263.64 | 512.94 | -$249.30 |
| 9/28/2015 | 21 | 60.50 | 516.60 | $285.62 | $230.98 | 512.94 | -$281.96 |
| 10/5/2015 | 22 | 51.50 | 428.87 | $226.84 | $202.03 | 415.06 | -$213.03 |
| 10/12/2015 | 23 | 60.50 | 426.48 | $242.45 | $184.02 | 512.94 | -$328.92 |
| 10/19/2015 | 24 | 41.50 | 206.46 | $224.22 | -$17.75 | 306.31 | -$324.06 |
| | | | | | | **Total Variance** | **-$6,257.04** |

*See* Claimant's Calculations Spreadsheet at Lucio_Week over Week Tab.

## V.      Respondent Had No Good Faith Justification For Underpaying Claimant.

"Under the FLSA, liquidated damages are mandatory absent a showing of good faith by the employer."  *Reyes v. Aqua Life Corp.,* 632 Fed. Appx. 552, 555 (11th Cir. 2015) (citing 29 U.S.C. § 216(b); *Joiner v. City of Macon*, 814 F.2d 1537, 1538-39 (11th Cir. 1987)).  "Under the Portal to Portal Pay Act, 29 U.S.C. § 260, a court may in its sound discretion refuse to award liquidated damages if the employer shows that the act or omission giving rise to the action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act."  *Olson v. Superior Pontiac-GMC, Inc.,* 765 F.2d 1570, 1579 (11th Cir. 1985).  "The employer must plead and prove that the act or omission complained of was: (1) in good faith; (2) in conformity with; and (3) in reliance on an administrative regulation, order, ruling, approval or interpretation of an agency of the United States." *Olson,* 765 F.2d at 1579 (citing 29 U.S.C. §§ 258 & 260); *see also Roberts v. Gordy,* 877 F.3d 1024, 1028 (11th Cir. 2017) ("failure to plead an affirmative defense typically results in waiver of that defense"); *Morales-Arcadio v. Shannon Produce Farms, Inc.,* No. 05-062, 2007 WL 2106188 at *21 (S.D. Ga. Jul. 18, 2007) (recognizing that 29 U.S.C. § 260 provides an "affirmative defense" against liquidated damages if employer acted in "good faith" and "with reasonable grounds for believing [he was not] violat[ing] the [FLSA]" (edits in original)).

The Arbitrator's consideration of liquidated damages should end there because Respondents never pled that any "act or omission complained of was: (1) in good faith; (2) in conformity with; and (3) in reliance on an administrative regulation, order, ruling, approval or interpretation of an agency of the United States," or any similar affirmative defense.  *Olson,* 765 F.2d at 1579; *compare* Joint Exhibit J-4, Respondent's Response to Claimant's Statement of Claim.

Even assuming *arguendo* that Respondents plead the § 260 defense to liquidated damages, the Arbitrator should deny it on the merits.  Notably, "[t]he employer bears a substantial burden to demonstrate good faith because 'double damages are the norm, single damages the exception.'" *Talbott v. Lakeview Ctr., Inc.,* No. 06-378, 2010 WL 11557948 at *16 (N.D. Fla. Feb. 2, 2010) (citing *Kinney v. Dist. of Columbia,* 994 F.2d 6, 12 (D.C. Cir. 1993); *Alvarez v. IBP, Inc.,* 339 F.3d 894, 910 (9th Cir. 2003, aff'd, 546 U.S. 21 (2005)).  Part's Authority's lack of an objective believe that Claimant was an independent contractor is shown by the totality of the evidence of its treatment of her, much of which is detailed above.  Further, Claimant highlights three items evidence showing Respondent's lack of both subjective and objective good faith belief in its compliance. First, Respondent has been repeatedly sued based on misclassification of delivery drivers provided through Diligent, but it persists in refusing to pay them minimum wage and overtime.  *See, e.g., Flores*, 250 F. Supp. 3d at 494-95 (employer's FLSA violation as willful, and thus "plainly inconsistent" with "a finding of good faith," where employer had been involved in prior litigation and regulatory agency actions related to misclassification of employees and wage violations in the past, but did not show that it "took affirmative action to assure compliance with FLSA's requirements").  Second, Mr. Rosenthal, Respondent's Vice President and former Chairman of Parts Authority, testified that Respondent does not have any delivery drivers who are independent contractors.  *See* Rosenthal Depo. Day One 20:1-22 (Q. Okay. Does Parts Authority have any delivery drivers that are independent contractors?  A. No.").  Third, Mr. Rosenthal further testified that, other than Ms. Lucio not being on the Parts Authority payroll, there was not "any other reason to say Ms. Lucio was not an employee of Part Authority."  *See* Rosenthal Depo. Day One 20:1-22; *see also id.* at 21:14-25.

