# **EXHIBIT D**

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| SUSAN LUCIO,<br><br>                Claimant<br><br>       v.<br><br>PARTS AUTHORITY, LLC and PARTS AUTHORITY INC.,<br><br>                Respondents. | Case No. 01-18-0000-6169<br><br>**RESPONDENTS' PRE-HEARING MEMORADUM OF LAW** |

## PRELIMINARY STATEMENT

BBB Logistics, Inc. d/b/a Diligent Delivery Systems ("Diligent") provides logistical services to its customers, which include assessing a customer's property movement requirements and determining which delivery modalities (*e.g.*, direct employees, long haul operators, overnight couriers, spot delivery personnel, scalable dedicated owner-operators) or combination thereof, best meets those requirements. When the recommended solution is scalable owner-operators, Diligent refers engagement opportunities to independent owner-operators with which it contracts. This is an arbitration proceeding to recover wages under the Fair Labor Standards Act ("FLSA") by one such independent owner-operator, Susana Lucio, who accepted engagements at one such customer, Parts Authority.

To be eligible for wages under the FLSA, an individual must prove that she was an employee of the putative employer. As to Diligent, the only entity that engaged her to provide delivery services and the only entity that compensated her for doing so, claimant was not an employee, but an acknowledged independent owner-operator. To avoid this gaping flaw in her case, claimant ignores Diligent and presses her claim directly against Diligent's customer, Parts Authority. But Parts Authority had a contract and relationship with Diligent, not with claimant.

Parts Authority paid Diligent the price Diligent agreed to accept from Parts Authority for its services. Parts Authority neither contracted with, interviewed, hired, supervised, fired, nor paid Lucio. Lucio was in business as an independent owner-operator delivering auto parts for customers both before and after making deliveries for Parts Authority; and she was free to do so at the same time she was making deliveries for Parts Authority. Claimant's delivery services were not integral to Parts Authority's business; deliveries were and could be readily assumed by other contractors.

As to Diligent, claimant was an independent contractor; as to Parts Authority, she was a delivery modality – an "independent contractor once removed." Like the FedEx, UPS, U.S.P.S. or Uber driver, claimant was independent of Parts Authority. And because she was not an employee of Parts Authority, claimant is not entitled to wages from Parts Authority under the FLSA. Her complaint, therefore, must be dismissed and she should be assessed one half of the costs of these proceedings.

## STATEMENT OF FACTS AND PRIOR PROCEEDINGS

Lucio received an opportunity to provide delivery services to Parts Authority under an Owner Operator Agreement she entered into with BBB Logistics, Inc. The Owner Operator Agreement provides, among other things:

> DILIGENT has the need from time to time, for the services of Owner Operators regarding Items for customers of DILIGENT…. Operator is engaged in providing the required services and is willing to be available, from time to time, to undertake to perform such services for the customers of DILGIENT, as an Owner Operator, when and as the Operator shall chose and elect to do so. (Agreement WHEREAS clause)

> The parties agree and acknowledge that Operator's relationship with DILIGENT hereunder is that of an Owner Operator, and any and all services performed or provided by Operator hereunder shall be provided by it in such capacity. (Agreement ¶ 1(a))

> Neither the Operator nor its employees or servants are to be considered employees of DILIGENT at any time, under any circumstances for any purpose. (Agreement ¶ 1(c))

> During the term of this Agreement, DILIGENT may, from time to time in its sole discretion, inform the Operator of the opportunity to perform services by advising Operator of the place and time of the services designated by DILIGENT's customers and of any terms designated by DILIGENT's customers relating specifically to the results of the services to be provided. Operator shall have the right to decline or accept any such noticed opportunity. (Agreement ¶ 3(a))
>
> Should the Operator elect to perform services, the Operator shall perform the services and, in connection therewith, shall select the route or routes to be taken. All other matters relating to the services regarding any particular Item shall be in control of and the discretion of the Operator. (Agreement ¶ 3(d))
>
> Operator shall direct, in all respects the operation and maintenance of the equipment used in performance of this Agreement, which direction shall include, but not be limited to, selection of drivers, helpers, … maintenance and purchase of fuel …. (Agreement ¶ 8(a))

In connection with entering into the Owner Operator Agreement, Lucio was given responses to Frequently Asked Questions concerning her rights and obligations and the expected relationship between the parties.