Indeed, Parts Authority likely saved tens of millions of dollars by the temp worker scheme it used to underpay Ms. Lucio and her colleagues – liquidated damages are required to deter and punish this willful exploitation of vulnerable workers.  In sum, Parts Authority's actions were far from being in good faith and Ms. Lucio is entitled to liquidated damages.[17]

## VI.    Claimant Is Entitled To An Award Of $12,514.08 And Attorneys' Fees And Costs.

Claimant is entitled to $6,257.04 is unpaid legally required wages, plus an additional $6,257.04  in liquidated damages, totaling $12,514.08.  Ms. Lucio's Arbitration Submission further specifically requests an award of attorneys' fees and costs pursuant to the FLSA.  *See* Claimant's Statement of Claim ¶¶ 64, 77.  The United States Supreme Court has been clear that litigants retain all substantive statutory rights in the arbitral forum.  *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28-29 (1991).  It is undisputed that plaintiffs prevailing in wage and hour claims must be awarded both attorney's fees and the cost of the action.   *See, e.g.*, *Southward v. Tonerrefillkits.com, LLC*, No. 13-168, 2014 WL 268443, at *2 (M.D. Fla. Jan. 16, 2014) ("[F]ee awards [are] mandatory for prevailing plaintiffs.") (quoting *Kreager v. Solomon & Flanagan, P.A.*, 775 F.2d 1541, 1542 (11th Cir.1985)).[18]

---

[17] "Additionally, the Court has discretion to award liquidated damages notwithstanding any showing by Defendant that it acted in good faith and had reasonable grounds to believe it was not violating the FLSA." *Parks v. MRB, Inc.*, No. 14-1996, 2015 WL 13298573 at *6 (N.D. Ga. Nov. 16, 2015) (citing 29 U.S.C. § 260; *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999) ("Even if the district court determines that the employer's actions were taken in good faith and based on reasonable grounds, the district court still retains the discretion to award liquidated damages.")).

[18] Attorney's fees are typically determined via the lodestar method.  *See, e.g.*, *Satterfield v. CFI Sales & Mktg., Inc.*, No. 09-1827, 2013 WL 2455961, at *2-3 (M.D. Fla. June 6, 2013) (fees are "generally determined using the familiar lodestar approach"); *Posner v. Showroom, Inc.*, 762 F.2d 1010, 1010 (6th Cir. 1985) ("attorney's fee awards should be calculated with reference to the factors of a reasonable rate and time reasonably expended as opposed to the dollar amount of relief obtained.  If the rule were otherwise, then attorneys might not be willing to accept cases involving small monetary claims even though such cases implicate the important policies underlying the

## VII.    Conclusion

For all the foregoing reasons, Claimant Susana Lucio respectfully requests that she be awarded her full damages of $12,514.08, plus attorney's attorneys' fees and costs, together with any other relief this tribunal deems just and proper.

Dated: January 8, 2019                    Respectfully Submitted,

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**

By: */s/Jeremiah Frei-Pearson*
Jeremiah Frei-Pearson
John Sardesai-Grant
Andrew C. White
445 Hamilton Avenue, Suite 605
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 824-1561
jfrei-pearson@fbfglaw.com
jsardesdai-grant@fbfglaw.com
awhite@fbfglaw.com

**WEINHAUS & POTASHNICK**
Mark Potashnick, MO Bar # 41315
11500 Olive Boulevard, Suite 133
St. Louis, Missouri 63141
Telephone: (314) 997-9150 ext. 2
Facsimile: (314) 997-9170
markp@wp-attorneys.com

**LIBERMAN, GOLDSTEIN & KARSH**
Eli Karsh, MO Bar # 43061
230 South Bemiston Avenue, Suite 1200
Clayton, Missouri 63105
Telephone: (314) 862-3333 ext. 13
Facsimile: (314) 863-0605
elikarsh@aol.com

*Attorneys for Claimant*

---

FLSA.  Indeed, this court has upheld substantial awards of attorney's fees even though a plaintiff recovered only nominal damages") (citations omitted).

74