1. What is the nature of the relationship between Diligent and your business?

    You operate your own business as an Owner Operator…. Diligent acknowledges that as an Owner Operator – (i) you can elect to accept, or not accept, a client-engagement opportunity offered to you, (ii) you can engage or hire others to complete an engagement, and (iii) you can perform services for others even while you contract with Diligent.

7. Must I perform a client engagement personally?

    No. You can perform the necessary services yourself, or you can employ or engage others to perform the services for you.

11. Will I have to provide full time, dedicated or exclusive services?

    No. While DILGENT may inform you about client opportunities that are available, DILIGENT acknowledges that because you have your own business, you will be making your services available to the public and may not be in a position to accept all client engagements made known to you.

19. What are the financial considerations in electing to provide services?

    You will receive the contract payment when you complete an engagement. Diligent and you will negotiate the amount of that payment up front. This is the only payment you will receive.

> You need to build your profit margin into the contract payment.
> You have a significant investment in your own truck, tarp, tools and equipment.
>
> You are responsible for any tolls, registration fees, license fees or other fee or expenses required to complete an engagement. You may incur losses due to delays, slow-downs or mechanical breakdowns.

27. Can Diligent discharge me?

> No, you are not an employee. Diligent can terminate the Owner Operator agreement if you breach the agreement or if the contract is no longer available with our client.

Diligent's Master Client Services Agreement with Parts Authority provides that Diligent shall inform Owner Operators of the opportunity to provide delivery services for Parts Authority. (MCSA ¶ 2) Parts Authority pays an agreed flat monthly rate for the services provided by Diligent (MCSA ¶ 4). The MSCA provides that the intended relationship between Parts Authority the owner operators referred by Diligent was that of independent contractor:

> The parties are, and intend to remain, independent Owner Operators (Contractors) from each other, and from the Owner Operator. The parties further acknowledge that any Owner Operator that agrees to perform services for Client shall be an Owner Operator with respect to both Client and DILIGENT. No agency, employment, joint venture, or partnership shall be created hereby or between these parties, and neither party hereto shall make any representation that would create the appearance of such a relationship. DILIGENT shall clearly advise any Owner Operator it informs of an opportunity to provide services for Client that DILIGENT, Client and the Owner Operator are all independent operators with respect to each other and that no other relationship shall exist as between such parties.

(MCSA ¶ 9). The MCSA was clarified by an amendment made October 13, 2011:

> Diligent and Client and owner operators supplied by Diligent are and shall be independent contractors in their relationship with each other and neither is nor shall be considered an agent, employee or legal representative of the other for federal or state tax purposes or for any other purposes whatsoever.

The Owner Operator Agreement, the FAQs and the MCSA make plain that the intended relationship between Parts Authority and claimant was that of independent owner operator and

-4-

not employer-employee. Claimant cannot meet her burden of proving that the actions of Parts Authority were inconsistent with its contractual intent to treat claimant as an independent contractor or that she was economically dependent upon Parts Authority. If claimant seldom or even never exercised her contractual right to reject engagements, subcontract engagement she did accept, or market her delivery services to others, it was her decision. Her choices cannot retroactively make her economically dependent upon Parts Authority and convert her status to that of an employee entitled to extra-contractual payments of overtime or expenses.

The action began as a putative collective action filed in the United States District Court for the Eastern District of New York against Parts Authority for violation of the Fair Labor Standards Act ("FLSA")(*Johnson, et al. v. Parts Authority, et al.,* 16 cv. 06852 (E.D.N.Y. 2016)). Claimant joined the action as a plaintiff on March 6, 2017. Plaintiffs did not name Diligent as a defendant in the action; instead, their approach was to disclaim any relationship between Diligent and Parts Authority, including integrated entity, joint-employer or agency.

Parts Authority moved to compel arbitration under the Diligent owner operator agreement because Parts Authority was a Diligent customer. In opposition to the motion, plaintiffs represented to the court:

> Mr. Johnson only brings this claim against Parts Authority. He alleges that Parts Authority was his employer…. He doesn't allege that Diligent was his employer. The arbitration agreement, in fact, says Diligent was not his employer. **He doesn't allege that Parts Authority or Diligent were related in any way**, were components of a single employer relationship, were joint employers, were joint tortfeasors, were under common control **or any other relationship which results in in the legal treatment of them as the same entity or holds one responsible for the conduct of the other**.

(Transcript of July 31, 2017 Oral Argument on Motion to Compel Arbitration at 10-11 (emphasis added). In a report and recommendation dated August 17, 2017, the Magistrate Judge recommended that the motion to stay the court proceeding and compel individual arbitration be

granted. Plaintiffs filed objections, and by Order dated September 30, 2017, the district court confirmed the Report and Recommendation. That case is still pending; this arbitration is pursuant to the court's holdings; and the court's holdings are the law of the case. Lucio is judicially estopped from changing course in the arbitration. Thus, the essential question presented is whether Lucio, while performing services as a contractor of Diligent for Diligent's customer Parts Authority, became an employee of Parts Authority within the meaning of the FLSA. Clearly, she did not.

## APPLICABLE LEGAL STANDARDS

### A. FLSA Claims for Overtime Pay

For a worker to prevail on an FLSA claim, she must prove that she was a covered employee under the statute. *Bonet v. Now Courier, Inc.*, 203 F. Supp. 3d 1195 (S.D. Fla. 2016)("if Plaintiff fails to prove that he was performing services as an employee and the evidence shows that he was acting in some other capacity – such as an independent contractor capacity – Plaintiff has failed to prove his claim."); *Arena v. Plandome Taxi Inc.*, 2014 WL 1427907 (E.D.N.Y. April 14, 2014)(to recover under the FLSA, plaintiff must show he was an employee of defendant rather than an independent contractor). "[A] FLSA plaintiff carries the burden of proving all elements of a FLSA claim, including the existence of an employee-employer relationship." *Smith v. MTI Limo & Shuttle, Inc.*, 2011 WL 13272825 (N.D. Ga. Sept. 12, 2011) "To determine whether an individual falls into the category of covered "employee" or exempted "independent contractor," courts look to the "economic reality" of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1310 (11th Cir. 2013). Courts have cited six factors to use as guides in applying the economic reality test:

> (1) the nature and degree of the employer's control as to the manner in which the work is to be performed;
>
> (2) the employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered is an integral part of the employer's business.

*Id.* at 1311-12; *Saleem v. Corporate Transp. Group, Ltd.*, 854 F.3d 131, 139 n. 19 (2d Cir. 2017). Eleventh Circuit courts also consider whether the business has "authority to hire or fire" the plaintiff, "determine[s] the rate and method of payment," and "maintain[s] employment records." *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997). No one factor is determinative; the central question is the worker's economic dependence upon the business for which she is laboring. *Scantland,* 721 F.3d at 1312. Considering these factors with respect to the evidence here shows that claimants were not economically dependent on Parts Authority:

- Parts Authority did not interview or hire her;

- Parts Authority did not pay her for her services nor determine how much she would be paid for her services;

- Parts Authority did not provide her with any employee benefits;

- Parts Authority did not require her to work any particular schedule;

- Parts Authority did not require her to personally perform her deliveries;

- Parts Authority did not restrict her from performing delivery services for others, including Parts Authority's competitors;

- Parts Authority did not supervise her in the performance of her delivery duties;

- Her delivery duties were performed away from Parts Authority's premises;

- She could interrupt her deliveries without authorization in order to do other things, including picking her children up at school and having work done on her car;

- She supplied the equipment needed to do her work and she used that same equipment to operate her own auto parts delivery business both before and after she delivered for Parts Authority; and

- She filed an income tax return as an independent business owner.

The Eleventh Circuit's decision in *Layton v. DHL Express (USA) Inc.*, 686 F. 3d 1172 (11th Cir. 2012) holding that delivery drivers contracted through a vendor were not employees of DHL, is instructive. DHL was in the package delivery business. It contracted with Sky Land Express to supply extra drivers to deliver DHL packages, the sine qua non of DHL's business. Sky Land drivers used Sky Land's vehicle to make deliveries. DHL inspected the drivers' vehicles and uniforms, subjected them to background checks, and communicated directly with them about customer complaints, requests for re-deliveries and other non-routine matters. Despite this close working relationship between DHL and the Sky Land drivers, the Appeals Court held that DHL did not employ the drivers within the meaning of the FLSA:

> Our undertaking is oriented by the desire to discover the economic reality of the total circumstances … Here, DHL bore no financial or managerial responsibility for Drivers. For the most part, DHL simply tasked Sky Land, and thus Drivers, with macro-level goals—deliver the packages, respond to customer complaints—and provided little guidance regarding the manner by which to execute daily tasks. Sky Land alone held the power to hire, fire, and pay Drivers. Sky Land alone owned the vans that allowed Drivers to complete their essential job function, and because Sky Land's contract with DHL was not exclusive, Sky Land could have served other companies using those vehicles. We find that the totality of the economic circumstances indicates that Drivers were not economically dependent upon DHL, and we therefore affirm the district court on the grounds that DHL was not a joint employer of Drivers.

In analyzing whether a worker is an employee or an independent contractor, the correct legal test is the economic realities "actual exercise of control" as opposed to the joint employer test of "power to control." *Saleem v. Corporate Transp. Group, Ltd.*, 854 F.3d 131, 149 n.37 (2d Cir.

2017). Lucio was subject to significantly less control by Parts Authority than that exercised by DHL over the Sky Land drivers.

### 1. Nature and Degree of Control

The first factor is the nature and degree of control exercised by Parts Authority over the manner in which Lucio's work was performed. This factor favors a finding of independent contractor status because Parts Authority exercised very little, if any, control. Parts Authority could not require Lucio to make deliveries; whether she performed an engagement on a particular day was up to her. If she wished to decline an engagement she advised Diligent, not Parts Authority. If she accepted an engagement, she was not required to complete it herself. She could send her own replacement for all or part of her day. Lucio did not submit an employment application to Parts Authority, she was not interviewed for a job by Parts Authority, she was not subjected to a drug test, she was not given an employee handbook or other form or work rules, and she had no Parts Authority identification card.

Most significantly, Parts Authority did not hire Lucio, did not pay her for her services, did not determine the manner or rate of her pay, did not maintain records of her employment and did not have authority to fire her. In terms of hiring, Parts Authority did not receive an application from Lucio, did not interview her or conduct a background check, did not provide her with new hire employment forms or an employee handbook and did not advise her that she had been hired.

Furthermore, Lucio spent the majority of her work days in her own car, making deliveries by herself, away from Parts Authority's facilities. No one from Parts Authority ever rode with her or followed her to see how she was performing. Thus, Lucio went basically unsupervised while completing her contracted services. There were many days when Lucio did not accept the engagement from Diligent to provide delivery services at Parts Authority. On the days she did

accept an engagement, she was free to provide those services personally or to arrange for others to fulfill that contractual obligation. And, while Lucio denies performing delivery services for Parts Authority's competitors while she was delivering for Parts Authority, she certainly was free to do so.

To the extent that Parts Authority required Lucio to be available to provide delivery services for the contracted time of 8:00 a.m. to 6:00 p.m., Parts Authority was only enforcing the benefits of its bargain as set forth in its contract with Diligent. Whether that availability was by Lucio directly, Lucio's employee, another delivery driver referred by Lucio or Diligent, or a combination thereof, was immaterial to Parts Authority. And in the end, it was Diligent – not Parts Authority – which Lucio claims told her she needed to choose between her work and her family. And it was Diligent – not Parts Authority – which Lucio informed she had chosen family.

In sum, the absence of any material control over Lucio by Parts Authority provides great weight, if not conclusive evidence, that she was not an employee of Parts Authority for purposes of the FLSA.

### 2. Opportunity for Profit or Loss

The second factor is the workers' opportunity for profit or loss and their investment in the business. The more entrepreneurial the work, the more it points to independent contractor status. Lucio had the ability (within profitability parameters) to negotiate the rate she would charge Diligent for the engagement. She also had control over her expenses. She could have utilized a more fuel efficient vehicle or retained subcontractors to complete all or part of her engagement. Each of these elements presented Lucio with the opportunity to generate net additional revenue.

### 3. Investment In Equipment

In the economic reality test, large capital expenditures – such as providing a car —are relevant to determining whether an individual is an employee or an independent contractor. *Saleem, supra*, 854 F.3d 144. Here, claimant provided her own vehicle and paid for her own insurance, fuel and other expenses. This factor weighs in favor of independent contractor status because her ownership of the means of performance empowered her to offer similar delivery services to others. And that is exactly what Lucio did both before and after providing delivery services to Parts Authority.

### 4. Degree of Skill Required

The fourth factor considered in assessing the economic reality of the relationship is the degree of skill and independent initiative required to perform the work. Typically, a higher skill level is a factor in favor of independent contractor status, and concededly, the functions of a delivery driver do not require advanced skills.[1] In this instance, however, the semi-skilled nature of the duties allows for greater entrepreneurial opportunities for the claimant in terms of ready availability of subcontracting and providing services to other customers. In other words, claimant could easily accept engagements with other entities or find subcontractors for herself with little start-up time. Therefore, this factor is neutral.

### 5. Permanence or Duration of the Relationship

Although Lucio made deliveries for Parts Authority for five months, her relationship was actually a series of daily engagements. She was free to reject an engagement on any particular

---

[1] *But see, Arena v. Delux Transp. Serv. Inc.*, 3 F. Supp. 3d 1, 12 (E.D.N.Y. 2014)("In order for Plaintiff to drive for Delux, he had to know how to drive and he had to be licensed by the Town of North Hempstead…. He also had to navigate his routes and maintain the safety of his passengers, and had to have initiative to accept dispatched calls and transport his passengers in an efficient manner. This constitutes a skill set sufficient to favor against employee status.")

day and did so on many occasions. If she accepted the engagement for the day, she was obligated to complete it, but she was not required to personally perform the work. This factor leans heavily toward independent contractor status.

### 6. Whether the Work Is an Integral Part of Parts Authority's Business

The final factor courts consider is the extent to which the work is an integral part of the employer's business. Parts Authority is a supplier of auto parts. Claimant delivered some of those parts to some of its local customers. Claimant's services can be and were replaced by other owner operators or means of distribution. Therefore whether delivery driving is integral to Parts Authority's business carries little weight with respect to a particular driver. *Arena, supra*, 2014 WL 1427907 (E.D.N.Y. April 14, 2014)("While Arena argues that because Plandome was a transportation business, the operation of taxicabs was 'the most integral part of Defendants' business,' it is equally important that Arena was not an indispensable driver, since he was replaced by other drivers in his absence").

### CONCLUSION

When the relationship between Lucio and Parts Authority is viewed under the FLSA economic realities test, the only reasonable outcome is that she was intended to be and at all material times was an independent contractor. Starting in 2014 or perhaps earlier, Lucio was operating a business delivering auto parts for Auto Tech Supply apparently being compensated through Subcontracting Concepts, LLC. At that time, Diligent and Parts Authority were parties to a master client services agreement by which Diligent agreed to refer independent parts delivery businesses to deliver products for Parts Authority. On May 11, 2015, Lucio contracted with Diligent to receive opportunities to provide delivery services for Diligent customers as an independent owner operator in exchange for a fee to be paid by Diligent. Lucio accepted the

opportunity to provide services to Parts Authority. Diligent alone held the power to enter into or terminate Lucio's contract; Lucio negotiated her compensation with Diligent; Diligent alone held the power to pay her and did pay her according to her contract; Lucio owned the vehicle that allowed her to complete her deliveries and she could have, and did, serve other companies using that vehicle; and Lucio ended her engagement to deliver for Parts Authority by telling Diligent. Equally importantly, Lucio represented to the Government that she was an independent contractor both when she was driving for ATS, as well as when she accepted assignments at Parts Authority. She admittedly filed a Schedule C listing herself as operating a delivery business and deducted some of her driving expenses on her tax returns.[2] Given these undisputed facts, the economic reality of the total circumstances clearly establishes that Lucio was not an employee of Parts Authority; she was an independent contractor once removed and the Arbitrator should so rule.

Even if one were to assume, arguendo, that claimant could meet her burden of proving she was an employee of Parts Authority under the FLSA, only a minimal amount for overtime would be due. Lucio claims that she worked Monday to Friday from 8 a.m. to 6 p.m. and on

---

[2] The status a person claimed on her tax return is a significant factor to be considered in determining whether a worker was an independent contractor. *Deboisiere v. Am. Modification Agency*, 2010 WL 4340642 at *3 (E.D.N.Y. Oct. 22, 2010)( It is a significant consideration if the person classifies himself as an independent contractor for income tax purposes.); *Gagen v. Kipany Prods. Ltd.*, 27 A.D.3d 1043, 1044 (3d Dept. 2006)("the manner in which the relationship is treated for income tax purposes is certainly a significant consideration" in distinguishing between an employee and an independent contractor). *See, Meyer v. United States Tennis Assoc.*, 607 Fed. Appx. 121, 123 (2d Cir. 2015) (tennis umpires were independent contractors of USTA because they "worked at their own convenience, were free to engage in other employment, did not receive fringe benefits, and were not on defendant's payroll. Plaintiffs also generally claimed independent contractor status on their income tax returns."). Indeed, Courts recognize that a litigant should not be permitted to take a position in litigation different from the representation of her status she made to the government and claimant should be stopped in this litigation from claiming that she was not an independent contractor in relation to Parts Authority. *Mahoney-Buntzman v. Buntzman*, 12 N.Y.3d 415, 422 (2009); *Foti v. Foti*, 114 A.D.3d 1207 (4th Dept. 2014).

Saturdays from 8 a.m. to 3 p.m. She acknowledges that was eligible for a 30 minute meal break.[3] Thus, assuming Lucio worked six days in a week – and there were multiple weeks when she did not -- the working time would generally be 54 hours. The evidence will also show that Lucio provided services to Parts Authority for 24 weeks between May 11 and October 22 and that Diligent paid her approximately $87.50 per day, for an effective hourly rate of $9.73 and an overtime premium rate of $4.87. Therefore, the value of unpaid overtime would be $1636.32 (14 hours x 24 weeks x $4.87).

Dated: Rye, New York
       January 8, 2019

Abrams, Fensterman, Fensterman, Eisman,
Formato, Ferrara, Wolf & Cerone, LLP
150 Linden Oaks
Rochester New York 14625

Dorf & Nelson, LLP
555 Theodore Fremd Ave.
Rye, New York 10580

Counsel for Respondent

Of Counsel:   Sharon Stiller
                 Andrew P. Marks

---

[3] Lucio claims she was unable to take a break on day she started her deliveries after 8:00 a.m., but by starting later, she still would not have "worked" ten hours in the day. Furthermore, Lucio acknowledges that she took time during the day to perform personal tasks, like getting an oil change in her car.