# **<u>EXHIBIT E</u>**

1

1           AMERICAN  ARBITRATION ASSOCIATION
                CASE NO. 01-18-0000-6169
2   --------------------------------------------x

3   SUSANA LUCIO,

4                        Claimant,
            vs.
5
    PARTS AUTHORITY, LLC; PARTS
6   AUTHORITY, INC.; PARTS
    AUTHORITY LAUREL AVENUE, LLC,
7   PARTS AUTHORITY PARTNERS
    FRANKLIN AVE, LLC, PARTS
8   AUTHORITY SOUTHERN, LLC, PARTS
    AUTHORITY-WAW, LLC, PA AUSTIN,
9   LLC, PARTS AUTHORITY GEORGIA,
    LLC, and YARON ROSENTHAL,

10
                        Respondents.
11
    --------------------------------------------x
12

13

14

15              JANUARY 15, 2019

16                 9:57 A.M.

17

18              ARBITRATION

19      HELD BEFORE ARBITRATOR DEBORAH MASUCCI

20

21

22

23

24
    Terri Fudens
25  Court Reporter

2

1          AMERICAN ARBITRATION ASSOCIATION
              CASE NO. 01-18-0000-6169
2   -------------------------------------------x

3   SUSANA LUCIO,

4                      Claimant,

5        vs.

6   PARTS AUTHORITY, LLC, et al.,

7                      Respondent.

8   -------------------------------------------x
                              January 15, 2019
9                              9:57 a.m.

10

11

12

13          ARBITRATION taken in the above titled

14   actions held at the Offices of Abrams Fensterman,

15   3 Dakota Drive, Suite 300, New Hyde Park, New York,

16   before Terri Fudens, a Certified Shorthand Reporter

17   and Notary Pubic within and for the State of New

18   York.

19

20

21

22

23

24

25

3

1    APPEARANCES:

2

3          WEINHAUS & POTASHNICK
           Attorneys for Claimant
4                11500 Olive Boulevard
                 Suite 133
5                St. Louis, Missouri  63141
                 314.997.9150
6
           BY:  MARK POTASHNICK, ESQ.
7                markp@wp-attorneys.com

8

9          FINKELSTEIN, BLANKINSHIP, FREI-PEARSON &
           GARBER, LLP
10         Attorneys for Claimant
           445 Hamilton Avenue
11         Suite 605
           White Plains, New York  10601
12         914.298.3284

13         BY:  JEREMIAH FREI-PEARSON, ESQ.
                jfrei-pearson@fbfglaw.co.
14                  -and-
                ANDREW WHITE, ESQ.
15              awhite@fbfglaw.com

16

17         DORF & NELSON LLP
           Attorney for Respondents
18               The International Corporate Center
                 555 Theodore Fremd Avenue
19               Rye, New York  10580
                 914.381.7600
20
           BY:  ANDREW P. MARKS, ESQ.
21              amarks@dorflaw.com

22

23

24

25

4

1   APPEARANCES CONTINUED:

2

3           ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN
            FORMATO, FERRARA & WOLF
4           Attorneys for Respondents
                  3 Dakota Drive
5                 Suite 300
                  Lake Success, New York 11042
6                 (516) 328-2300

7           BY:  SHARON P. STILLER, ESQ.

8

9

10  ALSO PRESENT:

11          Alexander Buller, Esq.
            General Counsel
12          Parts Authority Auto Parts Super Stores
                  3 Dakota Drive
13                New Hyde Park, New York  11042
                  516.300.1265
14                Abuller@partsauthority.com

15

16

17

18

19

20

21

22

23

24

25

5

1   ARBITRATION                    JANUARY 15, 2019

2               C O N T E N T S

3   Appearances                         Page 3-4

4

5   Exhibit Index                       Page 6

6

7   Examination of Susana Lucio:

8        Direct by Mr. Potashnick      Page  29

9        Cross by Mr. Marks            Page  85

10

11   Examination of Michael Earner:

12        Direct by Mr. White          Page 163

13        Cross by Mr. Marks           Page 203

14        Redirect by Mr. White        Page 214

15

16   Examination of Renan Oliveria:

17        Direct by Mr. Potashnick     Page 219

18        Cross by Mr. Marks           Page 299

19

20   Afternoon Session                 Page 131

21

22   Certification                     Page 236

23

24   Word Index                        Page 237

25

6

1    **ARBITRATION**                                    **JANUARY 15, 2019**

2                              **EXHIBITS**

3    **RESPONDENT'S**          **DESCRIPTION**                        **PAGE:**

4        **A**           **The Transcript of Civil Cause        218**
                         **for Motion Hearing before the**
5                        **Honorable Robert M. Levy,**
                         **United States Magistrate Judge**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ARBITRATION**

1          ARBITRATOR MASUCCI:  Good morning

2     everyone.  My name is Deborah Masucci.  I'm the

3     arbitrator appointed to hear this matter.  The

4     matter is Susana Lucio versus Parts Authority,

5     LLC.

6          For the record, I want to go around the

7     room and have everybody introduce themselves for

8     the court reporter.  I also would like to remind

9     everybody that when they speak, you speak

10    clearly and not rapidly so that the court

11    reporter can take down all of the words that

12    you're saying.

13         SUSANA LUCIO:  Susana Lucio.

14         MR. POTASHNICK:  Mark Potashnick,

15    co-counsel for the claimant.

16         MR. FREI-PEARSON:  Good morning.

17    Jeremiah Frei-Pearson, co-counsel for the

18    claimant.  J-E-R-E-M-I-A-H.  Last name is

19    F-R-E-I dash P-E-A-R-S-O-N.

20         MR. WHITE:  Good morning.  Andrew

21    White, co-counsel for the claimant.

22         MS. BULLER:  Good morning.  Alexandra

23    Buller.  I'm Parts Authority's in-house counsel.

24         MR. ROSENTHAL:  Yaron Rosenthal.  I'm

25    one of the members of Parts Authority LLC.

1           MS. STILLER:  Sharon Stiller, attorney

2     with the law firm Abrams Fensterman, counsel for

3     Parts Authority.

4           MR. MARKS:  Andrew Marks, counsel for

5     Parts Authority.

6           ARBITRATOR MASUCCI:  I just want to

7     handle some housekeeping issues so that we know

8     what to anticipate.

9           The first thing is that if you have

10    cell phones, please put them on silent so that

11    no one is disturbed.

12          I would like to know how long you think

13    that the hearing will go today and what

14    witnesses you will offer today.

15          MR. FREI-PEARSON:  So claimants have

16    three witnesses today, the first one being

17    Miss Lucio.  I think Mark is doing her directly.

18          What do you think, about a half hour?

19          MR. POTASHNICK:  An hour.

20          MR. FREI-PEARSON:  So an hour for the

21    direct.

22          The second witness would be Ron

23    Oliveria, but we're going to have Mr. Oliveria

24    go third because he is in class right now.

25    Mr. Oliveria's direct testimony should be about

**ARBITRATION**

1    25 minutes.

2              And who would be our third witness, but

3    who is our second witness, is Michael Earner.

4              About how long do you think

5    Mr. Earner's testimony will go?

6              MR. POTASHNICK:  45 minutes or so.

7              MR. FREI-PEARSON:  We also have an

8    opening statement if you would like to hear it.

9              ARBITRATOR MASUCCI:  Yes.

10             So that will be the day, because I

11   understand that Mr. Oliveria won't be here until

12   4 o'clock.

13             MR. FREI-PEARSON:  We're happy to go

14   out of order.  We would anticipate that around

15   1:30 or 2:00 we would be done with our second

16   witness.  And so if they would like to call any

17   of their witnesses during that interim just to

18   be more efficient, we're happy to do that.

19             ARBITRATOR MASUCCI:  Miss Stiller.

20             MS. STILLER:   Mr. Marks is going to be

21   handling the hearing, and I will let him speak

22   to the order of witnesses.

23             I just have a question so everybody can

24   deal with their schedule about whether the court

25   will be breaking for lunch.

**ARBITRATION**

1          MR. MARKS:  So respondents have four

2     potential witnesses.  Of course we're not sure

3     of what we intend to do at the time.

4          We have a Parts Authority general

5     manager who is here, and we might be able to

6     take his testimony out of order today.

7          ARBITRATOR MASUCCI:  Okay.

8          MR. MARKS:  We may be calling

9     Mr. Rosenthal.  I'm not sure.  We have Paul

10    Spicker, who is general counsel and human

11    resources director of Diligent, who is in

12    Houston, Texas.

13          And we have Fred Rosenau, who is the

14    operations manager for Parts Authority, and he

15    is in Atlanta.

16          MS. STILLER:  For Diligent?

17          MR. MARKS:  Sorry.  For Diligent.

18          And we -- I don't think we can call him

19    today.  That's why I didn't think we would get

20    it done today.

21          ARBITRATOR MASUCCI:  Okay.  I did read

22    the E-mails.  I just wanted some clarification.

23    I figured that we would have to come back

24    tomorrow at least for one.  But you're certain

25    that you're going to be calling him or --

**ARBITRATION**

1          MR. MARKS:  I'm certain we'll call him.

2          ARBITRATOR MASUCCI:  All right.

3          As I said in my E-mail, I'm willing to

4    stay as late as necessary today or tomorrow.  My

5    schedule is yours.  The only thing is in the

6    morning coming here, I'm prey to the Long Island

7    Expressway.  I live in Brooklyn.  I did leave at

8    8 o'clock this morning.  So you can see I just

9    got here 10 minutes beforehand.

10          MR. MARKS:  If you left at 9:00, you'd

11    probably get here at the same time.

12          ARBITRATOR MASUCCI:  I know.

13          Miss Stiller, to answer your question,

14    yes, we will have a lunch break.  Is there a

15    place for people to eat close by?

16          MS. STILLER:  I don't think so, but I

17    think we can arrange for people to order out.

18          Do you have any menus?  Because if you

19    do, probably the easiest thing to do might be to

20    circulate some menus, order out, and then we've

21    got separate rooms that everybody can be in.

22          ARBITRATOR MASUCCI:  Okay.

23          As far as going forward, what I

24    anticipate is that each side will have an

25    opening statement, and then you'll present your

**ARBITRATION**

1       first witness, Miss Lucio.

2               After direct and cross, we will take a

3       five or 10-minute break depending on what is

4       needed by everyone so that we can pace the

5       testimony today and so that we don't feel that

6       we're rushed, and you can take a breather.

7               Any questions?

8               MS. STILLER:  It may be helpful to take

9       more breaks than usual just because of the

10      facilities being outside.

11              ARBITRATOR MASUCCI:  You mean timing

12      for the breaks?

13              MS. STILLER:  It might be helpful, for

14      example, to take a break after the witness'

15      direct depending on how long it is, in case

16      anybody needs to use the facilities.

17              ARBITRATOR MASUCCI:  Yes.  Definitely.

18              MS. STILLER:  I know that that's not

19      ideal, but I wish we had bathrooms inside.

20              ARBITRATOR MASUCCI:  That's okay.

21      There's no problem.

22              MR. MARKS:  We had a minor kerfuffle

23      about the deposition transcript.  I think by AAA

24      rules, the party who desires to have a

25      transcript should pay for the transcript.

**ARBITRATION**

1           MS. STILLER:  Arbitration transcript.

2           ARBITRATOR MASUCCI:  You said

3     deposition.

4           MR. MARKS:  The party who wishes to

5     have a transcript of the arbitration is the

6     party who pays for it.  That's the rule.

7           As the other side pointed out, I think

8     in your order number 1 you said if you want to

9     have a transcript, you should split the cost.  I

10    don't recall how that order came to be, but if

11    that is your order, then we will split the fee.

12          ARBITRATOR MASUCCI:  Why don't we do

13    that.

14          Is there any other --

15          MR. MARKS:  Not at this moment.

16          MR. FREI-PEARSON:  Not from claimant?

17          ARBITRATOR MASUCCI:  So we will

18    proceed.

19          MR. FREI-PEARSON:  Good morning.  What

20    brings us to this arbitration are the rules that

21    protect all American employees.  The Fair Labor

22    Standards Act, or FLSA, requires that all

23    employees be paid overtime and the minimum wage

24    including reimbursement for expenses they incur

25    in their job duties.

**ARBITRATION**

14

1          The FLSA defines the terms employee and
2     employer very broadly so as to protect workers,
3     particularly vulnerable workers without special
4     skills.  At the same time, the FLSA exempts
5     independent contractors from its coverage so as
6     to allow private independent businesses to
7     interact with each other without being burdened
8     by the government's wage regulations.

9          We're here today because Parts
10    Authority and Diligent misclassified Susana
11    Lucio and thousands of other low wage delivery
12    drivers as independent contractors in order to
13    increase their profits by paying the drivers far
14    less than the FLSA requires.

15         At this arbitration, claimant will
16    prove three things.  First, she'll prove that
17    she was an employee, not an independent
18    contractor.  She will also prove that Parts
19    Authority was her employer.  Importantly under
20    the FLSA, a worker can have multiple employers
21    and can recover against any one of the
22    employers.  Finally, claimant will prove her
23    damages.

24         Before Miss Lucio started working for
25    Parts Authority, Diligent made Miss Lucio sign a

**ARBITRATION**

1    contract stating that she was an independent

2    contractor.  But the law is clear that when the

3    words on the page are contrary to the facts on

4    the ground, it is the facts on the ground that

5    control, not the contract.  Here, the real facts

6    conclusively show that Miss Lucio was not an

7    independent contractor.

8          The courts used the economic reality

9    test from US v. Silk to determine whether or not

10    a worker truly is an independent contractor.

11          Under this test, the ultimate question

12    is whether as a matter of economic reality,

13    workers depend on someone else's business for

14    the opportunity to render service or whether

15    they are in business for themselves.

16          The courts typically consider five

17    factors would apply to the Economic Reality

18    Test.  They're listed on the PowerPoint.

19          ARBITRATOR MASUCCI:  And they were in

20    the opening statement in your brief.

21          MR. FREI-PEARSON:  Exactly.

22          Each of those factors favors a finding

23    that Miss Lucio was, in fact, an employee and

24    not an independent contractor.  First,

25    significant control is exercised over

**ARBITRATION**

1    Miss Lucio.  Parts Authority controlled what she

2    did, which was to deliver auto parts to Parts

3    Authority customers.

4         Every day, like any common employee,

5    and like Parts Authority's W2 drivers,

6    Miss Lucio went to her job site and did all the

7    duties assigned to her by her boss, the Parts

8    Authority manager.

9         Parts Authority set Miss Lucio's hours.

10   Parts Authority approved Miss Lucio's breaks and

11   sometimes prevented her from taking breaks.

12   Parts Authority dictated the deliveries

13   Miss Lucio made, the order of those deliveries,

14   and the amount of time those deliveries

15   contained.

16         Parts Authority closely supervised

17   Miss Lucio's work calling her throughout the day

18   and requiring her to call Parts Authority.

19   Parts Authority trained Miss Lucio.  Parts

20   Authority required Miss Lucio to wear a Diligent

21   uniform.

22         Miss Lucio's rate of pay was set by

23   Diligent acting as Parts Authority's agent and

24   guided by Parts Authority's contract with

25   Diligent.  Parts Authority prevented Miss Lucio

**ARBITRATION**

1          from earning additional income from Parts

2          Authority's customers.

3               Miss Lucio could not bid for jobs or

4          negotiate her rate of pay.  And Miss Lucio had

5          no real ability to hire and manage others,

6          although the contract Miss Lucio signed with

7          Diligent said Miss Lucio could hire a

8          replacement.  This was one of many fictions in

9          the contract.

10              In fact, Renan Oliveria, another Parts

11         Authority driver, will testify that the Parts

12         Authority manager explicitly told drivers they

13         couldn't hire replacements.  Even if Parts

14         Authority did allow Miss Lucio to hire

15         replacements, which it did not, Miss Lucio could

16         not legally hire a replacement because the low

17         wages she received would have forced her to pay

18         any replacement wages below the minimum required

19         by the FLSA.

20              Moreover, as a low wage earner,

21         Miss Lucio had no practical ability to hire

22         workers.  Like nearly all other low wage

23         earners, she lived on her own income and used it

24         to feed her family, not to hire additional

25         people to work subminimum wage jobs for Parts

Case 1:16-cv-06852-DLI-RML   Document 52-6   Filed 09/22/20   Page 19 of 372 PageID #: 1229

1      Authority.

2              So the first factor, the control

3      factor, very clearly favors employee status.

4      The second factor, profit or loss, Miss Lucio

5      had no real opportunity for profit or loss.  She

6      earned a flat amount per workday, regardless of

7      how many deliveries she made or how efficiently

8      she drove.  Indeed Parts Authority dictated her

9      deliveries and the routes.

10             No amount of hustle, ingenuity or

11     dedication could change what she made.  Again,

12     she had no practical ability to hire anyone

13     else, and her work was limited to whatever Parts

14     Authority assigned her to deliver.

15             Miss Lucio could not refuse Parts

16     Authority assignments, and she regularly worked

17     50 to 60 hours a week for Parts Authority which,

18     as a practical matter with family, prevented her

19     from taking on an additional job or additional

20     work.

21             Miss Lucio did not invest in any

22     special equipment providing only her cell phone

23     and automobile, things owned by millions of

24     adults in America.  So again, the second factor,

25     profit or loss, strongly favors employee status.

**ARBITRATION**

1          Let's go to the third factor, which is

2     special skills.  The only so-called skills

3     required for this job is the ability of an adult

4     to drive from location to location and to check

5     in on itself.

6          The other job duties, such as checking

7     paperwork and checking parts were duties that

8     she was trained to do for Parts Authority and

9     are also within the common ability of most

10    adults.  This factor, the Special Hills, factor

11    also strongly militates in favor of employee

12    status.

13          The next factor, the duration of the

14    relationship also favors employee status.  Parts

15    Authority claims that Miss Lucio was hired for a

16    finite time, a series of daily contracts.

17     That's just not true.  She was hired to deliver

18    parts for Parts Authority six days a week for an

19    indefinite duration, like a common at will

20    employee and like Parts Authority's W2 drivers.

21          She was not free to take days off like

22    Parts Authority claims.  In fact, she was

23    repeatedly told she could not take days off.

24    When Miss Lucio said she needed to cut back the

25    day she worked to be with her sick child, she

**ARBITRATION**

1    was told that she must choose between her family

2    and her job.  Not her independent business

3    opportunity, her job, and was essentially forced

4    to resign when she still insisted on taking time

5    to be with her daughter.

6         If Miss Lucio could have continued to

7    work the 50 to 60 hours a week at the time Parts

8    Authority needed her, her supposedly finite job

9    would have continued to this day.

10        So the duration of the employment

11   status also favors employee status.  The final

12   factor also favors employee status.

13        Miss Lucio's work was an integral part

14   of Parts Authority's business.  Parts Authority

15   specifically advertises its fast deliveries to

16   customers, and Mr. Rosenthal himself has

17   admitted that making deliveries is an important

18   part of Parts Authority's job.  These deliveries

19   would not have been possible without Miss Lucio

20   and her low wage earnings peers.

21        So again, all of these factors

22   individually favor employee status.  And taken

23   together, the economic reality is simply

24   overwhelming.  We believe Parts Authority

25   employed Miss Lucio.

**ARBITRATION**

1          Diligent has appeared to sometimes

2     argue that if Miss Lucio was an employee, she

3     was employed by Diligent, not Parts Authority.

4     This argument is unavailing because under the

5     FLSA -- first of all, the facts show that Parts

6     Authority is the one that did the vast majority

7     of the control.

8          Regardless, under the FLSA, any

9     employee is jointly or severally liable to

10    employees for the FLSA violations.  Thus, Parts

11    Authority can't shield itself from liability by

12    arguing that diligent is the proper defendant,

13    even if your Honor finds there was one more than

14    one employer.

15          Now Miss Lucio was paid at least

16    $6,257.04, less than required by the FLSA.  Our

17    pre-hearing brief describes the relevant

18    calculations in excruciating detail, and

19    Mr. Earner will go through those calculations

20    again, so I'll spare your Honor all of the

21    details.

22          But one thing worth knowing is Parts

23    Authority simply did not produce all relevant

24    documents.  For example, Parts Authority's

25    manager wrote down when Miss Lucio arrived to

**ARBITRATION**

1    work and when she left.  Those documents weren't

2    produced for us, so we had to go based on

3    Miss Lucio's records.

4          Similarly we asked Parts Authority to

5    produce all the delivery slips from Miss Lucio.

6    They didn't do that.  One of the reasons we know

7    they didn't do that is there's multiple days

8    where, according to the delivery slips that were

9    produced, Miss Lucio just made one or two

10    deliveries.  But as Miss Lucio will testify, she

11    never made less than six deliveries.

12          So what we did is we made a series of

13    conservative estimates to account for the gap in

14    the data.  For every day where there were less

15    than six deliveries, we assumed a total of six

16    deliveries at the average rate.  This

17    necessarily undercounts, because it assumes that

18    every day when we just got one or two slips,

19    there were only six deliveries.  Where it's

20    unlikely that every single day there was the

21    lowest amount of deliveries, it also assumes

22    that the days where there were more than six

23    slips produced, Parts Authority produced every

24    slip.  There is no reason to believe that's

25    true.

**ARBITRATION**

1          Nonetheless, as we explained in our

2     prehearing brief and as Mr. Earner will testify,

3     we made a series of conservative assumptions in

4     order to calculate Miss Lucio's damages as

5     $6,257.04.  Now Miss Lucio is entitled to

6     $12,514.08 plus attorneys' fees and costs.

7          At the beginning I talked about the

8     FLSA's rules.  One of the FLSA's most important

9     rules is that liquidated damages are mandatory

10    unless the employer pleads and affirmatively

11    proves its good faith and reasonable grounds

12    that were complied, in which case your Honor has

13    discretion as to whether or not to award

14    affirmative damages.

15          Even if they prove that they acted in

16    good faith, your Honor still has discretion to

17    award full liquidated damages because courts

18    have explained that to compensate vulnerable

19    employees and to the term employers, liquidated

20    damages are the norm in FLSA cases.

21          Here the Parts Authority didn't even

22    plead that it acted in good faith, and that

23    makes sense because Parts Authority can't show

24    good faith.  They've been sued for this numerous

25    times.  Parts Authority used temporary drivers

**ARBITRATION**

1      like Miss Lucio and her peers to make millions

2      of dollars violating the FLSA.  This money was

3      made on the backs of Miss Lucio and her low wage

4      earning peers.  And they knew this was unlawful.

5           They drafted a contract describing what

6      a true independent contractor relationship would

7      be.  That contract was a fiction intended to

8      create legal protection so that they could

9      exploit low wage workers.  W2 workers of Parts

10     Authority get paid overtime.  They get

11     reimbursed for their driving expenses.

12          Parts Authority made a lot of money by

13     not giving Miss Lucio and her peers the same

14     protection.  Her damages are $12,514.08.  She is

15     entitled to every single penny.

16          Thank you for your attention.

17          ARBITRATOR MASUCCI:  Thank you.

18          Mr. Marks.

19          MR. MARKS:  I don't have a PowerPoint,

20     or an expert witness, or thousands and thousands

21     of documents which we calculated.

22          The reason I don't is because what we

23     do have is the facts.  Plaintiffs in their brief

24     and in their opening statement have now told

25     you, oh, Parts Authority drafted a contract.

**ARBITRATION**

1          Parts Authority didn't draft a

2     contract.  What they're trying to do is

3     conglomerate two entities.  They started that

4     only after they began this case in court

5     claiming they weren't making that statement.

6     They told the court that there is no

7     relationship, we are not pleading any

8     relationship between Diligent and Parts

9     Authority.

10          What we now have is the idea that

11    whatever Diligent did is now attributable to

12    Parts Authority, and somehow they've become a

13    single employer or a joint employer.  But I do

14    think what you need to do is listen to the

15    facts.

16          The testimony just doesn't support what

17    we've just heard.  Parts Authority did not

18    control Miss Lucio.  Parts Authority set out

19    deliveries to make.  Miss Lucio came there, she

20    picked up a delivery and she went.

21          We took her deposition and I asked

22    Miss Lucio:  Other than telling you that you

23    should do the work taking the delivery, other

24    than directing you at what time to come and

25    giving you a delivery or a pickup, did you

**ARBITRATION**

1      receive any other instruction from Parts

2      Authority?  And her answer is no.

3              And why not?  Because when she was

4      contracted with Diligent, Diligent told her:

5      I'm contracting you to have this coverage.  This

6      coverage is Monday to Friday and Saturday.  The

7      coverage starts at 8 and ends at 6, a little bit

8      less on Saturday.

9              That's what Miss Lucio agreed to do.

10              We gave her a document.  We had a

11      conversation with her.  We told her -- this is

12      Diligent.  Diligent told her that you don't have

13      to come.  You're an independent contractor.

14      There were days when Miss Lucio didn't come.  We

15      told her she could send somebody else.  Now if

16      she didn't, that's her choice.

17              But Diligent has many drivers who do

18      have subcontractors, who have multiple routes

19      and do make money off of that by controlling

20      their expenses and doing other things.

21              So this isn't some idea that we got in

22      bed together.  Diligent was in business long

23      before it had any relationship with Parts

24      Authority doing exactly the same thing.  Parts

25      Authority acquired stores in Georgia, asked

**ARBITRATION**

27

1          Diligent to supply contractor drivers.  That's

2     what Diligent did.

3               That's what Miss Lucio did before she

4     was contracted with Diligent, and that's the

5     same role she had after she contracted with

6     Diligent with another entity, ATS.

7               So she's certainly in the business.

8     She filed a tax return saying she's in the

9     business.  And I would only add that while we

10    have this elaborate discussion of regression

11    analysis of the various things, Miss Lucio

12    reported her expenses to the IRS

13    contemporaneously when she did it, not some

14    after done model.

15              She didn't report anywhere near the

16    amount that they're claiming as expenses.  And

17    it's not true that an employee under the --

18    inaccurate statement of law that employs under

19    the FLSA are entitled to reimbursement of their

20    expenses.  Employees under the FLSA are entitled

21    to reimbursement expenses to the extent that

22    their expenses drive their wages below minimum

23    wage.  That didn't happen here.

24              But Miss Lucio is not an employee.  I

25    think we need to look at what the FLSA is doing.

**ARBITRATION**

1    Supreme Court recently said that there is no

2    basis to construe exemptions for the FLSA,

3    strictly construe that against the employer.

4    And although courts said it was the broadest

5    definition of employment, it is a definition,

6    and we need to look at what that definition is

7    in Georgia.  And I will refer to Georgia's state

8    law which says when you have an agreement, a

9    written agreement, there is a presumption that

10   that individual is an independent contractor.

11          And it is Miss Lucio's burden, not

12   Parts Authority's burden, to prove her status as

13   an employee.  It's not our burden to prove she's

14   an independent contractor.  Because she already

15   has told us under oath that we didn't exercise

16   control over what she did, we didn't give her

17   any instructions, she cannot possibly meet this

18   burden.

19          I await to hear the facts if they're

20   different than what she testified to at the

21   deposition, but I assume that they wouldn't be,

22   and I assume we will have a judgment in our

23   favor.  Thank you.

24          ARBITRATOR MASUCCI:  Thank you.

25          Mr. Potashnick.

**ARBITRATION**

1              MR. POTASHNICK:  The claimant calls

2         Miss Lucio.

3              ARBITRATOR MASUCCI:  Terri will

4         administer an oath to you.

5    S U S A N A    L U C I O, a Claimant herein,

6                   having been first duly sworn by Terri

7                   Fudens, a Notary Public of the State

8                   of New York, was examined and

9                   testified as follows:

10                   DIRECT EXAMINATION

11   BY MR. POTASHNICK:

12         Q.    Miss Lucio, please state your full name

13   for the record.

14         A.    Susana Lucio.

15         Q.    What city do you live in?

16         A.    I live in Roswell, Georgia.

17         Q.    Where are you originally from?

18         A.    I'm from Mexico.

19         Q.    How far did you get in school?

20         A.    I went to the 11th grade.

21         Q.    Did you previously work for Parts

22   Authority?

23         A.    Yes.

24         Q.    When did that job begin?

25         A.    I begin that job in May 11, 2015.

**ARBITRATION**

1   Q. When did your job at Parts Authority

2 end?

3   A. It ended October 22, 2015.

4   Q. What kind of business is Parts

5 Authority?

6   A. It's auto parts.

7   Q. What was your position at Parts

8 Authority?

9   A. I was a delivery driver.

10   Q. How did it come about that you began to

11 work for Parts Authority?

12   A. Well, I needed a job, and I called my

13 brother-in-law Renan, and he was telling me that

14 Parts Authority was hiring.  My brother-in-law Renan

15 told me --

16    MR. MARKS:  I would object to hearsay.

17    MR. POTASHNICK:  It's an arbitration.

18    MR. MARKS:  Then my objection will be

19   overruled, but I point out that she's testifying

20   to an out-of-court statement, and it's

21   overruled.

22    Thank you.

23    ARBITRATOR MASUCCI:  How do you spell

24   your brother-in-law's name?

25    MS. LUCIO:  O-L-I-V-E-R-A.

**ARBITRATION**

31

1          ARBITRATOR MASUCCI:  And the first
2      name?
3              MS. LUCIO:  Renan is R-E-N-A-N.
4          A.    He told me that Parts Authority was
5  hiring.  So he gave me a phone number, and that's
6  when I called Fred.  And he told me that Fred would
7  set me up to go to work for Parts Authority.
8          Q.    Who was Fred?
9          A.    Fred was the Diligent guy that did the
10  paperwork.
11             ARBITRATOR MASUCCI:  Fred was the?
12             MS. LUCIO:  The Diligent guy.
13             ARBITRATOR MASUCCI:  The Diligent guy?
14             MS. LUCIO:  The Diligent guy that gave
15      me the paperwork.
16          Q.    Did you meet with Fred?
17          A.    Yes, I did.
18          Q.    Did he give you paperwork to sign?
19          A.    Yes.
20          Q.    After you signed the paperwork, what
21  happened?
22          A.    Well, he gave me a bunch of papers, and
23  he just laid it down on the desk, and he told me in
24  order to work for Parts Authority, I have to sign
25  those papers.  So I signed it.

**ARBITRATION**

32

1      Q.    Did you read the paperwork before you

2   signed it?

3      A.    Naturally, because he was rushing me

4   because he say that they needed a delivery driver in

5   the facility, in the warehouse where I used to do the

6   deliveries.

7      Q.    Did Fred give you a copy of the

8   paperwork?

9      A.    No.

10     Q.    Let me turn your attention to Joint

11  Exhibit 7, please.

12          ARBITRATOR MASUCCI:  While you're

13      looking for what you're looking for, can I have

14      a stipulation from both sides that all of

15      these -- the joint exhibits should be accepted

16      as exhibits?

17          MR. MARKS:  Yes.

18          MR. FREI-PEARSON:  So stipulated.

19     Q.    I will have you take a look at page 20

20  from Joint Exhibit 7.

21          Can you identify that document for us,

22  please?

23     A.    Yes.

24     Q.    What is that document?

25     A.    Operator Proposal.

ARBITRATION

1       Q.    Did you sign this document?

2       A.    Yes.

3       Q.    When did you sign this document?

4       A.    I signed that document on May 11, 2015.

5       Q.    Was that before or after you began

6    working for Parts Authority?

7       A.    It was before.

8       Q.    Why did you sign this document?

9       A.    Because Fred told me that I had to.

10      Q.    Were you given a copy of this document?

11      A.    No.

12      Q.    Did Fred give you an opportunity to

13   read it?

14      A.    No.

15      Q.    If you look at the second bullet point,

16   you see the number $2,300 written in.  Who wrote in

17   that amount?

18      A.    I did.

19      Q.    Where did that amount come from?

20      A.    Fred told me to write it down.

21      Q.    Did you ever negotiate that amount?

22      A.    No.

23      Q.    Did you ever have the opportunity to

24   negotiate that amount?

25      A.    No.

**ARBITRATION**

34

1      Q.    If you look at the second bullet point,

2   it says:  I will provide an invoice requesting

3   payment of my fees for each engagement.

4              Did you ever have to submit an invoice

5   to Diligent or to Parts Authority for the cost of

6   your services to them?

7      A.    No.

8      Q.    Did you ever have to submit an invoice

9   to either Diligent or Parts Authority to get paid?

10     A.    No.

11     Q.    Did you ever submit an invoice to

12  Diligent or to Parts Authority?

13     A.    No.

14     Q.    Let me turn your attention to the

15  fourth bullet point now.

16              It says:  I do not require from you any

17  training or any instruction on how to complete an

18  engagement.

19              After you began working for Parts

20  Authority, did you require any instruction?

21     A.    Yes.

22     Q.    Were you given any instruction?

23     A.    Yes.

24     Q.    Who gave you that instruction?

25     A.    It was Tammie.

**ARBITRATION**

1      Q.     What instruction did Tammie give you

2   once you were hired?

3      A.     Well, he told me that I have to get two

4   day's training.  He set me up with a delivery driver

5   to drive for two days.  And he told me -- she told me

6   that CJ will treat me the right way.

7               ARBITRATOR MASUCCI:  Who is CJ?

8               MS. LUCIO:  That's how they call him.

9        It was a delivery guy that did delivery.  I know

10       him by the nickname CJ.

11              ARBITRATOR MASUCCI:  Okay.  That's his

12       name.  That's all right.

13      Q.     Who was Tammie?

14      A.     Tammie was my warehouse manager.

15      Q.     Did you actually observe Tammie assign

16   CJ to train you for two days?

17      A.     Yes.

18      Q.     Did you actually have two days of

19   training when you first started at Parts Authority?

20      A.     Yes.

21      Q.     Who provided that training?

22      A.     Tammie.

23      Q.     Did you ride along with CJ?

24      A.     Yes.

25      Q.     What were you taught as part of that

**ARBITRATION**

36

1   training?

2          A.    Well, he told me how Tammie wanted to

3   be.  He told me how the delivery is supposed to be

4   done, which way to go to the customers, what papers

5   the customer needed to be signed, and he told me how

6   to -- he basically told me how to do my job.

7          Q.    The fourth bullet point down says:

8   Also, rather I will retain absolute control over the

9   means and methods used to complete an engagement

10  including the selection of which routes to follow.

11               After you started your job, did Tammie

12  treat you like you retained control over the way you

13  performed your job --

14               MR. MARKS:  Objection.

15         Q.    -- or determined delivery routes?

16               MR. MARKS:  Now I object.

17               ARBITRATOR MASUCCI:  Overruled.

18         A.    Yes.  She would tell me.  She would

19  require me to do -- she told me how to do my

20  deliveries, what roles to take, and how fast she

21  wanted me to do the deliveries.  And she also

22  approved my breaks, and sometimes she took away my

23  breaks.

24         Q.    Let me turn to the first page of Joint

25  Exhibit 7, please.  It's numbered, actually, page 2

ARBITRATION

1    at the bottom.

2                 Can you identify this document for us,

3    please?

4          A.    Yes.

5          Q.    What is this document?

6          A.    The operator agreement.

7          Q.    Did you sign this document?

8          A.    Yes.

9          Q.    How did it come about that you signed

10   this document?

11         A.    Fred told me to sign it.

12         Q.    Okay.  When did you sign this document?

13         A.    I signed that document on May 11, 2015.

14         Q.    Was that before or after you began your

15   work for Parts Authority?

16         A.    It was before.

17         Q.    Did Fred give you an opportunity to

18   read this document?

19         A.    No.

20         Q.    Did Fred tell you to hurry up and sign?

21         A.    Yes.

22         Q.    Were you given a copy of this document

23   that we're looking at, the owner operating agreement,

24   to take with you or for your own use?

25         A.    No.

**ARBITRATION**

1          Q.     Paragraph 3D of this document is at the
2     bottom of page 3.  It says:  Should the
3     owner/operator elect to perform services, the
4     operator shall perform the services and in connection
5     therewith shall select the route or routes to be
6     taken.
7                 Did that turn out to be true once you
8     began working for Parts Authority?
9          A.     No.
10          Q.     Why do you say that?
11          A.     Because Tammie was controlling my runs,
12     she was controlling my breaks, she was controlling
13     the way I should take my routes, and she was
14     controlling how fast I was doing my routes.  And she
15     also took -- she approved if I was entitled for break
16     or not.
17          Q.     Did Tammie sometimes give you more than
18     one delivery to take on a route?
19          A.     Yes.
20          Q.     Could you take the deliveries in any
21     way that you wanted?
22          A.     No.
23          Q.     Why not?
24          A.     Because she said I have to do it how
25     she told me to do it.

**ARBITRATION**

39

1          Q.    Would she tell you that one delivery

2    has to go first, one has to go second and so forth?

3          A.    Yes.  She gave me the route, which is

4    like the same order in the routes.

5          Q.    Paragraph 3D also says:  All other

6    matters relating to the services regarding any

7    particular items shall be in the control and the

8    discretion of operator.

9                Once you began working for Parts

10   Authority, did that turn out to be true?

11         A.    No.

12         Q.    Tell us why you say that.

13         A.    Because like I say, Tammie was

14   controlling everything, how fast I was loading my

15   van, how fast I was doing my routes.  And she will

16   call me if I already did my deliveries.  And she

17   would shoot me out if I was like -- she would have

18   told me like you should be here like five minutes

19   ago.  Where are you?

20         Q.    Did she say she was calling you while

21   you were on your deliveries?

22         A.    Yes.

23         Q.    What kind of things was she telling you

24   when she called you while you were on your

25   deliveries?

**ARBITRATION**

40

1          A.      Well, she will told me where I was,

2     what I was doing and why I was taking too long.

3          Q.      Did that happen frequently?

4          A.      Yes.

5          Q.      About how frequently?

6          A.      Several times a day.

7          Q.      Let's go to paragraph 5C of the same

8     document, which is at the bottom of page 4, please.

9     It talks about having to prepare invoices for

10    Diligent.

11              Did that turn out to be true once you

12    began working for Parts Authority?

13         A.      No.

14         Q.      Did you ever have to prepare an invoice

15    for Diligent or Parts Authority to get paid?

16         A.      No.

17              MR. MARKS:  Didn't we ask that before?

18              MR. POTASHNICK:  Sorry with the

19          repetitiveness.  It's going to be very quick

20          here.

21         Q.      Let's turn to a later page of Joint

22    Exhibit 7, which is at page 28 at the bottom.

23              What is this document, please?

24         A.      It's for frequently asked questions.

25         Q.      Did you sign this document?

ARBITRATION

1         A.    Yes.

2         Q.    Why did you sign this document?

3         A.    Because Fred told me that I had to.

4         Q.    Did Fred give you an opportunity to

5    read this document?

6         A.    No.

7         Q.    How did Fred prevent you from an

8    opportunity to read this document?

9         A.    He basically was over me and staring at

10   me while I was, like, trying to look at papers.

11        Q.    What was he saying?

12        A.    He said to hurry up because they need

13   another delivery driver right away.

14        Q.    When did you sign this document?

15        A.    I sign it on May 11, 2015.

16        Q.    Was that at the same time you signed

17   the operator proposal that we looked at and the

18   owner/operator agreement that we looked at?

19        A.    Yes.

20        Q.    Did you sign this document, frequently

21   asked questions, before or after you began your work

22   with Parts Authority?

23        A.    Before.

24        Q.    Were you given a copy of this document,

25   the frequently asked questions?

**ARBITRATION**

42

1          A.     No.

2          Q.     Question 3 in these frequently asked

3    questions says:  How do I get the opportunity to

4    provide delivery services for a client?  By

5    negotiating terms with Diligent for each engagement.

6                 Did you ever negotiate your pay or any

7    other terms of your work with Diligent?

8          A.     No.

9          Q.     Did you ever an opportunity to

10   negotiate your pay or any of the other terms of your

11   work with Diligent?

12         A.     No.

13         Q.     Let's turn to question 10, please.

14                It says:  Will there be any set hours?

15   No.  You will have to complete any engagement that

16   you accept or you will assume liability for not doing

17   so.  You determine and control the number of hours

18   required to complete an engagement.

19                After you began work for Parts

20   Authority, did it turn out to be true that you did

21   not have any set hours of work?

22         A.     No.

23         Q.     Why do you say that?

24         A.     Because Fred and Tammie told me what

25   time I should start working, which was 8 a.m., and

**ARBITRATION**

1    that I have to be there on time, and she doesn't like

2    people to be late, so I have to be there before 8.

3          Q.    Were you given any time that your work

4    day would end?

5          A.    Yes.

6          Q.    Who gave that to you?

7          A.    Fred and Tammie told me that.

8          Q.    What time did they give you as the time

9    your work day would end?

10          A.    I have to be there until 6 p.m. or

11    sometimes after that.  My work would finish like

12    6:45 or 7 p.m.

13          Q.    Why would your work go beyond 6 p.m.?

14          A.    Because they gave me late runs, which

15    is like five minutes to six.  And if I denied those

16    runs, Tammie would chew me out and tell me that I

17    have to take those runs, otherwise Parts Authority

18    would not need me anymore.

19          Q.    Let me turn your attention to question

20    and answer 13 which is on the same page, 29.  It

21    says:  Will Diligent provide me with any written or

22    verbal instructions for the order or sequence in

23    which the services must be performed?  No.  The

24    customer will describe the type of services to be

25    provided.  You will use your experience and

**ARBITRATION**

44

1    background to determine the order and sequence of the

2    services to be provided, including the routes to

3    follow.

4                    After you started work for Parts

5    Authority, did that turn out to be true, that you

6    could determine the order of tasks or the order of

7    deliveries on routes?

8            A.    No.

9            Q.    Why do you say that?

10           A.    Because Tammie would set my routes and

11   told me what routes to take.  And if I take the -- if

12   I take the wrong route, she will call me and say

13   where I was.

14           Q.    What happened after you signed these

15   documents that we've just looked at?

16           A.    Fred told me to go to the warehouse and

17   start working for Parts Authority.

18           Q.    Whose warehouse is that?

19           A.    It's Parts Authority's warehouse.

20           Q.    Who was the manager of that warehouse?

21           A.    It was Tammie.

22           Q.    Where was that Parts Authority facility

23   located?

24           A.    200 Hembree Parkway.

25           Q.    During the weekdays, Monday through

ARBITRATION

1    Friday, what hours did you typically work for Parts

2    Authority?

3              A.    I would work 8 a.m. to 6 p.m. or later.

4              Q.    You told us about why you worked later.

5              A.    Yes.

6              Q.    Who was assigning you to work later?

7              A.    Tammie.

8              Q.    On Saturdays, what hours would you

9    work?

10             A.    On Saturdays I would work 8 a.m. to

11   3 p.m., or we rotate drivers, which is like sometimes

12   drivers have to work until 5, and sometimes it was my

13   turn to work until 5.

14             Q.    About how many hours a week were you

15   working for Parts Authority typically?

16             A.    Typically I was working 50 to 60 hours

17   for the six days.

18             Q.    Were there a couple of weeks where you

19   worked less than 50 hours?

20             A.    Yes.  I was basically working 30 to 40

21   hours a week.

22             Q.    Did you have a supervisor at Parts

23   Authority?

24             A.    Yes.

25             Q.    Who was that?

**ARBITRATION**

1          A.      Tammie.

2          Q.      What was Tammie's job at Parts

3    Authority?

4          A.      She was a warehouse manager.

5          Q.      How often would you communicate with

6    Tammie during the time that you worked for Parts

7    Authority?

8          A.      Every day.

9          Q.      Was it usually just once a day?

10          A.      Several times a day.

11          Q.      Were those communications with Tammie

12    in person, by phone, by text, by E-mail; what

13    methods?

14          A.      She would usually call me and tell me

15    where I was and if I was done with the delivery, and

16    how -- she wanted to be like faster and come back and

17    get more deliveries.

18          Q.      So she would call you while you were

19    out on deliveries?

20          A.      Yes.

21          Q.      So what other kinds of management would

22    Tammie call you about when you were on deliveries?

23          A.      To make sure I was doing the right

24    thing, or she would call me if she needed me to do

25    something else.

**ARBITRATION**

47

1          Q.    If she needed you to do something else,

2    would she reassign you through the phone call?

3          A.    Yes.  Like pick up checks or go to

4    another location and get a check.  Stuff like that.

5                ARBITRATOR MASUCCI:  And pick up

6       another check from a different client?

7                MS. LUCIO:  Yes.

8          Q.    Were there times when deliveries took

9    longer than expected?

10         A.    Yes.

11         Q.    Can you give me examples of what

12   happened?

13         A.    Well, sometimes I have to -- like I

14   say, I have to -- five minutes to 6 they will assign

15   me like a late run, or so I have to take that run and

16   finish later that day.

17               So sometimes if I took longer runs, I

18   mean longer time, it's because either the road was

19   closed and I have to make a U-turn and come back and

20   find another route.  I have to not follow the route

21   because I couldn't go through the same route.  So she

22   will call me and say where are you.  So I have to

23   explain to her what I was doing over there.  So it

24   was kind of frustrating over -- I was working on all

25   the pressure all the time.

**ARBITRATION**

1        Q.    Were you ever chewed out because you
2    didn't take the route that Tammie told you to take?
3        A.    Yes.
4        Q.    While you performed work for Parts
5    Authority, did you communicate with anybody from
6    Diligent?
7        A.    Yes.
8        Q.    Who was that?
9        A.    Fred.
10       Q.    Have you ever spoken to anybody from
11   Diligent other than Fred?
12       A.    No.
13       Q.    About how often was Fred in the Parts
14   Authority shop while you worked there?
15       A.    I saw him a few times only.
16       Q.    About how often did you communicate
17   with Fred during the time you worked for Parts
18   Authority?
19       A.    I would call him like -- maybe on those
20   times I would call him like two times.
21       Q.    What topics did you communicate with
22   Fred about?
23       A.    Because at one point I had a question
24   about why -- because I was like five minutes late
25   that day because I have to drive my daughter to

**ARBITRATION**

1    school.  So she told me you not allowed to take a

2    break today because you were late.  So I was like why

3    not?  So she told me no, you can't.  You have to work

4    the whole shift.  I was like I was concerned about my

5    daughter who was going to go pick her up.  I have two

6    kids.

7              So I called Fred and I say, look Fred,

8    Tammie is taking my breaks away.  Who should I listen

9    to?  So Fred told me like no.  You have to listen to

10   Tammie because Tammie is your boss.  Whatever she

11   say, that's what you have to do.

12             Q.    Did being a delivery driver for Parts

13   Authority require any particular skill?

14             A.    No.

15             Q.    When you were training with CJ for two

16   days, what was CJ telling you to do?

17             A.    He would tell me what to do on the

18   route, and he showed me what papers the customer

19   needed to be signed, and he told me how Tammie wanted

20   to be the job done.  And he showed me which way to

21   get to the customers and give them the parts.  And he

22   showed me how to check the invoice, check with the

23   parts numbers to make sure I delivered the right

24   part.

25             Q.    Was that part of your job to check

**ARBITRATION**

50

1   parts for delivery against invoices to make sure you

2   were delivering the right parts?

3          A.    Yes.

4          Q.    Was it part of your job to obtain

5   customer signatures to verify deliveries?

6          A.    Yes.

7          Q.    Was it part of your job to ask the

8   customers if they had any returns or defects?

9          A.    Yes.  I needed to make sure of that,

10  because otherwise if the customer called Tammie and

11  say I got some returns, Tammie will chew me out and

12  say why didn't you ask the customer for returns.

13              So I was obligated to ask the customers

14  if they have any returns like cords or batteries, or

15  stuff like that that they needed to be credited to

16  their accounts.

17         Q.    Was it part of your job to answer

18  customers' questions or concerns?

19         A.    No.

20         Q.    What were you supposed to do on the job

21  if a customer that you were delivering to had a

22  question or a concern?

23         A.    Well, the customer will ask me

24  questions, and I would call Tammie, and say Tammie,

25  the customer has a question.  Would you talk to them?

ARBITRATION

1            And then Tammie would talk to the

2    customers about the questions that the customer had

3    to Parts Authority.

4            Q.    How did you know you were supposed to

5    get customers' signatures to verify deliveries of

6    products?

7            A.    That's how I was trained to do.

8            Q.    How did you know you were supposed to

9    ask about returns or defects at the customer

10   location?

11           A.    Well that's how CJ trained me to ask

12   questions to the customers.

13           Q.    How did you know you were supposed to

14   get Tammie on the phone if the customer had a

15   question or concern?

16           A.    Because that's how CJ trained me to do.

17           Q.    Were there particular doors that you

18   were supposed to use for deliveries?

19           A.    Yes.

20           Q.    How did you know that?

21           A.    Because CJ told me which door to do my

22   deliveries so I can get a customer signature on the

23   invoice, that way they verified that they got their

24   right part.

25           Q.    How did you know it was part of your

**ARBITRATION**

52

```
 1    job to check parts for delivery against invoices to

 2    make sure you would be delivering the correct parts?

 3           A.    That's how Tammie tell me to do that.

 4           Q.    Work started at 8 a.m.  Did you ever

 5    arrive a little after 8 a.m.?

 6           A.    Yes.

 7           Q.    What did Tammie say to you when that

 8    happened?

 9           A.    Well, she will call me and ask me where

10    I was.  And I should be there -- you know, she would

11    tell me like you should be here by now.  Where are

12    you?

13                 So I have to explain to her that I was

14    dropping off my daughter, and I will be there in a

15    few minutes.

16           Q.    How old was your daughter at the time?

17           A.    She was six.

18           Q.    Did Tammie ever impose any consequence

19    or discipline for being late?

20           A.    Yes.

21           Q.    What was that?

22           A.    She took my breaks away.

23           Q.    Did anyone at Parts Authority keep

24    track of when you began and ended your shifts?

25           A.    Yes.
```

**ARBITRATION**

53

1           Q.      Who was that?

2           A.      Tammie.

3           Q.      How did Tammie do that?

4           A.      She got like a notepad where she was

5     writing all the names of the delivery drivers.

6           Q.      A notepad?

7           A.      Yes.

8           Q.      Did you ever see that notepad?

9           A.      Yes.

10          Q.      What was written on the notepad that

11    you saw?

12          A.      It had all the names that Diligent

13    would send to Parts Authority, and they had the name,

14    and the time in and time out.

15          Q.      Were you one of the delivery drivers

16    whose names and times in and times out you saw on

17    Tammie's notepad?

18          A.      Yes.

19          Q.      Who determined how many days per week

20    you had to work for Parts Authority?

21          A.      Tammie and Fred.

22                  MR. MARKS:  Objection.  Foundation.

23                  ARBITRATOR MASUCCI:  Overruled.  I want

24        to hear it.

25          Q.      Is that something that they told you?

ARBITRATION

54

1          A.     Yes.

2          Q.     When you finished a delivery or a group

3    of deliveries, what were you supposed to do?

4          A.     I had to get back to the warehouse, to

5    Parts Authority warehouse, for more deliveries.

6          Q.     How did you know that?

7          A.     Because that's how I was trained.

8          Q.     By who?

9          A.     By CJ.

10         Q.     If you finished a delivery assigned

11   that would take you after 6 o'clock, could you go

12   home?

13         A.     Yes.

14         Q.     Was that still the case if the delivery

15   was finished before 6 p.m.?

16         A.     If it was close to 6 p.m., I would call

17   Tammie and ask Tammie if it was okay for me to go or

18   come back to the house, but I have to get her

19   approval first.

20         Q.     Could you determine your work schedule

21   at Parts Authority?

22         A.     No.

23         Q.     Why not?

24         A.     Because they told me when I was to

25   start and when I should go home.

**ARBITRATION**

1      Q.     When you say "they," who are you

2   referring to?

3      A.     Tammie.

4      Q.     How did you know where to deliver Parts

5   Authority's products?

6      A.     Well, that's how they trained me to

7   do -- to take all my delivers to the places, and I

8   just had to -- that's how Tammie was training me to

9   do my deliveries.  I would just follow the addresses.

10     Q.     How many deliveries would you make in

11  an average day?

12     A.     I will make six or more, sometimes over

13  that.

14     Q.     Could you determine when you got around

15  to performing your deliveries?

16     A.     No.

17     Q.     How do you know that?

18     A.     Because they had the routes already, so

19  they told me which way and what routes to take.

20     Q.     Okay.  Did Tammie ever tell you how

21  fast you needed to do your deliveries?

22     A.     Yes.  She will call me and ask me where

23  I was and told me that I needed to be back five

24  minutes ago or what I was doing or where I was at.

25     Q.     Could you determine how fast or slow to

**ARBITRATION**

1  load your own vehicle with Parts Authority's

2  products?

3           A.    No.

4           Q.    Why not?

5           A.    Because Tammie was supervising how fast

6  I was loading my car, and she told me to do it quick

7  so that way I can get out with the produce to do the

8  delivery.

9           Q.    Are you familiar with the term hot shot

10 delivery?

11          A.    Yes.

12          Q.    Tell us what a hot shot delivery is.

13          A.    Those are the ones that needs to be

14 done faster, less than an hour.

15          Q.    Were you ever assigned to deliver hot

16 shot deliveries?

17          A.    Yes.

18          Q.    Were you told how fast to deliver those

19 hot shot deliveries?

20          A.    Yes.

21          Q.    Who told you that?

22          A.    Tammie.

23          Q.    Did you comply with Tammie's

24 instructions on how fast to deliver those hot shot

25 deliveries?

**ARBITRATION**

1          A.     Yes.

2          Q.     Could you decide to deliver a product

3     on the next day or the following day?

4          A.     No.

5          Q.     Why not?

6          A.     Because that's not how I was trained.

7     I was supposed to do my deliveries the same day.

8          Q.     Did you ever try to refuse a delivery

9     that Tammie assigned to you?

10         A.     Yes.

11         Q.     What came about?

12         A.     Because sometimes she would give me a

13    total of six or 10 batteries, and I told her that

14    that was overloading my minivan, and that would cause

15    some damage in my car.

16              She would reply me, well, that's what

17    you have to do.  If you don't want to do it, we won't

18    need you anymore.

19         Q.     Did you ever try to refuse a delivery

20    that was assigned to you close to 6 p.m.?

21         A.     Yes.

22         Q.     What was the result?

23         A.     She would say that I needed to take

24    that route, and if she didn't care, it was close to

25    6 p.m.  She say that I needed to take it, otherwise I

**ARBITRATION**

1   can just go home.

2          Q.    By that, was she requiring you to do

3   the delivery?

4          A.    Yes.

5          Q.    Before you left Parts Authority's

6   facility with deliveries, what were you supposed to

7   do?

8          A.    I was supposed to get the invoice, make

9   sure it match the parts with the invoice, and make

10  sure I was taking, like I say, the right part.

11  Otherwise if I want to take the right parts, Tammie

12  would get mad at me because I didn't check the

13  invoice.

14         Q.    Did it ever occur that you left the

15  Parts Authority facility with a wrong part?

16         A.    Yes.

17         Q.    What was the consequence of that?

18         A.    The consequences was that Tammie would

19  chew me out and say you supposed to be checking the

20  produce.  What were you doing?  She would get mad at

21  me.

22              So I had to come back, get the right

23  part and head out again to deliver the right part to

24  the customer, and she would, like, get mad at me

25  because I didn't check the part.

1      Q.    Did Tammie ever observe you checking to
2   make sure that the parts were correct before leaving
3   for deliveries?
4      A.    Yes.
5      Q.    Did she ever try and stop you from
6   doing that?
7      A.    No.  Never.
8      Q.    What were you supposed to do when you
9   arrived at each delivery location?
10      A.    I supposed to get there and get -- get
11   the parts to the customers and make sure they sign
12   the invoice and verify -- like they verify me that
13   they got the right part.
14      Q.    How did you know to do that?
15      A.    Well, that's how Tammie and CJ trained
16   me to do.
17      Q.    What is a packing slip or invoice?
18      A.    An invoice where it has the part number
19   and what part needs to be delivered, and it has the
20   address where I'm supposed to be delivering the parts
21   and the quantity of how many parts there were, and it
22   has the address of the customers.
23      Q.    Let me turn your attention to Joint
24   Exhibit 1 please, which is just a one-page exemplary
25   document.

**ARBITRATION**

60

1                   Can you identify that document for us?

2          A.    Yes.

3          Q.    Is that a document you worked with at

4    Parts Authority?

5          A.    Yes.

6          Q.    What is that document?

7          A.    Invoice.

8          Q.    Is that the type of document you would

9    check against the parts that were prepared for you to

10   deliver?

11         A.    Yes.

12         Q.    Did Tammie require you to do anything

13   that wasn't part of Parts Authority's work?

14         A.    Yes.

15         Q.    What did she require you to do?

16         A.    She would make me get her lunch.  She

17   would like get hungry and say can you get me my

18   lunch.  Sometimes I have to make a special delivery

19   just to get her lunch.

20         Q.    Did Tammie require you to mail her

21   letters?

22         A.    Yes.  She would say can you take this

23   to the post office, and I will say yes.

24         Q.    All right.  Did you look at the

25   letters?

**ARBITRATION**

61

1        A.    Yeah.  It was her personal mail.

2        Q.    It wasn't Parts Authority envelopes?

3        A.    No.

4        Q.    Who was Tammie's assistant?

5        A.    It was Monica.

6        Q.    What was Monica's position at Parts

7   Authority?

8        A.    She was a supervisor and dispatcher.

9   They call her dispatcher.  She give the runs and

10   like, of course, it was Tammie next to Monica all the

11   time.  She was keeping an eye on everything.

12        Q.    Did Monica ever require you to do

13   anything that wasn't work related?

14        A.    Yes.

15        Q.    What did she require you to do?

16        A.    One time she told me that her car

17   needed some tires.  She asked me to go get her some

18   tires.  So I drove her car to Tire Plus, went and got

19   her tires, and wait for them to install the tires,

20   and then I came back again with her car, park it, and

21   then I say okay.

22              After that she got mad at me because

23   even though I did her a favor, she was complaining

24   because I took too long.  You know, it was like what

25   is this.  Why is she doing this to me?

**ARBITRATION**

1      Q.    What did Tammie tell you about whether

2  you can or can't use your cell phone in Parts

3  Authority's facility?

4      A.    She told me not to use it.

5      Q.    Did you comply with that rule the best

6  you could?

7      A.    I think the best I could.

8      Q.    Did you ever ask Tammie to make

9  telephone calls from Parts Authority's facilities on

10  your cell phone?

11      A.    Yes.

12      Q.    What would be her responses?

13      A.    She would say no.

14      Q.    What kind of situations came up that

15  caused you to ask Tammie for permission to make

16  calls?

17      A.    Sometimes I receive a call from the

18  school about my daughter, and I have to take the

19  phone call.  Whether she like it or not, I needed to

20  talk to see what was wrong with my daughter.

21      Q.    Did you tell Tammie that was the reason

22  you needed to make the phone call?

23      A.    Yes.

24      Q.    What was her response?

25      A.    She say I was not allowed, but I

**ARBITRATION**

1    already done it.

2             Q.    Did Tammie ever discipline you?

3             A.    Yes.

4             Q.    She disciplined you for doing what?

5             A.    How fast I was doing my deliveries.

6    Like she would say you supposed to do it faster, and

7    you supposed to be here like five minutes ago, and

8    she would -- she would like take away my breaks by

9    not doing what she told me to do.

10            Q.    Did she ever discipline you for

11   arriving late to work?

12            A.    Yes.

13            Q.    What was the discipline?

14            A.    She would take my breaks away.  She say

15   you late, so you not entitled to it.

16            Q.    Typically, about how many days a week

17   would Tammie take away your breaks?

18            A.    Two times.

19            Q.    Did Tammie ever criticize you for your

20   work performance?

21            A.    Yes.

22            Q.    What did she criticize you about?

23            A.    She criticized me for taking too long

24   on my runs, for not doing her -- what she requires me

25   to do, and she would criticize me for taking too long

1  on my runs.  She would criticize me for being late,

2  and she also took my breaks away.

3         Q.    Did you ever ask Tammie for breaks from

4  work?

5         A.    Yes.

6         Q.    What did you ask Tammie for those

7  breaks for so that you could do it?

8         A.    Well, I used my breaks to go pick up my

9  son because my son had like anxiety, panic attacks

10  and depression.  So I usually asked Tammie if I could

11  see my son on my breaks and make sure my son was

12  doing okay.  So she say it's not my problem.  You

13  can't go.

14         Q.    Did Tammie ever deny you a break from

15  work when you requested it?

16         A.    Yes.

17         Q.    About how often would she deny you a

18  break from work when you asked?

19         A.    Twice.  Two times a week or more.

20         Q.    Did Parts Authority keep track of your

21  deliveries?

22         A.    Yes.

23         Q.    How did it do that?

24         A.    They had a computer.

25         Q.    Who was Tammie's boss?

**ARBITRATION**

65

1           A.      It was Mr. Glen.

2           Q.      About how many times did you actually

3    see Glen?

4           A.      I just saw him like a few times.

5           Q.      Did you ever spend any considerable

6    amount of time with Glen?

7           A.      No.

8           Q.      Did you ever have a conversation with

9    Glen?

10          A.      No.

11          Q.      Did Parts Authority provide you a

12   vehicle to use to make deliveries?

13          A.      No.

14          Q.      So whose vehicle did you drive to

15   perform those deliveries?

16          A.      My car, my minivan.

17          Q.      What make and model is that?

18          A.      It's a 2010 Dodge Caravan.

19          Q.      About how many total miles did you

20   drive your 2010 Dodge Caravan for Parts Authority?

21          A.      Like 12,000.

22          Q.      What do you base that on?

23          A.      On the mileage that I was driving a

24   day.

25          Q.      Did any manager or supervisor from

**ARBITRATION**

```
 1    Parts Authority ever observe your Dodge Caravan?

 2            A.    Yes.

 3            Q.    Who was that?

 4            A.    Tammie.

 5            Q.    Did Tammie tell you that your Dodge

 6    Caravan was not appropriate for deliveries of Parts

 7    Authority's products to its customers?

 8            A.    No.

 9            Q.    Did Tammie ever indicate that she was

10    pleased that you had such a large vehicle?

11            A.    Yes.

12            Q.    What did she tell you about that?

13            A.    She say it was more convenient, so that

14    way she can put like 10 batteries in my van and

15    sometimes load it up with a lot of stuff, like car

16    parts.  And because it was long, the rack and pinions

17    fit perfect, because I had to put all the seats down,

18    and I will put the rack and pinion in my minivan.

19            Q.    Did Parts Authority provide you with a

20    gasoline card to pay for the gas you used to make

21    deliveries?

22            A.    No.

23            Q.    Did Parts Authority ever ask you how

24    much you were spending on your car to perform your

25    job?
```

1          A.     No.

2          Q.     Did Parts Authority ever ask you to

3    turn in a receipt so you could get reimbursed for any

4    vehicle cost?

5          A.     No.

6          Q.     Did Parts Authority ever ask for any

7    receipt?

8          A.     No.

9          Q.     Did Parts Authority give you a car

10   allowance?

11         A.     No.

12         Q.     Did Parts Authority ever reimburse you

13   for any vehicle cost?

14         A.     No.

15         Q.     Did Parts Authority record your

16   odometer mileage?

17         A.     Yes.

18         Q.     Who at Parts Authority recorded your

19   odometer mileage?

20         A.     Tammie would go in my car and check it

21   out and see how many miles I was driving that day.

22         Q.     Was Tammie writing it down?

23         A.     I'm not sure of that.

24         Q.     How often would Tammie look at your

25   odometer in your car?

**ARBITRATION**

68

1        A.    Maybe two or three times a week.

2        Q.    Did you drive your Dodge Caravan for

3   personal reasons also during the time you drove it

4   for Parts Authority?

5        A.    Yes.

6        Q.    Was most of your driving during that

7   time for Parts Authority or for personal reasons?

8        A.    It was more for Parts Authority than

9   personal reasons.

10        Q.    Did you have any other job at the time

11   you worked for Parts Authority?

12        A.    No.

13        Q.    Roughly, about what percentage of your

14   driving during the time you worked for Parts

15   Authority was for Parts Authority?

16        A.    It was basically like 95 percent, and

17   5 percent out of my own time.

18        Q.    Okay.  Who did the Dodge Caravan belong

19   to?

20        A.    It was me and my husband.

21        Q.    So it's your marital property?

22        A.    Yes.

23        Q.    Did you have to buy gas to perform your

24   job for Parts Authority?

25        A.    Yes.

**ARBITRATION**

69

1          Q.    Did you have to pay for oil changes to
2     perform your job for Parts Authority?

3          A.    Yes.

4          Q.    Did you have to pay for other
5     maintenance of the vehicle to perform your job for
6     Parts Authority?

7          A.    Yes.

8          Q.    Did you have to pay for repairs on the
9     vehicles -- on your vehicle to perform your job for
10    Parts Authority?

11         A.    Yes.

12         Q.    Did you have to pay taxes, license and
13    registration fees on that vehicle so you could use it
14    for Parts Authority?

15         A.    Yes.

16         Q.    Did you have to pay for insurance so
17    you could drive for Parts Authority?

18         A.    Yes.

19         Q.    Do you believe that your car was
20    depreciating or losing value as you drove it for
21    Parts Authority?

22              MR. MARKS:  Objection.

23         A.    Yes.

24              ARBITRATOR MASUCCI:  On what basis?

25              MR. MARKS:  A belief is not any kind of

**ARBITRATION**

 1      fact in this case.

 2                ARBITRATOR MASUCCI:  Overruled.

 3           Q.    Do you think that you had higher car

 4      expenses than the average driver while you drove for

 5      Parts Authority?

 6                MR. MARKS:  Objection.  Foundation.

 7                ARBITRATOR MASUCCI:  Overruled.

 8           A.    Yes.

 9           Q.    Can you explain why?

10           A.    Because it was -- it was a lot of

11      driving and a lot of stopping.  It was a lot of

12      turning.  It was a lot of turning on and off my

13      engine, and it was a lot of, you know, gas that I

14      have to use.  And also, you know, it was a bigger car

15      than most cars.  It was a minivan.

16           Q.    Let's turn to document 8 in the Joint

17      Exhibit folder, please.

18                What is that document?

19           A.    It's the pay stuff.

20           Q.    Is it a summary of your pay at Parts

21      Authority?

22           A.    Yes.

23           Q.    To the best of your knowledge, do you

24      believe that that document is correct?

25           A.    No.

**ARBITRATION**

71

1      Q.    You think it's incorrect?

2      A.    Yes, it's correct.

3            MR. MARKS:  I'm sorry.  Which is it;

4      correct or incorrect?

5            MS. LUCIO:  It's correct.

6            ARBITRATOR MASUCCI:  This says

7      Diligent.  The paystubs were from Diligent or

8      Parts Authority?

9      A.    It's Diligent.

10     Q.    That was my next question.  Okay.

11           Did you have regular pay days while you

12     worked for Parts Authority?

13     A.    Yes.

14     Q.    When were you paid?

15     A.    I was paid every 5th and every 20 or

16     every month.

17     Q.    Did that correspond to the pay periods

18     of the first half of the month and the last half of

19     the month?

20     A.    Yes.

21     Q.    How much were you supposed to be paid

22     per half month?

23     A.    I was supposed to get paid $1,150.

24     Q.    Did you ever receive $1,150 per half

25     month?

**ARBITRATION**

72

1          A.     No.

2          Q.     Were there half months that you worked

3     every day from Monday to Saturday?

4          A.     Yes.

5          Q.     Were you ever paid overtime wages while

6     you worked at Parts Authority?

7          A.     No, never.

8          Q.     While you worked at Parts Authority,

9     did you depend on your income from Parts Authority to

10    meet your living expenses?

11         A.     Yes.

12         Q.     Did you ever try to take a day off from

13    work from Parts Authority?

14         A.     Yes.

15         Q.     Who was the first person you asked to

16    take a day off?

17         A.     I have to ask Tammie.

18         Q.     What would be Tammie's responses?

19         A.     She would say she approve it if Fred

20    was okay with that.

21         Q.     Did you ask Fred for days off?

22         A.     Yes.

23         Q.     What did Fred tell you?

24         A.     Fred told me that I have to ask Tammie

25    because Tammie was my boss.

**ARBITRATION**

73

1          Q.     Did Fred or Tammie ever deny you a day

2    off from work?

3          A.     Yes.

4          Q.     Was it Fred or Tammie?

5          A.     It was Tammie.

6          Q.     What reason did she give you for

7    denying you a day off?

8          A.     Because I needed to stay with my son,

9    which was suffering with anxiety, panic attacks and

10   depression, and they deny me for that.

11         Q.     What did she tell you when she denied

12   you?

13         A.     She say that's not her problem, that

14   she doesn't care.

15         Q.     Did you ever form any business entity,

16   like a corporation or limited liability company, to

17   perform deliveries for Parts Authority?

18         A.     No.

19         Q.     Did you ever form any business entity

20   like a corporation or limited liability company to

21   perform any work?

22         A.     No.

23         Q.     Did you ever advertise your services as

24   Parts Authority's delivery driver?

25         A.     No.

**ARBITRATION**

74

1          Q.     Did you ever advertise your services as
2     a delivery driver of any kind?
3          A.     No.
4          Q.     Did you ever acquire and maintain any
5     inventory of auto parts that you owned or managed?
6          A.     No.
7          Q.     Were you responsible for acquiring or
8     maintaining Parts Authority's inventory?
9          A.     No.  Just delivering parts.
10         Q.     Did you ever rent commercial space to
11    maintain any inventory of parts?
12         A.     No.
13         Q.     Have you ever rented any commercial
14    space for any reason?
15         A.     No.
16         Q.     Could you hire an assistant to perform
17    your deliveries at Parts Authority?
18         A.     No.
19         Q.     Why not?
20         A.     Because it was already in low money
21    that I couldn't afford paying somebody else to do the
22    job.
23         Q.     Did you count on that money to meet
24    your living expenses?
25         A.     Yes.

**ARBITRATION**

75

1          MR. MARKS:  Objection.

2          ARBITRATOR MASUCCI:  It's asked and

3     answered.

4          MR. MARKS:  I will be quicker and

5     bolder next time.

6          ARBITRATOR MASUCCI:  There is some

7     repetition.  I've been allowing it, but just be

8     mindful.

9          MR. MARKS:  It's argumentative to put

10     those two questions together.

11     Q.    When you worked for Parts Authority,

12  did you manage or supervise anyone else?

13     A.    No.

14     Q.    Did any of the Parts Authority's other

15  delivery drivers that you worked with in Roswell,

16  Georgia manage or supervise anybody else?

17     A.    No.

18          MR. MARKS:  Foundation.

19          ARBITRATOR MASUCCI:  Overruled.

20     Q.    Did you make profits or wages from

21  working at Parts Authority?

22     A.    Just wages.

23     Q.    Did anybody at Parts Authority or

24  Diligent ever tell you to try to obtain more business

25  from Parts Authority's customers?

**ARBITRATION**

1           A.     No.

2           Q.     Was it part of your job at Parts

3    Authority to try and obtain more business from Parts

4    Authority's customers?

5           A.     No.

6           Q.     Could you perform any other work or

7    jobs while you were working for Parts Authority?

8           A.     No.

9           Q.     Why not?

10          A.     Because Parts Authority was consuming

11   most of my time.  I was there like 8 a.m. to 6 p.m.,

12   so I couldn't do nothing else.

13          Q.     Did you have to wear a uniform shirt

14   for Parts Authority?

15          A.     Yes.

16          Q.     Who gave you that shirt?

17          A.     Fred.

18          Q.     Who told you to wear that shirt?

19          A.     Tammie.

20          Q.     Did you ever try to wear a different

21   shirt to work?

22          A.     Yes.

23          Q.     What happened?

24          A.     She would get mad at me.

25          Q.     What would she tell you?

**ARBITRATION**

77

1          A.    She would say I was not allowed to wear
2     other than the uniform.
3          Q.    What did the shirt say?
4          A.    It says Diligent.
5                ARBITRATOR MASUCCI:  The shirt said
6          Diligent?
7                MS. LUCIO:  Diligent.
8          Q.    Did Parts Authority have its own
9     delivery drivers who were not hired through Diligent?
10         A.    Yes.
11         Q.    What differences in the job did you
12    observe between the delivery drivers hired through
13    Diligent and Parts Authority's own delivery drivers?
14         A.    Well, they wore a different shirt, and
15    also they put parts, like they put them on the
16    shelves, and also they do a little bit of cleaning.
17         Q.    Other than that, did you observe any
18    other differences in treatment between the delivery
19    drivers there for Diligent, and the delivery drivers
20    that worked for Parts Authority as W2 employees?
21         A.    No.
22         Q.    Was there any difference in the way
23    Tammie supervised the two sets of delivery drivers,
24    those through Diligent and Parts Authority's own
25    delivery drivers?

**ARBITRATION**

78

1          A.      No.

2          Q.      About how many Parts Authority's own

3   delivery drivers worked at the Roswell Parts

4   Authority location when you worked there at any time?

5          A.      Only two.

6          Q.      About how many Diligent drivers worked

7   at the Roswell Parts Authority location when you

8   worked there?

9          A.      We were like five.

10         Q.      Whose vehicles were Parts Authority's

11  own delivery drivers driving to perform their

12  deliveries?

13         A.      Their own cars.

14         Q.      How do you know that?

15         A.      Because they drove in with their cars,

16  and I see them taking deliveries on their own car.

17         Q.      Before October 22, 2015, had you ever

18  asked for time off to be with your children?

19         A.      Yes.

20         Q.      About how old was your son at the time

21  you worked for Parts Authority?

22         A.      My son was 16 years old.

23         Q.      Well, who did you ask for time off?

24         A.      Tammie.

25         Q.      What was her response?

**ARBITRATION**

79

1          A.     She say she didn't care, because I

2    needed her to give me my breaks because I usually --

3    on my breaks, I usually go pick up my son from

4    school.  And because of his depression and anxiety, I

5    used to like pick him up from school, take him home,

6    drop him off, make sure he was safe, and then just

7    drove back to the Parts Authority location and start

8    working my day, and continue with my day, and then --

9    but I had peace of mind that my son was okay.

10               But when she didn't give me those days,

11   those breaks, I was basically stressful thinking how

12   my son was doing, how he was like -- how he was doing

13   over there by himself.  And he was like calling me

14   mom, where are you, what are you doing, when are you

15   coming and get me.  So I was like just calm down, and

16   I'll be there soon.  I didn't get a break today, but

17   I will pick you up as soon as I can.

18               So I was like -- my son was like

19   talking to me all the time, but Tammie did not allow

20   me to go get my son.

21         Q.     Do you want just a minute?

22         A.     (Nodding)

23               ARBITRATOR MASUCCI:  Take your time.

24               (At this time, a brief recess was

25       taken.)

**ARBITRATION**

1                    CONTINUED EXAMINATION

2    BY MR. POTASHNICK:

3         A.    I'm fine.

4         Q.    Did you ever ask not to work on a

5    Saturday?

6         A.    Yes.

7         Q.    Why did you ask not to work on a

8    Saturday?

9         A.    Because one day I was working there on

10   Saturdays, and it was only -- it was guys there

11   working that day, and I was the only girl.

12              Tammie usually took weekends off, and

13   Tammie was not there.  So I was the only woman there

14   working.  I took a delivery, come back, and the guys

15   were doing drugs in the warehouse.  So I was like --

16   when I got in and drop off the invoice that they gave

17   me to do the delivery, the house was full of smoke.

18   They were doing drugs.

19              So I got scared.  So I went in, in the

20   car and sit down until I get another delivery.  I

21   didn't want to deal with them.  So I just went and

22   sit down in my car until maybe something else come up

23   that day, that Saturday, that day that I worked.  I

24   was just taking deliveries.

25        Q.    Were those guys in the warehouse acting

**ARBITRATION**

81

1   the same or different than usual?

2          A.     No.   They were acting crazy.

3          Q.     Who did you ask not to work on

4   Saturdays?

5          A.     I will ask Tammie.

6          Q.     What was Tammie's response?

7          A.     She say that she didn't give me

8   Saturdays off.  She say no.

9          Q.     What did Tammie tell you to do?

10          A.     That day -- when that happened

11   Saturday, I went on Monday to work.  I talked to

12   Tammie about the situation that was there on

13   Saturday.  So that's why I asked her to be off

14   Saturdays.  But she didn't allow it.

15          Q.     What did Tammie tell you to do with the

16   information that you had learned when you returned to

17   the warehouse on Saturday?

18          A.     She told me that she would take care of

19   the matter, and she asked me to -- she told me to

20   talk to HR about what happened on Saturday.

21          Q.     Did the delivery drivers in the

22   warehouse that were doing the drugs work for Parts

23   Authority directly, or for Diligent, or both?

24          A.     They were working for Parts Authority

25   and Diligent.

**ARBITRATION**

82

1          Q.      Both?

2          A.      Both.

3          Q.      Did you speak to Parts Authority's HR

4    about what happened in the warehouse?

5          A.      Yes.

6          Q.      What did Parts Authority's HR

7    representative tell you would be done?

8          A.      She said she told me that she would

9    take care of the matter and just let her take care of

10   the matter.  She just wanted me to explain what

11   happened that day.

12         Q.      Did she take care of the behavior of

13   just the Parts Authority delivery drivers who were

14   doing the drugs or all of the delivery drivers who

15   were doing the drugs?

16         A.      She will take care of everybody that

17   was doing that.

18         Q.      Was there any other drug use in the

19   warehouse that you saw after that?

20         A.      No.

21         Q.      Did you ever see the Parts Authority --

22   I'm sorry -- the Diligent delivery driver who was

23   involved in the drug use doing drugs in the workplace

24   after that?

25         A.      No.

1          Q.     How did your employment with Parts

2     Authority end?

3          A.     Well, one night my daughter got an

4     asthma attack.  So I rush her to the hospital so she

5     can be seen by the doctor.  So we stay there until

6     like 4 a.m. in the morning.  And then I just, I

7     called in the morning before -- before 8.  I called

8     Tammie and I asked Tammie, I can't work today.  My

9     daughter was in the hospital.  She had an asthma

10    attack, and I needed to be with her.  And she -- she

11    told me that I couldn't do it because either like she

12    say I had too many problems, that she give me a

13    choice, either continue working for Parts Authority

14    or choose my family.  I just say well, I choose my

15    family, because my daughter needed me that day.

16         Q.     Did you call Fred after that?

17         A.     Yes.

18         Q.     Did you tell Fred what had happened?

19         A.     Yes.

20         Q.     Did Fred give you a choice?

21         A.     He told me that it was Tammie, and that

22    he would have nothing else to say to me.  That

23    Tammie -- you know, Tammie tell me that, you know,

24    either choose my family or the job, so he had no

25    problem with that.  So I resigned.

ARBITRATION

84

1          Q.     Did you still have any Parts Authority

2    parts when you resigned?

3          A.     Yes.

4          Q.     What parts were those?

5          A.     I had a battery in my car, a car

6    battery.

7          Q.     Did you tell somebody that you still

8    had that battery?

9          A.     Yes.

10          Q.     Who did you tell?

11          A.     Fred.

12          Q.     What did Fred tell you to do about that

13    battery?

14          A.     Fred told me to take it to the

15    warehouse, to the Parts Authority's warehouse and to

16    drop it off and just leave from there.

17          Q.     Did he tell you when to do that?

18          A.     Yeah.  He told me to do it the same

19    morning.

20          Q.     Is that what you did?

21          A.     Yes, I did.

22          Q.     Did you ever see Tammie terminate a

23    delivery driver working through Diligent?

24          A.     Yes.

25          Q.     Who was that?

**ARBITRATION**

85

1          A.    CJ.

2                MR. POTASHNICK:  That's all subject to

3          redirect.

4                ARBITRATOR MASUCCI:  So why don't we

5          take a break.

6                (At this time, a brief recess was

7          taken.)

8                    CROSS EXAMINATION

9    BY MR. MARKS:

10         Q.    Miss Lucio, before you began providing

11   delivery services to Parts Authority, you were a

12   delivery driver; is that right?

13         A.    Yes.

14         Q.    And you were a delivery driver for a

15   competitor company called ATS; right?

16         A.    Yes.

17         Q.    What does that stand for?

18         A.    Auto Tech Supply.

19         Q.    How long had you had that job as of May

20   of 2015?

21         A.    I had it for like a year.

22         Q.    A year.  And when you met with Fred on

23   May 11th, 2015, you still had that job; right?

24         A.    Yes.

25         Q.    So when you testified on direct

**ARBITRATION**

86

1  examination that you needed a job when you were

2  meeting with Fred, that's not really true.  You had a

3  job; correct?

4          A.    Well, I wanted to see if Parts

5  Authority would pay me more, and I wanted to see if I

6  would get more allowances to support my family.

7          Q.    Okay.  Then did you ask when you met

8  with Fred to pay you more?

9          A.    No.

10         Q.    Wasn't that your intention, to go to

11  try to get more?

12         A.    I guess 1,150 would look good in a

13  piece of paper, so I didn't negotiate anything with

14  him.  I didn't say anything about the amount that he

15  told me to write down on the agreement.

16         Q.    You made it sound on direct like you

17  were compelled with Fred, and you didn't have any

18  time, and he was rushing you, but you testified at

19  deposition that he didn't rush you; didn't you?

20         A.    He was staring at me.  He was like --

21  it was a desk, and he was in front of me, and he was

22  staring at me and told me to hurry up because they

23  needed a delivery driver.

24         Q.    I'm sorry.  He told you to hurry up?

25         A.    Yes.

**ARBITRATION**

87

1          Q.    You didn't testify to that at the
2     deposition either; did you?
3          A.    That's why I'm telling you now.
4          Q.    I asked you the question at deposition,
5     and you said you didn't say anything.
6          A.    I may not understand you that day.
7          Q.    Is there anything else in your
8     deposition, because I don't want to go through this
9     all day?  When I ask you a question now and it's
10    different, that you then say I didn't understand you.
11              Have you read your deposition lately?
12         A.    No.
13         Q.    You didn't read it to prepare for this
14    hearing?
15         A.    No.
16         Q.    Have you ever read it?
17         A.    No.
18         Q.    Thinking back then, let's start that
19    way, when I took your deposition, which was on
20    October 23 of 2018, is there any other question that
21    I asked you that you think was confusing to you then
22    that you would testify differently now?
23         A.    I probably was tired.
24         Q.    You were probably tired?
25              MR. MARKS:  Let me interject an

**ARBITRATION**

1      objection about occurred several months ago and

2      many of them, that's entirely an unfair

3      question.

4                ARBITRATOR MASUCCI:  Why don't you ask

5      the questions that are pertinent.

6      Q.    Your meeting with Fred lasted about an

7  hour, didn't it?

8      A.    No.

9      Q.    Again, you testified back in October

10 that it lasted an hour.  Which was it?  How long did

11 it last?

12     A.    He basically told me to sign it and

13 told me that they needed another delivery driver, so

14 he sent me to Parts Authority.

15     Q.    How long did your meeting last?

16     A.    Less than an hour.

17     Q.    How much less than, 59 minutes?

18     A.    Maybe 35 minutes.

19     Q.    If you testified it lasted an hour back

20 in October, now you're changing that testimony?

21                MR. POTASHNICK:  Let me object here.

22     He's not showing her any testimony.

23                MR. MARKS:  Do you want me to?  I can

24     waste my time.

25                MR. POTASHNICK:  I believe it assumes

**ARBITRATION**

1          facts not in evidence.

2                    MR. MARKS:  You have the deposition.

3                    ARBITRATOR MASUCCI:  Okay.  To the

4          extent that there was a difference in the

5          testimony, you just identify what the difference

6          is, or show it to refresh her recollection.

7                    MR. MARKS:  I can do it that way, the

8          standard litigation way.

9                    ARBITRATOR MASUCCI:  Do you have two

10         copies of it?

11                   MR. MARKS:  I do.

12                   ARBITRATOR MASUCCI:  I will give this

13         to her.

14                   MR. MARKS:  She's probably the youngest

15         person here, so probably her vision would be

16         better.  It's the same thing, it's just a

17         Min-U-Script versus a larger one.

18                   Do you want one, gentleman?

19                   MR. FREI-PEARSON:  We have it.

20         Q.    So what I'm showing you is the

21    deposition that we took back in October.  Okay?  Let

22    me direct your attention to page 24, lines 6 and 7.

23                   Question:  How long did you meet with

24    Fred?  Answer:  It was just like an hour.

25                   A.    Mm-hmm.

ARBITRATION

90

1          Q.      Was it an hour or a half hour?

2          A.      It was less than an hour.

3          Q.      Was it closer to an hour or closer to a

4     half hour?

5          A.      It was closer to an hour.

6          Q.      This meeting that you had with Fred

7     and -- do you know him as Fred or do you know him as

8     Mr. Rosenau?

9          A.      Fred.

10         Q.      You called him Mr. Fred, so I'll use

11    that.  We're talking about Fred Rosenau.

12                 That meeting took place in Mr. Fred's

13    office; correct?

14         A.      Yes.

15         Q.      Not in a Parts Authority facility;

16    right?

17         A.      No.

18         Q.      There was no Parts Authority symbols in

19    the office; correct?

20         A.      No.

21         Q.      Not even a Parts Authority coffee mug;

22    right?

23         A.      No.

24         Q.      Fred asked you about your delivery

25    experience at ATS; correct?

**ARBITRATION**

91

1          A.    Yes.

2          Q.    You told him and represented to him

3     that you knew how to be a delivery driver; correct?

4          A.    Yes.

5          Q.    When you had a meeting with Fred, you

6     discussed with him an opportunity to perform services

7     at Parts Authority; yes?

8          A.    No.

9          Q.    You didn't discuss Parts Authority?

10          A.    No.  He just send me the paperwork and

11     told me to sign it.

12          Q.    You signed it with no idea what it was

13     that you were going to be asked to do?

14          A.    Because like you say, you say I have

15     experience doing delivery.  So I was assuming that,

16     you know, driving as a delivery driver was going to

17     be the same thing, you know.

18          Q.    My question was a little different.

19     Let me rephrase it.

20          A.    Okay.

21          Q.    When you met with Fred, were you

22     discussing an opportunity for you to do delivery

23     services at Parts Authority?

24          A.    When I meet with Fred, he just give me

25     the paperwork and told me to sign it so I can go work

**ARBITRATION**

1    for Parts Authority that same day.

2              Q.    So you were discussing Parts Authority?

3              A.    He just told me that.

4              Q.    Diligent has other customers.  You

5    weren't discussing those; right?

6              A.    No.

7              Q.    Just Parts Authority?

8              A.    Just Parts Authority.

9              ARBITRATOR MASUCCI:  Can I ask a

10        question?

11             In your direct testimony you said your

12        brother-in-law told you there was a job at Parts

13        Authority to go visit --

14             MS. LUCIO:  Yes.

15             ARBITRATOR MASUCCI:  -- Fred.

16             MS. LUCIO:  He gave me the phone number

17        of Fred, and I call him.

18             ARBITRATOR MASUCCI:  So you

19        specifically went to see Fred about a job at

20        Parts Authority; is that correct?

21             MS. LUCIO:  Yes.

22             Q.    Your brother-in-law Renan was a Parts

23   Authority -- provided services for Parts Authority?

24             A.    Yes.

25             Q.    Through Diligent; right?

**ARBITRATION**

93

1          A.     Yes.

2          Q.     And he had told you, your

3   brother-in-law did, that the delivery for Parts

4   Authority was similar to your deliveries at ATS;

5   correct?

6          A.     Yes.

7          Q.     And by that, you understood that you

8   were going to be offered or discuss a position as an

9   independent owner/operator through Diligent; correct?

10          A.     Yes.

11          Q.     And you know what that is because prior

12   to ATS, you were an employee of Maids; correct?

13          A.     Yes.

14          Q.     A W2 employee?

15          A.     Yes.

16          Q.     And when you went to ATS, you were an

17   independent owner/operator and got a 1099 form;

18   correct?

19          A.     Yes.

20          Q.     And filed income taxes in 2014 as an

21   independent owner/operator; correct?

22          A.     Yes, because they gave me the 1099.

23          Q.     Were you paid directly by ATS, or were

24   you paid by subcontracting concepts?

25          A.     It was another company.

**ARBITRATION**

94

1        Q.    And you signed a contract similar to

2   the contract you had with Diligent?

3        A.    Yes.  But the only thing, I had more

4   freedom over there.

5        Q.    No question pending.

6              ARBITRATOR MASUCCI:  Your lawyer will

7      ask you to clarify it.

8        Q.    On your 2014 tax return, you described

9   the nature of your business as delivery service;

10  correct?

11       A.    Yes.

12       Q.    After you left, stopped driving for

13  Diligent, you went back to being an independent

14  owner/operator for ATS; correct?

15       A.    No.

16       Q.    You didn't go back to ATS?

17       A.    No.

18       Q.    When I asked you at your deposition,

19  did you not testify that you went back to ATS?

20       A.    No.  I went and worked as a painter,

21  and then I worked for maybe three months, and then I

22  went back to ATS.

23       Q.    Okay.  So you didn't go directly back

24  to ATS.  There was a little interruption in that

25  period --

**ARBITRATION**

95

1              A.      Yes.

2              Q.      -- and then you became, went back to

3      ATS as an owner/operator driver?

4              A.      Yes.

5              Q.      So in 2015, you earned income from ATS

6      as an owner/operator; yes?

7              A.      Well, they gave me the 1099.

8              Q.      I will ask it again.  In 2015, you

9      earned income from ATS as an owner/operator; yes?

10             A.      Yes.

11             Q.      You filed that combined with the income

12     that had been paid to you by Diligent on your 2015

13     tax return; correct?

14             A.      Yes.

15             Q.      And you have an accountant do that for

16     you; yes?

17             A.      Yes.

18             Q.      Was it a good accountant?

19             A.      Excuse me?

20             Q.      Was it a good accountant?

21             A.      I don't know.

22             Q.      Do you think that your accountant

23     sought to maximize your offsets against your income

24     for purposes of determining your profits and losses

25     of the operation of your business?

**ARBITRATION**

96

1           MR. POTASHNICK:  Objection.  Calls for

2       speculation.

3           A.    I didn't make any promise.  I just made

4    wages.

5           ARBITRATOR MASUCCI:  Why don't you

6       rephrase the question.

7           MR. MARKS:  Sure.

8           Q.    On your 2015 tax return you reported

9    income from ATS as well as from Parts Authority;

10   correct?

11          A.    Yes.

12          Q.    And against that income on a Schedule

13   C, you took expenses based upon your services -- the

14   cost of providing services in that business for both

15   ATS and Diligent; correct?

16          A.    Yes.

17          Q.    My question was whether you think that

18   the estimation of your expenses incurred in operating

19   that business in 2015 was a fair estimate of the

20   expenses you incurred?

21          A.    No.

22          Q.    It was high or low or what?

23          A.    It was low.

24          Q.    So your accountant underreported your

25   expenses?

**ARBITRATION**

97

1          A.     I don't understand your question.

2          Q.     Do you think that your accountant

3     accurately reported your expenses in 2015?

4          A.     No.

5          Q.     So it was inaccurate.

6                 Do you think it was reported in an

7     amount that was greater than the expenses you

8     incurred or lower than the expenses you incurred?

9          A.     Because by working for Parts Authority,

10    I was making less money, and then I was spending more

11    money working for Parts Authority.  So it didn't

12    compensate, even though I put the expenses on the tax

13    return.

14         Q.     Did you provide your accountant in 2015

15    with any evidence of your expenses?

16         A.     Yes, I did, the best I could.

17         Q.     What did you provide your accountant?

18         A.     I just -- because IRS asks you for

19    receipt and everything.  So sometimes I didn't keep

20    my receipt.  By working for Parts Authority, I didn't

21    have all the receipts.  So I just did the best I

22    could to, you know, to have proof, because I want to

23    be okay with IRS.  I do not want to claim less or

24    more because I do not want to get in trouble with

25    IRS.

**ARBITRATION**

98

1          Q.      Good.  No one does.  It's a pain.

2          A.      Yes.

3          Q.      So you gave your accountant the

4    receipts that you had?

5          A.      The best I could.

6          Q.      You wanted to be honest because you

7    were afraid the government might look at you?

8          A.      Yes.

9          Q.      So you honestly reported your expenses

10   that you incurred?

11         A.      Yes.

12         Q.      To your knowledge, did your accountant

13   then honestly report that on your tax return?

14         A.      Yes.

15         Q.      Now let me ask you:  Do you have the

16   exhibits there?

17              ARBITRATOR MASUCCI:  Yes, she does.

18         Q.      Let's go back to an exhibit that your

19   attorney asked you about.

20              Look at Joint Exhibit 7, the proposal.

21   Your attorney asked you about that.  That's at

22   page 20.

23              So the first bullet point on your

24   operated proposal that you signed says that you have

25   your own delivery business and will provide all

**ARBITRATION**

1    services and owner operator.  That was true, you did

2    have your own delivery business; correct?

3              A.    No, I did not.

4              Q.    You were not operating as an

5    owner/operator for ATS?

6              A.    Yes, but I didn't advertise my service.

7              Q.    I didn't ask if you advertised your

8    service.  Now that you bring that up, did anyone

9    prevent you from advertising your services?

10             A.    Yes.

11             Q.    Who prevented you from advertising your

12   services?

13             A.    Tammie.

14             Q.    May 11th you were not working at Parts

15   Authority yet.  You signed this, you testified

16   earlier, before --

17             A.    I worked same day.

18             Q.    -- before you went to Parts Authority;

19   correct?

20             A.    I worked the same day.

21             Q.    When you signed this proposal, I'm

22   asking you who prevented you, prior to May 11, 2015,

23   from advertising your services as an independent

24   business?

25             A.    Like I say, I didn't read the whole

**ARBITRATION**

1    thing.  I just signed it.

2            Q.    That's, again, not my question.  My

3    question is --

4            A.    You're telling me like who liked the

5    services and everything.  I didn't read the whole

6    thing.  I just signed it.  So how do I going to know

7    this if I didn't read it?

8            Q.    Again, no one prevented you from

9    reading something you signed; right?

10           A.    Yes.  He was mad because he was staring

11   at me and standing over me, and he was like looking

12   at me trying to hurry me up so I can work with Parts

13   Authority.

14           Q.    But he never said hurry up; correct?

15           A.    Yes, he did.

16           Q.    He said that?

17           A.    Yes.

18           Q.    Let me ask you then again to look back

19   at your deposition that we took at page 61, line 21.

20   I asked you --

21                 ARBITRATOR MASUCCI:  Let her get to it.

22           A.    Yes.

23           Q.    I'm not talking about this document.

24   This is talking about the FAQs.  In fairness, I just

25   want you to know that.

**ARBITRATION**

1              Now we're talking about the proposal,

2    and I asked you about the FAQs.  This document was

3    presented to you before you started driving through

4    Diligent; correct?  Answer:  Correct.  Question:

5    Okay.  And you had an opportunity to read it;

6    correct?

7              A.    Yes.

8              Q.    You're saying you could read the FAQs,

9    but you did not read the proposal; is that your

10   testimony?

11             A.    I just read what I could, you know.  I

12   didn't read the whole thing.

13             Q.    You didn't read the whole thing?

14             A.    No.  I signed it.

15             Q.    Back to my question for a second; okay?

16   well, while you have that in front of you, I found

17   what I wanted.

18             Can I direct your attention to page 60,

19   line 4, Question:  Did he, we're talking Fred, rush

20   you through the documents and say don't read them?

21   Answer:  No.  No.  He never say.

22             So you now recall differently than you

23   recalled at your deposition, that he did say don't

24   read the documents?

25             MR. POTASHNICK:  I object.  The part

**ARBITRATION**

102

1          was truncated that opposing counsel just read.

2          Q.     No, he never say.  It was just signed.

3          A.     I never read it.

4                 ARBITRATOR MASUCCI:  Could you just

5          read 1 through 6, line 1 through 6.  On page 60,

6          line 1 through 6.

7                 Now will you ask the question?

8          Q.     My question is:  Did Fred or did Fred

9    not tell you that you need to hurry up and you can't

10   read the document?

11         A.     No.

12         Q.     He did not tell you that; correct?

13         A.     But the way he was looking at me and

14   staring at me.  And, you know, I have common sense.

15   He want me to hurry up so I can go to work for Parts

16   Authority.

17         Q.     That was your assumption, but he never

18   said that?

19         A.     Well, I was right there.

20         Q.     Back on the proposal, the third bullet

21   point says that you will provide at your own costs

22   all tools and equipment, such as a truck and a tarp

23   and all labor needed to complete an engagement that I

24   accept.

25                You did provide your own equipment,

**ARBITRATION**

1    your vehicle and phone.  I don't know if you needed

2    anything else, but you did provide that; yes?

3          A.    Yes.

4          Q.    I think on direct you were asked

5    whether Parts Authority reimbursed you for any

6    expenses, and I think you said no.

7          A.    No.

8          Q.    Diligent didn't reimburse you for any

9    expenses?

10          A.    I didn't have from either one.

11          Q.    The fourth bullet point says:  I didn't

12    require from you any training or any instruction on

13    how to complete an engagement.

14                That was true; wasn't it?  You didn't

15    need anyone to tell you how to deliver auto parts;

16    did you?

17          A.    Not really.  But basically I was tell

18    me, tell me how to do the job.

19          Q.    Did Tammie tell you or did CJ tell you?

20          A.    Well, Tammie told CJ to train me how to

21    do the job.

22          Q.    You heard her say that?

23          A.    Yes.

24          Q.    When the training was going forward, he

25    told you -- brought you to customers and said use

**ARBITRATION**

104

1   this door?

2          A.    Yes.

3          Q.    And he said use this paperwork?

4          A.    Yes.

5          Q.    Is there anything else he trained you

6    on that didn't involve Parts Authority's particular

7    delivery model?

8          A.    Well, he told me that Tammie wanted to

9    be done, like get the signature from customers and

10   get the returns.  And he told me that Tammie wanted

11   to -- like if we're not finished with the delivery,

12   go back again and get more deliveries.  That's how I

13   was trained.

14         Q.    You had engaged -- when you accepted

15   your engagement, you knew it was to make yourself

16   available to make deliveries all day; right, from 8

17   to 6?  Fred had told you that; right?

18         A.    Yes.

19         Q.    So wouldn't that entail going back to

20   make more deliveries if you have availability?

21         A.    Yes.  I was obligated to turn back

22   again to get more deliveries.

23         Q.    You were there to make deliveries to

24   provide coverage for deliveries from 8 to 6; yes?

25         A.    Yes.  Sometimes after 6 p.m.

**ARBITRATION**

1      Q.    Is it your testimony that Tammie told

2   you to go down this road and make a right turn and

3   make a left over there?

4      A.    Yes.

5      Q.    When did she ever tell you that?

6      A.    Because --

7      Q.    Not why.  When?

8      A.    Every run I took.

9      Q.    So every time you went out, Tammie was

10  standing there saying oh, this has to go to Bob's gas

11  station.  Go down Route 402, make a left turn, drive

12  a hundred feet, so it's like -- almost like Alexa?

13     A.    They do the routes.  They're called

14  their routes, which is you have to go to, like you

15  say, Bob's and then go to another auto shop.  And

16  then go to another shop, and then you have to take

17  the freeway in order to get to the other shops.  And

18  on Exit 6 -- I have another six runs going that way.

19          So I have to do it in the sequence that

20  Tammie would give it to me.  I couldn't deny going to

21  take the road and go straight to the freeway and just

22  start my routes on Exit 6.

23     Q.    Well, if you had multiple deliveries

24  that were in an order to go, it wouldn't make sense

25  to do that, to go someplace -- go north, then go

**ARBITRATION**

1   south and then go west.  It would make sense to go

2   north and north and north; correct?

3          A.     That was how I was told to do that.

4          Q.     But you knew that as a delivery driver

5   that would make sense?

6          A.     That's how I was told.

7          Q.     But you knew as a delivery driver

8   before you were told that's what you would do?

9          A.     Yeah, because he taught me how to do

10  the job.

11         Q.     Even before at ATS, that's how you

12  would do it; right?

13         A.     No, because they had different

14  customers.  They don't have the same customers.

15         Q.     Correct, they don't have the same

16  customers, but their customers have locations.

17               At the warehouse, Tammie had an office

18  in the back of the warehouse; correct?

19         A.     No.

20         Q.     She did not have an office in the back?

21         A.     No.

22         Q.     There was a dispatcher; correct?

23         A.     Yes.

24         Q.     When you came to the warehouse to pick

25  up, there were other drivers there as well; yes?

**ARBITRATION**

107

1          A.     Yes.

2          Q.     How was the work distributed, first

3     come, first served?

4          A.     Yes.

5          Q.     So you would arrive.  There would be an

6     invoice with a product to be taken someplace;

7     correct?

8          A.     Yes.

9          Q.     You didn't pick that product off the

10    shelf; right?

11         A.     No.

12         Q.     It was there for you?

13         A.     Yes.  It was on the desk, on Tammie's

14    desk.

15         Q.     It was your job to make sure that the

16    invoice was the same part, so you didn't take the

17    wrong thing; correct?

18         A.     Yes.

19         Q.     And then would there be a conversation

20    you had with the dispatcher or Tammie?

21         A.     No.  Tammie would just tell me take the

22    run.

23         Q.     So she said take this one?

24         A.     Yes.  Just take this one.

25         Q.     And other people were waiting to take

**ARBITRATION**

1  other runs?

2          A.    Yes.

3          Q.    Is it your testimony that Tammie, while

4  that's happening, would tell you, okay, I want you to

5  take Route 42 and then make a left turn, and go a

6  hundred yards and make a right turn; that's how she

7  would tell you to do it, or did you decide how to get

8  to that specific customer?

9          A.    No.  Usually I took a route, I took the

10  run, and at one point I was going to Express Oil Crab

11  Apple.  And then I went to the road that I was --

12  that I'm supposed to go that road.  So it happened

13  that that road was closed.  So I was like making -- I

14  have to make a U-turn.  I couldn't cross the road.

15                So I turn away and go to Alpharetta

16  Highway.  I have to take that road and make a longer

17  run.  So when I was making -- finding a way to get to

18  the Crab Apple, they're on the phone.  Where are you?

19  What are you doing?  You supposed to get back by now.

20                So I have to explain to Tammie, look,

21  the road was closed, so I have make another

22  alternator road so I can get to deliver the products

23  because people were calling for them.

24          Q.    So Tammie would call you, and the

25  person would call to see why it was taking you so

1     long?

2               A.     Yes.

3               Q.     Not what road you were taking?

4               A.     No.  She was asking me why I was taking

5     too long.

6               Q.     Basically whenever she called you,

7     that's what she would say, why is it taking you so

8     long?

9               A.     Yes.

10              Q.     In your proposal, again the 5th bullet

11    point says that you reserve the right to perform

12    services for other customers at the same time that I

13    performed services for your clients, Diligent

14    clients; right?

15              A.     Diligent's clients?

16              Q.     Aren't they Diligent's clients?

17              A.     I don't understand the question.

18              Q.     I'm reading what you signed.  I reserve

19    the right to perform services for other customers at

20    the same time I performed services for your clients.

21                     Parts Authority was a diligent client;

22    correct?

23              A.     I guess.  I was working for Parts

24    Authority.

25              Q.     WORLDPAC was a Diligent client;

**ARBITRATION**

1   correct?

2           A.      I don't know about that.

3           Q.      So you don't know any other Diligent

4   clients?

5           A.      No.

6           Q.      Did anyone at Parts Authority tell you

7   you couldn't perform services for other customers?

8           A.      How could I do that?  I was already

9   working.

10          Q.      My question is did anyone tell you you

11  couldn't do it?

12          A.      No.

13          Q.      Now you asked -- so you asked a

14  question and I will tell you.  There were multiple

15  days that you did not fulfill your engagement at

16  Parts Authority; correct?

17          A.      Multiple?

18          Q.      Yes.  Like you didn't show up every

19  time you were supposed to show up; right?

20          A.      Yes.

21          Q.      Yes, you did?

22          A.      I didn't show up sometimes.

23          Q.      For example --

24          A.      Because I asked for the days off, and

25  they gave them to me.

**ARBITRATION**

111

1          Q.     For example, I don't know, August 19,
2     21, 22, 24, you didn't provide services for Parts
3     Authority through Diligent; correct?
4          A.     Yes.
5          Q.     And on those days, no one told you
6     well, you can't go work for somebody else, you can't
7     provide delivery services for anybody else; did they?
8          A.     No.  They said this because I was
9     spending time with my family that they need me.
10         Q.     Whose decision was that?
11         A.     I asked for permission.
12         Q.     Whose decision was to it stay and
13    provide time with your family?
14         A.     I have to ask Tammie for those days,
15    for permission.
16         Q.     It was your decision, was it not, when
17    you wanted to take time off?
18         A.     I had those days off, and they approve
19    it, so I took those days off.
20         Q.     On those days off when you weren't
21    working, you did what you wanted to do; correct?
22         A.     Yes.  Like I said, I spend it with
23    family.
24         Q.     No one told you from Parts Authority
25    oh, you can't provide services through Uber, you

**ARBITRATION**

1    can't go back and provide services to ATS.  No one

2    told you that; correct?

3            A.    No, because I was already working more

4    than 10-hour shift in Parts Authority.

5            Q.    But you're off, you're not working at

6    all that day.

7            A.    Like I say, I asked for approval from

8    Tammie.

9            Q.    We're going around in a circle, but

10   you've not answering my question which is whether

11   anyone told you that on those days you could not do

12   work for someone else?

13               ARBITRATOR MASUCCI:  She's already

14      answered that.

15               MR. MARKS:  What's the answer?

16               ARBITRATOR MASUCCI:  I thought the

17      answer was no, nobody told her.

18               MR. MARKS:  As long as you understand

19      that.

20           Q.    I apologize.  If you had said that, my

21   bad.

22               The 6th bullet point says that I may or

23   may not perform the services myself.  I may hire my

24   own employees or engage an operator at my own choice

25   and at my own costs.

**ARBITRATION**

113

1          I know you testified here because your

2    attorney said it, and well, I couldn't because I was

3    making not a lot of money, but the fact is no one

4    told you that you couldn't do that; did they?

5          A.    They didn't tell me exactly.

6          Q.    You understood when you signed the

7    owner/operator agreement that you were not going to

8    be an employee of Diligent; correct?

9          A.    No.  I was going to be an employee of

10   Parts Authority.

11         Q.    Is the answer to my question, yes, you

12   did not understand you would be an employee of

13   Diligent?

14         A.    Yes.

15         Q.    You were an independent contractor of

16   Diligent; correct?

17         A.    That's what they told me.

18         Q.    No one at Parts Authority ever paid you

19   one penny; right?

20         A.    No.

21         Q.    Diligent paid you money?

22         A.    Yes.

23         Q.    You never asked Parts Authority why

24   aren't you paying me, why is Diligent paying me;

25   right?

**ARBITRATION**

114

```
 1            A.    No.

 2            Q.    You never asked them that?

 3            A.    No.

 4            Q.    And you never asked Diligent what's

 5  this money for, I'm employed by Parts Authority;

 6  correct?

 7            A.    No.

 8            Q.    Yes, it's correct what I'm saying; yes?

 9            A.    Yes.

10            Q.    Now in your owner/operator agreement,

11  which is still Exhibit 7, paragraph 3A, which is on

12  page 4.  I'm sorry.  Page 3.

13                 It says that Diligent can inform you of

14  opportunities to perform services by advising you of

15  a place and time of the services designated by

16  Diligent customers and any terms designated by

17  Diligent's customers relating specifically to the

18  results of the services to be provided.

19                 Diligent did advise you of an

20  opportunity to perform services for its customer

21  Parts Authority; right?

22            A.    Yes.

23            Q.    Diligent advised you of the place and

24  time of the services designated by Parts Authority,

25  specifically the Roswell store from 8 to 6 p.m.;
```

**ARBITRATION**

1   correct?

2          A.    Yes.  I was told by Fred and Tammie.

3          Q.    And paragraph 3A continues to say:  You

4   have the opportunity -- you have the right to decline

5   or accept that opportunity, and you accepted the

6   opportunity; correct?

7          A.    Yes.  I signed the papers.

8          Q.    No one forced you to do that, that was

9   your voluntary choice; right?

10         A.    I needed a job.

11         Q.    Again, you had a job paying you money;

12   correct?

13         A.    Yes.

14                MR. POTASHNICK:  Objection.  Asked and

15      answered.

16                MR. MARKS:  If your client --

17                ARBITRATOR MASUCCI:  I got it.

18         Q.    The Parts Authority Roswell store was

19   closer to your house than ATS; right?

20         A.    Yes.

21         Q.    Was it closer to where your children

22   were going to school, too?

23         A.    Yes.

24         Q.    So you thought that that opportunity

25   was beneficial to you to accept; yes?

**ARBITRATION**

116

1          A.     Yes.

2          Q.     I don't want to be redundant here, but

3    I want to refer to the FAQs, which you also signed at

4    the time which are part of Exhibit 7 and start at

5    page 28.  Actually I want to go on 7, which is

6    page 29.

7                The FAQ 7 says:  Must I perform a

8    client engagement personally?

9                The answer is:  No.  You can perform

10   the necessary services yourself, or you can employ or

11   engage others to perform the services for you.

12                No one ever contradicted that

13   statement; did they?

14                MR. POTASHNICK:  I object.  Asked and

15        answered.  It's the same statement.

16                MR. MARKS:  I didn't ask that question.

17                ARBITRATOR MASUCCI:  Go ahead.

18          Q.     No one ever contradicted that written

19   statement, did they, telling you you had to perform

20   them yourself?

21          A.     Yes.

22          Q.     Who did that?

23          A.     Tammie.

24          Q.     Let me direct your attention to

25   page 104 of your deposition at line 18 to 20.  I

**ARBITRATION**

1   asked you did anyone tell you you could not hire

2   anyone to help you, and your answer was no, nobody.

3   No.

4           Do you now want to change that

5   testimony and say Tammie told you you couldn't hire

6   anyone to help you or do your work?

7           A.   Yes, because when somebody else was in

8   the car and she would come out and send them home.

9   So nobody could be -- other than you, you have to be

10  performing the job.  Otherwise she will chew you out

11  if somebody else would do that.  We were not allowed

12  to have somebody else do the job.

13          Q.   Did you have your child in your car?

14          A.   No.

15          Q.   Who did you have in your car?

16          A.   It happened to other drivers.  They

17  have like either somebody, or they would send them

18  home.

19          Q.   Did it happen to you?

20          A.   No.

21          Q.   You never tried to have anybody help

22  you?

23          A.   No.

24          Q.   And nobody ever told you you couldn't

25  do that?

**ARBITRATION**

1          A.     Not exactly.

2                 ARBITRATOR MASUCCI:  Could you just

3          wait until she finishes answering the question

4          before you say anything, please.

5                 MR. MARKS:  I keep trying to do that.

6          Q.     On days that you didn't provide

7     service, did you ever try to send someone in your

8     place?

9          A.     No.  I was not allowed.

10         Q.     You were not allowed.  Who didn't allow

11    you?

12         A.     Like I say, the contract say one thing,

13    but when you work for Parts Authority, it's another

14    thing.  The contract is one thing, and when you work

15    for Parts Authority, it's another thing.  They say

16    you allowed to hire somebody, but they will not allow

17    to do that.

18         Q.     Who would not allow?

19         A.     Parts Authority.

20         Q.     Who at Parts Authority?

21         A.     Tammie.

22         Q.     So Tammie told you?

23         A.     Yes.  Tammie would not allow anybody to

24    perform the job other than you.

25         Q.     You could not send a substitute?

**ARBITRATION**

1          A.    No.  I didn't have the money to pay

2    somebody else to do that.  I was not making enough.

3          Q.    That's a different answer.

4          A.    I'm sorry.

5          Q.    You felt you couldn't do it, or Tammie

6    told you you couldn't do it?  Which one is it?

7          A.    Tammie told me I couldn't do that.

8          Q.    When did she tell you that?

9          A.    Many times.

10          Q.    You tried many times to send someone,

11    but she said no?

12          A.    Like I said, other drivers tried to,

13    but she will not allow it.  I assume she will not

14    allow it.

15              ARBITRATOR MASUCCI:  You first said

16          that you observed her telling other drivers that

17          they could not send somebody else, that they had

18          to perform it.

19                  Are you saying that she told you that

20          too, or your understanding is solely from your

21          observing her do it with others?

22              MS. LUCIO:  By observing how she was

23          doing with others.

24              ARBITRATOR MASUCCI:  Okay.

25          Q.    Did you ever tell Diligent, hey my

**ARBITRATION**

120

1   contract allows this, but I feel I can't do that, and

2   I want to do that?

3           A.    No.

4           Q.    Did you report daily to Fred when you

5   were working?

6           A.    No.

7           Q.    You didn't call him every morning and

8   say okay, I'm on a job?

9           A.    No.

10          Q.    When you were not going to be, did you

11  call Fred?

12          A.    No.

13          Q.    You only called Tammie?

14          A.    Yes.

15          Q.    And Tammie would do what, call Fred?

16          A.    I don't know what she did.  But I

17  called Tammie and let her know I was coming late or

18  if, you know, that I was on my way to work.

19          Q.    And if you weren't going to be in, you

20  asked Fred; didn't you?

21          A.    No.  I asked Tammie.

22          Q.    You never talked to Fred about you're

23  not going to come in that day?

24          A.    No.

25          Q.    Never?

**ARBITRATION**

1          A.     No.

2          Q.     When Diligent sent you over to Parts

3    Authority to begin providing services, nobody at

4    Parts Authority's gave you any kind of driving test;

5    did they?

6          A.     No.  I already know how to drive.

7          Q.     Parts Authority didn't give you a drug

8    test?

9          A.     No.

10         Q.     Parts Authority didn't ask you to fill

11   out any paperwork; right?

12         A.     No.

13         Q.     Parts Authority didn't give you a

14   employee handbook; correct?

15         A.     No.

16         Q.     The payments for your services that you

17   received from Diligent are the payments that you

18   contracted to receive from Diligent; correct?

19         A.     Can you say it again?

20         Q.     Sure.  The payments that you received

21   from Diligent for providing delivery services to its

22   customer, Parts Authority, were the payments that you

23   had contracted to receive in your operator's

24   agreement; yes?

25         A.     Yes.

**ARBITRATION**

1    Q.    Did Tammie treat you any differently

2    than she treated other Diligent drivers?

3    A.    No.  She treated us all the same.

4    Q.    So she went into everyone's vehicle and

5    inspected their mileage?

6    A.    Yes.

7    Q.    What would be the purpose of her

8    inspecting your mileage?

9         MR. POTASHNICK:  Objection.  Calls for

10    speculation.

11    Q.    Did she tell you why she was inspecting

12    your mileage?

13    A.    Sometimes we will say oh, I drive like

14    120 miles.  And then she will say that's not true,

15    and then she will go and check it out to see who

16    drove 120 miles or more.

17    Q.    The decision to provide services by

18    using a van was your decision; right?

19    A.    Yes, that's the only kind I had.

20    Q.    You could have gotten a smaller car?

21    A.    No.  That's the only car I had, a

22    minivan.

23    Q.    Well, that's not true though.  You have

24    another car.  Didn't you have two cars?

25    A.    Yeah, but the other one was a truck, so

**ARBITRATION**

123

1   my husband took it to work.

2          Q.    You could have used the truck; right?

3          A.    It was the same.  It's the six

4   cylinder.  It would be the same.

5          Q.    No one told you you needed to have a

6   van to make deliveries; correct?

7          A.    No.

8          Q.    Had you gotten a smaller car, it would

9   have cost you less to drive it; right?

10         A.    Maybe, yeah.

11         Q.    The decision about gas, that was made

12  by you; right?

13         A.    Yes.

14         Q.    And the insurance you purchased, that

15  was your decision; right?

16         A.    Yes.  I have to have insurance,

17  otherwise I will get a ticket.

18         Q.    You need insurance, but where to get

19  it, whether you get through the General, or you spend

20  15 minutes and save 15 percent, that's you; yes?

21         A.    Yes.

22         Q.    We were both talking at the same time.

23  I get it.  I apologize.

24               Your insurance carrier that you choose

25  was your decision; correct?

ARBITRATION

124

1        A.      Mm-hmm.  Yes.

2        Q.      When you began in May to provide

3   delivery services to Diligent's customer Parts

4   Authority, you didn't have to show Parts Authority

5   authorization to work; correct?

6        A.      What do you mean?

7        Q.      Well, there is a requirement by the

8   United States government to provide authorization to

9   work if you're an employee, whether that's a Social

10  Security card, or a passport, one from column A, two

11  from column B type of identification; right?

12       A.      No.  They knew I had a driver's

13  license.  That's all I needed.

14       Q.      You didn't have to show them that

15  you're authorized to work in the United States?

16       A.      No.

17       Q.      You didn't submit any W4 form; correct?

18       A.      No.

19       Q.      No Parts Authority supervisor ever

20  traveled along with you to see how you were making

21  your deliveries?

22       A.      Excuse me?

23       Q.      No Parts Authority supervisor or

24  employee at all ever traveled with you to see how

25  your deliveries were going; correct?

**ARBITRATION**

125

1          A.     No.  They just did by calling me.

2          Q.     Calling you.  They didn't call the

3     customers; did they?

4          A.     No.  Sometimes I put the customer on

5     the phone so they can talk to Tammie.

6          Q.     Let me direct your attention to

7     page 113 of your deposition, line 16.

8          A.     What page?

9               ARBITRATOR MASUCCI:  113.

10          Q.     Question:  Did Parts Authority or

11     Diligent require you to take any specific route from

12     where you were going to where you were trying to get

13     to?  Answer:  No.

14               Your testimony here today is they did

15     tell you how to get there; is that right?

16          A.     Yes.

17          Q.     So were you accurate at your deposition

18     under oath or no?

19          A.     Well, like I was telling you, I told

20     you how Tammie was treating me.  So it's basically

21     that's what I'm saying right now, that they

22     controlled me in every run that I had.

23          Q.     I know you're saying that now.  You

24     didn't say that then; did you?

25          A.     No.

**ARBITRATION**

126

1          Q.     In fact, you told me earlier that you

2     used the -- not earlier -- in the deposition that you

3     used GPS to figure out where you were going from time

4     to time; yes?

5          A.     Yes.

6          Q.     No customer ever called up Parts

7     Authority to complain about deliveries you had made

8     to your knowledge; correct?

9          A.     No.  Only when they have questions they

10    want to talk to Tammie.

11         Q.     That's when you said I can't answer

12    this question, talk to Tammie; yes?

13         A.     Yes.

14         Q.     Do you know if Diligent -- if Parts

15    Authority employee drivers were supposed to answer

16    the question?

17         A.     They didn't know either.

18         Q.     Do you know whether they were supposed

19    to answer though?

20         A.     No.  They supposed to call Tammie too.

21         Q.     You didn't have any probationary period

22    at Parts Authority; did you?

23         A.     What does that mean?

24         Q.     You don't know what a probationary

25    period is?

**ARBITRATION**

127

1          A.    No.

2                ARBITRATOR MASUCCI:   She asked what

3      does that mean.

4          Q.    No one from Parts Authority ever

5     performed an employment review; did they?

6          A.    No.

7          Q.    I think, just to confirm, you testified

8     that Tammie asked you to wear a shirt that said

9     Diligent Delivery?

10          A.    Yes.

11          Q.    And Parts Authority delivery drivers

12     wore a different shirt; correct?

13          A.    Yes.

14          Q.    Did they say Parts Authority?

15          A.    Yes.

16          Q.    Parts Authority never required you to

17     put any signage on your car indicating that you were

18     working at Parts Authority; right?

19          A.    No.

20          Q.    They never gave you any kind of ID card

21     or anything like that; right?

22          A.    No.  The other drives didn't have that

23     either.

24          Q.    So Fred told you that the engagement

25     started at 8 a.m.; correct?

**ARBITRATION**

128

1          A.    Yes.

2          Q.    And if you arrived after 8 a.m., you

3    were not fulfilling your engagement that you had

4    contracted to; correct?

5          A.    Yes.

6          Q.    On the other side of that engagement,

7    the beneficiary of that engagement was Parts

8    Authority and Tammie; yes?

9          A.    Yes.

10          Q.    So Tammie was telling you you need to

11    fulfill your engagement, be here at 8; yes?

12          A.    Yeah, otherwise she would take away my

13    breaks if I was late.

14          Q.    Was there any agreement that you had in

15    writing that spoke about any break?

16          A.    I supposed to get 30-minute break.

17          Q.    Where is that written?

18          A.    That's what they told me.  I was

19    allowed to have 30-minute break.

20          Q.    Who told you that?

21          A.    Tammie.  She gave everybody a 30-minute

22    break.

23          Q.    Diligent didn't contract with you to

24    have a break; correct?

25          A.    No.

**ARBITRATION**

129

1      Q.   You're agreement with Diligent was you

2  were available by coverage from 8 to 6; yes?

3      A.   Yes.  That's why I wanted to make sure

4  that day when I called Fred and said who should I

5  listen to, because Tammie is taking my breaks away

6  knowing that she would give breaks to other people,

7  and that's why I wanted to make sure who I was

8  listening to.

9          Fred told me I have to listen to Tammie

10  because she was my boss, and I supposed to do what

11  she says.

12      Q.   We'll get there, but Tammie's giving

13  you a break was not in the contract, correct; it was

14  a gift from Tammie?

15      A.   I don't know that.  I can't answer

16  that.

17      Q.   Did Fred say you're not entitled to a

18  break because there's nothing in your engagement that

19  gives that?

20      A.   To be honest, I barely speak to Fred

21  about breaks and stuff like that.

22      Q.   In fact, the entire time you only spoke

23  to him about a break once; right?

24      A.   She took it away from me, so I talked

25  to Fred.

**ARBITRATION**

130

1      Q.    Once in the entire time you were

2  providing services?

3      A.    She would take it away from me like

4  twice a week sometimes.

5            ARBITRATOR MASUCCI:  Wait.  Listen to

6      the question.

7      Q.    You spoke to Fred.  You reported to

8  Fred on one occasion in the entire time you were

9  providing delivery services that Tammie had taken

10  away your break; correct?

11     A.    Yes.

12     Q.    In that conversation, did Fred say what

13  break are you talking about, it's not in our

14  engagement?

15     A.    No, he didn't say that.

16     Q.    According to you, he said she's your

17  boss?

18     A.    Yes.

19     Q.    Did you respond to him, well, I'm an

20  independent contractor for you, here's my contract,

21  what are you talking about?

22     A.    To be honest, I just say why not, why

23  she not giving me a break.  He said well, you have to

24  listen to her.  And that was the end of the

25  conversation.

**ARBITRATION**

131

1      Q.    The break was a half an hour; right?

2      A.    Yes.

3      Q.    So if you were a half hour late coming

4  to work, you were not fulfilling your engagement, and

5  she took that back in the half hour by not giving you

6  a break; is that right?

7      A.    Yes.

8            ARBITRATOR MASUCCI:  Why don't we take

9      a break now.

10           (After a luncheon recess was taken, the

11      following was had:)

12           A F T E R N O O N   S E S S I O N

13             CONTINUED EXAMINATION

14  BY MR. MARKS:

15      Q.    Do you recall specifically what

16  information you put on your 2014 tax return?

17      A.    No.

18      Q.    I didn't think so.

19           I want to show you your tax return.  I

20  don't think it's necessary to offer this in evidence.

21  I don't think it's -- we don't need this hanging

22  around in some kind of exhibit.

23           So I will just show it to you, and then

24  I would ask you to confirm aspects of it.  And then

25  we can put it away, unless you want me to introduce

ARBITRATION

132

1   it.

2               ARBITRATOR MASUCCI:  Why don't you see

3       what he wants to do.

4               MR. POTASHNICK:  Let's see how it goes.

5               MR. MARKS:  I will show this to the

6       witness.

7          Q.    Miss Lucio, I show you what has been

8    produced by your counsel as a 2014 tax return.

9          A.    Okay.

10         Q.    Can I direct your attention to, I don't

11   know, like five pages in.  It's on Schedule C.

12              On Schedule C, could you tell me how

13   much income you reported for your profit or loss from

14   business?  It would be on line 1.

15         A.    $7,734.

16         Q.    The expenses which are on line 28, can

17   you tell me how much those are?

18         A.    Expenses?

19         Q.    Yes.

20         A.    $5,916.

21         Q.    Then three pages from the last is a

22   Form 1099 Miscellaneous for the Subcontracting

23   Concepts, LLC.

24              Can you tell me how much income is

25   designated on your Form 1099 Miscellaneous?

**ARBITRATION**

133

1          A.      $7,733.63.

2          Q.      That was payable to you from

3    Subcontracting Concepts, LLC; correct?

4          A.      Yes.

5          Q.      I don't have anything further with the

6    document.  I just wanted those documents in the

7    record.

8                  MR. MARKS:  Do you want the document in

9        the record?

10                 MR. POTASHNICK:  No.

11         Q.      Can you tell me, Miss Lucio, what time

12   it was that you were -- what time of day it was that

13   you were granted a break by 10?

14         A.      It was by the time that I needed to

15   pick up my son.

16         Q.      What time was that?

17         A.      It was 1:30.

18         Q.      Your break would be how long?  1:30 to

19   what?

20         A.      1:30 to 2.

21         Q.      In that time, where was your son's

22   school?

23         A.      It's about five miles from where Parts

24   Authority is.

25         Q.      You would drive the five miles to

1    school, pick him up and bring him to your house?  How

2    far was that from the school?

3           A.    I would drop him off in a Waffle House,

4    the corner of my house.  So I can tell him to go home

5    from there.  It was like let's say 10 minutes

6    walking.

7           Q.    I'm more interested in you than he.

8                 How far was the Waffle House from the

9    school?

10          A.    From the school in -- it was like 15

11   minutes.

12          Q.    And then how far was the Waffle House

13   back to -- if you went back to the Parts Authority

14   store or warehouse, how far was that?

15          A.    The same.  The same.  The same

16   distance, like 15, 10 to 15 minutes.

17          Q.    How many miles; do you know?

18          A.    No, I don't know.

19          Q.    When you were out making a delivery

20   run, Parts Authority had no tracking device; correct?

21          A.    No.

22          Q.    So was there anything that prevented

23   you from picking up your son at that time, dropping

24   him at the Waffle House and then completing your run?

25          A.    No.  I have to get Tammie approval in

**ARBITRATION**

1   order to do that.

2           Q.    She wouldn't know if you did it without

3   her approval; correct?

4           A.    No, because she would call me.

5           Q.    How would she know to call you?

6           A.    She will tell me where I was and what I

7   was doing.

8           Q.    It's your testimony, is it not, that

9   she called you several times a day on your phone?

10          A.    Yes.

11          Q.    And she texted you as well; right?

12          A.    Sometimes.

13          Q.    Most times; right?

14          A.    No.  She will call me most of the time.

15          Q.    On page 15 of your deposition I asked

16  you at line 15:  And how many times did Tammie text

17  you?  Answer:  We communicate almost every day.

18  Question:  By text message?  Answer:  Yes.

19                So she texted you every day you're

20  saying; right?

21          A.    She would do both.

22          Q.    She texted you every day; correct?

23          A.    Yes.

24          Q.    And in this proceeding you were asked

25  to produce those text messages?

**ARBITRATION**

136

1          A.     Yes.

2          Q.     And you didn't produce a single text

3    message from Tammie; correct?  Do you have any text

4    message from Tammie?

5          A.     I think I did give some to my lawyers.

6          Q.     If you gave them some, how many is

7    that?

8          A.     Just I think a couple.  I don't

9    remember.

10          Q.     The text messages you gave counsel and

11    produced to us were to Monica; correct?

12          A.     Yeah.  Monica was the dispatcher and

13    like I say --

14          Q.     And you didn't produce any text

15    messages to Tammie?

16          A.     She would usually call me.

17          Q.     But she texted you every day?

18          A.     She would call me every day too.

19          Q.     Would you agree that most of the time

20    that you were providing services through Diligent to

21    Parts Authority, you were off Parts Authority

22    premises in your own vehicle?

23          A.     Yes.

24          Q.     Would that be like 85 percent of the

25    time you're off premises in your own vehicle?

**ARBITRATION**

1          A.     No.  95 percent.

2          Q.     95 percent.  The other 5 percent, you

3    were waiting for more deliveries?

4          A.     No.  That was -- that counts like

5    8 a.m. to 6 p.m., or sometimes after that.

6          Q.     My question is, and maybe we got again

7    off on the wrong foot, but I asked you how much time

8    was spent off the premises.  I said 85.  You said 95.

9          A.     Yeah, 95.

10          Q.     Mathematically that would leave

11    5 percent of your time on the premises.

12          A.     What does premises mean?

13          Q.     Their building and the warehouse.

14          A.     I was 95 percent in the warehouse, and

15    I was 5 percent picking up my kids and going home.

16          Q.     You did not spend 95 percent of your

17    time inside the Parts Authority warehouse, did you?

18          A.     No.  I was --

19          Q.     On the road making deliveries?

20          A.     Yes.

21          Q.     So what percentage of your time was

22    spent in the warehouse as opposed to being outside

23    the warehouse making a delivery, picking up your son,

24    whatever it is you were doing?

25          A.     Just to go in and pick up the

**ARBITRATION**

1  deliveries, probably like -- or sometimes just wait

2  for the delivery and hope that they had some chairs

3  there.

4          MR. MARKS:  Correct me if I'm wrong.

5      The testimony was if they had some chairs, she

6          would sit down inside.

7      A.    I would say 10 percent.

8      Q.    While you were waiting for deliveries,

9  I think you testified at deposition that you would

10 just look at your phone and do stuff like that?

11     A.    No.

12     Q.    What would you do while you were

13 waiting for a delivery?

14     A.    I was just waiting there.

15     Q.    You weren't looking at your phone?

16     A.    They had like a little break room.  I

17 would sit down over there, and then Tammie would call

18 me and say hey, you have a delivery.  So I came out

19 and got the run.

20     Q.    The question is:  While you were in the

21 break room waiting for something to happen, you would

22 not be on your phone looking at your phone?

23     A.    Only when I had a call.  I have to ask

24 Tammie can I use my phone, and she would say yes.

25     Q.    While we're getting that, when you

**ARBITRATION**

139

1    spoke with Fred about Tammie not giving you a

2    break --

3           A.    Yes.

4           Q.    -- do you recall when that conversation

5    took place?

6           A.    I don't remember the day.

7           Q.    Was it in the beginning of your

8    services or towards the end of your services?

9           A.    It was in the middle of the services.

10          Q.    That conversation was by phone;

11   correct?

12          A.    Yes.

13          Q.    I want to be clear, maybe I

14   misunderstood what you said before.

15                When you missed a day of the

16   engagement, you missed a day, you didn't go anywhere;

17   correct --

18          A.    Mm-hmm.

19          Q.    -- you called Tammie and not Fred?

20          A.    I called Fred and then I called Tammie.

21          Q.    You called Fred first?

22          A.    Yes.

23          Q.    And Fred said to call Tammie?

24          A.    I would let Tammie know that I was

25   going to be off that day.

**ARBITRATION**

1          Q.     Why would you do that?

2          A.     Because she needed to know.

3          Q.     Why didn't you call Fred?

4          A.     I already speak to Fred.  Then Fred

5     said here, prove it.  So they both have to

6     communicate about me being off.

7          Q.     Let me direct your attention to page 86

8     of your transcript, line 13.

9          A.     Okay.

10          Q.     Line 13:  Talking about the break room,

11     was there a TV or something in the break room?

12     Answer:  No, just like we were playing with our

13     phones or just, you know, making phone calls if we

14     needed to.

15                 Is that true?

16          A.     Yeah, it was true, only if we needed

17     to.

18                 ARBITRATOR MASUCCI:  Was it true that

19          you were playing with your phones when you were

20          in the break room?

21          A.     I had my phone in my hand, and I just

22     have to -- if I needed to make a phone call or if

23     somebody text me, I would just look at a text.

24          Q.     Page 90 of your deposition, line 19,

25     Question:  And when you missed a day, did you do

**ARBITRATION**

1   something?  Did you call Fred?  What did you do?

2              MR. POTASHNICK:  I object to that

3       question.  It's compound.

4          Q.    Answer:  I have to call Fred.  You

5   didn't -- when I asked you what you had to do, you

6   didn't tell me you had to call Tammie, did you?

7          A.    I called Fred and Fred communicate to

8   Tammie I was going to be off that day.

9          Q.    At some point in time while you were

10  engaged to provide coverage to Parts Authority for

11  Diligent, you made a complaint about the amount of

12  your compensation; correct?

13         A.    Yes.

14         Q.    You made that complaint to Fred of

15  Diligent; correct?

16         A.    What do you mean?

17         Q.    It's Fred who you called and said I'm

18  not getting paid enough money?

19         A.    Yes.

20         Q.    You didn't call Tammie or anyone at

21  Parts Authority; correct?

22         A.    No.

23         Q.    No, you did not?

24         A.    No, I didn't.

25         Q.    In fact, during the entire time you

**ARBITRATION**

1    were working there, you never made a complaint to

2    Parts Authority about your pay; right?

3             A.    No.

4             Q.    That's because you understood that it

5    was Diligent who controlled your pay and not Parts

6    Authority; is that right?

7             A.    Yes.

8             Q.    When you're arrived in the morning at

9    the Parts Authority store, and assuming -- how much

10   time would there be if you arrived at 8 before you

11   had a delivery to make?

12            A.    Right away.

13            Q.    Every day it was right away?

14            A.    Yeah, because I already had the -- the

15   orders, last night they drop them off for people that

16   ordered to have the parts in the morning.  They would

17   have it ready.  They will be ready for delivery.

18            Q.    So every day it was 8 o'clock you would

19   go?

20            A.    Yes.

21            Q.    Never 8:05 or 8:10?

22            A.    No.  Tammie had asked.

23            Q.    You don't have any records of the times

24   you made deliveries; correct?

25            A.    No.

**ARBITRATION**

143

1      Q.    You have no records of the days you
2   worked; correct?

3      A.    No.  Just the paystub when I got paid.

4      Q.    You have no record of the hours you
5   worked; correct?

6      A.    I know I work 8 a.m. to 6 p.m. and
7   sometimes after that if I had a late run.

8      Q.    And Sometimes you were late to work.

9            But my question is:  You have no record
10  of that; correct?

11     A.    No.

12     Q.    The first time you heard about Parts
13  Authority was when your brother-in-law Renan
14  mentioned the company to you; correct?

15     A.    Yes.

16     Q.    Before you met with Fred, you hadn't
17  even spoken to anyone at Parts Authority?

18     A.    No.

19     Q.    No one at Parts Authority ever gave you
20  any reason to believe that Fred was a manager or
21  employee of Parts Authority; did they?

22     A.    No.

23     Q.    Fred never told you he was a hiring
24  agent for Parts Authority; right?

25     A.    No.

**ARBITRATION**

144

1          Q.    Tammie never said that she's Fred's
2     boss; did she?

3          A.    No.

4          Q.    Tammie never said that she's your boss;
5     did she?

6          A.    I was listening to Tammie.

7          Q.    I understand that.  But she never used
8     those words; right?   Your understanding that she was
9     your boss was something that Fred had told you;
10    correct?

11         A.    Yeah.  Fred told me she was my boss.

12         Q.    No one at Parts Authority told you that
13    Fred worked for Parts Authority at all?

14         A.    No.

15         Q.    I think you testified he wasn't there a
16    lot?

17         A.    He wasn't there a lot.

18         Q.    When you stopped providing delivery
19    services to Parts Authority in October, you told
20    Fred; right?

21         A.    I called Tammie.

22         Q.    You told Fred; right?

23         A.    And Fred, yes.

24         Q.    At that time did Fred offer you other
25    engagement opportunities with other customers?

ARBITRATION

1          A.     No.

2          Q.     Do you know what Parts Authority Laurel

3    Avenue, LLC is?

4          A.     No.

5                 ARBITRATOR MASUCCI:  Laurel,

6          L-A-U-R-E-L?

7                 MR. MARKS:  Yes.

8          Q.     Do you know what Parts Authority

9    Partners Franklin Avenue LLC is?

10         A.     No.

11         Q.     Do you know what Parts Authority-WAW

12   LLC is?

13         A.     No.

14         Q.     Do you know what PA Austin LLC is?

15         A.     No.

16         Q.     Do you know what Parts Authority

17   Georgia LLC is?

18         A.     No.

19         Q.     Did you ever speak to Yaron Rosenthal?

20         A.     No.

21         Q.     Do you know if he ever told you to do

22   anything?

23         A.     No.

24         Q.     Can you tell me why you're suing those

25   companies and that individual as a respondent?

**ARBITRATION**

146

1              MR. POTASHNICK:  I object for a couple

2       of reasons.  Calls for a legal conclusion.

3       Secondly, there's already been an agreement

4       between the sides here about who we would

5       proceed against as a respondent in this claim.

6              MS. STILLER:  I don't think it was on

7       this case.

8              MR. POTASHNICK:  I think it was on

9       both.

10              MS. STILLER:  At any rate, if you're

11       not going to be proceeding against those

12       entities that he just mentioned, and you're

13       stipulating to that, then that's fine.

14              MR. POTASHNICK:  That wasn't the

15       agreement either.  The agreement was that we'd

16       limit the entities that as named as respondents

17       with the respondents' agreement that they would

18       be able to pay any possible recovery in this

19       case.

20              MS. STILLER:  Why are you objecting to

21       the question?  That stipulation has nothing to

22       do with his ability to question about those.

23              ARBITRATOR MASUCCI:  I'm confused,

24       because on the caption and all the papers, it

25       just says Susana Lucio versus Parts Authority

1     LLC on these pages.

2            MR. MARKS:  I don't know what you have.

3     If you look at the Statement of Claim and the

4     deposition transcript, it's a little bit

5     broader.

6            ARBITRATOR MASUCCI:  Which I know.

7            MR. MARKS:  And The Statement of Claim,

8     which is a Joint Exhibit.  Maybe we can

9     straighten that out.

10           MR. POTASHNICK:  To answer your

11    question, I'm objecting because it was our

12    understanding that that would apply to both of

13    the claims.  And to cross examine a lay witness

14    on something that we've agreed about seems to

15    undermine the prior agreement that we had.

16           MS. STILLER:  Number 1, we didn't have

17    an agreement on this case.  Number 2, you're the

18    one who chose to sue all of those entities, and

19    there either was a reason or wasn't a reason

20    that your witness should know about with respect

21    to suing them.  If there is no reason, you're

22    stipulating them out of the case, that's fine.

23    If you're not stipulating them out of the case,

24    then as far as I know, they are still in the

25    case and, therefore, the questioning is

**ARBITRATION**

148

1      permissible.

2              Again I don't mean to step on your

3      toes.

4              MR. MARKS:  Or make a ruling for the

5      arbitrator, whether it's permissible or not.

6      That's your call.

7              ARBITRATOR MASUCCI:  Why don't we hold

8      that question.  I think the two of you need to

9      speak and clarify who the parties are in this

10     case.

11             MS. STILLER:  I don't think he's saying

12     that there is any stipulation that those -- can

13     I finish.

14             I don't think he's saying that there's

15     any stipulation in this case, that the entities

16     that Mr. Marks just mentioned are not parties to

17     the case.

18             ARBITRATOR MASUCCI:  Are you

19     stipulating that all of these entities are or

20     are not parties to the case?

21             MR. POTASHNICK:  We're stipulating to

22     something nuanced there.  What we stipulated to

23     was that we would proceed only against

24     particular entities to eliminate the issue of

25     all these other entities out there, and for them

**ARBITRATION**

1      to bring back all these other entities as a

2      subject of cross-examination at this stage I

3      think is disingenuous.

4               MS. STILLER:  Number 1, I'm not sure

5      what you said.  Number 2, it's not my

6      understanding of the stipulations that I believe

7      was only in the Johnson case.

8               So you may be correct that we do need

9      to speak further, and probably reserve any

10     rights with respect to that area of questioning.

11              ARBITRATOR MASUCCI:  Hold that

12     question.

13              When we finish with this witness,

14     because I have a list of questions too, then

15     we'll take a break.  You guys meet and decide

16     what you need to decide, and at that point we'll

17     figure out whether or not the question should be

18     asked.

19              MR. MARKS:  Okay.  And I would only say

20     this at this point.  I'm trying to be

21     ingenuous, not disingenuous.

22              The stipulation did not apply to Yaron

23     Rosenthal, so the question is not the individual

24     allegations that Mr. Rosenthal is the employer

25     of this claimant, I think, are appropriate

**ARBITRATION**

150

1          regardless.  I think she's answered those

2          questions.

3                    ARBITRATOR MASUCCI:  That's fair.

4                    MR. POTASHNICK:  To the extent it

5          applies to your run, I still interject an

6          objection on the basis that it calls for a legal

7          conclusion.

8                    ARBITRATOR MASUCCI:  I don't think he

9          asked a legal question.  He asked if she knew.

10                   MR. MARKS:  My last question was why is

11         she suing them.

12                   MR. POTASHNICK:  I think that's

13         different.

14                   ARBITRATOR MASUCCI:  That is different.

15                   MR. MARKS:  That's why I told you.  I

16         will withdraw that question.

17                   ARBITRATOR MASUCCI:  Thank you.

18                       CONTINUED EXAMINATION

19    BY MR. MARKS:

20         Q.    To your knowledge, you have no known

21    relationship with Mr. Rosenthal?

22         A.    No.

23         Q.    You don't know whether he's had any

24    input into setting the policy that Parts Authority

25    would contract with Diligent; correct?

**ARBITRATION**

1      A.    No.

2            MR. MARKS:  Two-minute break while I

3      confer with co-counsel outside, or did you want

4      to ask questions of the witness?

5            ARBITRATOR MASUCCI:  Do you have any

6      redirect?

7            MR. POTASHNICK:  Just a little bit.

8            ARBITRATOR MASUCCI:  I have a list of

9      questions I would rather ask before you break.

10           MR. MARKS:  I just wanted to see if we

11     had any more questions to ask.

12           ARBITRATOR MASUCCI:  Then let's take a

13     two-minute break.

14           (At this time, a brief recess was

15     taken.)

16                CONTINUED EXAMINATION

17   BY MR. POTASHNICK:

18     Q.    Miss Lucio, Mr. Marks asked you about

19   the company called ATS that you performed work for

20   prior to your work for Parts Authority.

21           Do you recall that?

22     A.    Yes.

23     Q.    Okay.  What were the differences in the

24   way that ATS treated you from the way that Parts

25   Authority treated you?

**ARBITRATION**

152

1          A.     Well, I have -- I had more freedom.  I

2     would be able to -- I would not ask.  I would just

3     tell the guy I'll come back.  I'll go get my

4     daughter, and then they wouldn't say anything.  I

5     would come out with more freedom working for them.

6          Q.     Did you have to ask anybody's

7     permission to do your tasks?

8          A.     No.

9          Q.     Could you set your own hours?

10         A.     Yes.

11         Q.     Did you have a supervisor at ATS?

12         A.     No.

13         Q.     Did you have to ride along for training

14    with anybody at ATS?

15         A.     No.

16         Q.     Did ATS put time limits on your

17    deliveries?

18         A.     No.

19         Q.     Did ATS try and hurry your deliveries?

20         A.     No.

21         Q.     When you prepared your 2015 taxes, did

22    you have any Parts Authority invoices to customers?

23         A.     No.

24         Q.     If you were five minutes late, would

25    Tammie take away an entire 30-minute break?

**ARBITRATION**

153

 1       A.    Yes.

 2       Q.    Did she do that to you?

 3             MR. MARKS:   Could we have less leading

 4    questions.

 5             ARBITRATOR MASUCCI:  Just rephrase the

 6       questions in a way that you're not giving the

 7       answers.

 8       Q.    Did you consider your workplace at

 9    Parts Authority to be Parts Authority's facility in

10    Roswell or your car?

11             MR. MARKS:  Same objection.

12             ARBITRATOR MASUCCI:  I don't know what

13       the question is.

14             MR. MARKS:  It's certainly designed to

15       say yes to the question.

16             MR. POTASHNICK:  It's either or.

17             ARBITRATOR MASUCCI:  Could you ask the

18       question, please.

19       Q.    What did you consider your workplace to

20    be when you worked for Parts Authority's?

21       A.    I would drive to the location of Parts

22    Authority and park my car there, and pick up the

23    delivery and start working.

24       Q.    Did you consider that your workplace?

25       A.    Yes.  That's why I went every day.

1          Q.    You were asked about some text

2    messages.  Can you take a look in your binder you

3    have here at number 15, please.

4               What are these documents that we're

5    looking at that are in Joint Exhibit 15?

6          A.    These are the ones that Monica, the

7    dispatcher, send it to me.  At one point I wanted to

8    go home two minutes to six, and she would text me

9    this message about why that I was -- I was leaving at

10   5:58.  She told me that it was not -- she say it is

11   5:58, not 6 p.m.  I did not dismiss you.  Do not ask

12   for any more favors.  That's the second time you did

13   this.  You doing this or you do that.

14               MR. POTASHNICK:  That's all I had.

15               MR. MARKS:  Can I just ask one question

16       about the text message that's now been offered?

17               ARBITRATOR MASUCCI:  Yes.

18                    FURTHER EXAMINATION

19   BY MR. MARKS:

20          Q.    Can I ask why, or if you know why, a

21   text message was sent at 4:59 talking about something

22   that would happen an hour later, if that's what she's

23   talking about?

24          A.    4:59?

25          Q.    Yes.  So it says that it's 5:58, not

**ARBITRATION**

155

1   6 p.m., and that message is sent at 16:59, which

2   converting from military time is 4:59.  So you asked

3   an hour in advance whether you could leave at 5:58?

4           A.    No.

5           Q.    So you don't know what that is?

6           A.    I don't understand.

7                 MR. FREI-PEARSON:  May I clarify

8       something?

9                 ARBITRATOR MASUCCI:  Yes.

10                MR. FREI-PEARSON:  So there were issues

11      downloading stuff from her phone, and I believe

12      you're in a different time zone than here;

13      correct?

14                ARBITRATOR MASUCCI:  Georgia is the

15      same as New York.

16                MR. FREI-PEARSON:  I think there was

17      some sort of a timezone issue.  We had some

18      issues getting stuff off of the phone.

19      Certainly no one was doctoring anything.

20                ARBITRATOR MASUCCI:  The question was

21      related to the fact that on the text messages it

22      looks like the text was actually sent at 4:59.

23                MR. FREI-PEARSON:  And what I'm

24      suggesting, and I'm not a hundred percent sure

25      of that, but there were issues getting stuff off

**ARBITRATION**

1    her phone.  So wherever the phone was retrieved

2    from, she sent the phone to our office and then

3    we had to get some things off of it.

4             I'm not sure that the hours were

5    correct after all of that happening, but the

6    time stamps are exactly on point.

7             ARBITRATOR MASUCCI:  You think when you

8    downloaded the text message, that the technology

9    changed the time?

10            MR. FREI-PEARSON:  That would be my

11    informed speculation.  I'm not certain of that.

12    That would be the explanation that makes the

13    most sense to me.

14            ARBITRATOR MASUCCI:  I don't understand

15    it myself, but --

16            MR. FREI-PEARSON:  It's all magic to

17    me.

18            ARBITRATOR MASUCCI:  All right.  I have

19    about six questions.

20            You testified that Tammie did not work

21    on Saturday?

22            MS. LUCIO:  Yes.

23            ARBITRATOR MASUCCI:  Who actually gave

24    you your assignments on Saturday if she wasn't

25    there?

**ARBITRATION**

1              MS. LUCIO:  It was the supervisor,

2       dispatcher.

3              ARBITRATOR MASUCCI:  It was Monica?

4              MS. LUCIO:  It was Monica, yes.  And

5       before Monica was another person named -- it was

6       another guy before Monica.

7              ARBITRATOR MASUCCI:  So when that

8       person gave you your assignments, routes, did

9       they also supervise you in the same way, meaning

10      that if they thought you were taking longer than

11      you should, did they call you, did they follow

12      up with you to find out where you were located,

13      why you were taking too long to make a delivery

14      or to load trucks?

15             MS. LUCIO:  Not quite.  He didn't keep

16      up with that because basically Tammie was the

17      one who was the warehouse manager, so everybody

18      do the right thing when she was there.

19             You see what I'm saying?  She was like

20      basically the boss.  She was the boss.

21             ARBITRATOR MASUCCI:  So it was more

22      relaxed on Saturday when she wasn't there?

23             MS. LUCIO:  Basically, yes.

24             ARBITRATOR MASUCCI:  When you were

25      working for ATS, what was different about your

1      job versus when you are now working for Parts

2      Authority, meaning that you testified that you

3      had to have the -- you had to check the invoices

4      to make sure you had the correct parts.  You

5      testified that when you went to the customer's

6      site, they had to sign off the invoice.

7              What was different about the procedures

8      in the two?

9              MS. LUCIO:  Well, they have --

10     basically they have me to -- they have their

11     order ready and they already scanned it, the

12     parts and everything.  Which I have to do that

13     in Parts Authority.  I just pick up my run and

14     go.

15             But if I have like to be at a certain

16     place, I would go sometimes and pick up my

17     daughter, drop her off, and come back to work.

18     I have more freedom.  I have more freedom in

19     ATS.

20             ARBITRATOR MASUCCI:  What I'm trying to

21     ask is not about the freedom, but you said that

22     there was a procedure that you had to follow

23     that CJ actually showed you what the customer

24     needed to sign, how the delivery itself was

25     done.  Was there a different procedure that you

1       followed?

2                MS. LUCIO:  It was the same, it was

3       just that I was not calling like all the time.

4       It was exactly the same.  I would make sure I

5       have the right parts and get in my car and

6       drive.

7                But nobody was calling me or telling me

8       oh, you have to be here a certain time or you

9       have to be here at this place.  I would just

10      drive, come back, and that's how my day went.

11      If I needed to do something else, I would come

12      and say look, I will be back in an hour.  I need

13      to do something.  They'll say okay.

14                ARBITRATOR MASUCCI:  Okay.  When you

15      were working for ATS, did you ever advertise for

16      your services?

17                MS. LUCIO:  No.

18                ARBITRATOR MASUCCI:  So whether it was

19      ATS, or Diligent, or Parts Authority, you didn't

20      advertise for your services?

21                MS. LUCIO:  No.

22                ARBITRATOR MASUCCI:  In J1, it's the

23      list of your payments.  No, that's not J1.  It's

24      8.  All of these amounts are very different.

25      Why?

1              MS. LUCIO:  Because on this one, like
2       the first line, the first week I worked for
3       Parts Authority, that's how much they paid.
4       That was the first -- you know, it was -- if you
5       notice, I start on May 11, 2015, which is the
6       payroll.  They pay the guys on the 5th.  So I
7       only got basically the rest of the pay day which
8       was until the 20th.
9              ARBITRATOR MASUCCI:  So on the
10      agreement it says the pay was $2,300.  For what
11      period?  Is that a month?
12             MS. LUCIO:  Yes, a month.
13             ARBITRATOR MASUCCI:  So $1,037.54 is
14      for half a month; right?
15             MS. LUCIO:  Yes.
16             ARBITRATOR MASUCCI:  My math is that
17      it's $1,150.  What's the difference between
18      $1,150 and $1,037 if it's $2,300 a month.
19             MS. LUCIO:  Because they took -- they
20      would take money away.
21             ARBITRATOR MASUCCI:  There was some
22      withholdings?
23             MS. LUCIO:  Yes.  Yes.  They will
24      charge you for giving you the job.
25             MS. STILLER:  Can we define what they

**ARBITRATION**

1           did.

2                     ARBITRATOR MASUCCI:  It's Diligent.  So

3           this one -- what I'm trying to ask is that there

4           were times --

5                     MR. MARKS:  I will say this.  We will

6           put on testimony about how the pay is

7           calculated.

8                     ARBITRATOR MASUCCI:  Thank you.  I'm

9           trying to figure out where the differences are.

10          There's testimony that there were days that you

11          did not work, and I don't know.  I'm trying to

12          reconcile why there's the differences in pay.

13                    Earlier there was a question about

14          taking another job, and I think I answered for

15          you, but I want to clarify that.  Although you

16          said that you worked from 8 to 6 every day,

17          there were days that you needed to take off for

18          your family.

19                    MS. LUCIO:  Yes.

20                    ARBITRATOR MASUCCI:  Was there anything

21          stopping you from accepting another job and

22          telling Diligent I'm not working on Friday

23          without an explanation and going to work for

24          another job?

25                    MS. LUCIO:  I would not -- I would

1       not -- if I asked the Diligent guy that I wanted

2       to be off a certain day because I needed to do

3       something else, he would say why?  Why are you

4       asking for days off?  We needed you to be

5       working.

6                Diligent would tell me I'm losing

7       money.  I'm losing money because you're

8       basically off.  So I would just go ahead and

9       work.

10              ARBITRATOR MASUCCI:  You also testified

11       that -- I think this is what you testified --

12       that if you needed a day off for family reasons,

13       that you would call Fred; right?

14       A.    Yes.

15              ARBITRATOR MASUCCI:  And that he would

16       then talk to Tammie and tell her that you needed

17       a day off.

18              MS. LUCIO:  Yes.

19              ARBITRATOR MASUCCI:  Why on the other

20       hand -- and you may or may not know this, if

21       Tammie took -- if Tammie took away your break,

22       you would call Fred, and Fred would then say

23       tell Tammie, because she's your boss.

24              MS. LUCIO:  Yes.

25              ARBITRATOR MASUCCI:  Why was there a

**ARBITRATION**

163

1            difference?  If you were to take a day off, why

2            didn't Fred say -- I know I'm asking you to

3            think about what is in Fred's mind, but why did

4            Fred not treat that request for a day off the

5            same way.

6                    MS. LUCIO:  To be honest, I don't know.

7            He told me.

8                    ARBITRATOR MASUCCI:  Those are my

9            questions.  Anything else?

10                    MR. MARKS:  I'm okay.

11                    ARBITRATOR MASUCCI:  All right.  So

12            then let's take 10 minutes.

13                    (At this time, a brief recess was

14            taken.)

15    M I C H A E L    E A R N E R, a Witness herein,

16                    having been first duly sworn by Terri

17                    Fudens, a Notary Public of the State

18                    of New York, was examined via

19                    videotape and testified as follows:

20                    ARBITRATOR MASUCCI:  What is your name?

21                    MR. EARNER:  My name is Michael Patrick

22            Earner.

23                    DIRECT EXAMINATION

24    BY MR. WHITE:

25                    Q.    Mr. Earner, thank you for taking the

1    time to be here today.

2              Could you start with what is your

3    educational background?

4              MR. MARKS:  The nature of this

5         testimony is an expert witness testimony, and we

6         have not been provided with any witness

7         disclosures, and we object to the continuous

8         testimony of this witness.

9              MR. WHITE:  To be clear, plaintiff's

10        position is that Mr. Earner is here as a lay

11        witness.  He has not exercised any sort of

12        expert judgment on any of the things he's done.

13        He's summarized and collated the luminous data,

14        but he has not exercised any sort of expertise.

15             ARBITRATOR MASUCCI:  This data is?

16             MR. WHITE:  It's a conglomeration of

17        all the documents that have been produced and

18        the invoices.  I believe we produced as J1 the

19        sample that one invoice sheet, almost a thousand

20        of those were produced.

21             As will come out through his testimony.

22        Mr. Earner pulled data from and summarized

23        almost a thousand invoices, as well as the list

24        of checks and other inputs that were only

25        provided by counsel.

ARBITRATION

165

1              ARBITRATOR MASUCCI:  These invoices are

2      what?

3              MR. WHITE:  Your Honor can turn to

4      Joint Exhibit J-1.  All the invoices are joint

5      exhibits.

6              MS. STILLER:  These were invoices that

7      were produced by Parts Authority, so we produced

8      on disk a number -- over a thousand pages of

9      invoices, delivery invoices.  And just for the

10     sake of not having over a thousand pages of

11     documents, we agreed that we could use a

12     representative invoice which is what this is.

13     And the other invoices are on disk or thumb

14     drive.

15             MR. WHITE:  Yes.

16             ARBITRATOR MASUCCI:  So these are

17     invoices relating to the deliveries that were

18     made?

19             MS. STILLER:  Right.

20             MR. MARKS:  And from those documents,

21     this witness has done something with exhibits,

22     drawn -- either made a demonstrative exhibit, so

23     we don't need his testimony, or made a

24     conclusion which would make it, since he has no

25     personal knowledge of this case, make it expert

**ARBITRATION**

1    testimony.  I know he's not bringing an opinion

2    to the case, perhaps, but we don't know what his

3    skill set is.  We don't know anything about how

4    effective he was in making those conclusions.

5              This information should have -- I did

6    ask for it, and they told me he's not an expert,

7    so they're not giving it to me.  It should have

8    been provided.  There was a time for disclosure.

9    I could have deposed him, or something, had it

10   been in advance, and I may have chosen it.

11             I'm now being deprived of that

12   opportunity.

13             MR. WHITE:  Claimant's position is

14   still that Mr. Earner is a lay witness and was

15   not subject to any disclosure for any expert

16   witnesses.

17             Under Federal Rule of Evidence 1006,

18   there's voluminous case law that it does not

19   make you an expert witness to summarize

20   voluminous data.  We can cite to case law if

21   your Honor would like.

22             MR. FREI-PEARSON:  In similar

23   arbitrations where people like Mr. Earner have

24   testified and summarized voluminous data that

25   have been allowed in arbitrations and also court

**ARBITRATION**

1           cases.  This is a lay witness who is reviewing

2           voluminous data and summarizing it for specific

3           rules and Federal Rules of Evidence that allows

4           lay witnesses to do this in court.  So certainly

5           it should be allowed in arbitration.

6                    If your Honor has concerns, it should

7           be apparent by the end of this testimony that

8           Mr. Earner is not being offered in an expert

9           capacity, and that should be clear by the time

10          he's done testifying.  He just performed simple

11          math at our direction in order to calculate

12          damages, and that's how damages are calculated

13          in all wage cases.

14                    ARBITRATOR MASUCCI:  I'm going to allow

15          the testimony.  Let's proceed and see where it

16          goes.

17                    Have him describe his background, where

18          he's worked, what his skill set is so we at

19          least have that.

20                    CONTINUED EXAMINATION

21    BY MR. WHITE:

22          Q.    Mr. Earner, I'll ask you again.  Could

23    you start by what is your educational background?

24          A.    Certainly.  I have a Bachelor's of Arts

25    degree in Criminal Justice.  I also have a Masters in

1   Business Administration as well as a JD and LLM and

2   Taxation from Suffolk University.

3              I've also completed graduate course

4   work in forensic psychology and attended a

5   certificate program at MIT in artificial intelligence

6   and business applications.

7        Q.    Thank you.  What is your professional

8   background?

9        A.    So professionally I probably start

10  after my first year of college.  I actually started

11  working as a delivery driver for an online grocery

12  store.  I worked there for a few years.  Started to

13  really do well as a driver.

14             And one day I was walking by where they

15  were kind of planning all the delivery routes and

16  stuff like that.  And I realized there was a whole

17  bunch of people sitting much like this, sitting at a

18  table with sheets and passing stuff back and forth.

19             When I was in high school, I learned

20  about different computer programs, and I said hey,

21  there's probably some software that will help you

22  guys do this.  I didn't actually do anything with it,

23  just made a recommendation.  That simple

24  recommendation kind of caught the eye of some of the

25  senior management in the online grocery store.  When

**ARBITRATION**

169

1  the operation expanded in the late '90s down to the

2  Washington DC area, they asked me if I wanted to go

3  there as a transportation manager.

4              So that brought me down to DC.  I spent

5  a couple of years in DC.  I happened to be in

6  Washington, DC on September 11th.  Like most people

7  at the time I was kind of impacted by it.  I think

8  that's fair to say across the United States.

9              I had a younger brother who joined the

10  Army shortly after September 11.  About a year and a

11  half later my brother deployed to Afghanistan.  At

12  that the point I was, you know, in my mid 20s, felt

13  extremely guilty that my younger brother was willing

14  to really put his life on the line for the United

15  States, and I wasn't.  And I decided to join the

16  Army.

17              I joined the Army of the absolute

18  lowest levels as an E1 private in the infantry and

19  wanted to join a unit to go and do what my brother

20  was doing, which was fighting.

21              So I was actually -- after I graduated

22  from training, I actually got assigned my first duty

23  station in Fort Drum, New York, here in upstate,

24  New York.  I deployed to Afghanistan and I was

25  injured during a combat mission in Afghanistan and

**ARBITRATION**

1  medevaced and ended up at Walter Reed Army Medical

2  Center.  I spent about five months in recovery at

3  Walter Reed.

4              While I was there, I was actually

5  recruited into a special branch of the Army called

6  CID, the Criminal Investigation Division.  I'm not

7  sure if it still is, but at the time it was the only

8  branch or the only arm of the Army that you couldn't

9  get into through a recruiter.  You had to actually be

10  recruited from the ranks.

11             So I went through -- I was selected to

12  start an internship.  I completed a one year

13  internship as a criminal investigative intern and

14  then ultimately was selected for a special engine

15  course and spent seven months -- six and a half

16  months training in Missouri to become certified as a

17  special agent.

18             While I was in training they did, you

19  know, testing and interviews, and I was one of two

20  people from my class selected for kind of a special

21  duty assignment, and I was sent to Fort Meed, which

22  is where NSA is.  While I was at NSA, or working in

23  support of NSA, I was still a CID special agent.  I

24  got involved in drug tracking and tracking the

25  movements of drugs and drug threats and things like

**ARBITRATION**

1   that primarily.  And I did a number of other

2   investigations.

3                   After my time there at Fort Meed, I was

4   then transferred to South Korea where I was a field

5   agent, a supervisory special agent in charge of a

6   drug team and tracking.  Really drug intelligence and

7   drug movements throughout that region.

8                   I continued to have injuries, issues

9   with my injuries.  And in 2012 I was offered the

10  opportunity to retire from government service, and I

11  accepted that as an agent.  So I medically separated

12  from the Army.  It ultimately didn't happen until

13  2013.  And in 2013 is when I started law school.  I

14  spent three years at Suffolk Law.  Like I said, I

15  graduated with a JD, and I did an accelerated LLM and

16  focused my studies on legal technology innovation,

17  which is for theory type stuff.

18                  And once I was in my last year of law

19  school, there was an individual named Gabe Miller,

20  who was the CEO.  He was starting a national law

21  firm.  And he reached out to the school and said

22  we're looking for somebody that understands business

23  technology, taxes, a whole bunch of stuff.  And he

24  contacted the dean of the school.

25                  Ultimately it resulted in me getting an

**ARBITRATION**

172

1  interview with this individual.  I was actually hired

2  as a contract employee.  During my last year of law

3  school, I would do about 20 hours a week, and I

4  really kind of helped build sort of the

5  infrastructure.  Not physically built it, but the

6  flow charts, and the logic, and how things should

7  move around the company.  And I was initially hired

8  out of law school as a national partnership manager.

9  I wasn't an attorney yet.  I had to take the bar

10  still.

11          Once I passed the bar exam, I became

12  Associate General Counsel and still had an

13  operational role.  I ultimately was promoted to

14  Director of Operations, and then Chief Operating

15  Officer.  I rose very quickly in that company.

16          The decision was made last September to

17  actually close Advocates United.  And as I was

18  ramping it down, I had an opportunity to move over to

19  my present employer, which is Total Trial Solutions,

20  which is where I work now as the president of Total

21  Trial Solutions.

22          ARBITRATOR MASUCCI:  Where did you get

23      your undergraduate?

24          MR. EARNER:  Thomas Edison State

25      College.

**ARBITRATION**

1              MR. MARKS:  Since that took 15 minutes

2        to tell us what the qualifications are, I have

3        to wonder why someone with such tremendous

4        qualifications, and government service, and

5        knowledge, and degrees would be necessary to do

6        what we're now about to hear, which is I just

7        put this into a spreadsheet and did this.  I

8        think that there's -- again, I repeat, this is

9        an expert witness.  Clearly that's why they're

10       using him, because they could have used a

11       secretary to do what it is that this

12       individual -- what it is is being asked to do.

13       I think we're hiding it.

14              ARBITRATOR MASUCCI:  Let's hear it.

15       Q.    Just to pick up with what you had said

16   a moment ago, who is your current employer again?

17       A.    Total Trial Solutions.

18       Q.    Who owns Total Trial Solutions?

19       A.    An individual named Andrew Finkelstein

20   is the majority owner, and a minority owner is an

21   individual named Michael Caputo.

22       Q.    Is Andrew Finkelstein also one of the

23   partners in FBFG Law, plaintiff's counsel?

24       A.    He is.

25       Q.    Did that affect your work in any way in

**ARBITRATION**

174

1   this matter?

2          A.    No, not at all.

3          Q.    Was there an opportunity for that to

4   affect your work in any way in this matter?

5               MR. MARKS:  Objection.  What does that

6         mean, opportunity?  He's going to say no.  What

7         does that mean?

8               You mean since they pay him and he pays

9         you, that's not an opportunity?  Where are we

10        going with that?

11         Q.    What does Total Trial Solutions do?

12         A.    It helps law firms prepare for trial in

13   litigation and creates video assets, it creates

14   demonstrative aids, things like that.

15         Q.    What do you generally do at Total Trial

16   Solutions?

17         A.    I've only been there a few months, but

18   as the president, I direct the day-to-day

19   operations of the individuals that usually do this

20   type of work.

21         Q.    So you don't usually do this type of

22   work?

23         A.    No.  I've never done it.

24         Q.    Has Total Trial Solutions summarized

25   and presented data in connection with arbitrations in

**ARBITRATION**

1   the past?

2          A.    It has on four occasions that I know
3   of.

4          Q.    Who normally performs that work; who
5   performed the work on those four occasions?

6          A.    That was done by, she was a paralegal.
7   I believe Jennifer Kelly.  She would -- she was the
8   individual that usually did it.  She has moved on.

9                Before I even started working there she
10  had moved on.  Normally it would be her or somebody
11  like her.

12         Q.    Why did you do this work in this case
13  instead of the paralegal doing it?

14         A.    I was just getting started, and this
15  was something that I knew I would be able to do, and
16  I just decided to take it on.  I don't really have
17  any real motivation other than it was certainly
18  something that was within my ability and I was able
19  to do.

20         Q.    Was the paralegal's name Kelly Kacey?

21         A.    Kelly Kacey it was, yes.

22         Q.    And was Miss Kacey ever designated as
23  an expert witness?

24         A.    No, not at all.

25         Q.    So what specifically did you do in

**ARBITRATION**

176

1    filling that role that Miss Kacey had filled before?

2                    MR. MARKS:  Are we now on to what you

3        did in this case?  Can we just ask that

4        question?

5                    ARBITRATOR MASUCCI:  We can.

6        Q.    What did you do in this arbitration?

7        A.    So I took the documents that were

8    provided, the invoice documents that were referenced

9    earlier.  I extracted -- I used a web-based publicly

10   available software to extract very specific

11   information from the documents, and then I used

12   inputs to just display math.

13       Q.    Up on the screen here, is this a page

14   from the spreadsheet you produced?

15       A.    Yes.

16       Q.    For clarity sake, because of Internet

17   connection issues, the spreadsheet itself is not

18   producing as it was.  We have PDFs that were just

19   printouts of the spreadsheet, so I'm going to be

20   going through the PDFs.

21                   ARBITRATOR MASUCCI:  This is the same

22       document that was sent as part of the exhibits.

23       I will say when I looked at it, it had value on

24       that too.

25       Q.    There is an issue where you need to

**ARBITRATION**

1   enable an Internet connection, and it doesn't always

2   work right way.  So the printouts that are also

3   provided in the Joint exhibits are just captures of

4   how it looks when the Internet connection is up and

5   is running properly?

6                   MR. MARKS:  What exhibit is that, sir?

7                   MR. WHITE:  That is Claimant's

8         Exhibit 1.

9                   MS. STILLER:  I don't think we have

10        that.  That should not have been -- it was only

11        the Joint exhibits that were submitted.

12                  MR. MARKS:  I guess he's going to offer

13        it.

14                  MS. STILLER:  But I think he's

15        indicating that he had previously.

16                  ARBITRATOR MASUCCI:  No, he didn't.

17        Q.    Distributed it previously, but not

18   offering it as an exhibit yet.

19                  MS. STILLER:  Is there an extra volume

20        of this exhibit?

21                  MR. MARKS:  On the other side of the

22        computer, I believe.  I don't know if that's

23        extra or what.

24        Q.    So let's walk through the different

25   pieces that you produced on the spreadsheet.

**ARBITRATION**

178

1              The first tab in the spreadsheet is

2     labeled Lucio_data; is that correct?

3          A.     That's correct.  That's not what's on

4     the screen, but that is the first half.  Yes, I do

5     know that.

6          Q.     How did you compile the information

7     that's on the Lucio_data tab?

8          A.     That information was what I extracted

9     through again that software Docuparser.

10    D-O-C-U-P-A-R-S-E-R.  It's an Internet -- it's a

11    web-based program.  It's opened to anybody.  You can

12    upload invoices to it or any documents.  But in this

13    case I uploaded invoices to it.

14              And then you can literally drag and

15    drop and isolate parts of the invoice, and the

16    program will recognize data and then put it out into

17    an Excel spreadsheet.  So that was the origin of

18    this.

19              You can see the date that it went

20    through that Docuparser, the 2018 11/05, and then you

21    can see the original invoice.  So each one of the

22    invoices has a file name, and the convention looks

23    like it's the date and the time that the invoice was

24    originally created as the name of the invoice, but

25    that's how the record was produced.

1       Q.    Did you double check that Docuparser

2   was operating properly to create this?

3       A.    I did.  In fact I had to go through

4   every single one of these lines and verify them.  I

5   ran into an issue of the fact that it condensed

6   stuff, so I had to verify all of them.  It's not a

7   perfect program.  The information came out correctly,

8   but as you can see, there's not spaces lined up and

9   things like that, so I had to actually verify

10  everything one line at a time.  It's very monotonous.

11      Q.    I'm going to show Exhibit J1.  That's

12  just a sample invoice that we were discussing a

13  moment earlier.

14            Is this an example of the invoice

15  documents that you ran the Docuparser program to

16  extract the text from?

17      A.    Yes.  That's an example.

18      Q.    And how many of these did you say you

19  processed in that way?

20      A.    There were 990 that were not -- they

21  were original documents that went through and

22  processed through the system that way.

23      Q.    Were there any other files included

24  with the data that you extracted these from?

25      A.    There were.  There were actually nine

**ARBITRATION**

180

1   additional files that had no data in the middle.

2   They were just blank files.

3            Q.    For the 990 invoices provided by Parts

4   Authority, it did actually have data in them.  Is the

5   data from all of them captured on this tab?

6            A.    Yes, it is.

7            Q.    I notice at the bottom -- and if anyone

8   is using a hard copy, this is on page 28, the 28th

9   page.

10                 MR. MARKS:  You didn't number the

11       pages.

12                 MR. WHITE:  At the halfway point.

13                 MR. MARKS:  Sorry?

14                 MR. WHITE:  At the halfway point.

15                 MR. MARKS:  It's at the halfway point

16       like where the first arrow is.

17                 MR. WHITE:  The first tab.

18            Q.    So I noticed that four of these entries

19   at the bottom were highlighted.  Why is that?

20            A.    When I first put all the invoices that

21   were provided by Parts Authority in, I realized these

22   four invoices that are dates that were inconsistent

23   with the other invoices.  So I had highlighted them

24   in yellow and contacted Miss Lucio's counsel and

25   asked what to do with them.

**ARBITRATION**

1        Q.    How were they inconsistent?

2        A.    I'm sorry.  So the other invoices were

3    all from the year 2015, and these four invoices

4    originated either in 2017 or 2018.  So they were in

5    with the other ones.  I wasn't sure.  They just stood

6    out to me.

7        Q.    What did Miss Lucio's counsel tell you

8    to do after you flagged these as having odd dates?

9        A.    To disregard them, not use the

10   documents at all.

11            ARBITRATOR MASUCCI:  There are other

12        ones that also have 2018 dates.

13            MR. EARNER:  So in this first column on

14        the left, that is the date of the document,

15        which is also the date it was printed.  That is

16        the date that I actually -- the 11/05 date is

17        the date that I actually did the extraction

18        through that software.  I just wanted to keep

19        all the information in case anybody had

20        questions, so that's why it's all included.

21        Q.    Let's go through some of the

22   calculations that would be extracted.  The second --

23   let's go to the tab on the spreadsheet.  This tab was

24   Lucio_calculationsoriginal.  Can you describe what

25   you did to create this tab?

**ARBITRATION**

1           MR. MARKS:  I'm sorry.  Is there a

2       printout of that too?

3           MR. WHITE:  There should be tabbies for

4       each different tab, and each one should have a

5       label.  It should have a cover.  The A, B, C

6       tabs.

7           MR. MARKS:  This is B.

8           MR. WHITE:  Each one has a cover sheet.

9       Lucio calculations original.  And the next one

10      tab --

11          ARBITRATOR MASUCCI:  It's C.

12      Q.    Can you describe what you did to create

13  the Lucio_calculations (original tab)?

14      A.    Yes.  So the first thing it did was all

15  of the delivery addresses that were extracted through

16  Docuparser, I pull over to this document here, and

17  that's what that list is right there.  And then I

18  just numbered them to make sure I had all 990 of

19  them.

20      Q.    Once you pulled over those addresses,

21  what did you do next?

22      A.    The next thing that I needed to do to

23  figure out what driving distances were is obtain the

24  originating address or where Miss Lucio started from,

25  so I contacted Miss Lucio's counsel and asked

**ARBITRATION**

1   Miss Lucio's counsel to get the originating address,

2   basically where did these start from?  If we know

3   where they're going, I need to know where they

4   started from.

5         Q.   What was that address that you used?

6         A.   That is the origin address, 200 Henry

7   Park Drive in Roswell, Georgia.

8         Q.   How did you get that address again?

9         A.   I got that from Miss Lucio's counsel.

10        Q.   Once you had the origination address,

11   what did you do next?

12        A.   What I did was I needed to figure out

13   the distance between the starting address and the

14   ending address.  So I used this little link that says

15   request URL to essentially send the starting address

16   and the ending address to Google Maps, and Google

17   Maps then returned the answer of how far it was

18   between the two points.

19        Q.   I'm advancing on the screen to the

20   first colored tabby.  Is that what this URL column

21   is?

22        A.   That's exactly what it is.  This right

23   here is instead of actually going to like

24   GoogleMaps.com and typing in a start address ad an

25   end address, this just sends it directly to Google

**ARBITRATION**

184

1  and says give me the information back.  That's all it

2  is.  It's really a basic request.

3              ARBITRATOR MASUCCI:  So it's the second

4      tab.

5              MR. WHITE:  Yes.

6      Q.    What did you do with the data that

7  Google sent back?

8      A.    Well, the information that I was

9  interested in was the distance, and Google sent the

10 distance calculation back, and it actually sent it

11 back in kilometers.

12     Q.    I am advancing to the next colored

13 tabby.

14     A.    There it is.

15     Q.    So was this kilometer distance

16 something you entered, or was it automatically

17 provided by Google?

18     A.    That was automatically provided by

19 Google.

20     Q.    What did you do with that kilometer

21 distance once Google sent it back to you?

22     A.    The first thing I did is I knew that in

23 the United States we use miles, so I wanted to

24 convert it to miles.  Excel has a built-in function,

25 a built-in formula that converts kilometers to miles.

1    So I removed KM, because it won't recognize that.

2    That's text.  Then convert it into -- use the formula

3    built into Excel to convert it to miles.  That's all.

4              MR. WHITE:  There seems to be an issue

5         with the PDFs.  Again in the original format,

6         you can see the headlines for each of these, but

7         it seems that it cut off on the PDFs.

8              We'll happily produce in PDF format the

9         remaining sections of it.  And like I said, it's

10        in the Excel version that was distributed

11        earlier on that's ultimately going to be asked

12        to be entered into evidence at the conclusion of

13        this.

14        Q.    For purposes of describing what you

15    did, what did you do; what did the mathematical

16    function in Excel give you?

17        A.    It gave me the one way mileage.  Again,

18    if you're talking about the conversion one, it gave

19    me the one way distance in miles once I did the

20    conversion.

21        Q.    And then what did you do with that data

22    once you had the one way miles?

23        A.    I was told to account for the round

24    trip by Miss Lucio's counsel, and I just simply

25    multiplied it by two to account for the trip out and

**ARBITRATION**

1  the trip back.

2           Q.    Did you manually multiply it by two,

3  or did you use a function in Excel?

4           A.    I used a function in Excel.

5           Q.    At the bottom of this -- again it's

6  coming up its value because of the issue.  I see

7  there's a line that's called average miles per

8  delivery.  If the Excel was functioning properly,

9  what would this be giving?

10          A.    That would be giving the average of all

11  of the deliveries that there were records provided

12  for and how far or what the average trip was.

13          Q.    Sitting here today, do you remember

14  what that was when this was working properly?

15          A.    It was -- I do actually.  It's 9.59.

16  Yes.

17          Q.    How did you get that 9.59 number?

18          A.    I didn't.  That was a built-in function

19  in Excel also that calculated the average of all of

20  the round trips that it had previously calculated.

21          Q.    What did you do to create column J on

22  this spreadsheet?

23          A.    Column J is just simply the dates from

24  the original records when the original delivery was

25  done.

**ARBITRATION**

1          Q.      What is Column K?

2          A.      Column K is the workweek, I guess it

3     would be called, 5/11/15.  I recall looking it up.

4     That was a Monday.

5                  So to group the data week over week, I

6     had to identify week 1, week 2, week 3.  And I was

7     told by Miss Lucio's counsel that Sunday through

8     Saturday is a workweek.  So each one of those dates

9     fell into a convention that it was week one.  So 5/11

10    through whatever the last day of the week is is week

11    1, and then it goes to week 2 and so on.

12         Q.      Has every date for which an invoice was

13    produced been assigned a workweek in that manner?

14         A.      It has, yes.

15         Q.      The next tab is

16    Lucio_calculationstrueup.

17                 What did you do to create this tab?

18    And that's tab B on the printouts.

19         A.      So this is an exact copy of the prior

20    tab with one single exception.  The exception is

21    flagged.  It's what's highlighted in grey.

22         Q.      What is that exception?

23         A.      That is -- I was provided information

24    again from Miss Lucio's counsel that she had I guess

25    previously testified, or there was a record that she

**ARBITRATION**

1  never made less than six deliveries in a day.

2          And on some of those days I received

3  invoices that had less than six deliveries.  So on

4  any day that had less than six deliveries, I added

5  this line and highlighted it and flagged it to

6  account for the variants, the difference.

7      Q.   How did you account for the variance or

8  the difference?

9      A.   That's actually up there in column I.

10  You'll see a number, the 38.36.  If you look at

11  5/12/15, the next column on the right, there were

12  only two deliveries that day.  So that 38.36 --

13        MR. MARKS:  What day?

14      A.   5/12/15.

15        You can see there are only two records

16  that were provided for that day.  So in order to get

17  to the six records, there was an addition of four

18  additional deliveries at the average rate of 9.59.

19  So 9.59 times four is that 38.36 number.

20      Q.   How many days did you have to do this

21  adjustment for?

22      A.   40 days.

23        MS. STILLER:  Can I just ask a

24      clarification question?

25        When you say 9.69 --

**ARBITRATION**

1          MR. EARNER:  9.59.

2          MS. STILLER:  Where do I find the 9.59

3     on this?

4          MR. WHITE:  That's where I was saying

5     it was cut off.  It's the average.  I will show

6     you on the original.

7          MS. STILLER:  You have to make it

8     larger for me to see the original then.

9          MR. EARNER:  It would be on the

10    original tab as well.  It's on both.

11         MR. WHITE:  At the very bottom there is

12    an average under the line that is now

13    populating.  It would be column I at the very

14    bottom once you have the full record there.

15    Column I is normally populated with each

16    individual round trip delivery distance.

17         Does that clarify your question?

18         MS. STILLER:  It does kind of.

19         MR. MARKS:  I can wait until cross.

20         ARBITRATOR MASUCCI:  Yes.

21         MR. MARKS:  It seemed like we stuck

22    some frog DNA in here.  We now have Jurassic

23    Park.

24         ARBITRATOR MASUCCI:  I have one

25    question.  Is the assumption that every route

ARBITRATION

190

1        test was one invoice, meaning every route is one

2        delivery?

3            Q.    Do you want to answer?

4                  MR. EARNER:  You're asking me?

5                  ARBITRATOR MASUCCI:  Yes.

6                  MR. EARNER:  If the assumption was

7        every route is one delivery, yes.  I just didn't

8        have any other way to do it.  I didn't have any

9        information otherwise that said it was more than

10       one or that there were piggyback routes or

11       anything like that.  There was nothing provided

12       to me that would even allow me to take that into

13       consideration.

14                 ARBITRATOR MASUCCI:  Let me rephrase

15       it.

16                 So if she was given a route that had

17       three deliveries, your analysis does not account

18       for the fact that she may have made several

19       drop-offs on one route.

20           A.    That's correct.  I was never provided

21   information that said that that ever occurred, and I

22   had no way to know.

23                 MR. MARKS:  Are we wasting time here,

24       because we know that that happened.

25                 MS. STILLER:  And she even testified

**ARBITRATION**

191

1      that that happened in her testimony.

2                    ARBITRATOR MASUCCI:  Let's continue.

3                        CONTINUED EXAMINATION

4      BY MR. WHITE:

5            Q.    The Lucio_hours table, what did you do?

6                  What is reflected on this tab?

7            A.    This is week over week.

8                  MR. MARKS:  What tab is that?

9                  MR. WHITE:  I believe it's D.

10                 ARBITRATOR MASUCCI:  It is.

11           Q.    What is this tab?

12           A.    This is a week-over-week summarization

13     of what Miss Lucio's actual pay was.  I believe

14     that's -- yes, that's exactly what it is.

15           Q.    Going to Joint Exhibit J2, are these

16     the checks that you used for your calculations of her

17     actual pay?

18           A.    Can you scroll down?  Do you mind,

19     please.

20                 Yes, they are.

21           Q.    How frequently were these checks issued

22     according to the document?

23           A.    These were issued --

24                 MR. MARKS:  I object.  You want to say

25        what's the date of the document?  I'm not sure

**ARBITRATION**

192

1        how he can testify to that.

2            Q.    I will withdraw and rephrase if counsel

3    prefers.

4                MR. MARKS:  I do prefer if you ask

5        appropriate questions based on the record.

6                ARBITRATOR MASUCCI:  We don't have to

7        have arguments.  Okay.

8                Rephrase the question.

9            Q.    When were the checks issued?

10           A.    On the 15th and the last day of each

11   month.

12           Q.    How did you apportion the amounts from

13   those checks to different work weeks?

14           A.    After contacting Miss Lucio's counsel,

15   I was told to include everything up to the date prior

16   that the check was issued as compensation that was

17   included in this check.  So the very first check

18   issued on 5/15/15, everything from 5/14 prior to when

19   she started would be included in that check.  That's

20   the information that was given.

21           Q.    You used that same process for each of

22   the subsequent checks?

23           A.    I did, yes.

24           Q.    How did you determine which days she

25   worked to apportion the check amounts?

**ARBITRATION**

1          A.     Those came directly off the invoices.

2     That was the data that was shown earlier.

3          Q.     How did you calculate the hours for

4     those days?

5          A.     I was given that information again from

6     Miss Lucio's counsel.  The original information I

7     received is that Miss Lucio worked from 8 a.m. to

8     6 p.m. Monday through Friday, and then 8 a.m. to

9     5 p.m. on Saturdays.  So when I started, it was

10    Monday through Friday, 10 hours, and Saturday, nine

11    hours.

12         Q.     You say that's how you started.  What

13    other elements went into the number?

14         A.     I was also told by Miss Lucio's

15    counsel, that there were four days a week that she

16    worked in excess of her past, 6 p.m.  Some of the

17    days were 45 minutes, other days were one hour, and

18    also that four days a week she would have 30-minute

19    breaks that needed to be accounted for as well.

20         Q.     How did you account for that on this

21    spreadsheet?

22         A.     That's accounted for Monday and Tuesday

23    each week.  I just added 45 minutes to those first

24    two days.  Wednesday and Thursday added one hour, and

25    then there was a 30-minute break deduction, and

**ARBITRATION**

194

1    that's where we arrive at the 10.25 for Monday

2    Tuesday, and 10.5 as a normative standard.

3            Q.    And you used those assumptions for

4    every work week?

5            A.    Yes.

6            Q.    The assumptions stayed constant?

7            A.    They stayed constant, yes.

8            Q.    This tab also has a box called federal

9    minimum wage rate?

10           A.    Yes.

11           Q.    What is this?

12           A.    That is the federal minimum wage rate

13   that was given to me by Miss Lucio's counsel that I

14   was told was in effect in 2015.

15               The regular rate is $7.25, and the

16   overtime rate is one and a half times that or $10 and

17   87 and a half cents.

18           Q.    We have to hear the last tab.  I will

19   switch to PDF4.  This is the tab labeled

20   Lucio_weekoverweek.

21               What did you do to create this tab?

22           A.    This is a summary of the prior tabs and

23   the information on the prior tabs.

24           Q.    I'm sorry.  It's a tab, the second to

25   last of the lettered tab?

**ARBITRATION**

1                MR. MARKS:  It's E.

2          A.    So this is a summary of the information

3    that was in the prior tabs that we just reviewed with

4    one addition to it, and that addition is under

5    mileage calculations, which is the mileage rate that

6    .575 was again a number provided to me by

7    Miss Lucio's counsel that I was told was the IRS

8    reimbursable rate for that period of time.

9          Q.    Just to be clear on this final

10   summarized table, how did you get the total hours

11   worked column?

12         A.    That is a summary of what we just

13   covered in the last tab for that first week, a total

14   of all of the hours that were worked in that week,

15   and it happened to be 60.5 hours that week.

16         Q.    The first two weeks were 60.5.  Why is

17   the third week less than that?

18         A.    It would be because she worked less

19   than 60 and a half hours.  So if we go back to the

20   other one, we'll be able to see it.

21         Q.    So that's --

22         A.    In that week three, 5/26/15, she didn't

23   have any delivery slips for Monday.  But it was --

24   she didn't work that Monday.  That's why there's less

25   hours.

**ARBITRATION**

196

1          Q.     How did you calculate the actual paid
2     column?
3          A.     That is the information from the checks
4     that was assigned to each day on a pro rata basis.
5          Q.     Did you calculate the miles column?
6          A.     That's a summary of the miles from that
7     true up tab that we covered earlier.  Again, just
8     condensed into a total week.  It was all done with
9     built-in Excel functions.
10          Q.     You just testified a second ago about
11     what the mile rate column was?
12          A.     Yes.
13          Q.     What is the mileage value column?
14          A.     The mileage value is again a simple
15     Excel function.  It multiplies the miles times the
16     reimbursable rate to get a dollar value.
17          Q.     Did you do that calculation manually?
18          A.     No.  That's done with a basic Excel
19     function as well.
20          Q.     What's the effective pay column?
21          A.     That is another basic Excel function.
22               MR. MARKS:  I lost where we are.  Can
23          you tell me where we are?
24               ARBITRATOR MASUCCI:  It's tab E.
25          There's only one after tab E.

**ARBITRATION**

1          MR. MARKS:  I apologize.  Thank you.

2          Q.    Just to start again, what's the

3     effective paid column?

4          A.    That right there is a calculation using

5     Excel, the basic function of Excel that takes the

6     actual pay and subtracts the not reimbursed mileage

7     value to arrive at an effective pay for each week.

8          Q.    Did you do that calculation manually?

9          A.    No.  Again, that's an Excel formula.

10          Q.    What's the effective hourly wage

11     column?

12          A.    That is the mathematical calculation

13     using Excel that takes into account the total hours

14     worked at a regular rate.  I'm sorry.  The total

15     hours worked and the effective pay to arrive at what

16     an actual hourly rate is where the first 40 hours

17     would be a regular rate and the excess hours would be

18     at a time and a half rate to arrive at a dollar value

19     of what the effective pay rate was once the mileage

20     is taken into consideration as well.

21          Q.    For this effective pay rate column, the

22     value never goes above $5.22 a mile; is that correct?

23     Am I reading the column correct?

24          A.    That's correct, yes.  $5.22 an hour,

25     yes.

**ARBITRATION**

1    Q.    Why is there a negative number on one

2    of these rows?

3    A.    During Miss Lucio's last week with the

4    actual pay that was given to her, when you take into

5    account the actual mileage driven and the

6    reimbursement rate, it actually costs money.  She

7    lost money by making deliveries.

8    Q.    This next section is labeled what she

9    was supposed to get based on Federal minimum wage.

10   What did you do to create this box?  We can start

11   with the regular hours column.

12   A.    Sure.  The regular hours is again a

13   summary of the prior tab with the first 40 hours

14   following under the regular rate, and you can see

15   that she worked at least 40 hours.  It looks like one

16   column there for 31 hours.

17   So whatever happened, that week she

18   worked less than 40 hours, and then that's how that

19   first column is calculated.

20   The second column is the 40 hours

21   multiplied by the federal minimum wage rate from the

22   prior tab to arrive at a dollar value.

23   Q.    How did you put together the overtime

24   hours columns?

25   A.    That is a difference or what the excess

**ARBITRATION**

1   hours in that week was over 40 hours brought forward

2   to that column to show overtime hours, and then

3   multiplied by the overtime rate, which is the federal

4   minimum wage rate times one and a half, that 10.875

5   on the prior sheet to arrive at a total summary if at

6   the minimum wage what the overtime pay would have

7   been for that week.

8          Q.    What is the federal minimum wage total

9   column?

10         A.    Again, basic function, addition

11  function.  It is the total regular hours, dollar

12  amount plus, the total overtime hours, dollar amount.

13         Q.    This final column here called wage

14  variance, what is that column?

15         A.    Another mathematical formula.  That's

16  the difference between that federal minimum wage

17  calculation that we just went through.  When you

18  subtract the effective wage, which is the one to the

19  left of that that we covered just a few minutes ago

20  that takes into consider or consideration the

21  non-reimbursed mileage.

22         Q.    So what is this column showing?

23         A.    That's effectively an underpayment from

24  the federal minimum wage total against the actual

25  effective pay total.  That's how much Miss Lucio was

1  underpaid for the week.

2        Q.    What's this total variance line at the

3  bottom?

4        A.    That is a total of all of the lines

5  that are above it.  That represents the $6,257.04

6  over 24 weeks that Miss Lucio was paid or underpaid.

7        Q.    For all the different cells on all the

8  different tabs in this spreadsheet, what were the

9  inputs that went into it?

10        A.    Sorry.  Can I have that question --

11        Q.    All the different data that you had to

12  arrange to have going into it.

13        A.    It was the data we first covered that

14  was extracted from the individual invoices.  It was

15  the information provided by Google for the driving

16  distances.  It was the paycheck data that came off

17  the paychecks.  It was the inputs that were provided

18  by Miss Lucio's counsel, the federal minimum wage

19  right, the IRS reimbursement rate, as well as the

20  true up decision for less than six deliveries in a

21  day.  Those all went into this calculation.

22        Q.    So what filled in every other cell

23  besides the one that were just the direct inputs?

24        A.    Other than the ones I just mentioned,

25  those were all calculations using Excel and built-in

1    functions that are within.

2              Q.    Just straightforward math?

3              A.    Straightforward math.  That includes

4    all of this.  Just basic math.

5                    MR. WHITE:  That's all I have for

6         direct.

7                    ARBITRATOR MASUCCI:  Let's take a few

8         minutes.

9                    MR. MARKS:  Can we wait until I cross

10        examine the witness?

11                   ARBITRATOR MASUCCI:  Let's wait until

12        he cross examines the witness, and I actually

13        have one question.

14                   Earlier today I thought Miss Lucio

15        testified that Saturdays she worked from 9 to 3,

16        but sometimes until 5.  And what I heard him say

17        is that the calculation was based on Saturday

18        work of 9 to 5.

19                   If I'm incorrect, that's fine.  But I

20        would like to go back to where she testified on

21        her Saturday hours to clarify that.

22                   MR. WHITE:  Your recollection of the

23        testimony is correct from before.

24                   ARBITRATOR MASUCCI:  Right.  That's my

25        recollection also, that she testified to 9 to 3.

**ARBITRATION**

1           And you calculated Saturday based on

2     nine to five; correct?

3           MR. EARNER:  That's correct.  And just

4     for the point of clarity, there was excess hours

5     that were in here that would have mostly likely

6     been at the overtime rate, and we can look at

7     that very quickly as well.

8           ARBITRATOR MASUCCI:  You might want to

9     look at it on a break.  How long do we need?

10           MS. STILLER:  Are we going to go ahead

11     with the witness that you wanted to take out of

12     order?  And if so, do we need to do it now?  Do

13     I need to get my IT person in to make sure we're

14     set up to do it by video?

15           MR. FREI-PEARSON:  Mr. Oliveria is in

16     class until 3:45, and then he's going to go to

17     the place to testify at 4.

18           ARBITRATOR MASUCCI:  So we might be

19     able to get a little bit of cross in.

20           MR. FREI-PEARSON:  I have my phone with

21     me.  As soon as Mr. Oliveria calls me, then

22     I'll know he is where he needs to be.  And I

23     suggest that we take a break and work out the

24     video.

25           MS. STILLER:  I don't think we need a

**ARBITRATION**

1          lot of time together, but just a little.

2                    ARBITRATOR MASUCCI:  Okay.

3                    (Time noted:  3:35 p.m.)

4                    CROSS EXAMINATION

5     BY MR. MARKS:

6          Q.    Mr. Earner, explain to me again how you

7     figured out the hours that you assigned to

8     Miss Lucio?

9          A.    Yes.  They were given to me by

10    Miss Lucio's counsel.

11         Q.    What were they?

12         A.    They were 8 to 6 p.m. Monday through

13    Friday, and 8 to 5 p.m. on Saturday.

14         Q.    And then you added some time as well

15    beyond that?

16         A.    Yes.  I was instructed to do so by

17    Miss Lucio's counsel.

18         Q.    How much time?  I understand all the

19    information you got you got from --

20         A.    I wanted to make sure I didn't add

21    anything.

22         Q.    You didn't read her deposition?

23         A.    Not at all.

24         Q.    You didn't talk to Miss Lucio?

25         A.    No.  I never saw her before today.

**ARBITRATION**

1              So I will answer your question.

2              I was told that she worked four days a

3    week in excess of 6 p.m., and the excess time was

4    anywhere from 45 minutes to an hour.  I was

5    instructed to apportion that two days at 45 minutes,

6    two days at one hour and also deduct breaks as well,

7    four 30-minute breaks throughout the week.  One on

8    Monday, one on Tuesday, one on Wednesday, one on

9    Thursday.

10         Q.    Was it just random what days you

11   attributed that to?

12         A.    That's what was given to me.

13         Q.    They said put this break on Monday?

14         A.    Yes.

15         Q.    Would that have any impact on the

16   analysis if you moved the break to Friday?

17         A.    It could.

18         Q.    It could change it?

19         A.    Yes.  I would have to think it all the

20   way through, but if the breaks were taken later in

21   the week, she would hit her overtime earlier, and it

22   will actually increase the rest of the calculations.

23         Q.    The extra 45 minutes you added from

24   Monday to Friday, if that were later in the week,

25   that would undo that?

**ARBITRATION**

1          A.    I would have to do the math.  I would

2    have to use the formula to say for sure, but I can

3    say with a hundred percent certainty, yes, it will

4    change things.  Yes.

5          Q.    How long did it take you to do this

6    whole entire calculation?

7          A.    The whole sheet, about four hours.

8          Q.    So this whole job took four hours to

9    get to the conclusion?

10         A.    No.  There was some review time.  I

11   shared it with Miss Lucio's counsel, including review

12   time of this sheet, six hours, six and a half hours.

13         Q.    A total of six and a half hours to do

14   this whole project?

15         A.    Yes.

16         Q.    How much did you charge for that?

17         A.    I haven't charged anything yet.

18         Q.    How much were you going to charge?

19         A.    Whatever the same rate was for the last

20   one.  I think it was approximately $190 an hour I

21   guess.  I don't do the actual billing.

22         Q.    You don't set your own rate as

23   president of the equipment?

24         A.    No.  In fact, I'm not going to be

25   ignored in any way by being here.  Personally I'm on

**ARBITRATION**

1    a salary.

2           Q.     You're not paying for your time now?

3           A.     This is where I am for my work day

4    today.

5           Q.     So you're not going to charge for that?

6           A.     I'm not going to charge any sort of

7    special rate.  No.  My company is going to charge

8    again probably -- I will even set it now, $190 for

9    the work I did on this.

10          Q.     How many work days did you include in

11   your calculation?

12          A.     How many work days?

13          Q.     Yes.

14          A.     One work day for every day we had a

15   record.

16          Q.     How many days is that?

17          A.     I don't know the exact number of days.

18   I know it was 24 weeks, and she averaged six days a

19   week.  So I can give you a ballpark figure if you

20   want.

21          Q.     I would like to know the actual figure.

22          A.     We can count it, if you want.  We can

23   go through.

24          Q.     You haven't done that, I guess?

25          A.     I haven't done that now.  Every day

**ARBITRATION**

207

1    that she had a delivery record I counted as a work

2    day.  That's what I can tell with a hundred percent

3    certainty.

4              Q.    On how many days did you not have

5    records and you had to use six deliveries?

6              A.    So there were never any days that we

7    added six deliveries if there wasn't a record.  If

8    there was a record to establish a work day, and there

9    were less than six records, there were 40 of those

10   days, if that's your work.

11             Q.    40 days were less than six records?

12             A.    That's correct.

13             Q.    That's like 33 percent of the time is

14   less than six records; right?

15             A.    I'd have to do the math.  I mean if you

16   figured it out --

17             Q.    I figured she worked 124 work days.

18   That's information that we provided.

19                   Are you aware of that?

20             A.    Yes.  Absolutely.

21             Q.    So you're aware of the list of days

22   that Diligent produced that said these are the days

23   she was compensated for; correct?

24             A.    I was aware of the days that there were

25   records.  If that's the same thing you're talking

**ARBITRATION**

208

1   about, then yes, that's correct.

2          Q.    It's not.  Did you receive a list of

3   the days that Diligent compensated the claimant for?

4          A.    I don't recall receiving it.  If I did,

5   I didn't use it for these calculations.

6          Q.    Now again, I think we covered this

7   before, but all of your calculations on distance

8   involved from the store to the customer on the

9   invoice, back to the store?

10         A.    Yes.  Google's calculations, but yes

11  all the calculations I used, yes.

12         Q.    So there's no account made for a

13  situation where three invoices were given at the same

14  time; correct?

15         A.    No.  In fact, to my knowledge, nothing

16  like that was ever produced.  At least I never

17  received it, so I had no way to know that.  If that

18  record exists, it wasn't provided to me.

19         Q.    You didn't ask about that?

20         A.    No.  I was given what was provided.

21         Q.    Would that materially change your

22  calculation?

23         A.    Materially?

24         Q.    Yes.

25         A.    It would be speculative.  I have no

**ARBITRATION**

1    idea.  I don't know.

2            Q.    You used the average miles per

3    delivery.  So, I don't know.  If one day she went a

4    thousand miles, and every other day she went one

5    mile, you would have the same results.  Is average

6    the right thing to use here, or should it be media?

7            A.    That's a judgment call.  I have no

8    idea.  I didn't make any decisions.  I asked

9    Miss Lucio's counsel.

10           Q.    That's a judgment call?

11           A.    Yes, to use that.

12           Q.    Do you know what the work week was at

13   Parts Authority?

14           A.    No.

15           Q.    You used Saturday to Sunday or Sunday

16   to Saturday?

17           A.    Sunday to Saturday.  That's what was

18   provided to me.

19           Q.    If the work week was Thursday to

20   Wednesday, would that make a change in your

21   calculations?

22           A.    I'm sure it would have.  I don't know

23   how.  Materially, very unlikely.

24           Q.    It's interesting how you know that

25   that's not material.  But when I asked you before,

**ARBITRATION**

1   you weren't able to say it wasn't material.

2         Do you know that it's not material?

3         ARBITRATOR MASUCCI:  Could you let him

4      answer the question before you ask your next

5      question, please.

6      A.   What I'm saying is if it starts on

7   Saturday, right, versus Tuesday, versus Wednesday,

8   the delivery slips were still the same for every

9   finite day.  Perhaps it was too far to say material.

10  I don't know that it wouldn't materially change.

11        But if you're asking me, I didn't

12  calculate it that way.  I don't know the answer to

13  that.

14      Q.   Did you include any situation where

15  Miss Lucio made a delivery and then went home instead

16  of going back to the store?

17      A.   I was never informed of that when that

18  happened.  I didn't have the information to calculate

19  it.

20      Q.   Now I think you said that you used a

21  check date, so you included everything up until the

22  14th.

23      A.   That would be for that first check,

24  yes.  That's what I said the day prior.  Everything

25  up to the day prior to the day the check was issued,

**ARBITRATION**

1  from the date of the last calculated date to the date

2  prior to when the next check was issued, that was the

3  inclusive.

4          Q.    So not the 15, just the 14?

5          A.    On that first one, yes.

6          Q.    Okay.  On every other one, what was the

7  period?

8          A.    From the 15th through the end of the

9  month or the day prior to the check issued, so it

10  would have included 15th as well on the next check.

11                Does that make sense?

12          Q.    No.  Maybe I'm just not following.  For

13  the first pay period you computed it to the 14th?

14          A.    That's correct, yes.

15          Q.    Then the second pay period you computed

16  from the 15th to the end of the month?

17          A.    To the day prior to the end of the

18  month.  The check was issued at the end of the month,

19  the last day of the month.

20          Q.    Your assumption was that the check did

21  not include the final day of the month or the 15th of

22  the month?

23          A.    That's what I was told, yes.  I didn't

24  make any assumptions.

25          Q.    So you're saying that the check then

ARBITRATION

1  for, I don't know, April -- the check for June would

2  have included May 31 through June 14?

3         A.    That's correct, yes.  If that's the

4  date, yes.

5         Q.    Those are dates.

6         A.    Yeah.  I would have to look at the

7  check to make sure there was one issued.  But yes, I

8  believe that is in the window.  Actually, I can check

9  right here.  So yes, I can confirm that.

10        Q.    So you didn't give any deposition

11 testimony?

12        A.    None.

13        Q.    Did you do anything to verify the math

14 that you did?

15        A.    To verify it?

16        Q.    Yes.

17        A.    I did spot check it from time to time,

18 yes.

19        Q.    What did you do to a spot check?

20        A.    I would manually calculate using a

21 calculator.

22        Q.    So you checked the math that was done,

23 not the --

24        A.    So In order to verify that my function

25 was working, what was done in Excel, I would spot

**ARBITRATION**

1  check using an actual math calculator outside that,

2  and I never had any discrepancy between the two and

3  never changed it.

4          Q.    But you kept the same assumptions?

5          A.    I used the same strategy, yes.

6          Q.    Which was 8 to 5 on Saturday?  Yes?

7          A.    That was part of them, yes.

8          Q.    The 1st to the 14th, or the 31st to the

9  14th?

10         A.    Yes, sir.

11         Q.    Every delivery being a single delivery;

12  yes?

13         A.    That's correct, yes, sir.

14         Q.    And even if she went home, you were

15  still giving her mileage back to the store; yes?

16         A.    I had no other information other than

17  what I told you.

18         Q.    You also assumed that she worked passed

19  6 o'clock four days a week?

20         A.    Again, I made no assumptions.  I was

21  given that information, and that's in the

22  calculation.  That's included, yes, sir, if that's

23  what you're asking.

24         Q.    If all of those things are wrong, then

25  your calculation is wrong?

**ARBITRATION**

214

1         A.     That's correct.

2                MR. MARKS:   Thank you.   I have nothing

3     else.

4                ARBITRATOR MASUCCI:   Redirect?

5                   EXAMINATION

6 BY MR. WHITE:

7         Q.     Mr. Earner, you testified that Total

8 Trial Solutions has done spreadsheets like this in

9 other arbitrations; is that correct?

10        A.     On four occasions, yes, that I'm aware

11 of.

12        Q.     In those other spreadsheets that were

13 put together, did the delivery distance calculations

14 include multiple deliveries on the same runs?

15                MR. MARKS:   Relevance.

16                ARBITRATOR MASUCCI:   What is the

17     relevance?

18                MR. WHITE:   Just establishing the

19     difference in the underlying data set that we

20     had to work with.

21                ARBITRATOR MASUCCI:   Are they

22     arbitrations similar to this one?

23        Q.     Were those delivery driver

24 arbitrations?

25        A.     Yes, they were.

**ARBITRATION**

1       Q.     In which you calculated -- in which

2    Total Trial Solutions calculated -- were those

3    arbitrations in which Total Trial Solutions had to

4    calculate the distances that delivery drivers

5    performed runs?

6              MR. MARKS:  I object.  If we're going

7         to talk about what we did in other classes, it's

8         clearly expert testimony because he's going to

9         make a comparison to what happened here.

10             ARBITRATOR MASUCCI:  I think that you

11        should disregard the question.

12             Is there anything else?

13             I don't have any questions.

14             MR. FREI-PEARSON:  We're waiting for

15        Mr. Oliveria who had a lab, but I expect he will

16        call me shortly.  He said he was on his way.  He

17        had to go to another building.

18             ARBITRATOR MASUCCI:  You can go off the

19        record.

20             (At this time, a recess was taken.)

21             MR. WHITE:  I'd like to offer into

22        evidence Claim C1, the spreadsheet that was

23        described in the testimony of Michael Earner.

24             MR. MARKS:  I object, because it's not

25        a demonstrative exhibit based on the facts we

**ARBITRATION**

216

1        have here, so it's irrelevant.

2                ARBITRATOR MASUCCI:  So in terms of

3        relevance, I'm going to take it in and apply

4        whatever worth I deem appropriate acknowledging

5        the facts that are variances between the

6        testimony and some of the information and

7        assumptions that were made.

8                MR. MARKS:  I would ask the arbitrator

9        to take judicial notice of the hearing

10       transcript in the Johnson v. Parts Authority

11       case in which Miss Lucio is a plaintiff.

12               The complaint is a Joint exhibit, and

13       her opt-in notice is a Joint exhibit, but I had

14       offered the transcript of oral argument wherein

15       claimants assert that Diligent is not the

16       employer.

17               ARBITRATOR MASUCCI:  Diligent is not

18       the employer?

19               MR. MARKS:  That's claimant's assertion

20       that was in opposition to arbitration, the

21       position being that we are not contending

22       that -- well, it's in our brief but, in fact,

23       Diligent was not his employer.  He doesn't

24       allege that Parts Authority or Diligent were

25       related in any way or were components of a

**ARBITRATION**

217

1        single employer relationship, or joint

2        employers, or joint tortfeasors were under

3        common control or any other relationship which

4        results in the legal treatment of them as the

5        same entity or holds one responsible for the

6        conduct of the others.

7                    MR. FREI-PEARSON:  May I respond to

8        that?

9                    ARBITRATOR MASUCCI:  Yes.

10                    MR. FREI-PEARSON:  We're not --

11        Miss Lucio is certainly not estopped by that

12        argument which is made to avoid arbitration so

13        that it can proceed in court -- we made an

14        argument, which is certainly not binding on

15        Miss Lucio's behalf.  In fact, that article was

16        made on behalf of Mr. Johnson.

17                    We have no objection to an exhibit

18        coming in because it's an arbitration.  As a

19        legal matter, if they're there to argue because

20        Mr. Johnson chose to assert a claim against

21        Parts Authority only, that that somehow estops

22        Miss Lucio, that's just wrong as a matter of

23        law.  For estoppel to happen, the court has to

24        agree with the argument in the same case and

25        rely on it.  Clearly the court didn't agree with

**ARBITRATION**

1      us because we wouldn't be here if they had.

2                So we have no objection to the

3      transcript coming, but we think it's entitled to

4      zero weight.

5                ARBITRATOR MASUCCI:  I will take it in,

6      again noting the arguments that are being made.

7      Has there been a stipulation as to the

8      respondents in this matter?

9                MR. FREI-PEARSON:  We have not yet

10     worked that out.  We had a conversation and

11     we'll continue to work that out.

12               MR. MARKS:  Can we please mark this as

13     Respondent's Exhibit A.

14               (Respondent's Exhibit A, the transcript

15     of Civil Cause for Motion Hearing before the

16     Honorable Robert M. Levy, United States

17     Magistrate Judge, marked for Identification as

18     of this date.)

19               ARBITRATOR MASUCCI:  We're going to

20     have the oath administered to you.  Can you

21     raise your right hand.

22     R E N A N    O L I V E R I A, a Witness herein,

23               having been first duly sworn by Terri

24               Fudens, a Notary Public of the State

25               of New York, was examined and

**ARBITRATION**

219

1                testified as follows:

2                    DIRECT EXAMINATION

3    BY MR. POTASHNICK:

4         Q.    Mr. Oliveria, I want to apologize again

5    for the logistical issues.

6                Can you tell us what you were doing

7    before you testified today?

8         A.    I'm in between classes right now on

9    break at Georgia Perimeter College.

10        Q.    What's your educational background?

11        A.    I graduated high school in 2009, and

12   I'm currently attending college.

13        Q.    Why are you here today?

14        A.    I'm here to tell the truth about how

15   Parts Authority treats its employees and how we're

16   underpaid.

17        Q.    Do you know Miss Lucio?

18        A.    Yes.  She's my sister-in-law.

19        Q.    Does that relationship affect your

20   ability to tell the truth?

21        A.    Absolutely not.  I'm here to tell the

22   truth.

23        Q.    What's your relationship with Parts

24   Authority?

25        A.    I used to work for them, and I filed a

**ARBITRATION**

220

1    claim against them.

2            Q.    When did you first work for Parts

3    Authority?

4            A.    January, 2015.

5            Q.    How did you start working for Parts

6    Authority?

7            A.    I asked my cousin's husband, and he

8    said that I could get a job at Parts Authority, so he

9    gave my number to Fred.  He contacted me and he

10   texted me, and I met him at his office at Norcross

11   next to the Parts Authority store.

12           Q.    What happened in that meeting?

13           A.    He asked me for documentation.  He made

14   me sign some paperwork, and I wasn't able to read

15   through all of it.

16           Q.    Why didn't you read through all of it?

17           A.    Fred made me feel rushed.

18           Q.    Do you know if the documents Fred made

19   you sign said you can hire other workers to do your

20   work for you?

21           A.    I don't know.

22           Q.    Is it a true statement that you could

23   hire other workers to do your work for you?

24           A.    No.

25           Q.    What else happened during the meeting?

1          A.     He said I would be working at Parts

2    Authority.

3          Q.     When did you start working for Parts

4    Authority?

5          A.     January of 2015.

6          Q.     And were you a temp worker or a W2

7    worker at that time?

8          A.     I was a temp worker.

9          Q.     What were your job responsibilities?

10          A.     To deliver car parts.

11          Q.     What were your hours?

12          A.     8 to 5:30, and sometimes 5 -- 8:30 to

13    6.

14          Q.     How did you get your hours?

15          A.     Kathy the manager assigned them to us.

16          Q.     Did you ever want to take days off?

17          A.     Yes.

18          Q.     Were your requests for days off

19    granted?

20          A.     Sometimes yes, sometimes no.

21          Q.     We talked earlier about whether or not

22    you were allowed to hire drivers to replace you.  Why

23    do you say you weren't allowed to hire drivers to

24    replace you?

25          A.     We had a meeting and at that meeting

**ARBITRATION**

222

1  Kathy told us specifically that we cannot hire or

2  have drivers replace us.

3          Q.      Who is Kathy?

4          A.      Kathy is the Parts Authority manager.

5          Q.      How often did Kathy have meetings?

6          A.      I'm sorry.  What was that question?

7          Q.      How often did Kathy have meetings with

8  the drivers?

9          A.      About once or twice a week.

10          Q.      What happened in those meetings?

11          A.      She would just mention about any

12  problems going on at the warehouse, if the drivers

13  were being late or if we were taking too long on

14  deliveries.

15          Q.      Were those meetings just for temp

16  drivers?

17          A.      They were for W2 and temp drivers.

18          Q.      Did you, and we'll get into this in

19  more detail later, but did you later on become a W2

20  driver after working as a temp driver?

21          A.      Yes, I did.

22          Q.      Did you have to use Parts Authority's

23  paperwork?

24          A.      Yes.  Two drivers and temp drivers had

25  to use Parts Authority paperwork.

1          Q.     Who told you to use Parts Authority
2     paperwork?
3          A.     Kathy, the manager.
4          Q.     Did you have to get Parts Authority
5     customers' signatures each delivery?
6          A.     Yes.
7          Q.     Was that true when you were a temp
8     driver and when you were a W2 driver?
9          A.     Yes.
10         Q.     Who told you to get signatures each
11    delivery?
12         A.     Kathy.
13         Q.     Did you have to check the accuracy of
14    the parts delivered each delivery?
15         A.     Yes.
16         Q.     Was that true when you were a temp
17    driver and when you were a W2 driver?
18         A.     Yes.
19         Q.     Who told you to check the accuracy?
20         A.     Kathy did.
21         Q.     Did you have to bring back Parts
22    Authority's paperwork for each delivery?
23         A.     Yes.
24         Q.     Was that true when you were a temp
25    driver and when you were a W2 driver?

**ARBITRATION**

224

1           A.     Yes.

2           Q.     Who told you to bring back the

3    paperwork?

4           A.     Kathy.

5           Q.     Did you manage anyone as a temp driver?

6           A.     No.

7           Q.     Could you change the amount of your

8    profit or loss by doing more or less work?

9           A.     No.  We had to do the work that was

10   given to us.  If I took a day off, I would get

11   deducted for that, and the work was or the pay was

12   predetermined.  We do not pick up extra work.

13          Q.     Did you ever ask Parts Authority

14   customers if you could do additional work for them?

15          A.     No.  I feel like I would get in trouble

16   if I did.

17          Q.     Who was your boss when you worked as a

18   Parts Authority temp driver?

19          A.     Kathy was.  We had to report to her at

20   the beginning and the end of the day, and she could

21   fire us if she wanted to.

22          Q.     How long did you work for Parts

23   Authority after you started in about January of 2015?

24          A.     About 13 months.

25          Q.     Why did that position end?

**ARBITRATION**

225

1          A.     The work and the hours were completely

2     controlled by Parts Authority.  I was working more

3     than 50 hours a week, and I needed more time to

4     myself.

5          Q.     Did you ever talk to Miss Lucio about

6     working for Parts Authority?

7          A.     Yes.  I was the one that told her about

8     the job.

9          Q.     How did that conversation go?

10          A.     I told her that she could contact Fred

11    and that she would be working for Parts Authority.

12          Q.     Did you tell her the job would be with

13    Diligent?

14          A.     No, because most of the work was done

15    at Parts Authority.

16          Q.     Do you know where Miss Lucio worked?

17          A.     She worked at the Roswell store.

18          Q.     Which store did you work at?

19          A.     The Woodstock store.

20          Q.     And how far apart were the Woodstock

21    and Roswell stores?

22          A.     I think about 15 miles.

23          Q.     Did you ever consider working at the

24    Roswell store?

25          A.     Yes.  My wife and I, we were planning

**ARBITRATION**

226

1    on either moving to Roswell or Marietta.  So I asked

2    Kathy if the stores ran the same, and she told me

3    that they were the same.  I also asked Susana about

4    information.  She told me they are the same.  And I

5    also spoke to other Parts Authority employees, and

6    they told me the same thing.

7              Q.    Did you ask Fred?

8              A.    No.

9              Q.    After you stopped being a temp driver

10   for Parts Authority, did you come to work for Parts

11   Authority again?

12             A.    Yes.

13             Q.    What happened?

14             A.    A friend of mine told me that Parts

15   Authority was hiring W2 drivers, and I spoke to

16   Kathy, filled out an application, and I was hired.

17             Q.    And about when did that happen?

18             A.    June of 2017.

19             Q.    Can you list all of the differences

20   between your job as a W2 driver for Parts Authority

21   and your job as a temp driver for Parts Authority?

22             A.    As a W2 employee I was paid more --

23   excuse me.  Sorry.

24                   As a W2 employee, I was paid more, I

25   had an hourly wage.  I had -- as a W2 employee, I

1    also had to clean the bathrooms and put up car parts

2    in between deliveries.  I did not have to do that as

3    a temp worker.  And also as a W2, I got reimbursed

4    for my driving costs.

5             Q.    As a W2, did you have to wear a

6    uniform?

7             A.    No.

8             Q.    As a temp did you have to wear a

9    uniform?

10            A.    Yes.

11            Q.    Are there any other differences?

12            A.    No, nothing I can think of right now.

13            Q.    Any differences in the way you

14   performed the runs themselves?

15            A.    No.  It was the same.

16            Q.    Any differences in the way the runs

17   were assigned?

18            A.    It was on a first come, first serve

19   basis.

20            Q.    As a temp driver, did you have the

21   ability to decide which runs to take?

22            A.    No.

23            Q.    As a W2 driver, did that change?

24            A.    No.  It was the same.

25            Q.    As a temp driver, did you have more

**ARBITRATION**

228

1  freedom over your schedule than you had when you were

2  a W2 driver?

3          A.    No.  We had set hours.  We had set

4  hours as a W2 and a temp driver.

5          Q.    As a temp driver, were you allowed to

6  work for other companies in between deliveries?

7          A.    As a temp driver I had to make the

8  deliveries and return to the warehouse.  It was the

9  same.

10         Q.    That didn't change when you were a W2

11  driver?

12         A.    It did not change.

13         Q.    When you were a temp driver, if a

14  customer had questions or complaints when you made a

15  delivery, what did you do?

16         A.    I called Kathy and she would try to

17  resolve it.

18         Q.    Did that change when you were a W2

19  driver?

20         A.    It did not change.

21         Q.    Did Kathy ever punish you?

22         A.    No.

23         Q.    Did Kathy ever threaten to punish you?

24         A.    Yes.  She would threaten us, to fire us

25  if we didn't do the work that Parts Authority wanted

1    us to do.

2            Q.    Did she make that threat to temp

3    drivers or just to W2 drivers?

4            A.    She made it to the W2 and temp drivers.

5    It was the same.

6                  MR. POTASHNICK:  No further questions

7        for me.  Opposing counsel may ask some

8        questions.

9                  We're going to wait and then you might

10       have some questions coming.

11           A.    Sure.

12                 (At this time, a brief recess was

13       taken.)

14                 ARBITRATOR MASUCCI:  Mr. Oliveria, this

15       is cross-examination.

16                   CROSS EXAMINATION

17   BY MR. MARKS:

18           Q.    Do you see me over here?  I'm in the

19   corner.

20           A.    Okay.

21           Q.    So you opted into a litigation pending

22   against Parts Authority seeking unpaid overtime and

23   minimum wage; is that right?

24           A.    Yes.

25           Q.    When did you do that?

**ARBITRATION**

230

1          A.      When did I file for that?

2          Q.      Yes.

3          A.      I'm not sure of the exact date.

4          Q.      It was before you went to Parts

5    Authority and got a job, right, as a W2 employee?

6          A.      I believe so.

7          Q.      You also told your sister-in-law that

8    she should go to work for Parts Authority as a

9    Diligent driver; correct?

10         A.      Yes.

11         Q.      So you recommended that job, even

12   though you thought at the time you were getting

13   ripped off; yes?

14         A.      At the time I did not believe that.  I

15   didn't know the information.

16         Q.      So for the first five months from

17   January to May of 2017, you claim you were not

18   getting -- you were working 50 hours or more and not

19   getting overtime?

20         A.      I wasn't -- I know in the beginning I

21   wasn't sure that I was getting ripped off, but I

22   eventually learned that I was.  I'm not sure when

23   that went about.  I don't know the date of my

24   realization.

25         Q.      So you intend to bring an arbitration

**ARBITRATION**

1  claim against Parts Authority alleging that they owe

2  you money; right?

3              MR. FREI-PEARSON:  Objection.  Calls

4      for a legal statement from a non-lawyer.

5              MR. MARKS:  He intends to bring a

6      lawsuit?

7              MR. FREI-PEARSON:  You said bring an

8      arbitration.

9              MR. MARKS:  I withdraw that.

10         Q.    You've commenced an action against

11  Parts Authority.  Do you intend to proceed with that

12  action?

13         A.    I will refer to my counsel for that.

14              ARBITRATOR MASUCCI:  I don't

15      understand.  Why don't you just either rephrase

16      it or ask it again so that I can understand.

17         Q.    You opted into a litigation; correct?

18         A.    Yes.

19         Q.    Under the Fair Labor Standards Act;

20  yes?

21         A.    I'm not sure.  I'm not a lawyer.

22         Q.    Oh.  So you don't know what claim you

23  made.  Did you claim overtime?

24         A.    I believe so, yes.

25         Q.    Did you claim that you were

**ARBITRATION**

232

1   misclassified as an independent contractor but were

2   actually an employee, is that the basis of your

3   claim?

4                   MR. FREI-PEARSON:  Objection.

5                   ARBITRATOR MASUCCI:  Go ahead and

6        answer.

7           A.     I was a temp worker.

8           Q.     You were a temp worker.  What does that

9   mean?

10          A.     They treated me differently, not as an

11  independent contractor.

12          Q.     Who treated you differently, not as an

13  independent contractor?

14          A.     Parts Authority.

15          Q.     What did Diligent do; how did they

16  treat you?

17                  ARBITRATOR MASUCCI:  Could you wait a

18       minute.

19          A.     Basically not much.

20                  ARBITRATOR MASUCCI:  Could you wait a

21       minute.

22                  You have to be careful when you're

23       asking questions, because there is a delay, so

24       he's not hearing you.  It's again slow down, but

25       because of the technology.

233

1          Q.     Have you spoken to Miss Lucio about her

2     claims against Parts Authority?

3          A.     Yes.

4          Q.     How frequently have you spoken with her

5     about it?

6          A.     Not very frequently.

7          Q.     More than five times?

8          A.     Not -- maybe not even five.

9          Q.     Did you review her deposition

10    testimony?

11         A.     No.

12         Q.     Can you tell me again what store --

13    what Parts Authority store you were working out of?

14         A.     I worked out the the Woodstock Parts

15    Authority store.

16         Q.     And do you know what Kathy's last name

17    is?

18         A.     I forgot.  I think it's Bryan.  I'm not

19    sure.

20         Q.     Did you speak with Miss Lucio about her

21    deposition?

22         A.     No.

23                MR. MARKS:  I'm done.  Thank you.

24                ARBITRATOR MASUCCI:  I've got a

25        question, and please clarify it for me.  I'm the

**ARBITRATION**

234

1        arbitrator.

2                MR. OLIVERIA:  Okay.

3                ARBITRATOR MASUCCI:  When you were

4        hired as a temp, were you hired by Diligent or

5        by Parts Authority directly?

6                MR. OLIVERIA:  I'm not sure.  The

7        paperwork I don't remember.

8                ARBITRATOR MASUCCI:  Was the paperwork

9        presented to you by Fred?

10               MR. OLIVERIA:  Yes.

11               ARBITRATOR MASUCCI:  Were you

12       classified as an independent contractor or a

13       temp?

14               MR. OLIVERIA:  I'm not sure what the

15       paperwork said.  I don't have a copy of it.

16               ARBITRATOR MASUCCI:  So you said that

17       you began work in January of 2015.  Miss Lucio

18       began in May of 2015.

19               MR. OLIVERIA:  Yes.

20               ARBITRATOR MASUCCI:  Were you

21       unsatisfied or dissatisfied with your work

22       between January and May?

23               MR. OLIVERIA:  I don't believe I knew

24       that I was being, like, quote unquote ripped off

25       at that point.

1            ARBITRATOR MASUCCI:  When did you

2     become aware that you might have been ripped

3     off.

4            MR. OLIVERIA:  I'm not sure of the

5     exact date.

6            ARBITRATOR MASUCCI:  When did you begin

7     work as a W2 employee.

8            MR. OLIVERIA:  June of 2017.

9            ARBITRATOR MASUCCI:  Okay.  When you

10    said that as a temp you wore a uniform, was

11    there anything written on the uniform?

12           MR. OLIVERIA:  Yes.  It said

13    Diligent.

14           ARBITRATOR MASUCCI:  That's all the

15    questions I have.  Any redirect?

16           MR. FREI-PEARSON:  Thank you again,

17    Renan.  We appreciate it.

18           ARBITRATOR MASUCCI:  Thank you.

19           MR. OLIVERIA:  You're welcome.

20           ARBITRATOR MASUCCI:  Good luck in

21    class.

22           MR. OLIVERIA:  I can hang up soon?

23           ARBITRATOR MASUCCI:  Right now.

24           Off the record.

25           (Time noted:  5:15 p.m.)

236

1                    C E R T I F I C A T E

2

3              I, Terri Fudens, a Shorthand Reporter

4    And Notary Public within and for the State of New

5    York, do hereby certify:

6              I reported the proceedings in the

7    Within-entitled matter, and that the within

8    Transcript is a true record of such proceedings.

9              I further certify that I am not related

10   By blood or marriage and that I am in no way

11   Interested in the outcome of this matter.

12              IN WITNESS WHEREOF, I have hereunto set

13   My hand this 26th day of January, 2019.

14

15

16

17   _____
                    TERRI FUDENS
18        Registration No. 01FU6230430
          Notary Public for the State of New York
19        My commission expires:  November 1, 2022

20

21

22

23

24

25

**$**

**$1,037 (1)**
160:18
**$1,037.54 (1)**
160:13
**$1,150 (4)**
71:23,24;160:17,18
**$10 (1)**
194:16
**$12,514.08 (2)**
23:6;24:14
**$190 (2)**
205:20;206:8
**$2,300 (3)**
33:16;160:10,18
**$5,916 (1)**
132:20
**$5.22 (2)**
197:22,24
**$6,257.04 (3)**
21:16;23:5;200:5
**$7,733.63 (1)**
133:1
**$7,734 (1)**
132:15
**$7.25 (1)**
194:15

**A**

**AAA (1)**
12:23
**ability (9)**
17:5,21;18:12;19:3,9;
146:22;175:18;219:20;
227:21
**able (9)**
10:5;146:18;152:2;
175:15,18;195:20;202:19;
210:1;220:14
**above (2)**
197:22;200:5
**Abrams (1)**
8:2
**absolute (2)**
36:8;169:17
**Absolutely (2)**
207:20;219:21
**accelerated (1)**
171:15
**accept (4)**
42:16;102:24;115:5,25
**accepted (4)**
32:15;104:14;115:5;
171:11
**accepting (1)**
161:21
**according (3)**
22:8;130:16;191:22
**account (10)**
22:13;185:23,25;188:6,7;

190:17;193:20;197:13;
198:5;208:12
**accountant (10)**
95:15,18,20,22;96:24;
97:2,14,17;98:3,12
**accounted (2)**
193:19,22
**accounts (1)**
50:16
**accuracy (2)**
223:13,19
**accurate (1)**
125:17
**accurately (1)**
97:3
**acknowledging (1)**
216:4
**acquire (1)**
74:4
**acquired (1)**
26:25
**acquiring (1)**
74:7
**across (1)**
169:8
**Act (2)**
13:22;231:19
**acted (2)**
23:15,22
**acting (3)**
16:23;80:25;81:2
**action (2)**
231:10,12
**actual (11)**
191:13,17;196:1;197:6,
16;198:4,5;199:24;205:21;
206:21;213:1
**actually (30)**
35:15,18;36:25;65:2;
116:5;155:22;156:23;
158:23;168:10,22;169:21,
22;170:4,9;172:1,17;179:9,
25;180:4;181:16,17;183:23;
184:10;186:15;188:9;198:6;
201:12;204:22;212:8;232:2
**ad (1)**
183:24
**add (2)**
27:9;203:20
**added (6)**
188:4;193:23,24;203:14;
204:23;207:7
**addition (4)**
188:17;195:4,4;199:10
**additional (7)**
17:1,24;18:19,19;180:1;
188:18;224:14
**address (14)**
59:20,22;182:24;183:1,5,
6,8,10,13,14,15,16,24,25
**addresses (2)**
55:9;182:15,20
**adjustment (1)**

188:21
**administer (1)**
29:4
**administered (1)**
218:20
**Administration (1)**
168:1
**admitted (1)**
20:17
**adult (1)**
19:3
**adults (2)**
18:24;19:10
**advance (2)**
155:3;166:10
**advancing (2)**
183:19;184:12
**advertise (5)**
73:23;74:1;99:6;159:15,
20
**advertised (1)**
99:7
**advertises (1)**
20:15
**advertising (3)**
99:9,11,23
**advise (1)**
114:19
**advised (1)**
114:23
**advising (1)**
114:14
**Advocates (1)**
172:17
**affect (3)**
173:25;174:4;219:19
**affirmative (1)**
23:14
**affirmatively (1)**
23:10
**afford (1)**
74:21
**Afghanistan (3)**
169:11,24,25
**afraid (1)**
98:7
**Again (46)**
18:11,24;20:21;21:20;
58:23;61:20;88:9;95:8;
100:2,8,18;104:12,22;
109:10;115:11;121:19;
137:6;148:2;167:22;173:8,
16;178:9;183:8;185:5,17;
186:5;187:24;193:5;195:6;
196:7,14;197:2,9;198:12;
199:10;203:6;206:8;208:6;
213:20;218:6;219:4;226:11;
231:16;232:24;233:12;
235:16
**against (17)**
14:21;28:3;50:1;52:1;
60:9;95:23;96:12;146:5,11;
148:23;199:24;217:20;

188:21
**220:1;229:22;231:1,10;**
**233:2**
**agent (7)**
16:23;143:24;170:17,23;
171:5,5,11
**ago (7)**
39:19;55:24;63:7;88:1;
173:16;196:10;199:19
**agree (3)**
136:19;217:24,25
**agreed (3)**
26:9;147:14;165:11
**agreement (18)**
28:8,9;37:6,23;41:18;
86:15;113:7;114:10;121:24;
128:14;129:1;146:3,15,15,
17;147:15,17;160:10
**ahead (4)**
116:17;162:8;202:10;
232:5
**aids (1)**
174:14
**Alexa (1)**
105:12
**Alexandra (1)**
7:22
**allegations (1)**
149:24
**allege (1)**
216:24
**alleging (1)**
231:1
**allow (12)**
14:6;17:14;79:19;81:14;
118:10,16,18,23;119:13,14;
167:14;190:12
**allowance (1)**
67:10
**allowances (1)**
86:6
**allowed (13)**
49:1;62:25;77:1;117:11;
118:9,10,16;128:19;166:25;
167:5;221:22,23;228:5
**allowing (1)**
75:7
**allows (2)**
120:1;167:3
**almost (4)**
105:12;135:17;164:19,23
**along (3)**
35:23;124:20;152:13
**Alpharetta (1)**
108:15
**alternator (1)**
108:22
**although (3)**
17:6;28:4;161:15
**always (1)**
177:1
**America (1)**
18:24
**American (1)**

13:21
**amount (16)**
 16:14;18:6,10;22:21;
 27:16;33:17,19,21,24;65:6;
 86:14;97:7;141:11;199:12,
 12;224:7
**amounts (3)**
 159:24;192:12,25
**analysis (3)**
 27:11;190:17;204:16
**Andrew (4)**
 7:20;8:4;173:19,22
**answered (6)**
 75:3;112:14;115:15;
 116:15;150:1;161:14
**anticipate (3)**
 8:8;9:14;11:24
**anxiety (3)**
 64:9;73:9;79:4
**anymore (2)**
 43:18;57:18
**apart (1)**
 225:20
**apologize (4)**
 112:20;123:23;197:1;
 219:4
**apparent (1)**
 167:7
**appeared (1)**
 21:1
**Apple (2)**
 108:11,18
**application (1)**
 226:16
**applications (1)**
 168:6
**applies (1)**
 150:5
**apply (4)**
 15:17;147:12;149:22;
 216:3
**appointed (1)**
 7:3
**apportion (3)**
 192:12,25;204:5
**appreciate (1)**
 235:17
**appropriate (4)**
 66:6;149:25;192:5;216:4
**approval (4)**
 54:19;112:7;134:25;135:3
**approve (2)**
 72:19;111:18
**approved (3)**
 16:10;36:22;38:15
**approximately (1)**
 205:20
**April (1)**
 212:1
**Arbitration (12)**
 13:1,5,20;14:15;30:17;
 167:5;176:6;216:20;217:12,
 18;230:25;231:8

**arbitrations (7)**
 166:23,25;174:25;214:9,
 22,24;215:3
**ARBITRATOR (169)**
 7:1,3;8:6;9:9,19;10:7,21;
 11:2,12,22;12:11,17,20;
 13:2,12,17;15:19;24:17;
 28:24;29:3;30:23;31:1,11,
 13;32:12;35:7,11;36:17;
 47:5;53:23;69:24;70:2,7;
 71:6;75:2,6,19;77:5;79:23;
 85:4;88:4;89:3,9,12;92:9,15,
 18;94:6;96:5;98:17;100:21;
 102:4;112:13,16;115:17;
 116:17;118:2;119:15,24;
 125:9;127:2;130:5;131:8;
 132:2;140:18;145:5;146:23;
 147:6;148:5,7,18;149:11;
 150:3,8,14,17;151:5,8,12;
 153:5,12,17;154:17;155:9,
 14,20;156:7,14,18,23;157:3,
 7,21,24;158:20;159:14,18,
 22;160:9,13,16,21;161:2,8,
 20;162:10,15,19,25;163:8,
 11,20;164:15;165:1,16;
 167:14;172:22;173:14;
 176:5,21;177:16;181:11;
 182:11;184:3;189:20,24;
 190:5,14;191:2,10;192:6;
 196:24;201:7,11,24;202:8,
 18;203:2;210:3;214:4,16,
 21;215:10,18;216:2,8,17;
 217:9;218:5,19;229:14;
 231:14;232:5,17,20;233:24;
 234:1,3,8,11,16,20;235:1,6,
 9,14,18,20,23
**area (2)**
 149:10;169:2
**argue (2)**
 21:2;217:19
**arguing (1)**
 21:12
**argument (5)**
 21:4;216:14;217:12,14,24
**argumentative (1)**
 75:9
**arguments (2)**
 192:7;218:6
**arm (1)**
 170:8
**Army (7)**
 169:10,16,17;170:1,5,8;
 171:12
**around (6)**
 7:6;9:14;55:14;112:9;
 131:22;172:7
**arrange (2)**
 11:17;200:12
**arrive (8)**
 52:5;107:5;194:1;197:7,
 15,18;198:22;199:5
**arrived (5)**
 21:25;59:9;128:2;142:8,

10
**arriving (1)**
 63:11
**arrow (1)**
 180:16
**article (1)**
 217:15
**artificial (1)**
 168:5
**Arts (1)**
 167:24
**aspects (1)**
 131:24
**assert (2)**
 216:15;217:20
**assertion (1)**
 216:19
**assets (1)**
 174:13
**assign (2)**
 35:15;47:14
**assigned (12)**
 16:7;18:14;54:10;56:15;
 57:9,20;169:22;187:13;
 196:4;203:7;221:15;227:17
**assigning (1)**
 45:6
**assignment (1)**
 170:21
**assignments (3)**
 18:16;156:24;157:8
**assistant (2)**
 61:4;74:16
**Associate (1)**
 172:12
**assume (4)**
 28:21,22;42:16;119:13
**assumed (2)**
 22:15;213:18
**assumes (3)**
 22:17,21;88:25
**assuming (2)**
 91:15;142:9
**assumption (4)**
 102:17;189:25;190:6;
 211:20
**assumptions (7)**
 23:3;194:3,6;211:24;
 213:4,20;216:7
**asthma (2)**
 83:4,9
**Atlanta (1)**
 10:15
**ATS (31)**
 27:6;85:15;90:25;93:4,12,
 16,23;94:14,16,19,22,24;
 95:3,5,9;96:9,15;99:5;
 106:11;112:1;115:19;
 151:19,24;152:11,14,16,19;
 157:25;158:19;159:15,19
**attack (2)**
 83:4,10
**attacks (2)**

64:9;73:9
**attended (1)**
 168:4
**attending (1)**
 219:12
**attention (11)**
 24:16;32:10;34:14;43:19;
 59:23;89:22;101:18;116:24;
 125:6;132:10;140:7
**attorney (5)**
 8:1;98:19,21;113:2;172:9
**attorneys' (1)**
 23:6
**attributable (1)**
 25:11
**attributed (1)**
 204:11
**August (1)**
 111:1
**Austin (1)**
 145:14
**Authority (295)**
 7:4,25;8:3,5;10:4,14;
 14:10,19,25;16:1,3,8,9,10,
 12,16,18,19,20,25;17:11,12,
 14;18:1,8,14,16,17;19:8,15,
 18,22;20:8,14,24;21:3,6,11,
 23;22:4,23;23:21,23,25;
 24:10,12,25;25:1,9,12,17,
 18;26:2,24,25;29:22;30:1,5,
 8,11,14;31:4,7,24;33:6;34:5,
 9,12,20;35:19;37:15;38:8;
 39:10;40:12,15;41:22;
 42:20;43:17;44:5,17,22;
 45:2,15,23;46:3,7;48:5,14,
 18;49:13;51:3;52:23;53:13,
 20;54:5,21;58:15;60:4;61:2,
 7;64:20;65:11,20;66:1,19,
 23;67:2,6,9,12,15,18;68:4,7,
 8,11,15,15,24;69:2,6,10,14,
 17,21;70:5,21;71:8,12;72:6,
 8,9,13;73:17;74:17;75:11,
 21,23;76:3,7,10,14;77:8,20;
 78:4,7,21;79:7;81:23,24;
 82:13,21;83:2,13;84:1;
 85:11;86:5;88:14;90:15,18,
 21;91:7,9,23;92:1,2,7,8,13,
 20,23,23;93:4;96:9;97:9,11,
 20;99:15,18;100:13;102:16;
 103:5;109:21,24;110:6,16;
 111:3,24;112:4;113:10,18,
 23;114:5,21,24;115:18;
 118:13,15,19,20;121:3,7,10,
 13,22;124:4,4,19,23;125:10;
 126:7,15,22;127:4,11,14,16,
 18;128:8;133:24;134:13,20;
 136:21,21;137:17;141:10,
 21;142:2,6,9;143:13,17,19,
 21,24;144:12,13,19;145:2,8,
 16;146:25;150:24;151:20,
 25;152:22;153:9,22;158:2,
 13;159:19;160:3;165:7;
 180:4,21;209:13;216:10,24;

217:21;219:15,24;220:3,6,8,
11;221:2,4;222:4,25;223:1,
4;224:13,18,23;225:2,6,11,
15;226:5,10,11,15,20,21;
228:25;229:22;230:5,8;
231:1,11;232:14;233:2,13,
15;234:5
**Authority's (36)**
7:23;16:5,23,24;17:2;
19:20;20:14,18;21:24;
28:12;44:19;55:5;56:1;58:5;
60:13;62:3,9;66:7;73:24;
74:8;75:14,25;76:4;77:13,
24;78:2,10;82:3,6;84:15;
104:6;121:4;153:9,20;
222:22;223:22
**Authority-WAW (1)**
145:11
**authorization (2)**
124:5,8
**authorized (1)**
124:15
**auto (6)**
16:2;30:6;74:5;85:18;
103:15;105:15
**automatically (2)**
184:16,18
**automobile (1)**
18:23
**availability (1)**
104:20
**available (3)**
104:16;129:2;176:10
**Avenue (2)**
145:3,9
**average (12)**
22:16;55:11;70:4;186:7,
10,12,19;188:18;189:5,12;
209:2,5
**averaged (1)**
206:18
**avoid (1)**
217:12
**await (1)**
28:19
**award (2)**
23:13,17
**aware (5)**
207:19,21,24;214:10;
235:2
**away (20)**
36:22;41:13;49:8;52:22;
63:8,14,17;64:2;108:15;
128:12;129:5,24;130:3,10;
131:25;142:12,13;152:25;
160:20;162:21

## B

**Bachelor's (1)**
167:24
**back (54)**
10:23;19:24;46:16;47:19;

54:4,18;55:23;58:22;61:20;
79:7;80:14;87:18;88:9,19;
89:21;94:13,16,19,22,23;
95:2;98:18;100:18;101:15;
102:20;104:12,19,21;
106:18,20;108:19;112:1;
131:5;134:13,13;149:1;
152:3;158:17;159:10,12;
168:18;184:1,7,10,11,21;
186:1;195:19;201:20;208:9;
210:16;213:15;223:21;
224:2
**background (6)**
44:1;164:3;167:17,23;
168:8;219:10
**backs (1)**
24:3
**bad (1)**
112:21
**ballpark (1)**
206:19
**bar (2)**
172:9,11
**barely (1)**
129:20
**base (1)**
65:22
**based (7)**
22:2;96:13;192:5;198:9;
201:17;202:1;215:25
**basic (6)**
184:2;196:18,21;197:5;
199:10;201:4
**basically (17)**
36:6;41:9;45:20;68:16;
79:11;88:12;103:17;109:6;
125:20;157:16,20,23;
158:10;160:7;162:8;183:2;
232:19
**basis (6)**
28:2;69:24;150:6;196:4;
227:19;232:2
**bathrooms (2)**
12:19;227:1
**batteries (3)**
50:14;57:13;66:14
**battery (4)**
84:5,6,8,13
**became (2)**
95:2;172:11
**become (4)**
25:12;170:16;222:19;
235:2
**bed (1)**
26:22
**beforehand (1)**
11:9
**began (15)**
25:4;30:10;33:5;34:19;
37:14;38:8;39:9;40:12;
41:21;42:19;52:24;85:10;
124:2;234:17,18
**begin (4)**

29:24,25;121:3;235:6
**beginning (4)**
23:7;139:7;224:20;230:20
**behalf (2)**
217:15,16
**behavior (1)**
82:12
**belief (1)**
69:25
**belong (1)**
68:18
**below (2)**
17:18;27:22
**beneficial (1)**
115:25
**beneficiary (1)**
128:7
**besides (1)**
200:23
**best (6)**
62:5,7;70:23;97:16,21;
98:5
**better (1)**
89:16
**beyond (2)**
43:13;203:15
**bid (1)**
17:3
**bigger (1)**
70:14
**billing (1)**
205:21
**binder (1)**
154:2
**binding (1)**
217:14
**bit (5)**
26:7;77:16;147:4;151:7;
202:19
**blank (1)**
180:2
**Bob's (2)**
105:10,15
**bolder (1)**
75:5
**boss (14)**
16:7;49:10;64:25;72:25;
129:10;130:17;144:2,4,9,11;
157:20,20;162:23;224:17
**both (11)**
32:14;81:23;82:1,2;96:14;
123:22;135:21;140:5;146:9;
147:12;189:10
**bottom (10)**
37:1;38:2;40:8,22;180:7,
19;186:5;189:11,14;200:3
**box (2)**
194:8;198:10
**branch (2)**
170:5,8
**break (43)**
11:14;12:3,14;38:15;49:2;
64:14,18;79:16;85:5;

128:15,16,19,22,24;129:13,
18,23;130:10,13,23;131:1,6,
9;133:13,18;138:16,21;
139:2;140:10,11,20;149:15;
151:2,9,13;152:25;162:21;
193:25;202:9,23;204:13,16;
219:9
**breaking (1)**
9:25
**breaks (28)**
12:9,12;16:10,11;36:22,
23;38:12;49:8;52:22;63:8,
14,17;64:2,3,7,8,11;79:2,3,
11;128:13;129:5,6,21;
193:19;204:6,7,20
**breather (1)**
12:6
**brief (10)**
15:20;21:17;23:2;24:23;
79:24;85:6;151:14;163:13;
216:22;229:12
**bring (8)**
99:8;134:1;149:1;223:21;
224:2;230:25;231:5,7
**bringing (1)**
166:1
**brings (1)**
13:20
**broader (1)**
147:5
**broadest (1)**
28:4
**broadly (1)**
14:2
**Brooklyn (1)**
11:7
**brother (4)**
169:9,11,13,19
**brother-in-law (6)**
30:13,14;92:12,22;93:3;
143:13
**brother-in-law's (1)**
30:24
**brought (3)**
103:25;169:4;199:1
**Bryan (1)**
233:18
**build (1)**
172:4
**building (2)**
137:13;215:17
**built (2)**
172:5;185:3
**built-in (5)**
184:24,25;186:18;196:9;
200:25
**BULLER (2)**
7:22,23
**bullet (4)**
33:15;34:1,15;36:7;98:23;
102:20;103:11;109:10;
112:22
**bunch (3)**

31:22;168:17;171:23
**burden (4)**
28:11,12,13,18
**burdened (1)**
14:7
**business (23)**
15:13,15;20:2,14;26:22;
27:7,9;30:4;73:15,19;75:24;
76:3;94:9;95:25;96:14,19;
98:25;99:2,24;132:14;
168:1,6;171:22
**businesses (1)**
14:6
**buy (1)**
68:23

# C

**C1 (1)**
215:22
**calculate (9)**
23:4;167:11;193:3;196:1,
5;210:12,18;212:20;215:4
**calculated (10)**
24:21;161:7;167:12;
186:19,20;198:19;202:1;
211:1;215:1,2
**calculation (13)**
184:10;196:17;197:4,8,
12;199:17;200:21;201:17;
205:6;206:11;208:22;
213:22,25
**calculations (14)**
21:18,19;181:22;182:9;
191:16;195:5;200:25;
204:22;208:5,7,10,11;
209:21;214:13
**calculator (2)**
212:21;213:1
**call (53)**
9:16;10:18;11:1;16:18;
35:8;39:16;44:12;46:14,18,
22,24;47:2,22;48:19,20;
50:24;52:9;54:16;55:22;
61:9;62:17,19,22;83:16;
92:17;108:24,25;120:7,11,
15;125:2;126:20;135:4,5,
14;136:16,18;138:17,23;
139:23;140:3,22;141:1,4,6,
20;148:6;157:11;162:13,22;
209:7,10;215:16
**called (30)**
30:12;31:6;39:24;49:7;
50:10;83:7,7;85:15;90:10;
105:13;109:6;120:13,17;
126:6;129:4;135:9;139:19,
20,20,21;141:7,17;144:21;
151:19;170:5;186:7;187:3;
194:8;199:13;228:16
**calling (10)**
10:8,25;16:17;39:20;
79:13;108:23;125:1,2;
159:3,7

**calls (10)**
29:1;62:9,16;96:1;122:9;
140:13;146:2;150:6;202:21;
231:3
**calm (1)**
79:15
**came (10)**
13:10;25:19;57:11;61:20;
62:14;106:24;138:18;179:7;
193:1;200:16
**can (93)**
7:11;9:23;10:18;11:8,17,
21;12:4,6;14:20,21;32:13,
21;37:2;47:11;51:22;56:7;
58:1;60:1,17,22;62:2;66:14;
70:9;79:17;83:5;88:23;89:7;
91:25;92:9;100:12;101:18;
102:15;108:22;114:13;
116:9,10;121:19;125:5;
131:25;132:10,16,24;
133:11;134:4;138:24;
145:24;147:8;148:12;154:2,
15,20;160:25;165:3;166:20;
176:3,5;178:11,14,19,21;
179:8;181:24;182:12;185:6;
188:15,23;189:19;191:18;
192:1;196:22;198:10,14;
200:10;201:9;202:6;205:2;
206:19,22,22;207:2;212:8,9;
215:18;217:13;218:12,20;
219:6;220:19;226:19;
227:12;231:16;233:12;
235:22
**capacity (1)**
167:9
**caption (1)**
146:24
**captured (1)**
180:5
**captures (1)**
177:3
**Caputo (1)**
173:21
**car (32)**
56:6;57:15;61:16,18,20;
65:16;66:15,24;67:9,20,25;
69:19;70:3,14;78:16;80:20,
22;84:5,5;117:8,13,15;
122:20,21,24;123:8;127:17;
153:10,22;159:5;221:10;
227:1
**Caravan (6)**
65:18,20;66:1,6;68:2,18
**card (3)**
66:20;124:10;127:20
**care (3)**
57:24;73:14;79:1;81:18;
82:9,9,12,16
**careful (1)**
232:22
**carrier (1)**
123:24
**cars (4)**

70:15;78:13,15;122:24
**case (26)**
12:15;23:12;25:4;54:14;
70:1;146:7,19;147:17,22,23,
25;148:10,15,17,20;149:7;
165:25;166:2,18,20;175:12;
176:3;178:13;181:19;
216:11;217:24
**cases (3)**
23:20;167:1,13
**caught (1)**
168:24
**cause (2)**
57:14;218:15
**caused (1)**
62:15
**cell (5)**
8:10;18:22;62:2,10;
200:22
**cells (1)**
200:7
**Center (1)**
170:2
**cents (1)**
194:17
**CEO (1)**
171:20
**certain (6)**
10:24;11:1;156:11;
158:15;159:8;162:2
**certainly (8)**
27:7;153:14;155:19;
167:4,24;175:17;217:11,14
**certainty (2)**
205:3;207:3
**certificate (1)**
168:5
**certified (1)**
170:16
**chairs (2)**
138:2,5
**change (13)**
18:11;117:4;204:18;
205:4;208:21;209:20;
210:10;224:7;227:23;
228:10,12,18,20
**changed (2)**
156:9;213:3
**changes (1)**
69:1
**changing (1)**
88:20
**charge (7)**
160:24;171:5;205:16,18;
206:5,6,7
**charged (1)**
205:17
**charts (1)**
172:6
**check (36)**
19:4;47:4,6;49:22,22,25;
52:1;58:12,25;60:9;67:20;
122:15;158:3;179:1;192:16,

17,17,19,25;210:21,23,25;
211:2,9,10,18,20,25;212:1,7,
8,17,19;213:1;223:13,19
**checked (1)**
212:22
**checking (4)**
19:6,7;58:19;59:1
**checks (8)**
47:3;164:24;191:16,21;
192:9,13,22;196:3
**chew (4)**
43:16;50:11;58:19;117:10
**chewed (1)**
48:1
**Chief (1)**
172:14
**child (2)**
19:25;117:13
**children (2)**
78:18;115:21
**choice (5)**
26:16;83:13,20;112:24;
115:9
**choose (5)**
20:1;83:14,14,24;123:24
**chose (2)**
147:18;217:20
**chosen (1)**
166:10
**CID (2)**
170:6,23
**circle (1)**
112:9
**circulate (1)**
11:20
**cite (1)**
166:20
**city (1)**
29:15
**Civil (1)**
218:15
**CJ (16)**
35:6,7,10,16,23;49:15,16;
51:11,16,21;54:9;59:15;
85:1;103:19,20;158:23
**claim (13)**
97:23;146:5;147:3,7;
215:22;217:20;220:1;
230:17;231:1,22,23,25;
232:3
**claimant (10)**
7:15,18,21;13:16;14:15,
22;29:1,5;149:25;208:3
**claimants (2)**
8:15;216:15
**Claimant's (3)**
166:13;177:7;216:19
**claiming (2)**
25:5;27:16
**claims (4)**
19:15,22;147:13;233:2
**clarification (2)**
10:22;188:24

**clarify (7)**
94:7;148:9;155:7;161:15;
189:17;201:21;233:25
**clarity (2)**
176:16;202:4
**class (4)**
8:24;170:20;202:16;
235:21
**classes (2)**
215:7;219:8
**classified (1)**
234:12
**clean (1)**
227:1
**cleaning (1)**
77:16
**clear (5)**
15:2;139:13;164:9;167:9;
195:9
**clearly (5)**
7:10;18:3;173:9;215:8;
217:25
**client (6)**
42:4;47:6;109:21,25;
115:16;116:8
**clients (6)**
109:13,14,15,16,20;110:4
**close (5)**
11:15;54:16;57:20,24;
172:17
**closed (3)**
47:19;108:13,21
**closely (1)**
16:16
**closer (5)**
90:3,3,5;115:19,21
**co-counsel (4)**
7:15,17,21;151:3
**coffee (1)**
90:21
**collated (1)**
164:13
**college (4)**
168:10;172:25;219:9,12
**colored (2)**
183:20;184:12
**column (31)**
124:10,11;181:13;183:20;
186:21,23;187:1,2;188:9,11;
189:13,15;195:11;196:2,5,
11,13,20;197:3,11,21,23;
198:11,16,19,20;199:2,9,13,
14,22
**columns (1)**
198:24
**combat (1)**
169:25
**combined (1)**
95:11
**coming (8)**
11:6;79:15;120:17;131:3;
186:6;217:18;218:3;229:10
**commenced (1)**

**231:10**
**commercial (2)**
74:10,13
**common (5)**
16:4;19:9,19;102:14;
217:3
**communicate (7)**
46:5;48:5,16,21;135:17;
140:6;141:7
**communications (1)**
46:11
**companies (2)**
145:25;228:6
**company (9)**
73:16,20;85:15;93:25;
143:14;151:19;172:7,15;
206:7
**comparison (1)**
215:9
**compelled (1)**
86:17
**compensate (2)**
23:18;97:12
**compensated (2)**
207:23;208:3
**compensation (2)**
141:12;192:16
**competitor (1)**
85:15
**compile (1)**
178:6
**complain (1)**
126:7
**complaining (1)**
61:23
**complaint (4)**
141:11,14;142:1;216:12
**complaints (1)**
228:14
**complete (6)**
34:17;36:9;42:15,18;
102:23;103:13
**completed (2)**
168:3;170:12
**completely (1)**
225:1
**completing (1)**
134:24
**complied (1)**
23:12
**comply (2)**
56:23;62:5
**components (1)**
216:25
**compound (1)**
141:3
**computed (2)**
211:13,15
**computer (3)**
64:24;168:20;177:22
**concepts (3)**
93:24;132:23;133:3
**concern (2)**

**50:22;51:15**
**concerned (1)**
49:4
**concerns (2)**
50:18;167:6
**conclusion (5)**
146:2;150:7;165:24;
185:12;205:9
**conclusions (1)**
166:4
**conclusively (1)**
15:6
**condensed (1)**
179:5;196:8
**conduct (1)**
217:6
**confer (1)**
151:3
**confirm (3)**
127:7;131:24;212:9
**confused (1)**
146:23
**confusing (1)**
87:21
**conglomerate (1)**
25:3
**conglomeration (1)**
164:16
**connection (5)**
38:4;174:25;176:17;
177:1,4
**consequence (2)**
52:18;58:17
**consequences (1)**
58:18
**conservative (2)**
22:13;23:3
**consider (6)**
15:16;153:8,19,24;
199:20;225:23
**considerable (1)**
65:5
**consideration (3)**
190:13;197:20;199:20
**constant (2)**
194:6,7
**construe (2)**
28:2,3
**consuming (1)**
76:10
**contact (1)**
225:10
**contacted (4)**
171:24;180:24;182:25;
220:9
**contacting (1)**
192:14
**contained (1)**
16:15
**contemporaneously (1)**
27:13
**contending (1)**
216:21

**continue (4)**
79:8;83:13;191:2;218:11
**continued (9)**
20:6,9;80:1;131:13;
150:18;151:16;167:20;
171:8;191:3
**continues (1)**
115:3
**continuous (1)**
164:7
**contract (19)**
15:1,5;16:24;17:6,9;24:5,
7,25;25:2;94:1,2;118:12,14;
120:1;128:23;129:13;
130:20;150:25;172:2
**contracted (6)**
26:4;27:4,5;121:18,23;
128:4
**contracting (1)**
26:5
**contractor (16)**
14:18;15:2,7,10,24;24:6;
26:13;27:1;28:10,14;
113:15;130:20;232:1,11,13;
234:12
**contractors (2)**
14:5,12
**contracts (1)**
19:16
**contradicted (2)**
116:12,18
**contrary (1)**
15:3
**control (11)**
15:5,25;18:2;21:7;25:18;
28:16;36:8,12;39:7;42:17;
217:3
**controlled (4)**
16:1;125:22;142:5;225:2
**controlling (6)**
26:19;38:11,12,14;
39:14
**convenient (1)**
66:13
**convention (2)**
178:22;187:9
**conversation (9)**
26:11;65:8;107:19;
130:12,25;139:4,10;218:10;
225:9
**conversion (2)**
185:18,20
**convert (3)**
184:24;185:2,3
**converting (1)**
155:2
**converts (1)**
184:25
**copies (1)**
89:10
**copy (7)**
32:7;33:10;37:22;41:24;
180:8;187:19;234:15

**cords (1)**
50:14
**corner (2)**
134:4;229:19
**corporation (2)**
73:16,20
**correctly (1)**
179:7
**correspond (1)**
71:17
**cost (6)**
13:9;34:5;67:4,13;96:14;
123:9
**costs (5)**
23:6;102:21;112:25;
198:6;227:4
**counsel (31)**
7:23;8:2,4;10:10;102:1;
132:8;136:10;164:25;
172:12;173:23;180:24;
181:7;182:25;183:1,9;
185:24;187:7,24;192:2,14;
193:6,15;194:13;195:7;
200:18;203:10,17;205:11;
209:9;229:7;231:13
**count (2)**
74:23;206:22
**counted (1)**
207:1
**counts (1)**
137:4
**couple (4)**
45:18;136:8;146:1;169:5
**course (4)**
10:2;61:10;168:3;170:15
**court (11)**
7:8,10;9:24;25:4,6;28:1;
166:25;167:4;217:13,23,25
**courts (4)**
15:8,16;23:17;28:4
**cousin's (1)**
220:7
**cover (2)**
182:5,8
**coverage (7)**
14:5;26:5,6,7;104:24;
129:2;141:10
**covered (5)**
195:13;196:7;199:19;
200:13;208:6
**Crab (2)**
108:10,18
**crazy (1)**
81:2
**create (8)**
24:8;179:2;181:25;
182:12;186:21;187:17;
194:21;198:10
**created (1)**
178:24
**creates (2)**
174:13,13
**credited (1)**

**Criminal (3)**
167:25;170:6,13
**criticize (4)**
63:19,22,25;64:1
**criticized (1)**
63:23
**cross (10)**
12:2;85:8;108:14;147:13;
189:19;201:9,12;202:19;
203:4;229:16
**cross-examination (2)**
149:2;229:15
**current (1)**
173:16
**currently (1)**
219:12
**customer (23)**
36:5;43:24;49:18;50:5,10,
12,21,23,25;51:2,9,14,22;
58:24;108:8;114:20;121:22;
124:3;125:4;126:6;158:23;
208:8;228:14
**customers (30)**
16:3;17:2;20:16;36:4;
49:21;50:8,13;51:2,12;
59:11,22;66:7;75:25;76:4;
92:4;103:25;104:9;106:14,
14,16,16;109:12,19;110:7;
114:16,17;125:3;144:25;
152:22;224:14
**customers' (3)**
50:18;51:5;223:5
**customer's (1)**
158:5
**cut (3)**
19:24;185:7;189:5
**cylinder (1)**
123:4

# D

**daily (2)**
19:16;120:4
**damage (1)**
57:15
**damages (9)**
14:23;23:4,9,14,17,20;
24:14;167:12,12
**dash (1)**
7:19
**data (21)**
22:14;164:13,15,22;
166:20,24;167:2;174:25;
178:16;179:24;180:1,4,5;
184:6;185:21;187:5;193:2;
200:11,13,16;214:19
**date (19)**
178:19,23;181:14,15,16,
16,17;187:12;191:25;
192:15;210:21;211:1,1,1;
212:4;218:18;230:3,23;
235:5

**dates (6)**
180:22;181:8,12;186:23;
187:8;212:5
**daughter (12)**
20:5;48:25;49:5;52:14,16;
62:18,20;83:3,9,15;152:4;
158:17
**day (97)**
9:10;16:4,17;19:25;20:9;
22:14,18,20;40:6;43:4,9;
46:8,9,10;47:16;48:25;
55:11;57:3,3,7;65:24;67:21;
72:3,12,16;73:1,7;79:8,8;
80:9,11,23,23;81:10;82:11;
83:15;87:6,9;92:1;99:17,20;
104:16;112:6;120:23;129:4;
133:12;135:9,17,19,22;
136:17,18;139:6,15,16,25;
140:25;141:8;142:13,18;
153:25;159:10;160:7;
161:16;162:2,12,17;163:1,4;
168:14;187:10;188:1,4,12,
13,16;192:10;196:4;200:21;
206:3,14,14,25;207:2,8;
209:3,4;210:9,24,25,25;
211:9,17,19,21;224:10,20
**day's (1)**
35:4
**day-to-day (1)**
174:18
**DC (4)**
169:2,4,5,6
**deal (2)**
9:24;80:21
**dean (1)**
171:24
**Deborah (1)**
7:2
**decide (5)**
57:2;108:7;149:15,16;
227:21
**decided (2)**
169:15;175:16
**decision (10)**
111:10,12,16;122:17,18;
123:11,15,25;172:16;200:20
**decisions (1)**
209:8
**decline (1)**
115:4
**dedication (1)**

**18:11**
**deduct (1)**
204:6
**deducted (1)**
224:11
**deduction (1)**
193:25
**deem (1)**
216:4
**defects (2)**
50:8;51:9
**defendant (1)**
21:12
**define (1)**
160:25
**defines (1)**
14:1
**Definitely (1)**
12:17
**definition (3)**
28:5,5,6
**degree (1)**
167:25
**degrees (1)**
173:5
**delay (1)**
232:23
**deliver (13)**
16:2;18:14;19:17;55:4;
56:15,18,24;57:2;58:23;
60:10;103:15;108:22;
221:10
**delivered (3)**
49:23;59:19;223:14
**deliveries (90)**
16:12,13,14;18:7,9;20:15,
17,18;22:10,11,15,16,19,21;
25:19;32:6;36:20,21;38:20;
39:16,21,25;44:7;46:17,19,
22;47:8;50:5;51:5,18,22;
54:3,5;55:9,10,15,21;56:16,
19,25;57:7;58:6;59:3;63:5;
64:21;65:12,15;66:6,21;
73:17;74:17;78:12,16;
80:24;93:4;104:12,16,20,22,
23,24;105:23;123:6;124:21,
25;126:7;137:3,19;138:1,8;
142:24;152:17,19;165:17;
186:11;188:1,3,4,12,18;
190:17;198:7;200:20;207:5,
7;214:14;222:14;227:2;
228:6,8
**delivering (5)**
50:2,21;52:2;59:20;74:9
**delivers (1)**
55:7
**delivery (113)**
14:11;22:5,8;25:20,23,25;
30:9;32:4;35:4,9,9;36:3,15;
38:18;39:1;41:13;42:4;
46:15;49:12;50:1;52:1;53:5,
15;54:2,10,14;56:8,10,12;
57:8,19;58:3;59:9;60:18;

73:24;74:2;75:15;77:9,12,
13,18,19,23,25;78:3,11;
80:14,17,20;81:21;82:13,14,
22;84:23;85:11,12,14;
86:23;88:13;90:24;91:3,15,
16,22;93:3;94:9;98:25;99:2;
104:7,11;106:4,7;111:7;
121:21;124:3;127:9,11;
130:9;134:19;137:23;138:2,
13,18;142:11,17;144:18;
153:23;157:13;158:24;
165:9;168:11,15;182:15;
186:8,24;189:16;190:2,7;
195:23;207:1;209:3;210:8,
15;213:11,11;214:13,23;
215:4;223:5,11,14,22;
228:15
**demonstrative (3)**
165:22;174:14;215:25
**denied (2)**
43:15;73:11
**deny (5)**
64:14,17;73:1,10;105:20
**denying (1)**
73:7
**depend (2)**
15:13;72:9
**depending (2)**
12:3,15
**deployed (2)**
169:11,24
**deposed (1)**
166:9
**deposition (27)**
12:23;13:3;25:21;28:21;
86:19;87:2,4,8,11,19;89:2,
21;94:18;100:19;101:23;
116:25;125:7,17;126:2;
135:15;138:9;140:24;147:4;
203:22;212:10;233:9,21
**depreciating (1)**
69:20
**depression (3)**
64:10;73:10;79:4
**deprived (1)**
166:11
**describe (4)**
43:24;167:17;181:24;
182:12
**described (2)**
94:8;215:23
**describes (1)**
21:17
**describing (2)**
24:5;185:14
**designated (5)**
114:15,16,24;132:25;
175:22
**designed (1)**
153:14
**desires (1)**
12:24
**desk (4)**

31:23;86:21;107:13,14
**detail (2)**
21:18;222:19
**details (1)**
21:21
**determine (8)**
15:9;42:17;44:1,6;54:20;
55:14,25;192:24
**determined (2)**
36:15;53:19
**determining (1)**
95:24
**device (1)**
134:20
**dictated (2)**
16:12;18:8
**difference (10)**
77:22;89:4,5;160:17;
163:1;188:6,8;198:25;
199:16;214:19
**differences (9)**
77:11,18;151:23;161:9,
12;226:19;227:11,13,16
**different (24)**
28:20;47:6;76:20;77:14;
81:1;87:10;91:18;106:13;
119:3;127:12;150:13,14;
155:12;157:25;158:7,25;
159:24;168:20;177:24;
182:4;192:13;200:7,8,11
**differently (5)**
87:22;101:22;122:1;
232:10,12
**Diligent (112)**
10:11,16,17;14:10,25;
16:20,23,25;17:7;21:1,3,12;
25:8,11;26:4,4,12,12,17,22;
27:1,2,4,6;31:9,12,13,14;
34:5,9,12;40:10,15;42:5,7,
11;43:21;48:6,11;53:12;
71:7,7,9;75:24;77:4,6,7,9,
13,19,24;78:6;81:23,25;
82:22;84:23;92:4,25;93:9;
94:2,13;95:12;96:15;101:4;
103:8;109:13,21,25;110:3;
111:3;113:8,13,16,21,24;
114:4,13,16,19,23;119:25;
121:2,17,18,21;122:2;
125:11;126:14;127:9;
128:23;129:1;136:20;
141:11,15;142:5;150:25;
159:19;161:2,22;162:1,6;
207:22;208:3;216:15,17,23,
24;225:13;230:9;232:15;
234:4;235:13
**Diligent's (4)**
109:15,16;114:17;124:3
**direct (20)**
8:21,25;12:2,15;29:10;
85:25;86:16;89:22;92:11;
101:18;103:4;116:24;125:6;
132:10;140:7;163:23;
174:18;200:23;201:6;219:2

**directing (1)**
25:24
**direction (1)**
167:11
**directly (7)**
8:17;81:23;93:23;94:23;
183:25;193:1;234:5
**director (2)**
10:11;172:14
**discipline (4)**
52:19;63:2,10,13
**disciplined (1)**
63:4
**disclosure (2)**
166:8,15
**disclosures (1)**
164:7
**discrepancy (1)**
213:2
**discretion (3)**
23:13,16;39:8
**discuss (2)**
91:9;93:8
**discussed (1)**
91:6
**discussing (4)**
91:22;92:2,5;179:12
**discussion (1)**
27:10
**disingenuous (2)**
149:3,21
**disk (2)**
165:8,13
**dismiss (1)**
154:11
**dispatcher (7)**
61:8,9;106:22;107:20;
136:12;154:7;157:2
**display (1)**
176:12
**disregard (2)**
181:9;215:11
**dissatisfied (1)**
234:21
**distance (10)**
134:16;183:13;184:9,10,
15,21;185:19;189:16;208:7;
214:13
**distances (3)**
182:23;200:16;215:4
**distributed (3)**
107:2;177:17;185:10
**disturbed (1)**
8:11
**Division (1)**
170:6
**DNA (1)**
189:22
**doctor (1)**
83:5
**doctoring (1)**
155:19
**document (44)**

26:10;32:21,24;33:1,3,4,8,
10;37:2,5,7,10,12,13,18,22;
38:1;40:8,23,25;41:2,5,8,14,
20,24;59:25;60:1,3,6,8;
70:16,18,24;100:23;101:2;
102:10;133:6,8;176:22;
181:14;182:16;191:22,25
**documentation (1)**
220:13
**documents (19)**
21:24;22:1;24:21;44:15;
101:20,24;133:6;154:4;
164:17;165:11,20;176:7,8,
11;178:12;179:15,21;
181:10;220:18
**Docuparser (5)**
178:9,20;179:1,15;182:16
**D-O-C-U-P-A-R-S-E-R (1)**
178:10
**Dodge (6)**
65:18,20;66:1,5;68:2,18
**dollar (5)**
196:16;197:18;198:22;
199:11,12
**dollars (1)**
24:2
**done (26)**
9:15;10:20;27:14;36:4;
46:15;49:20;56:14;63:1;
82:7;104:9;158:25;164:12;
165:21;167:10;174:23;
175:6;186:25;196:8,18;
206:24,25;212:22,25;214:8;
225:14;233:23
**door (2)**
51:21;104:1
**doors (1)**
51:17
**double (1)**
179:1
**down (20)**
7:11;21:25;31:23;33:20;
36:7;66:17;67:22;79:15;
80:20,22;86:15;105:2,11;
138:6,17;169:1,4;172:18;
191:18;232:24
**downloaded (1)**
156:8
**downloading (1)**
155:11
**draft (1)**
25:1
**drafted (2)**
24:5,25
**drag (1)**
178:14
**drawn (1)**
165:22
**drive (18)**
19:4;27:22;35:5;48:25;
65:14,20;68:2;69:17;
105:11;121:6;122:13;123:9;
133:25;153:21;159:6,10;

165:14;183:7

**driven (1)**
198:5

**driver (47)**
17:11;30:9;32:4;35:4;
41:13;49:12;70:4;73:24;
74:2;82:22;84:23;85:12,14;
86:23;88:13;91:3,16;95:3;
106:4,7;168:11,13;214:23;
222:20,20;223:8,8,17,17,25,
25;224:5,18;226:9,20,21;
227:20,23,25;228:2,4,5,7,11,
13,19;230:9

**drivers (47)**
14:12,13;16:5;17:12;
19:20;23:25;26:17;27:1;
45:11,12;53:5,15;75:15;
77:9,12,13,19,19,23,25;78:3,
6,11;81:21;82:13,14;
106:25;117:16;119:12,16;
122:2;126:15;127:11;215:4;
221:22,23;222:2,8,12,16,17,
24,24;226:15;229:3,3,4

**driver's (1)**
124:12

**drives (1)**
127:22

**driving (14)**
24:11;65:23;67:21;68:6,
14;70:11;78:11;91:16;
94:12;101:3;121:4;182:23;
200:15;227:4

**drop (7)**
79:6;80:16;84:16;134:3;
142:15;158:17;178:15

**drop-offs (1)**
190:19

**dropping (2)**
52:14;134:23

**drove (8)**
18:8;61:18;68:3;69:20;
70:4;78:15;79:7;122:16

**drug (8)**
82:18,23;121:7;170:24,
25;171:6,6,7

**drugs (7)**
80:15,18;81:22;82:14,15,
23;170:25

**Drum (1)**
169:23

**duly (3)**
29:6;163:16;218:23

**duration (3)**
19:13,19;20:10

**during (12)**
9:17;44:25;46:6;48:17;
68:3,6,14;141:25;169:25;
172:2;198:3;220:25

**duties (4)**
13:25;16:7;19:6,7

**duty (2)**
169:22;170:21

## E

**E1 (1)**
169:18

**earlier (12)**
99:16;126:1,2;161:13;
176:9;179:13;185:11;193:2;
196:7;201:14;204:21;
221:21

**earned (3)**
18:6;95:5,9

**Earner (23)**
9:3;17:20;21:19;23:2;
163:21,22,25;164:10,22;
166:14,23;167:8,22;172:24;
181:13;189:1,9;190:4,6;
202:3;203:6;214:7;215:23

**earners (1)**
17:23

**Earner's (1)**
9:5

**earning (2)**
17:1;24:4

**earnings (1)**
20:20

**easiest (1)**
11:19

**eat (1)**
11:15

**economic (4)**
15:8,12,17;20:23

**Edison (1)**
172:24

**educational (3)**
164:3;167:23;219:10

**effect (1)**
194:14

**effective (10)**
166:4;196:20;197:3,7,10,
15,19,21;199:18,25

**effectively (1)**
199:23

**efficient (1)**
9:18

**efficiently (1)**
18:7

**either (17)**
34:9;47:18;83:11,13,24;
87:2;103:10;117:17;126:17;
127:23;146:15;147:19;
153:16;165:22;181:4;226:1;
231:15

**elaborate (1)**
27:10

**elect (1)**
38:3

**elements (1)**
193:13

**eliminate (1)**
148:24

**else (27)**
18:13;26:15;46:25;47:1;

74:21;75:12,16;76:12;
80:22;83:22;87:7;103:2;
104:5;111:6,7;112:12;
117:7,11,12;119:2,17;
159:11;162:3;163:9;214:3;
215:12;220:25

**else's (1)**
15:13

**E-mail (2)**
11:3;46:12

**E-mails (1)**
10:22

**employ (1)**
116:10

**employed (3)**
20:25;21:3;114:5

**employee (34)**
14:1,17;15:23;16:4;18:3,
25;19:11,14,20;20:11,12,22;
21:2,9;27:17,24;28:13;
93:12,14;113:8,9,12;121:14;
124:9,24;126:15;143:21;
172:2;226:22,24,25;230:5;
232:2;235:7

**employees (9)**
13:21,23;21:10;23:19;
27:20;77:20;112:24;219:15;
226:5

**employer (14)**
14:2,19;21:14;23:10;
25:13,13;28:3;149:24;
172:19;173:16;216:16,18,
23;217:1

**employers (4)**
14:20,22;23:19;217:2

**employment (4)**
20:10;28:5;83:1;127:5

**employs (1)**
27:18

**enable (1)**
117:1

**end (14)**
30:2;43:4,9;83:2;130:24;
139:8;167:7;183:25;211:8,
16,17,18;224:20,25

**ended (3)**
30:3;52:24;170:1

**ending (2)**
183:14,16

**ends (1)**
26:7

**engage (2)**
112:24;116:11

**engaged (2)**
104:14;141:10

**engagement (21)**
34:3,18;36:9;42:5,15,18;
102:23;103:13;104:15;
110:15;116:8;127:24;128:3,
6,7,11;129:18;130:14;
131:4;139:16;144:25

**engine (2)**
70:13;170:14

**enough (2)**
119:2;141:18

**entail (1)**
104:19

**entered (2)**
184:16;185:12

**entire (6)**
129:22;130:1,8;141:25;
152:25;205:6

**entirely (1)**
88:2

**entities (9)**
25:3;146:12,16;147:18;
148:15,19,24,25;149:1

**entitled (8)**
23:5;24:15;27:19,20;
38:15;63:15;129:17;218:3

**entity (4)**
27:6;73:15,19;217:5

**entries (1)**
180:18

**envelopes (1)**
61:2

**equipment (4)**
18:22;102:22,25;205:23

**essentially (2)**
20:3;183:15

**establish (1)**
207:8

**establishing (1)**
214:18

**estimate (1)**
96:19

**estimates (1)**
22:13

**estimation (1)**
96:18

**estopped (1)**
217:11

**estoppel (1)**
217:23

**estops (1)**
217:21

**Even (16)**
17:13;21:13;23:15,21;
61:23;90:21;97:12;106:11;
143:17;175:9;190:12,25;
206:8;213:14;230:11;233:8

**eventually (1)**
230:22

**everybody (7)**
7:7,9;9:23;11:21;82:16;
128:21;157:17

**everyone (2)**
7:2;12:4

**everyone's (1)**
122:4

**evidence (7)**
89:1;97:15;131:20;
166:17;167:3;185:12;
215:22

**exact (4)**
187:19;206:17;230:3;

235:5
**Exactly (8)**
  15:21;26:24;113:5;118:1;
  156:6;159:4;183:22;191:14
**exam (1)**
  172:11
**EXAMINATION (15)**
  29:10;80:1;85:8;86:1;
  131:13;150:18;151:16;
  154:18;163:23;167:20;
  191:3;203:4;214:5;219:2;
  229:16
**examine (2)**
  147:13;201:10
**examined (3)**
  29:8;163:18;218:25
**examines (1)**
  201:12
**example (6)**
  12:14;21:24;110:23;
  111:1;179:14,17
**examples (1)**
  47:11
**Excel (19)**
  178:17;184:24;185:3,10,
  16;186:3,4,8,19;196:9,15,
  18,21;197:5,5,9,13;200:25;
  212:25
**exception (3)**
  187:20,20,22
**excess (6)**
  193:16;197:17;198:25;
  202:4;204:3,3
**excruciating (1)**
  21:18
**Excuse (3)**
  95:19;124:22;226:23
**exemplary (1)**
  59:24
**exemptions (1)**
  28:2
**exempts (1)**
  14:4
**exercise (1)**
  28:15
**exercised (3)**
  15:25;164:11,14
**Exhibit (27)**
  32:11,20;36:25;40:22;
  59:24;70:17;98:18,20;
  114:11;116:4;131:22;147:8;
  154:5;165:4,22;177:6,8,18,
  20;179:11;191:15;215:25;
  216:12,13;217:17;218:13,14
**exhibits (8)**
  32:15,16;98:16;165:5,21;
  176:22;177:3,11
**exists (1)**
  208:18
**Exit (2)**
  105:18,22
**expanded (1)**
  169:1

expect (1)
  215:15
**expected (1)**
  47:9
**expenses (25)**
  13:24;24:11;26:20;27:12,
  16,20,21,22;70:4;72:10;
  74:24;96:13,18,20,25;97:3,
  7,8,12,15;98:9;103:6,9;
  132:16,18
**experience (3)**
  43:25;90:25;91:15
**expert (11)**
  24:20;164:5,12;165:25;
  166:6,15,19;167:8;173:9;
  175:23;215:8
**expertise (1)**
  164:14
**explain (6)**
  47:23;52:13;70:9;82:10;
  108:20;203:6
**explained (2)**
  23:1,18
**explanation (2)**
  156:12;161:23
**explicitly (1)**
  17:12
**exploit (1)**
  24:9
**Express (1)**
  108:10
**Expressway (1)**
  11:7
**extent (3)**
  27:21;89:4;150:4
**extra (4)**
  177:19,23;204:23;224:12
**extract (2)**
  176:10;179:16
**extracted (6)**
  176:9;178:8;179:24;
  181:22;182:15;200:14
**extraction (1)**
  181:17
**extremely (1)**
  169:13
**eye (2)**
  61:11;168:24

**F**

**facilities (3)**
  12:10,16;62:9
**facility (7)**
  32:5;44:22;58:6,15;62:3;
  90:15;153:9
**fact (16)**
  15:23;17:10;19:22;70:1;
  113:3;126:1;129:22;141:25;
  155:21;179:3,5;190:18;
  205:24;208:15;216:22;
  217:15
**factor (9)**

18:2,3,4,24;19:1,10,10,13;
  20:12
**factors (3)**
  15:17,22;20:21
**facts (10)**
  15:3,4,5;21:5;24:23;
  25:15;28:19;89:1;215:25;
  216:5
**Fair (5)**
  13:21;96:19;150:3;169:8;
  231:19
**fairness (1)**
  100:24
**faith (4)**
  23:11,16,22,24
**familiar (1)**
  56:9
**family (12)**
  17:24;18:18;20:1;83:14,
  15,24;86:6;111:9,13,23;
  161:18;162:12
**FAQ (1)**
  116:7
**FAQs (4)**
  100:24;101:2,8;116:3
**far (12)**
  11:23;14:13;29:19;134:2,
  8,12,14;147:24;183:17;
  186:12;210:9;225:20
**fast (11)**
  20:15;36:20;38:14;39:14,
  15;55:21,25;56:5,18,24;63:5
**faster (4)**
  46:16;56:14;63:6
**favor (4)**
  19:11;20:22;28:23;61:23
**favors (7)**
  15:22;18:3,25;19:14;
  20:11,12;154:12
**FBFG (1)**
  173:23
**Federal (11)**
  166:17;167:3;194:8,12;
  198:9,21;199:3,8,16,24;
  200:18
**fee (1)**
  13:11
**feed (1)**
  17:24
**feel (4)**
  12:5;120:1;220:17;224:15
**fees (3)**
  23:6;34:3;69:13
**feet (1)**
  105:12
**fell (1)**
  187:9
**felt (2)**
  119:5;169:12
**Fensterman (1)**
  8:2
**few (7)**
  48:15;52:15;65:4;168:12;

174:17;199:19;201:7
**fiction (1)**
  24:7
**fictions (1)**
  17:8
**field (1)**
  171:4
**fighting (1)**
  169:20
**figure (7)**
  126:3;149:17;161:9;
  182:23;183:12;206:19,21
**figured (1)**
  10:23;203:7;207:16,17
**file (2)**
  178:22;230:1
**filed (4)**
  27:8;93:20;95:11;219:25
**files (1)**
  179:23;180:1,2
**fill (1)**
  121:10
**filled (3)**
  176:1;200:22;226:16
**filling (1)**
  176:1
**final (4)**
  20:11;195:9;199:13;
  211:21
**Finally (1)**
  14:22
**find (3)**
  47:20;157:12;189:2
**finding (2)**
  15:22;108:17
**finds (1)**
  21:13
**fine (4)**
  80:3;146:13;147:22;
  201:19
**finish (4)**
  43:11;47:16;148:13;
  149:13
**finished (4)**
  54:2,10,15;104:11
**finishes (1)**
  118:3
**finite (3)**
  19:16;20:8;210:9
**Finkelstein (2)**
  173:19,22
**fire (2)**
  224:21;228:24
**firm (2)**
  8:2;171:21
**firms (1)**
  174:12
**first (52)**
  8:9,16;12:1;14:16;15:24;
  18:2;21:5;29:6;31:1;35:19;
  36:24;39:2;54:19;71:18;
  72:15;98:23;107:2,3;
  119:15;139:21;143:12;

160:2,2,4;163:16;168:10;
169:22;178:1,4;180:16,17,
20;181:13;182:14;183:20;
184:22;192:17;193:23;
195:13,16;197:16;198:13,
19;200:13;210:23;211:5,13;
218:23;220:2;227:18,18;
230:16

**fit (1)**
66:17

**five (18)**
12:3;15:16;39:18;43:15;
47:14;48:24;55:23;63:7;
78:9;132:11;133:23,25;
152:24;170:2;202:2;230:16;
233:7,8

**flagged (3)**
181:8;187:21;188:5

**flat (1)**
18:6

**flow (1)**
172:6

**FLSA (16)**
13:22;14:1,4,14,20;17:19;
21:5,8,10,16;23:20;24:2;
27:19,20,25;28:2

**FLSA's (2)**
23:8,8

**focused (1)**
171:16

**folder (1)**
70:17

**follow (6)**
36:10;44:3;47:20;55:9;
157:11;158:22

**followed (1)**
159:1

**following (4)**
57:3;131:11;198:14;
211:12

**follows (3)**
29:9;163:19;219:1

**foot (1)**
137:7

**forced (3)**
17:17;20:3;115:8

**forensic (1)**
168:4

**forgot (1)**
233:18

**form (6)**
73:15,19;93:17;124:17;
132:22,25

**format (2)**
185:5,8

**formula (5)**
184:25;185:2;197:9;
199:15;205:2

**Fort (3)**
169:23;170:21;171:3

**forth (2)**
39:2;168:18

**forward (3)**

11:23;103:24;199:1

**found (1)**
101:16

**Foundation (3)**
53:22;70:6;75:18

**four (16)**
10:1;175:2,5;180:18,22;
181:3;188:17,19;193:15,18;
204:2,7;205:7,8;213:19;
214:10

**fourth (3)**
34:15;36:7;103:11

**Franklin (1)**
145:9

**Fred (114)**
10:13;31:6,6,8,9,11,16;
32:7;33:9,12,20;37:11,17,
20;41:3,4,7;42:24;43:7;
44:16;48:9,11,13,17,22;
49:7,7,9;53:21;72:19,21,23,
24;73:1,4;76:17;83:16,18,
20;84:11,12,14;85:22;86:2,
8,17;88:6;89:24;90:6,7,9,10,
11,24;91:5,21,24;92:15,17,
19;101:19;102:8,8;104:17;
115:2;120:4,11,15,20,22;
127:24;129:4,9,17,20,25;
130:7,8,12;139:1,19,20,21,
23;140:3,4,4;141:1,4,7,7,14,
17;143:16,20,23;144:9,11,
13,20,22,23,24;162:13,22,
22;163:2,4;220:9,17,18;
225:10;226:7;234:9

**Fred's (3)**
90:12;144:1;163:3

**free (1)**
19:21

**freedom (7)**
94:4;152:1,5;158:18,18,
21;228:1

**freeway (2)**
105:17,21

**F-R-E-I (1)**
7:19

**FREI-PEARSON (28)**
7:16,17;8:15,20;9:7,13;
13:16,19;15:21;32:18;
89:19;155:7,10,16,23;
156:10,16;166:22;202:15,
20;215:14;217:7,10;218:9;
231:3,7;232:4;235:16

**frequently (9)**
40:3,5,24;41:20,25;42:2;
191:21;233:4,6

**Friday (8)**
26:6;45:1;161:22;193:8,
10;203:13;204:16,24

**friend (1)**
226:14

**frog (1)**
189:22

**front (2)**
86:21;101:16

**frustrating (1)**
47:24

**Fudens (3)**
29:7;163:17;218:24

**fulfill (2)**
110:15;128:11

**fulfilling (2)**
128:3;131:4

**full (4)**
23:17;29:12;80:17;189:14

**function (12)**
184:24;185:16;186:3,4,
18;196:15,19,21;197:5;
199:10,11;212:24

**functioning (1)**
186:8

**functions (2)**
196:9;201:1

**further (2)**
133:5;149:9;154:18;229:6

**G**

**Gabe (1)**
171:19

**gap (1)**
22:13

**gas (5)**
66:20;68:23;70:13;
105:10;123:11

**gasoline (1)**
66:20

**gave (26)**
26:10;31:5,14,22;34:24;
39:3;43:6,14;76:16;80:16;
92:16;93:22;95:7;98:3;
110:25;121:4;127:20;
128:21;136:6,10;143:19;
156:23;157:8;185:17,18;
220:9

**general (4)**
10:4,10;123:19;172:12

**generally (1)**
174:15

**gentleman (1)**
89:18

**Georgia (8)**
26:25;28:7;29:16;75:16;
145:17;155:14;183:7;219:9

**Georgia's (1)**
28:7

**gift (1)**
129:14

**girl (1)**
80:11

**given (16)**
33:10;34:22;37:22;41:24;
43:3;190:16;192:20;193:5;
194:13;198:4;203:9;204:12;
208:13,20;213:21;224:10

**gives (1)**
129:19

**giving (12)**

24:13;25:25;129:12;
130:23;131:5;139:1;153:6;
160:24;166:7;186:9,10;
213:15

**Glen (4)**
65:1,3,6,9

**goes (4)**
132:4;167:16;187:11;
197:22

**Good (14)**
7:1,16,20,22;13:19;23:11,
16,22,24;86:12;95:18,20;
98:1;235:20

**Google (9)**
183:16,16,25;184:7,9,17,
19,21;200:15

**GoogleMapscom (1)**
183:24

**Google's (1)**
208:10

**government (4)**
98:7;124:8;171:10;173:4

**government's (1)**
14:8

**GPS (1)**
126:3

**grade (1)**
29:20

**graduate (1)**
168:3

**graduated (3)**
169:21;171:15;219:11

**granted (2)**
133:13;221:19

**greater (1)**
97:7

**grey (1)**
187:21

**grocery (2)**
168:11,25

**ground (2)**
15:4,4

**grounds (1)**
23:11

**group (2)**
54:2;187:5

**guess (7)**
86:12;109:23;177:12;
187:2,24;205:21;206:24

**guided (1)**
16:24

**guilty (1)**
169:13

**guy (8)**
31:9,12,13,14;35:9;152:3;
157:6;162:1

**guys (6)**
80:10,14,25;149:15;
160:6;168:22

**H**

**half (22)**

8:18;71:18,18,22,24;72:2;
90:1,4;131:1,3,5;160:14;
169:11;170:15;178:4;
194:16,17;195:19;197:18;
199:4;205:12,13

**halfway (3)**
180:12,14,15

**hand (3)**
140:21;162:20;218:21

**handbook (1)**
121:14

**handle (1)**
8:7

**handling (1)**
9:21

**hang (1)**
235:22

**hanging (1)**
131:21

**happen (8)**
27:23;40:3;117:19;
138:21;154:22;171:12;
217:23;226:17

**happened (23)**
31:21;44:14;47:12;52:8;
76:23;81:10,20;82:4,11;
83:18;108:12;117:16;169:5;
190:24;191:1;195:15;
198:17;210:18;215:9;
220:12,25;222:10;226:13

**happening (2)**
108:4;156:5

**happily (1)**
185:8

**happy (2)**
9:13,18

**hard (1)**
180:8

**head (1)**
58:23

**headlines (1)**
185:6

**hear (7)**
7:3;9:8;28:19;53:24;
173:6,14;194:18

**heard (4)**
25:17;103:22;143:12;
201:16

**hearing (6)**
8:13;9:21;87:14;216:9;
218:15;232:24

**hearsay (1)**
30:16

**help (4)**
117:2,6,21;168:21

**helped (1)**
172:4

**helpful (2)**
12:8,13

**helps (1)**
174:12

**Hembree (1)**
44:24

**Henry (1)**
183:6

**herein (1)**
29:5;163:15;218:22

**here's (1)**
130:20

**hey (3)**
119:25;138:18;168:20

**hiding (1)**
173:13

**high (3)**
96:22;168:19;219:11

**higher (1)**
70:3

**highlighted (4)**
180:19,23;187:21;188:5

**Highway (1)**
108:16

**Hills (1)**
19:10

**himself (2)**
20:16;79:13

**hire (18)**
17:5,7,13,14,16,21,24;
18:12;74:16;112:23;117:1,
5;118:16;220:19,23;221:22,
23;222:1

**hired (10)**
19:15,17;35:2;77:9,12;
172:1,7;226:16;234:4,4

**hiring (3)**
30:14;31:5;143:23;226:15

**hit (1)**
204:21

**hold (2)**
148:7;149:11

**holds (1)**
217:5

**home (11)**
54:12,25;58:1;79:5;117:8,
18;134:4;137:15;154:8;
210:15;213:14

**honest (4)**
98:6;129:20;130:22;163:6

**honestly (2)**
98:9,13

**Honor (7)**
21:13,20;23:12,16;165:3;
166:21;167:6

**Honorable (1)**
218:16

**hope (1)**
138:2

**hospital (2)**
83:4,9

**hot (5)**
56:9,12,15,19,24

**hour (27)**
8:18,19,20;56:14;88:7,10,
16,19;89:24;90:1,1,2,3,4,5;
131:1,3,5;154:22;155:3;
159:12;193:17,24;197:24;
204:4,6;205:20

**hourly (3)**
197:10,16;226:25

**hours (56)**
16:9;18:17;20:7;42:14,17,
21;45:1,8,14,16,19,21;
143:4;152:9;156:4;172:3;
193:3,10,11;195:10,14,15,
19,25;197:13,15,16,17;
198:11,12,13,15,16,18,20,
24;199:1,1,2,11,12;201:21;
202:4;203:7;205:7,8,12,12,
13;221:11,14;225:1,3;228:3,
4;230:18

**house (3)**
54:18;80:17;115:19;
134:1,3,4,8,12,24

**housekeeping (1)**
8:7

**Houston (1)**
10:12

**HR (3)**
81:20;82:3,6

**human (1)**
10:10

**hundred (5)**
105:12;108:6;155:24;
205:3;207:2

**hungry (1)**
60:17

**hurry (9)**
37:20;41:12;86:22,24;
100:12,14;102:9,15;152:19

**husband (3)**
68:20;123:1;220:7

**hustle (1)**
18:10

# I

**ID (1)**
127:20

**idea (5)**
25:10;26:21;91:12;209:1,
8

**ideal (1)**
12:19

**identification (2)**
124:11;218:17

**identify (5)**
32:21;37:2;60:1;89:5;
187:6

**ignored (1)**
205:25

**impact (1)**
204:15

**impacted (1)**
169:7

**important (2)**
20:17;23:8

**Importantly (1)**
14:19

**impose (1)**
52:18

**inaccurate (1)**
27:18;97:5

**include (5)**
192:15;206:10;210:14;
211:21;214:14

**included (8)**
179:23;181:20;192:17,19;
210:21;211:10;212:2;
213:22

**includes (1)**
201:3

**including (4)**
13:24;36:10;44:2;205:11

**inclusive (1)**
211:3

**income (12)**
17:1,23;72:9;93:20;95:5,
9,11,23;96:9,12;132:13,24

**inconsistent (2)**
180:22;181:1

**incorrect (3)**
71:1,4;201:19

**increase (2)**
14:13;204:22

**incur (1)**
13:24

**incurred (5)**
96:18,20;97:8,8;98:10

**Indeed (1)**
18:8

**indefinite (1)**
19:19

**independent (24)**
14:5,6,12,17;15:1,7,10,24;
20:2;24:6;26:13;28:10,14;
93:9,17,21;94:13;99:23;
113:15;130:20;232:1,11,13;
234:12

**indicate (1)**
66:9

**indicating (2)**
127:17;177:15

**individual (11)**
28:10;145:25;149:23;
171:19;172:1;173:12,19,21;
175:8;189:16;200:14

**individually (1)**
20:22

**individuals (1)**
174:19

**infantry (1)**
169:18

**inform (1)**
114:13

**information (28)**
81:16;131:16;166:5;
176:11;178:6,8;179:7;
181:19;184:1,8;187:23;
190:9,21;192:20;193:5,6;
194:23;195:2;196:3;200:15;
203:19;207:18;210:18;
213:16,21;216:6;226:4;
230:15

**informed (2)**
156:11;210:17
**infrastructure (1)**
172:5
**ingenuity (1)**
18:10
**ingenuous (1)**
149:21
**in-house (1)**
7:23
**initially (1)**
172:7
**injured (1)**
169:25
**injuries (2)**
171:8,9
**innovation (1)**
171:16
**input (1)**
150:24
**inputs (5)**
164:24;176:12;200:9,17,
23
**inside (3)**
12:19;137:17;138:6
**insisted (1)**
20:4
**inspected (1)**
122:5
**inspecting (2)**
122:8,11
**install (1)**
61:19
**instead (3)**
175:13;183:23;210:15
**instructed (2)**
203:16;204:5
**instruction (7)**
26:1;34:17,20,22,24;35:1;
103:12
**instructions (3)**
28:17;43:22;56:24
**insurance (5)**
69:16;123:14,16,18,24
**integral (1)**
20:13
**intelligence (2)**
168:5;171:6
**intend (3)**
10:3;230:25;231:11
**intended (1)**
24:7
**intends (1)**
231:5
**intention (1)**
86:10
**interact (1)**
14:7
**interested (2)**
134:7;184:9
**interesting (1)**
209:24
**interim (1)**

**9:17**
**interject (2)**
87:25;150:5
**intern (1)**
170:13
**Internet (4)**
176:16;177:1,4;178:10
**internship (2)**
170:12,13
**interruption (1)**
94:24
**interview (1)**
172:1
**interviews (1)**
170:19
**into (25)**
122:4;150:24;170:5,9;
173:7;178:16;179:5;185:2,
3,12;187:9;190:12;193:13;
196:8;197:13,20;198:4;
199:20;200:9,12,21;215:21;
222:18;229:21;231:17
**introduce (2)**
7:7;131:25
**inventory (3)**
74:5,8,11
**invest (1)**
18:21
**Investigation (1)**
170:6
**investigations (1)**
171:2
**investigative (1)**
170:13
**invoice (30)**
34:2,4,8,11;40:14;49:22;
51:23;58:8,9,13;59:12,17,
18;60:7;80:16;107:6,16;
158:6;164:19;165:12;176:8;
178:15,21,23,24;179:12,14;
187:12;190:1;208:9
**invoices (27)**
40:9;50:1;52:1;152:22;
158:3;164:18,23;165:1,4,6,
9,9,13,17;178:12,13,22;
180:3,20,22,23;181:2,3;
188:3;193:1;200:14;208:13
**involve (1)**
104:6
**involved (3)**
82:23;170:24;208:8
**irrelevant (1)**
216:1
**IRS (6)**
27:12;97:18,23,25;195:7;
200:19
**Island (1)**
11:6
**isolate (1)**
178:15
**issue (6)**
148:24;155:17;176:25;
179:5;185:4;186:6

**issued (10)**
191:21,23;192:9,16,18;
210:25;211:2,9,18;212:7
**issues (7)**
8:7;155:10,18,25;171:8;
176:17;219:5
**items (1)**
39:7

## J

**J1 (4)**
159:22,23;164:18;179:11
**J-1 (1)**
165:4
**J2 (1)**
191:15
**January (6)**
220:4;221:5;224:23;
230:17;234:17,22
**JD (2)**
168:1;171:15
**Jennifer (1)**
175:7
**Jeremiah (1)**
7:17
**J-E-R-E-M-I-A-H (1)**
7:18
**job (64)**
13:25;16:6;18:19;19:3,6;
20:2,3,8,18;29:24,25;30:1,
12;36:6,11,13;46:2;49:20,
25;50:4,7,17,20;52:1;66:25;
68:10,24;69:2,5,9;74:22;
76:2;77:11;83:24;85:19,23;
86:1,3;92:12,19;103:18,21;
106:10;107:15;115:10,11;
117:10,12;118:24;120:8;
158:1;160:24;161:14,21,24;
205:8;220:8;221:9;225:8,
12;226:20,21;230:5,11
**jobs (3)**
17:3,25;76:7
**Johnson (2)**
149:7;216:10;217:16,20
**join (2)**
169:15,19
**joined (2)**
169:9,17
**joint (20)**
25:13;32:10,15,20;36:24;
40:21;59:23;70:16;98:20;
147:8;154:5;165:4,4;177:3,
11;191:15;216:12,13;217:1,
2
**jointly (1)**
21:9
**Judge (1)**
218:17
**judgment (4)**
28:22;164:12;209:7,10
**judicial (1)**
216:9

**June (4)**
212:1,2;226:18;235:8
**Jurassic (1)**
189:22
**Justice (1)**
167:25

## K

**Kacey (4)**
175:20,21,22;176:1
**Kathy (16)**
221:15;222:1,3,4,5,7;
223:3,12,20;224:4,19;226:2,
16;228:16,21,23
**Kathy's (1)**
233:16
**keep (6)**
52:23;64:20;97:19;118:5;
157:15;181:18
**keeping (1)**
61:11
**Kelly (3)**
175:7,20,21
**kept (1)**
213:4
**kerfuffle (1)**
12:22
**kids (2)**
49:6;137:15
**kilometer (1)**
184:15,20
**kilometers (2)**
184:11,25
**kind (16)**
30:4;39:23;47:24;62:14;
69:25;74:2;121:4;122:19;
127:20;131:22;168:15,24;
169:7;170:20;172:4;189:18
**kinds (1)**
46:21
**KM (1)**
185:1
**knew (10)**
24:4;91:3;104:15;106:4,7;
124:12;150:9;175:15;
184:22;234:23
**knowing (2)**
21:22;129:6
**knowledge (7)**
70:23;98:12;126:8;
150:20;165:25;173:5;
208:15
**known (1)**
150:20
**Korea (1)**
171:4

## L

**lab (1)**
215:15
**label (1)**

182:5
**labeled (3)**
178:2;194:19;198:8
**Labor (3)**
13:21;102:23;231:19
**laid (1)**
31:23
**large (1)**
66:10
**larger (2)**
89:17;189:8
**Last (20)**
7:18;71:18;88:11,15;
132:21;142:15;150:10;
171:18;172:2,16;187:10;
192:10;194:18,25;195:13;
198:3;205:19;211:1,19;
233:16
**lasted (3)**
88:6,10,19
**late (18)**
11:4;43:2,14;47:15;48:24;
49:2;52:19;63:11,15;64:1;
120:17;128:13;131:3;143:7,
8;152:24;169:1;222:13
**lately (1)**
87:11
**later (11)**
40:21;45:3,4,6;47:16;
154:22;169:11;204:20,24;
222:19,19
**Laurel (2)**
145:2,5
**L-A-U-R-E-L (1)**
145:6
**law (15)**
8:2;15:2;27:18;28:8;
166:18,20;171:13,14,18,20;
172:2,8;173:23;174:12;
217:23
**lawsuit (1)**
231:6
**lawyer (2)**
94:6;231:21
**lawyers (1)**
136:5
**lay (5)**
147:13;164:10;166:14;
167:1,4
**leading (1)**
153:3
**learned (3)**
81:16;168:19;230:22
**least (5)**
10:24;21:15;167:19;
198:15;208:16
**leave (4)**
11:7;84:16;137:10;155:3
**leaving (2)**
59:2;154:9
**left (10)**
11:10;22:1;58:5,14;94:12;
105:3,11;108:5;181:14;

199:19
**legal (8)**
24:8;146:2;150:6,9;
171:16;217:4,19;231:4
**legally (1)**
17:16
**less (26)**
14:14;21:16;22:11,14;
26:8;45:19;56:14;88:16,17;
90:2;97:10,23;123:9;153:3;
188:1,3,4;195:17,18,24;
198:18;200:20;207:9,11,14;
224:8
**lettered (1)**
194:25
**letters (2)**
60:21,25
**levels (1)**
169:18
**Levy (1)**
218:16
**liability (4)**
21:11;42:16;73:16,20
**liable (1)**
21:9
**license (2)**
69:12;124:13
**life (1)**
169:14
**liked (1)**
100:4
**likely (1)**
202:5
**limit (1)**
146:16
**limited (3)**
18:13;73:16,20
**limits (1)**
152:16
**line (19)**
100:19;101:19;102:5,6;
116:25;125:7;132:14,16;
135:16;140:8,10,24;160:2;
169:14;179:10;186:7;188:5;
189:12;200:2
**lined (1)**
179:8
**lines (3)**
89:22;179:4;200:4
**link (1)**
183:14
**liquidated (3)**
23:9,17,19
**list (8)**
149:14;151:8;159:23;
164:23;182:17;207:21;
208:2;226:19
**listed (1)**
15:18
**listen (7)**
25:14;49:8,9;129:5,9;
130:5,24
**listening (2)**

129:8;144:6
**literally (1)**
178:14
**litigation (4)**
89:8;174:13;229:21;
231:17
**little (11)**
26:7;52:5;77:16;91:18;
94:24;138:16;147:4;151:7;
183:14;202:19;203:1
**live (3)**
11:7;29:15,16
**lived (1)**
17:23
**living (2)**
72:10;74:24
**LLC (10)**
7:5,25;132:23;133:3;
145:3,9,12,14,17;147:1
**LLM (2)**
168:1;171:15
**load (3)**
56:1;66:15;157:14
**loading (2)**
39:14;56:6
**located (2)**
44:23;157:12
**location (9)**
19:4,4;47:4;51:10;59:9;
78:4,7;79:7;153:21
**locations (1)**
106:16
**logic (1)**
172:6
**logistical (1)**
219:5
**long (24)**
8:12;9:4;11:6;12:15;
26:22;40:2;61:24;63:23,25;
66:16;85:19;88:10,15;
89:23;100:1,5,8;112:18;
133:18;157:13;202:9;205:5;
222:13;224:22
**longer (5)**
47:9,17,18;108:16;157:10
**look (23)**
27:25;28:6;32:19;33:15;
34:1;41:10;49:7;60:24;
67:24;86:12;98:7,20;
100:18;108:20;138:10;
140:23;147:3;154:2;159:12;
188:10;202:6,9;212:6
**looked (4)**
41:17,18;44:15;176:23
**looking (10)**
32:13,13;37:23;100:11;
102:13;138:15,22;154:5;
171:22;187:3
**looks (4)**
155:22;177:4;178:22;
198:15
**losing (3)**
69:20;162:6,7

**loss (5)**
18:4,5,25;132:13;224:8
**losses (1)**
95:24
**lost (2)**
196:22;198:7
**lot (11)**
24:12;66:15;70:10,11,11,
12,13;113:3;144:16,17;
203:1
**low (10)**
14:11;17:16,20,22;20:20;
24:3,9;74:20;96:22,23
**lower (1)**
97:8
**lowest (2)**
22:21;169:18
**Lucio (106)**
7:4,13,13;8:17;12:1;
14:11,24,25;15:6,23;16:1,6,
13,19,20,25;17:3,4,6,7,14,
15,21;18:4,15,21;19:15,24;
20:6,19,25;21:2,15,25;22:5,
9,10;23:5;24:1,3,13;25:18,
19,22;26:9,14;27:3,11,24;
29:2,12,14;30:25;31:3,12,
14;35:8;47:7;71:5;77:7;
85:10;92:14,16,21;119:22;
132:7;133:11;146:25;
151:18;156:22;157:1,4,15,
23;158:9;159:2,17,21;160:1,
12,15,19,23;161:19,25;
162:18,24;163:6;182:9,24;
193:7;199:25;200:6;201:14;
203:8,24;210:15;216:11;
217:11,22;219:17;225:5,16;
233:1,20;234:17
**Lucio_calculations (1)**
182:13
**Lucio_calculationsoriginal (1)**
181:24
**Lucio_calculationstrueup (1)**
187:16
**Lucio_data (2)**
178:2,7
**Lucio_hours (1)**
191:5
**Lucio_weekoverweek (1)**
194:20
**Lucio's (29)**
16:9,10,17,22;20:13;22:3;
23:4;28:11;180:24;181:7;
182:25;183:1,9;185:24;
187:7,24;191:13;192:14;
193:6,14;194:13;195:7;
198:3;200:18;203:10,17;
205:11;209:9;217:15
**luck (1)**
235:20
**luminous (1)**
164:13
**lunch (5)**
9:25;11:14;60:16,18,19

**luncheon (1)**
  131:10

# M

**mad (6)**
  58:12,20,24;61:22;76:24;
  100:10
**magic (1)**
  156:16
**Magistrate (1)**
  218:17
**Maids (1)**
  93:12
**mail (2)**
  60:20;61:1
**maintain (2)**
  74:4,11
**maintaining (1)**
  74:8
**maintenance (1)**
  69:5
**majority (2)**
  21:6;173:20
**makes (2)**
  23:23;156:12
**making (14)**
  20:17;25:5;97:10;108:13,
  17;113:3;119:2;124:20;
  134:19;137:19,23;140:13;
  166:4;198:7
**manage (4)**
  17:5;75:12,16;224:5
**managed (1)**
  74:5
**management (2)**
  46:21;168:25
**manager (16)**
  10:5,14;16:8;17:12;21:25;
  35:14;44:20;46:4;65:25;
  143:20;157:17;169:3;172:8;
  221:15;222:4;223:3
**mandatory (1)**
  23:9
**manner (1)**
  187:13
**manually (4)**
  186:2;196:17;197:8;
  212:20
**many (26)**
  17:8;18:7;26:17;45:14;
  53:19;55:10;59:21;63:16;
  65:2,19;67:21;78:2,6;83:12;
  88:2;119:9,10;134:17;
  135:16;136:6;179:18;
  188:20;206:10,12,16;207:4
**Maps (2)**
  183:16,17
**Marietta (1)**
  226:1
**marital (1)**
  68:21
**Mark (3)**

7:14;8:17;218:12
**marked (1)**
  218:17
**Marks (100)**
  8:4,4;9:20;10:1,8,17;11:1,
  10;12:22;13:4,15;24:18,19;
  30:16,18;32:17;36:14,16;
  40:17;53:22;69:22,25;70:6;
  71:3;75:1,4,9,18;85:9;
  87:25;88:23;89:2,7,11,14;
  96:7;112:15,18;115:16;
  116:16;118:5;131:14;132:5;
  133:8;138:4;145:7;147:2,7;
  148:4,16;149:19;150:10,15,
  19;151:2,10,18;153:3,11,14;
  154:15,19;161:5;163:10;
  164:4;165:20;173:1;174:5;
  176:2;177:6,12,21;180:10,
  13,15;182:1,7;188:13;
  189:19,21;190:23;191:8,24;
  192:4;195:1;196:22;197:1;
  201:9;203:5;214:2,15;
  215:6,24;216:8,19;218:12;
  229:17;231:5,9;233:23
**Masters (1)**
  167:25
**MASUCCI (166)**
  7:1,2;8:6;9:9,19;10:7,21;
  11:2,12,22;12:11,17,20;
  13:2,12,17;15:19;24:17;
  28:24;29:3;30:23;31:1,11,
  13,32:12;35:7,11;36:17;
  47:5;53:23;69:24;70:2,7;
  71:6;75:2,6,19;77:5;79:23;
  85:4;88:4;89:3,9,12;92:9,15,
  18;94:6;96:5;98:17;100:21;
  102:4;112:13,16;115:17;
  116:17;118:2;119:15,24;
  125:9;127:2;130:5;131:8;
  132:2;140:18;145:5;146:23;
  147:6;148:7,18;149:11;
  150:3,8,14,17;151:5,8,12;
  153:5,12,17;154:17;155:9,
  14,20;156:7,14,18,23;157:3,
  7,21,24;158:20;159:14,18,
  22;160:9,13,16,21;161:2,8,
  20;162:10,15,19,25;163:8,
  11,20;164:15;165:1,16;
  167:14;172:22;173:14;
  176:5,21;177:16;181:11;
  182:11;184:3;189:20,24;
  190:5,14;191:2,10;192:6;
  196:24;201:7,11,24;202:8,
  18;203:2;210:3;214:4,16,
  21;215:10,18;216:2,17;
  217:9;218:5,19;229:14;
  231:14;232:5,17,20;233:24;
  234:3,8,11,16,20;235:1,6,9,
  14,18,20,23
**match (1)**
  58:9
**material (4)**
  209:25;210:1,2,9

**materially (4)**
  208:21,23;209:23;210:10
**math (11)**
  160:16;167:11;176:12;
  201:2,3,4;205:1;207:15;
  212:13,22;213:1
**mathematical (3)**
  185:15;197:12;199:15
**Mathematically (1)**
  137:10
**matter (12)**
  7:3,4;15:12;18:18;81:19;
  82:9,10;174:1,4;217:19,22;
  218:8
**matters (1)**
  39:6
**maximize (1)**
  95:23
**may (28)**
  10:8;12:8;29:25;33:4;
  37:13;41:15;85:19,23;87:6;
  99:14,22;112:22,23,23;
  124:2;149:8;155:7;160:5;
  162:20,20;166:10;190:18;
  212:2;217:7;229:7;230:17;
  234:18,22
**maybe (11)**
  48:19;68:1;80:22;88:18;
  94:21;123:10;137:6;139:13;
  147:8;211:12;233:8
**mean (13)**
  12:11;47:18;124:6;
  126:23;127:3;137:12;
  141:16;148:2;174:6,7,8;
  207:15;232:9
**meaning (3)**
  157:9;158:2;190:1
**means (1)**
  36:9
**medevaced (1)**
  170:1
**media (1)**
  209:6
**Medical (1)**
  170:1
**medically (1)**
  171:11
**Meed (2)**
  170:21;171:3
**meet (7)**
  28:17;31:16;72:10;74:23;
  89:23;91:24;149:15
**meeting (10)**
  86:2;88:6,15;90:6,12;
  91:5;220:12,25;221:25,25
**meetings (4)**
  222:5,7,10,15
**members (1)**
  7:25
**mention (1)**
  222:11
**mentioned (4)**
  143:14;146:12;148:16;

200:24
**menus (2)**
  11:18,20
**message (8)**
  135:18;136:3,4;154:9,16,
  21;155:1;156:8
**messages (5)**
  135:25;136:10,15;154:2;
  155:21
**met (5)**
  85:22;86:7;91:21;143:16;
  220:10
**methods (2)**
  36:9;46:13
**Mexico (1)**
  29:18
**Michael (4)**
  9:3;163:21;173:21;215:23
**mid (1)**
  169:12
**middle (2)**
  139:9;180:1
**might (8)**
  10:5;11:19;12:13;98:7;
  202:8,18;229:9;235:2
**mile (3)**
  196:11;197:22;209:5
**mileage (16)**
  65:23;67:16,19;122:5,8,
  12;185:17;195:5,5;196:13,
  14;197:6,19;198:5;199:21;
  213:15
**miles (20)**
  65:19;67:21;122:14,16;
  133:23,25;134:17;184:23,
  24,25;185:3,19,22;186:7;
  196:5,6,15;209:2,4;225:22
**military (1)**
  155:2
**militates (1)**
  19:11
**Miller (1)**
  171:19
**millions (2)**
  18:23;24:1
**mind (3)**
  79:9;163:3;191:18
**mindful (1)**
  75:8
**mine (1)**
  226:14
**minimum (14)**
  13:23;17:18;27:22;194:9,
  12;198:9,21;199:4,6,8,16,
  24;200:18;229:23
**minivan (5)**
  57:14;65:16;66:18;70:15;
  122:22
**minor (1)**
  12:22
**minority (1)**
  173:20
**Min-U-Script (1)**

**89**:17
**minute (3)**
79:21;232:18,21
**minutes (27)**
9:1,6;11:9;39:18;43:15;
47:14;48:24;52:15;55:24;
63:7;88:17,18;123:20;
134:5,11,16;152:24;154:8;
163:12;173:1;193:17,23;
199:19;201:8;204:4,5,23
**Miscellaneous (2)**
132:22,25
**misclassified (2)**
14:10;232:1
**Miss (101)**
8:17;9:19;11:13;12:1;
14:24,25;15:6,23;16:1,6,9,
10,13,17,19,20,22,25;17:3,4,
6,7,14,15,21;18:4,15,21;
19:15,24;20:6,13,19,25;
21:2,15,25;22:3,5,9,10;23:4,
5;24:1,3,13;25:18,19,22;
26:9,14;27:3,11,24;28:11;
29:2,12;85:10;132:7;
133:11;151:18;175:22;
176:1;180:24;181:7;182:24,
25;183:1,9;185:24;187:7,
24;191:13;192:14;193:6,7,
14;194:13;195:7;198:3;
199:25;200:6,18;201:14;
203:8,10,17,24;205:11;
209:9;210:15;216:11;
217:11,15,22;219:17;225:5,
16;233:1,20;234:17
**missed (3)**
139:15,16;140:25
**mission (1)**
169:25
**Missouri (1)**
170:16
**misunderstood (1)**
139:14
**MIT (1)**
168:5
**Mm-hmm (3)**
89:25;124:1;139:18
**model (3)**
27:14;65:17;104:7
**mom (1)**
79:14
**moment (3)**
13:15;173:16;179:13
**Monday (15)**
26:6;44:25;72:3;81:11;
187:4;193:8,10,22;194:1;
195:23,24;203:12;204:8,13,
24
**money (19)**
24:2,12;26:19;74:20,23;
97:10,11;113:3,21;114:5;
115:11;119:1;141:18;
160:20;162:7,7;198:6,7;
231:2

**Monica (10)**
61:5,10,12;136:11,12;
154:6;157:3,4,5,6
**Monica's (1)**
61:6
**monotonous (1)**
179:10
**month (17)**
71:16,18,19,22,25;160:11,
12,14,18;192:11;211:9,16,
18,18,19,21,22
**months (9)**
72:2;88:1;94:21;170:2,15,
16;174:17;224:24;230:16
**more (44)**
9:18;12:9;21:13;22:22;
38:17;46:17;54:5;55:12;
64:19;66:13;68:8;75:24;
76:3;86:5,6,8,11;94:3;97:10,
24;104:12,20,22;112:3;
122:16;134:7;137:3;151:11;
152:1,5;154:12;157:21;
158:18,18;190:9;222:19;
224:8;225:2,3;226:22,24;
227:25;230:18;233:7
**Moreover (1)**
17:20
**morning (13)**
7:1,16,20,22;11:6,8;
13:19;83:6,7;84:19;120:7;
142:8,16
**most (11)**
19:9;23:8;68:6;70:15;
76:11;135:13,14;136:19;
156:13;169:6;225:14
**mostly (1)**
202:5
**Motion (1)**
218:15
**motivation (1)**
175:17
**move (2)**
172:7,18
**moved (3)**
175:8,10;204:16
**movements (2)**
170:25;171:7
**moving (1)**
226:1
**much (15)**
66:24;71:21;88:17;
132:13,17,24;137:7;142:9;
160:3;168:17;199:25;
203:18;205:16,18;232:19
**mug (1)**
90:21
**multiple (7)**
14:20;22:7;26:18;105:23;
110:14,17;214:14
**multiplied (3)**
185:25;198:21;199:3
**multiplies (1)**
196:15

**multiply (1)**
186:2
**must (3)**
20:1;43:23;116:7
**myself (3)**
112:23;156:15;225:4

**N**

**name (13)**
7:2,18;29:12;30:24;31:2;
35:12;53:13;163:20,21;
175:20;178:22,24;233:16
**named (5)**
146:16;157:5;171:19;
173:19,21
**names (3)**
53:5,12,16
**national (1)**
171:20;172:8
**Naturally (1)**
32:3
**nature (2)**
94:9;164:4
**near (1)**
27:15
**nearly (1)**
17:22
**necessarily (1)**
22:17
**necessary (4)**
11:4;116:10;131:20;173:5
**need (23)**
25:14;27:25;28:6;41:12;
43:18;57:18;102:9;103:15;
111:9;123:18;128:10;
131:21;148:8;149:8,16;
159:12;165:23;176:25;
183:3;202:9,12,13,25
**needed (46)**
12:4;19:24;20:8;30:12;
32:4;36:5;46:24;47:1;49:19;
50:9,15;55:21,23;57:23,25;
61:17;62:19,22;73:8;79:2;
83:10,15;86:1,23;88:13;
102:23;103:1;115:10;123:5;
124:13;133:14;140:2,14,16,
22;158:24;159:11;161:17;
162:2,4,12,16;182:22;
183:12;193:19;225:3
**needs (4)**
12:16;56:13;59:19;202:22
**negative (1)**
198:1
**negotiate (6)**
17:4;33:21,24;42:6,10;
86:13
**negotiating (1)**
42:5
**New (6)**
29:8;155:15;163:18;
169:23,24;218:25
**next (17)**

**multiply (1)** — 
19:13;57:3;61:10;71:10;
75:5;182:9,21,22;183:11;
184:12;187:15;188:11;
198:8;210:4;211:2,10;
220:11
**nickname (1)**
35:10
**night (2)**
83:3;142:15
**nine (3)**
179:25;193:10;202:2
**nobody (6)**
112:17;117:2,9,24;121:3;
159:7
**Nodding (1)**
79:22
**None (1)**
212:12
**Nonetheless (1)**
23:1
**non-lawyer (1)**
231:4
**non-reimbursed (1)**
199:21
**Norcross (1)**
220:10
**norm (1)**
23:20
**normally (3)**
175:4,10;189:15
**normative (1)**
194:2
**north (4)**
105:25;106:2,2,2
**Notary (3)**
29:7;163:17;218:24
**noted (2)**
203:3;235:25
**notepad (5)**
53:4,6,8,10,17
**notice (4)**
160:5;180:7;216:9,13
**noticed (1)**
180:18
**noting (1)**
218:6
**NSA (3)**
170:22,22,23
**nuanced (1)**
148:22
**number (22)**
13:8;31:5;33:16;42:17;
59:18;92:16;147:16,17;
149:4,5;154:3;165:8;171:1;
180:10;186:17;188:10,19;
193:13;195:6;198:1;206:17;
220:9
**numbered (2)**
36:25;182:18
**numbers (1)**
49:23
**numerous (1)**
23:24

# O

**oath (4)**
28:15;29:4;125:18;218:20
**object (11)**
30:16;36:16;88:21;
101:25;116:14;141:2;146:1;
164:7;191:24;215:6,24
**objecting (2)**
146:20;147:11
**objection (17)**
30:18;36:14;53:22;69:22;
70:6;75:1;88:1;96:1;115:14;
122:9;150:6;153:11;174:5;
217:17;218:2;231:3;232:4
**obligated (2)**
50:13;104:21
**observe (5)**
35:15;59:1;66:1;77:12,17
**observed (1)**
119:16
**observing (2)**
119:21,22
**obtain (4)**
50:4;75:24;76:3;182:23
**occasion (1)**
130:8
**occasions (3)**
175:2,5;214:10
**occur (1)**
58:14
**occurred (2)**
88:1;190:21
**o'clock (5)**
9:12;11:8;54:11;142:18;
213:19
**October (7)**
30:3;78:17;87:20;88:9,20;
89:21;144:19
**odd (1)**
181:8
**odometer (3)**
67:16,19,25
**off (60)**
19:21,23;26:19;52:14;
70:12;72:12,16,21;73:2,7;
78:18,23;79:6;80:12,16;
81:8,13;84:16;107:9;
110:24;111:17,18,19,20;
112:5;134:3;136:21,25;
137:7,8;139:25;140:6;
141:8;142:15;155:18,25;
156:3;158:6,17;161:17;
162:2,4,8,12,17;163:1,4;
185:7;189:5;193:1;200:16;
215:18;221:16,18;224:10;
230:13,21;234:24;235:3,24
**offer (5)**
8:14;131:20;144:24;
177:12;215:21
**offered (2)**
93:8;154:16;167:8;171:9;

216:14
**offering (1)**
177:18
**office (7)**
60:23;90:13,19;106:17,
20;156:2;220:10
**Officer (1)**
172:15
**offsets (1)**
95:23
**often (7)**
46:5;48:13,16;64:17;
67:24;222:5,7
**oil (2)**
69:1;108:10
**old (3)**
52:16;78:20,22
**O-L-I-V-E-R-A (1)**
30:25
**Oliveria (20)**
8:23,23;9:11;17:10;
202:15,21;215:15;219:4;
229:14;234:2,6,10,14,19,23;
235:4,8,12,19,22
**Oliveria's (1)**
8:25
**once (17)**
35:2;38:7;39:9;40:11;
46:9;129:23;130:1;171:18;
172:11;182:20;183:10;
184:21;185:19,22;189:14;
197:19;222:9
**one (107)**
7:25;8:11,16;10:24;14:21;
17:8;21:6,13,14,22;22:6,9,
18;23:8;38:18;39:1,2;48:23;
53:15;61:16;80:9;83:3;
89:17,18;98:1;100:8;
103:10;107:23,24;108:10;
111:5,24;112:1;113:3,18,19;
115:8;116:12,18;118:12,14;
119:6;122:25;123:5;124:10;
127:4;130:8;143:19;144:12;
147:18;154:7,15;155:19;
157:17;160:1;161:3;164:19;
168:14;170:12,19;173:22;
178:21;179:4,10;182:4,8,9;
185:17,18,19,22;187:8,9,20;
189:24;190:1,1,7,10,19;
193:17,24;194:16;195:4,20;
196:25;198:1,15;199:4,18;
200:23;201:13;204:6,7,8,8,
8;205:20;206:14;209:3,4;
211:5,6;212:7;214:22;
217:5;225:7
**one-page (1)**
59:24
**ones (5)**
56:13;154:6;181:5,12;
200:24
**online (2)**
168:11,25
**only (32)**

11:5;18:22;19:2;22:19;
25:4;27:9;48:15;78:5;80:10,
11,13;94:3;120:13;122:19,
21;126:9;129:22;138:23;
140:16;148:23;149:7,19;
160:7;164:24;170:7,8;
174:17;177:10;188:12,15;
196:25;217:21
**opened (1)**
178:11
**opening (4)**
9:8;11:25;15:20;24:24
**operated (1)**
98:24
**operating (5)**
37:23;96:18;99:4;172:14;
179:2
**operation (2)**
95:25;169:1
**operational (1)**
172:13
**operations (3)**
10:14;172:14;174:19
**Operator (7)**
32:25;37:6;38:4;39:8;
41:17;99:1;112:24
**operator's (1)**
121:23
**opinion (1)**
166:1
**opportunities (2)**
114:14;144:25
**opportunity (24)**
15:14;18:5;20:3;33:12,23;
37:17;41:4,8;42:3,9;91:6,
22;101:5;114:20;115:4,5,6,
24;166:12;171:10;172:18;
174:3,6,9
**opposed (1)**
137:22
**opposing (2)**
102:1;229:7
**opposition (1)**
216:20
**opted (2)**
229:21;231:17
**opt-in (1)**
216:13
**oral (1)**
216:14
**order (25)**
9:14,22;10:6;11:17,20;
13:8,10,11;14:12;16:13;
23:4;31:24;39:4;43:22;44:1,
6,6;105:17,24;135:1;
158:11;167:11;188:16;
202:12;212:24
**ordered (1)**
142:16
**orders (1)**
142:15
**origin (2)**
178:17;183:6

**original (11)**
178:21;179:21;182:9,13;
185:5;186:24,24;189:6,8,10;
193:6
**originally (2)**
29:17;178:24
**originated (1)**
181:4
**originating (2)**
182:24;183:1
**origination (1)**
183:10
**others (5)**
17:5;116:11;119:21,23;
217:6
**otherwise (8)**
43:17;50:10;57:25;58:11;
117:10;123:17;128:12;
190:9
**out (58)**
9:14;10:6;11:17,20;13:7;
25:18;30:19;38:7;39:10,17;
40:11;42:20;43:16;44:5;
46:19;48:1;50:11;53:14,16;
56:7;58:19,23;67:21;68:17;
105:9;117:8,10;121:11;
122:15;126:3;134:19;
138:18;147:9,22,23;148:25;
149:17;152:5;157:12;161:9;
164:21;171:21;172:8;
178:16;179:7;181:6;182:23;
183:12;185:25;202:11,23;
203:7;207:16;218:10,11;
226:16;233:13,14
**out-of-court (1)**
30:20
**outside (4)**
12:10;137:22;151:3;213:1
**over (25)**
15:25;28:16;36:8,12;41:9;
47:23,24;55:12;79:13;94:4;
100:11;105:3;121:2;138:17;
165:8,10;172:18;182:16,20;
187:5;191:7;199:1;200:6;
228:1;229:18
**overloading (1)**
57:14
**overruled (7)**
30:19,21;36:17;53:23;
70:2,7;75:19
**overtime (14)**
13:23;24:10;72:5;194:16;
198:23;199:2,3,6,12;202:6;
204:21;229:22;230:19;
231:23
**overwhelming (1)**
20:24
**owe (1)**
231:1
**own (22)**
17:23;37:24;56:1;68:17;
77:8,13,24;78:2,11,13,16;
98:25;99:2;102:21,25;

112:24,24,25;136:22,25;
152:9;205:22
**owned (2)**
18:23;74:5
**owner (4)**
37:23;99:1;173:20,20
**owner/operator (12)**
38:3;41:18;93:9,17,21;
94:14;95:3,6,9;99:5;113:7;
114:10
**owns (1)**
173:18

**P**

**PA (1)**
145:14
**pace (1)**
12:4
**packing (1)**
59:17
**page (27)**
15:3;32:19;36:24,25;38:2;
40:8,21,22;43:20;89:22;
98:22;100:19;101:18;102:5;
114:12,12;116:5,6,25;125:7,
8;135:15;140:7,24;176:13;
180:8,9
**pages (6)**
132:11,21;147:1;165:8,
10;180:11
**paid (23)**
13:23;21:15;24:10;34:9;
40:15;71:14,15,21,23;72:5;
93:23,24;95:12;113:18,21;
141:18;143:3;160:3;196:1;
197:3;200:6;226:22,24
**pain (1)**
98:1
**painter (1)**
94:20
**panic (2)**
64:9;73:9
**paper (1)**
86:13
**papers (7)**
31:22,25;36:4;41:10;
49:18;115:7;146:24
**paperwork (20)**
19:7;31:10,15,18,20;32:1,
8;91:10,25;104:3;121:11;
220:14;222:23,25;223:2,22;
224:3;234:7,8,15
**Paragraph (5)**
38:1;39:5;40:7;114:11;
115:3
**paralegal (2)**
175:6,13
**paralegal's (1)**
175:20
**park (4)**
61:20;153:22;183:7;
189:23

**Parkway (1)**
44:24
**part (25)**
20:13,18;35:25;49:24,25;
50:4,7,17;51:24,25;58:10,
15,23,23,25;59:13,18,19;
60:13;76:2;101:25;107:16;
116:4;176:22;213:7
**particular (5)**
39:7;49:13;51:17;104:6;
148:24
**particularly (1)**
14:3
**parties (3)**
148:9,16,20
**Partners (2)**
145:9;173:23
**partnership (1)**
172:8
**Parts (365)**
7:4,23,25;8:3,5;10:4,14;
14:9,18,25;16:1,2,2,5,7,9,10,
12,16,18,19,19,23,24,25;
17:1,10,11,13,25;18:8,13,15,
17;19:7,8,14,18,18,20,22;
20:7,14,14,18,24,21:3,5,10,
22,24;22:4,23;23:21,23,25;
24:9,12,25;25:1,8,12,17,18;
26:1,23,24;28:12;29:21;
30:1,4,6,7,11,14;31:4,7,24;
33:6;34:5,9,12,19;35:19;
37:15;38:8;39:9;40:12,15;
41:22;42:19;43:17;44:4,17,
19,22;45:1,15,22;46:2,6;
48:4,13,17;49:12,21,23;
50:1,2;51:3;52:1,2,23;53:13,
20;54:5,21;55:4;56:1;58:5,
9,11,15;59:2,11,20,21;60:4,
9,13;61:2,6;62:2,9;64:20;
65:11,20;66:1,6,16,19,23;
67:2,6,9,12,15,18;68:4,7,8,
11,14,15,24;69:2,6,10,14,17,
21;70:5,20;71:8,12;72:6,8,9,
13;73:17,24;74:5,8,9,11,17;
75:11,14,21,23,25;76:2,3,7,
10,14;77:8,13,15,20,24;
78:2,3,7,10,21;79:7;81:22,
24;82:3,6,13,21;83:1,13;
84:1,2,4,15;85:11;86:4;
88:14;90:15,18,21;91:7,9,
23;92:1,2,7,8,12,20,22,23;
93:3;96:9;97:9,11,20;99:14,
18;100:12;102:15;103:5,15;
104:6;109:21,23;110:6,16;
111:2,24;112:4;113:10,18,
23;114:5,21,24;115:18;
118:13,15,19,20;121:2,4,7,
10,13,22;124:3,4,19,23;
125:10;126:6,14,22;127:4,
11,14,16,18;128:7;133:23;
134:13,20;136:21,21;
137:17;141:10,21;142:2,5,9,
16;143:12,17,19,21,24;

144:12,13,19;145:2,8,11,16;
146:25;150:24;151:20,24;
152:22;153:9,9,20,21;158:1,
4,12,13;159:5,19;160:3;
165:7;178:15;180:3,21;
209:13;216:10,24;217:21;
219:15,23;220:2,5,8,11;
221:1,3,10;222:23,24,25;
223:1,4,14,21;224:13,18,22;
225:2,6,11,15;226:5,10,10,
14,20,21;227:1;228:25;
229:22;230:4,8;231:1,11;
232:14;233:2,13,14;234:5
**party (3)**
12:24;13:4,6
**passed (2)**
172:11;213:18
**passing (1)**
168:18
**passport (1)**
124:10
**past (2)**
175:1;193:16
**Patrick (1)**
163:21
**Paul (1)**
10:9
**pay (42)**
12:25;16:22;17:4,17;42:6,
10;66:20;69:1,4,8,12,16;
70:19,20;71:11,17;86:5,8;
119:1;142:2,5;146:18;
160:6,7,10;161:6,12;174:8;
191:13,17;196:20;197:6,7,
15,19,21;198:4;199:6,25;
211:13,15;224:11
**payable (1)**
133:2
**paycheck (1)**
200:16
**paychecks (1)**
200:17
**paying (6)**
14:13;74:21;113:24,24;
115:11;206:2
**payment (1)**
34:3
**payments (5)**
121:16,17,20,22;159:23
**payroll (1)**
160:6
**pays (2)**
13:6;174:8
**paystub (1)**
143:3
**paystubs (1)**
71:7
**PDF (1)**
185:8
**PDF4 (1)**
194:19
**PDFs (4)**
176:18,20;185:5,7

**peace (1)**
79:9
**P-E-A-R-S-O-N (1)**
7:19
**peers (4)**
20:20;24:1,4,13
**pending (2)**
94:5;229:21
**penny (2)**
24:15;113:19
**people (12)**
11:15,17;17:25;43:2;
107:25;108:23;129:6;
142:15;166:23;168:17;
169:6;170:20
**per (6)**
18:6;53:19;71:22,24;
186:7;209:2
**percent (16)**
68:16,17;123:20;136:24;
137:1,2,2,11,14,15,16;
138:7;155:24;205:3;207:2,
13
**percentage (2)**
68:13;137:21
**perfect (2)**
66:17;179:7
**perform (26)**
38:3,4;65:15;66:24;68:23;
69:2,5,9;73:17,21;74:16;
76:6;78:11;91:6;109:11,19;
110:7;112:23;114:14,20;
116:7,9,11,19;118:24;
119:18
**performance (1)**
63:20
**performed (11)**
36:13;43:23;48:4;109:13,
20;127:5;151:19;167:10;
175:5;215:5;227:14
**performing (2)**
55:15;117:10
**performs (1)**
175:4
**perhaps (2)**
166:2;210:9
**Perimeter (1)**
219:9
**period (8)**
94:25;126:21,25;160:11;
195:8;211:7,13,15
**periods (1)**
71:17
**permissible (2)**
148:1,5
**permission (2)**
62:15;111:11,15;152:7
**person (7)**
46:12;72:15;89:15;
108:25;157:5,8;202:13
**personal (5)**
61:1;68:3,7,9;165:25
**personally (2)**

116:8;205:25
**pertinent (1)**
  88:5
**phone (29)**
  18:22;31:5;46:12;47:2;
  51:14;62:2,10,19,22;92:16;
  103:1;108:18;125:5;135:9;
  138:10,15,22,22,24;139:10;
  140:13,21,22;155:11,18;
  156:1,1,2;202:20
**phones (3)**
  8:10;140:13,19
**physically (1)**
  172:5
**pick (17)**
  47:3,5;49:5;64:8;79:3,5,
  17;106:24;107:9;133:15;
  134:1;137:25;153:22;
  158:13,16;173:15;224:12
**picked (1)**
  25:20
**picking (3)**
  134:23;137:15,23
**pickup (1)**
  25:25
**piece (1)**
  86:13
**pieces (1)**
  177:25
**piggyback (1)**
  190:10
**pinion (1)**
  66:18
**pinions (1)**
  66:16
**place (9)**
  11:15;90:12;114:15,23;
  118:8;139:5;158:16;159:9;
  202:17
**places (1)**
  55:7
**plaintiff (1)**
  216:11
**Plaintiffs (1)**
  24:23
**plaintiff's (2)**
  164:9;173:23
**planning (2)**
  168:15;225:25
**playing (2)**
  140:12,19
**plead (1)**
  23:22
**pleading (1)**
  25:7
**pleads (1)**
  23:10
**please (18)**
  8:10;29:12;32:11,22;
  36:25;37:3;40:8,23;42:13;
  59:24;70:17;118:4;153:18;
  154:3;191:19;210:5;218:12;
  233:25

**pleased (1)**
  66:10
**plus (3)**
  23:6;61:18;199:12
**pm (24)**
  43:10,12,13;45:3,11;
  54:15,16;57:20,25;76:11;
  104:25;114:25;137:5;143:6;
  154:11;155:1;193:8,9,16;
  203:3,12,13;204:3;235:25
**point (23)**
  30:19;33:15;34:1,15;36:7;
  48:23;98:23;102:21;103:11;
  108:10;109:11;112:22;
  141:9;149:16,20;154:7;
  156:6;169:12;180:12,14,15;
  202:4;234:25
**pointed (1)**
  13:7
**points (1)**
  183:18
**policy (1)**
  150:24
**populated (1)**
  189:15
**populating (1)**
  189:13
**position (7)**
  30:7;61:6;93:8;164:10;
  166:13;216:21;224:25
**possible (2)**
  20:19;146:18
**possibly (1)**
  28:17
**post (1)**
  60:23
**POTASHNICK (34)**
  7:14,14;8:19;9:6;28:25;
  29:1,1;30:17;40:18;80:2;
  85:2;88:21,25;96:1;101:25;
  115:14;116:14;122:9;132:4;
  133:10;141:2;146:1,8,14;
  147:10;148:21;150:4,12;
  151:7,17;153:16;154:14;
  219:3;229:6
**potential (1)**
  10:2
**PowerPoint (2)**
  15:18;24:19
**practical (3)**
  17:21;18:12,18
**predetermined (1)**
  224:12
**prefer (1)**
  192:4
**prefers (1)**
  192:3
**prehearing (1)**
  21:17
**pre-hearing (1)**
  21:17
**premises (5)**
  136:22,25;137:8,11,12

**prepare (4)**
  40:9,14;87:13;174:12
**prepared (2)**
  60:9;152:21
**present (2)**
  11:25;172:19
**presented (3)**
  101:3;174:25;234:9
**president (3)**
  172:20;174:18;205:23
**pressure (1)**
  47:25
**presumption (1)**
  28:9
**prevent (2)**
  41:7;99:9
**prevented (7)**
  16:11,25;18:18;99:11,22;
  100:8;134:22
**previously (5)**
  29:21;177:15,17;186:20;
  187:25
**prey (1)**
  11:6
**primarily (1)**
  171:1
**printed (1)**
  181:15
**printout (1)**
  182:2
**printouts (3)**
  176:19;177:2;187:18
**prior (18)**
  93:11;99:22;147:15;
  151:20;187:19;192:15,18;
  194:22,23;195:3;198:13,22;
  199:5;210:24,25;211:2,9,17
**private (2)**
  14:6;169:18
**pro (1)**
  196:4
**probably (11)**
  11:11,19;87:23,24;89:14,
  15;138:1;149:9;168:9,21;
  206:8
**probationary (2)**
  126:21,24
**problem (4)**
  12:21;64:12;73:13;83:25
**problems (2)**
  83:12;222:12
**procedure (2)**
  158:22,25
**procedures (1)**
  158:7
**proceed (6)**
  13:18;146:5;148:23;
  167:15;217:13;231:11
**proceeding (2)**
  135:24;146:11
**process (1)**
  192:21
**processed (2)**

**produce (8)**
  21:23;22:5;56:7;58:20;
  135:25;136:2,14;185:8
**produced (17)**
  22:2,9,23,23;132:8;
  136:11;164:17,18,20;165:7,
  7;176:14;177:25;178:25;
  187:13;207:22;208:16
**producing (1)**
  176:18
**product (3)**
  57:2;107:6,9
**products (5)**
  51:6;55:5;56:2;66:7;
  108:22
**professional (1)**
  168:7
**professionally (1)**
  168:9
**profit (5)**
  18:4,5,25;132:13;224:8
**profits (3)**
  14:13;75:20;95:24
**program (5)**
  168:5;178:11,16;179:7,15
**programs (1)**
  168:20
**project (1)**
  205:14
**promise (1)**
  96:3
**promoted (1)**
  172:13
**proof (1)**
  97:22
**proper (1)**
  21:12
**properly (4)**
  177:5;179:2;186:8,14
**property (1)**
  68:21
**Proposal (9)**
  32:25;41:17;98:20,24;
  99:21;101:1,9;102:20;
  109:10
**protect (2)**
  13:21;14:2
**protection (2)**
  24:8,14
**prove (8)**
  14:16,16,18,22;23:15;
  28:12,13;140:5
**proves (1)**
  23:11
**provide (22)**
  34:2;42:4;43:21;65:11;
  66:19;97:14,17;98:25;
  102:21,25;103:2;104:24;
  111:2,7,13,25;112:1;118:6;
  122:17;124:2,8;141:10
**provided (26)**
  35:21;43:25;44:2;92:23;

179:19,22

114:18;164:6,25;166:8;
176:8;177:3;180:3,21;
184:17,18;186:11;187:23;
188:16;190:11,20;195:6;
200:15,17;207:18;208:18,
20;209:18
**providing (9)**
18:22;85:10;96:14;121:3,
21;130:2,9;136:20;144:18
**psychology (1)**
168:4
**Public (3)**
29:7;163:17;218:24
**publicly (1)**
176:9
**pull (1)**
182:16
**pulled (2)**
164:22;182:20
**punish (2)**
228:21,23
**purchased (1)**
123:14
**purpose (1)**
122:7
**purposes (2)**
95:24;185:14
**put (22)**
8:10;66:14,17,18;75:9;
77:15,15;97:12;125:4;
127:17;131:16,25;152:16;
161:6;169:14;173:7;178:16;
180:20;198:23;204:13;
214:13;227:1

**Q**

**qualifications (2)**
173:2,4
**quantity (1)**
59:21
**quick (2)**
40:19;56:6
**quicker (1)**
75:4
**quickly (2)**
172:15;202:7
**quite (1)**
157:15
**quote (1)**
234:24

**R**

**rack (2)**
66:16,18
**raise (1)**
218:21
**ramping (1)**
172:18
**ran (3)**
179:5,15;226:2
**random (1)**

204:10
**ranks (1)**
170:10
**rapidly (1)**
7:10
**rata (1)**
196:4
**rate (29)**
16:22;17:4;22:16;146:10;
188:18;194:9,12,15,16;
195:5,8;196:11,16;197:14,
16,17,18,19,21;198:6,14,21;
199:3,4;200:19;202:6;
205:19,22;206:7
**rather (2)**
36:8;151:9
**reached (1)**
171:21
**read (27)**
10:21;32:1;33:13;37:18;
41:5,8;87:11,13,16;99:25;
100:5,7;101:5,8,9,11,12,13,
20,24;102:1,3,5,10;203:22;
220:14,16
**reading (3)**
100:9;109:18;197:23
**ready (3)**
142:17,17;158:11
**real (4)**
15:5;17:5;18:5;175:17
**reality (4)**
15:8,12,17;20:23
**realization (1)**
230:24
**realized (2)**
168:16;180:21
**really (8)**
86:2;103:17;168:13;
169:14;171:6;172:4;175:16;
184:2
**reason (9)**
22:24;24:22;62:21;73:6;
74:14;143:20;147:19,19,21
**reasonable (1)**
23:11
**reasons (6)**
22:6;68:3,7,9;146:2;
162:12
**reassign (1)**
47:2
**recall (7)**
13:10;101:22;131:15;
139:4;151:21;187:3;208:4
**recalled (1)**
101:23
**receipt (4)**
67:3,7;97:19,20
**receipts (2)**
97:21;98:4
**receive (6)**
26:1;62:17;71:24;121:18,
23;208:2
**received (6)**

17:17;121:17,20;188:2;
193:7;208:17
**receiving (1)**
208:4
**recently (1)**
28:1
**recess (7)**
79:24;85:6;131:10;
151:14;163:13;215:20;
229:12
**recognize (2)**
178:16;185:1
**recollection (2)**
89:6;201:22,25
**recommendation (2)**
168:23,24
**recommended (1)**
230:11
**reconcile (1)**
161:12
**record (18)**
7:6;29:13;67:15;133:7,9;
143:4,9;178:25;187:25;
189:14;192:5;206:15;207:1,
7,8;208:18;215:19;235:24
**recorded (1)**
67:18
**records (12)**
22:3;142:23;143:1;
186:11,24;188:15,17;207:5,
9,11,14,25
**recover (2)**
14:21
**recovery (2)**
146:18;170:2
**recruited (2)**
170:5,10
**recruiter (1)**
170:9
**redirect (4)**
85:3;151:6;214:4;235:15
**redundant (1)**
116:2
**Reed (2)**
170:1,3
**refer (3)**
28:7;116:3;231:13
**referenced (1)**
176:8
**referring (1)**
55:2
**reflected (1)**
191:6
**refresh (1)**
89:6
**refuse (3)**
18:15;57:8,19
**regarding (1)**
39:6
**regardless (3)**
18:6;21:8;150:1
**region (1)**
171:7

**registration (1)**
69:13
**regression (1)**
27:10
**regular (8)**
71:11;194:15;197:14,17;
198:11,12,14;199:11
**regularly (1)**
18:16
**regulations (1)**
14:8
**reimbursable (2)**
195:8;196:16
**reimburse (2)**
67:12;103:8
**reimbursed (4)**
24:11;67:3;103:5;197:6;
227:3
**reimbursement (5)**
13:24;27:19,21;198:6;
200:19
**related (3)**
61:13;155:21;216:25
**relating (3)**
39:6;114:17;165:17
**relationship (10)**
19:14;24:6;25:7,8;26:23;
150:21;217:1,3;219:19,23
**relaxed (1)**
157:22
**Relevance (3)**
214:15,17;216:3
**relevant (2)**
21:17,23
**rely (1)**
217:25
**remaining (1)**
185:9
**remember (4)**
136:9;139:6;186:13;234:7
**remind (1)**
7:8
**removed (1)**
185:1
**Renan (7)**
17:10;30:13,14;31:3;
92:22;143:13;235:17
**R-E-N-A-N (1)**
31:3
**render (1)**
15:14
**rent (1)**
74:10
**rented (1)**
74:13
**repairs (1)**
69:8
**repeat (1)**
173:8
**repeatedly (1)**
19:23
**repetition (1)**
75:7

**repetitiveness (1)**
40:19
**rephrase (7)**
91:19;96:6;153:5;190:14;
192:2,8;231:15
**replace (3)**
221:22,24;222:2
**replacement (3)**
17:8,16,18
**replacements (2)**
17:13,15
**reply (1)**
57:16
**report (4)**
27:15;98:13;120:4;224:19
**reported (7)**
27:12;96:8;97:3,6;98:9;
130:7;132:13
**reporter (2)**
7:8,11
**representative (2)**
82:7;165:12
**represented (1)**
91:2
**represents (1)**
200:5
**request (3)**
163:4;183:15;184:2
**requested (1)**
64:15
**requesting (1)**
34:2
**requests (1)**
221:18
**require (11)**
34:16,20;36:19;49:13;
60:12,15,20;61:12,15;
103:12;125:11
**required (6)**
16:20;17:18;19:3;21:16;
42:18;127:16
**requirement (1)**
124:7
**requires (3)**
13:22;14:14;63:24
**requiring (2)**
16:18;58:2
**reserve (3)**
109:11,18;149:9
**resign (1)**
20:4
**resigned (2)**
83:25;84:2
**resolve (1)**
228:17
**resources (1)**
10:11
**respect (2)**
147:20;149:10
**respond (2)**
130:19;217:7
**respondent (2)**
145:25;146:5

**respondents (3)**
10:1;146:16;218:8
**respondents' (1)**
146:17
**Respondent's (2)**
218:13,14
**response (3)**
62:24;78:25;81:6
**responses (2)**
62:12;72:18
**responsibilities (1)**
221:9
**responsible (2)**
74:7;217:5
**rest (2)**
160:7;204:22
**result (1)**
57:22
**resulted (1)**
171:25
**results (3)**
114:18;209:5;217:4
**retain (1)**
36:8
**retained (1)**
36:12
**retire (1)**
171:10
**retrieved (1)**
156:1
**return (10)**
27:8;94:8;95:13;96:8;
97:13;98:13;131:16,19;
132:8;228:8
**returned (2)**
81:16;183:17
**returns (6)**
50:8,11,12,14;51:9;
104:10
**review (4)**
127:5;205:10,11;233:9
**reviewed (1)**
195:3
**reviewing (1)**
167:1
**ride (2)**
35:23;152:13
**right (90)**
8:24;11:2;35:6,12;41:13;
46:23;49:23;50:2;51:24;
58:10,11,22,23;59:13;60:24;
85:12,15,23;90:16,22;92:5,
25;100:9;102:19;104:16,17;
105:2;106:12;107:10;108:6;
109:11,14,19;110:19;
113:19,25;114:21;115:4,9,
19;121:11;122:18;123:2,9,
12,15;124:11;125:15,21;
127:18,21;129:23;131:1,6;
135:11,13,20;142:2,6,12,13;
143:24;144:8,20,22;156:18;
157:18;159:5;160:14;
162:13;163:11;165:19;

177:2;182:17;183:22;
188:11;197:4;200:19;
201:24;207:14;209:6;210:7;
212:9;218:21;219:8;227:12;
229:23;230:5;231:2;235:23
**rights (1)**
149:10
**ripped (1)**
230:13,21;234:24;235:2
**road (12)**
47:18;105:2,21;108:11,
12,13,14,16,21,22;109:3;
137:19
**Robert (1)**
218:16
**role (3)**
27:5;172:13;176:1
**roles (1)**
36:20
**Ron (1)**
8:22
**room (6)**
7:7;138:16,21;140:10,11,
20
**rooms (1)**
11:21
**rose (1)**
172:15
**Rosenau (3)**
10:13;90:8,11
**ROSENTHAL (8)**
7:24,24;10:9;20:16;
145:19;149:23,24;150:21
**Roswell (12)**
29:16;75:15;78:3,7;
114:25;115:18;153:10;
183:7;225:17,21,24;226:1
**rotate (1)**
45:11
**Roughly (1)**
68:13
**round (3)**
185:23;186:20;189:16
**route (19)**
38:5,18;39:3;44:12;47:20,
20,21;48:2;49:18;57:24;
105:11;108:5,9;125:11;
189:25;190:1,7,16,19
**routes (21)**
18:9;26:18;36:10,15;38:5,
13,14;39:4,15;44:2,7,10,11;
55:18,19;105:13,14,22;
157:8;168:15;190:10
**rows (1)**
198:2
**rule (3)**
13:6;62:5;166:17
**rules (6)**
12:24;13:20;23:8,9;167:3,
3
**ruling (1)**
148:4
**run (13)**

47:15,15;105:8;107:22;
108:10,17;125:22;134:20,
24;138:19;143:7;150:5;
158:13
**running (1)**
177:5
**runs (15)**
38:11;43:14,16,17;47:17;
61:9;63:24;64:1;105:18;
108:1;214:14;215:5;227:14,
16,21
**rush (3)**
83:4;86:19;101:19
**rushed (2)**
12:6;220:17
**rushing (2)**
32:3;86:18

## S

**safe (1)**
79:6
**sake (2)**
165:10;176:16
**salary (1)**
206:1
**same (57)**
11:11;14:4;24:13;26:24;
27:5;39:4;40:7;41:16;43:20;
47:21;57:7;81:1;84:18;
89:16;91:17;92:1;99:17,20;
106:14,15;107:16;109:12,
20;116:15;122:3;123:3,4,
22;134:15,15,15;153:11;
155:15;157:9;159:2,4;
163:5;176:21;192:21;
205:19;207:25;208:13;
209:5;210:8;213:4,5;
214:14;217:5,24;226:2,3,4,
6;227:15,24;228:9;229:5
**sample (2)**
164:19;179:12
**Saturday (24)**
26:6,8;72:3;80:5,8,23;
81:11,13,17,20;156:21,24;
157:22;187:8;193:10;
201:17,21;202:1;203:13;
209:15,16,17;210:7;213:6
**Saturdays (8)**
45:8,10;80:10;81:4,8,14;
193:9;201:15
**save (1)**
123:20
**saw (6)**
48:15;53:11,16;65:4;
82:19;203:25
**saying (16)**
7:12;27:8;41:11;101:8;
105:10;114:8;119:19;
125:21,23;135:20;148:11,
14;157:19;189:4;210:6;
211:25
**scanned (1)**

158:11
**scared (1)**
  80:19
**schedule (7)**
  9:24;11:5;54:20;96:12;
  132:11,12;228:1
**school (19)**
  29:19;49:1;62:18;79:4,5;
  115:22;133:22;134:1,2,9,10;
  168:19;171:13,19,21,24;
  172:3,8;219:11
**screen (3)**
  176:13;178:4;183:19
**scroll (1)**
  191:18
**seats (1)**
  66:17
**second (16)**
  8:22;9:3,15;18:4,24;
  33:15;34:1;39:2;101:15;
  154:12;181:22;184:3;
  194:24;196:10;198:20;
  211:15
**Secondly (1)**
  146:3
**secretary (1)**
  173:11
**section (1)**
  198:8
**sections (1)**
  185:9
**Security (1)**
  124:10
**seeking (1)**
  229:22
**seemed (1)**
  189:21
**seems (3)**
  147:14;185:4,7
**select (1)**
  38:5
**selected (3)**
  170:11,14,20
**selection (1)**
  36:10
**send (11)**
  26:15;53:13;91:10;117:8,
  17;118:7,25;119:10,17;
  154:7;183:15
**sends (1)**
  183:25
**senior (1)**
  168:25
**sense (7)**
  23:23;102:14;105:24;
  106:1,5;156:13;211:11
**sent (12)**
  88:14;121:2;154:21;
  155:1,22;156:2;170:21;
  176:22;184:7,9,10,21
**separate (1)**
  11:21
**separated (1)**

171:11
**September (3)**
  169:6,10;172:16
**sequence (1)**
  43:22;44:1;105:19
**series (3)**
  19:16;22:12;23:3
**serve (1)**
  227:18
**served (1)**
  107:3
**service (7)**
  15:14;94:9;99:6,8;118:7;
  171:10;173:4
**services (52)**
  34:6;38:3,4;39:6;42:4;
  43:23,24;44:2;73:23;74:1;
  85:11;91:6,23;92:23;96:13,
  14;99:1,9,12,23;100:5;
  109:12,13,19,20;110:7;
  111:2,7,25;112:1,23;114:14,
  15,18,20,24;116:10,11;
  121:3,16,21;122:17;124:3;
  130:2,9;136:20;139:8,8,9;
  144:19;159:16,20
**set (17)**
  16:9,22;25:18;31:7;35:4;
  42:14,21;44:10;152:9;
  166:3;167:18;202:14;
  205:22;206:8;214:19;228:3,
  3
**sets (1)**
  77:23
**setting (1)**
  150:24
**seven (1)**
  170:15
**Several (5)**
  40:6;46:10;88:1;135:9;
  190:18
**severally (1)**
  21:9
**shall (3)**
  38:4,5;39:7
**shared (1)**
  205:11
**Sharon (1)**
  8:1
**sheet (5)**
  164:19;182:8;199:5;
  205:7,12
**sheets (1)**
  168:18
**shelf (1)**
  107:10
**shelves (1)**
  77:16
**shield (1)**
  21:11
**shift (2)**
  49:4;112:4
**shifts (1)**
  52:24

**shirt (9)**
  76:13,16,18,21;77:3,5,14;
  127:8,12
**shoot (1)**
  39:17
**shop (3)**
  48:14;105:15,16
**shops (1)**
  105:17
**shortly (2)**
  169:10;215:16
**shot (5)**
  56:9,12,16,19,24
**show (16)**
  15:6;21:5;23:23;89:6;
  110:18,19,22;124:4,14;
  131:19,23;132:5,7;179:11;
  189:5;199:2
**showed (4)**
  49:18,20,22;158:23
**showing (3)**
  88:22;89:20;199:22
**shown (1)**
  193:2
**sick (1)**
  19:25
**side (4)**
  11:24;13:7;128:6;177:21
**sides (2)**
  32:14;146:4
**sign (23)**
  14:25;31:18,24;33:1,3,8;
  37:7,11,12,20;40:25;41:2,
  14,15,20;59:11;88:12;91:11,
  25;158:6,24;220:14,19
**signage (1)**
  127:17
**signature (2)**
  51:22;104:9
**signatures (4)**
  50:5;51:5;223:5,10
**signed (25)**
  17:6;31:20,25;32:2;33:4;
  36:5;37:9,13;41:16;44:14;
  49:19;91:12;94:1;98:24;
  99:15,21;100:1,6,9;101:14;
  102:2;109:18;113:6;115:7;
  116:3
**significant (1)**
  15:25
**silent (1)**
  8:10
**Silk (1)**
  15:9
**similar (4)**
  93:4;94:1;166:22;214:22
**Similarly (1)**
  22:4
**simple (3)**
  167:10;168:23;196:14
**simply (4)**
  20:23;21:23;185:24;
  186:23

**single (8)**
  22:20;24:15;25:13;136:2;
  179:4;187:20;213:11;217:1
**sister-in-law (2)**
  219:18;230:7
**sit (4)**
  80:20,22;138:6,17
**site (2)**
  16:6;158:6
**sitting (3)**
  168:17,17;186:13
**situation (3)**
  81:12;208:13;210:14
**situations (1)**
  62:14
**six (30)**
  19:18;22:11,15,15,19,22;
  43:15;45:17;52:17;55:12;
  57:13;105:18;123:3;154:8;
  156:19;170:15;188:1,3,4,17;
  200:20;205:12,12,13;
  206:18;207:5,7,9,11,14
**skill (3)**
  49:13;166:3;167:18
**skills (3)**
  14:4;19:2,2
**slip (2)**
  22:24;59:17
**slips (6)**
  22:5,8,18,23;195:23;
  210:8
**slow (2)**
  55:25;232:24
**smaller (2)**
  122:20;123:8
**smoke (1)**
  80:17
**so-called (1)**
  19:2
**Social (1)**
  124:9
**software (4)**
  168:21;176:10;178:9;
  181:18
**solely (1)**
  119:20
**Solutions (10)**
  172:19,21;173:17,18;
  174:11,16,24;214:8;215:2,3
**somebody (14)**
  26:15;74:21;84:7;111:6;
  117:7,11,12,17;118:16;
  119:2,17;140:23;171:22;
  175:10
**somehow (2)**
  25:12;217:21
**someone (5)**
  15:13;112:12;118:7;
  119:10;173:3
**someplace (2)**
  105:25;107:6
**sometimes (30)**
  16:11;21:1;36:22;38:17;

43:11;45:11,12;47:13,17;
55:12;57:12;60:18;62:17;
66:15;97:19;104:25;110:22;
122:13;125:4;130:4;135:12;
137:5;138:1;143:7,8;
158:16;201:16;221:12,20,20
**son (15)**
64:9,9,11,11;73:8;78:20,
22;79:3,9,12,18,20;133:15;
134:23;137:23
**son's (1)**
133:21
**soon (4)**
79:16,17;202:21;235:22
**Sorry (15)**
10:17;40:18;71:3;82:22;
86:24;114:12;119:4;180:13;
181:2;182:1;194:24;197:14;
200:10;222:6;226:23
**sort (5)**
155:17;164:11,14;172:4;
206:6
**sought (1)**
95:23
**sound (1)**
86:16
**south (2)**
106:1;171:4
**space (2)**
74:10,14
**spaces (1)**
179:8
**spare (1)**
21:20
**speak (10)**
7:9,9;9:21;82:3;129:20;
140:4;145:19;148:9;149:9;
233:20
**special (12)**
14:3;18:22;19:2,10;60:18;
170:5,14,17,20,23;171:5;
206:7
**specific (4)**
108:8;125:11;167:2;
176:10
**specifically (7)**
20:15;92:19;114:17,25;
131:15;175:25;222:1
**speculation (3)**
96:2;122:10;156:11
**speculative (1)**
208:25
**spell (1)**
30:23
**spend (4)**
65:5;111:22;123:19;
137:16
**spending (3)**
66:24;97:10;111:9
**spent (6)**
137:8,22;169:4;170:2,15;
171:14
**Spicker (1)**

10:10
**split (2)**
13:9,11
**spoke (6)**
128:15;129:22;130:7;
139:1;226:5,15
**spoken (4)**
48:10;143:17;233:1,4
**spot (3)**
212:17,19,25
**spreadsheet (12)**
173:7;176:14,17,19;
177:25;178:1,17;181:23;
186:22;193:21;200:8;
215:22
**spreadsheets (2)**
214:8,12
**stage (1)**
149:2
**stamps (1)**
156:6
**stand (1)**
85:17
**standard (2)**
89:8;194:2
**Standards (2)**
13:22;231:19
**standing (2)**
100:11;105:10
**staring (5)**
41:9;86:20,22;100:10;
102:14
**start (19)**
42:25;44:17;54:25;79:7;
87:18;105:22;116:4;153:23;
160:5;164:2;167:23;168:9;
170:12;183:2,24;197:2;
198:10;220:5;221:3
**started (19)**
14:24;25:3;35:19;36:11;
44:4;52:4;101:3;127:25;
168:10,12;171:13;175:9,14;
182:24;183:4;192:19;193:9,
12;224:23
**starting (3)**
171:20;183:13,15
**starts (2)**
26:7;210:6
**state (6)**
28:7;29:7,12;163:17;
172:24;218:24
**statement (14)**
9:8;11:25;15:20;24:24;
25:5;27:18;30:20;116:13,
15,19;147:3,7;220:22;231:4
**States (6)**
124:8,15;169:8,15;
184:23;218:16
**stating (1)**
15:1
**station (2)**
105:11;169:23
**status (9)**

18:3,25;19:12,14;20:11,
11,11,22,22;28:12
**stay (4)**
11:4;73:8;83:5;111:12
**stayed (2)**
194:6,7
**step (1)**
148:2
**still (16)**
20:4;23:16;54:14;84:1,7;
85:23;114:11;147:24;150:5;
166:14;170:7,23;172:10,12;
210:8;213:15
**STILLER (30)**
8:1,1;9:19,20;10:16;
11:13,16;12:8,13,18;13:1;
146:6,10,20;147:16;148:11;
149:4;160:25;165:6,19;
177:9,14,19;188:23;189:2,7,
18;190:25;202:10,25
**stipulated (2)**
32:18;148:22
**stipulating (5)**
146:13;147:22,23;148:19,
21
**stipulation (6)**
32:14;146:21;148:12,15;
149:22;218:7
**stipulations (1)**
149:6
**stood (1)**
181:5
**stop (1)**
59:5
**stopped (3)**
94:12;144:18;226:9
**stopping (2)**
70:11;161:21
**store (18)**
114:25;115:18;134:14;
142:9;168:12,25;208:8,9;
210:16;213:15;220:11;
225:17,18,19,24;233:12,13,
15
**stores (3)**
26:25;225:21;226:2
**straight (1)**
105:21
**straighten (1)**
147:9
**straightforward (2)**
201:2,3
**strategy (1)**
213:5
**stressful (1)**
79:11
**strictly (1)**
28:3
**strongly (2)**
18:25;19:11
**stuck (1)**
189:21
**studies (1)**

171:16
**Stuff (14)**
47:4;50:15;66:15;70:19;
129:21;138:10;155:11,18,
25;168:16,18;171:17,23;
179:6
**subcontracting (3)**
93:24;132:22;133:3
**subcontractors (1)**
26:18
**subject (3)**
85:2;149:2;166:15
**subminimum (1)**
17:25
**submit (4)**
34:4,8,11;124:17
**submitted (1)**
177:11
**subsequent (1)**
192:22
**substitute (1)**
118:25
**subtract (1)**
199:18
**subtracts (1)**
197:6
**sue (1)**
147:18
**sued (1)**
23:24
**suffering (1)**
73:9
**Suffolk (2)**
168:2;171:14
**suggest (1)**
202:23
**suggesting (1)**
155:24
**suing (3)**
145:24;147:21;150:11
**summarization (1)**
191:12
**summarize (1)**
166:19
**summarized (5)**
164:13,22;166:24;174:24;
195:10
**summarizing (1)**
167:2
**summary (7)**
70:20;194:22;195:2,12;
196:6;198:13;199:5
**Sunday (4)**
187:7;209:15,15,17
**supervise (3)**
75:12,16;157:9
**supervised (2)**
16:16;77:23
**supervising (1)**
56:5
**supervisor (7)**
45:22;61:8;65:25;124:19,
23;152:11;157:1

**supervisory (1)**
171:5
**supply (2)**
27:1;85:18
**support (3)**
25:16;86:6;170:23
**supposed (27)**
36:3;50:20;51:4,8,13,18;
54:3;57:7;58:6,8,19;59:8,10,
20;63:6,7;71:21,23;108:12,
19;110:19;126:15,18,20;
128:16;129:10;198:9
**supposedly (1)**
20:8
**Supreme (1)**
28:1
**sure (43)**
10:2;9;46:23;49:23;50:1,
9;52:2;58:9,10;59:2,11;
64:11;67:23;79:6;96:7;
107:15;121:20;129:3,7;
149:4;155:24;156:4;158:4;
159:4;170:7;181:5;182:18;
191:25;198:12;202:13;
203:20;205:2;209:22;212:7;
229:11;230:3,21,22;231:21;
233:19;234:6,14;235:4
**Susana (7)**
7:4,13,13;14:10;29:14;
146:25;226:3
**switch (1)**
194:19
**sworn (3)**
29:6;163:16;218:23
**symbols (1)**
90:18
**system (1)**
179:22

**T**

**tab (31)**
178:1,7;180:5,17;181:23,
23,25;182:4,10,13;184:4;
187:15,17,18,20;189:10;
191:6,8,11;194:8,18,19,21,
24,25;195:13;196:7,24,25;
198:13,22
**tabbies (1)**
182:3
**tabby (2)**
183:20;184:13
**table (3)**
168:18;191:5;195:10
**tabs (5)**
182:6;194:22,23;195:3;
200:8
**talk (11)**
50:25;51:1;62:20;81:20;
125:5;126:10,12;162:16;
203:24;215:7;225:5
**talked (5)**
23:7;81:11;120:22;

129:24;221:21
**talking (14)**
79:19;90:11;100:23,24;
101:1,19;123:22;130:13,21;
140:10;154:21,23;185:18;
207:25
**talks (1)**
40:9
**Tammie (161)**
34:25;35:1,13,14,15,22;
36:2,11;38:11,17;39:13;
42:24;43:7,16;44:10,21;
45:7;46:1,6,11,22;48:2;49:8,
10,10,19;50:10,11,24,24;
51:1,14;52:3,7,18;53:2,3,21;
54:17,17;55:3,8,20;56:5,22;
57:9;58:11,18;59:1,15;
60:12,20;61:10;62:1,8,15,
21;63:2,17,19;64:3,6,10,14;
66:4,5,9;67:20,22,24;72:17,
24,25;73:1,4,5;76:19;77:23;
78:24;79:19;80:12,13;81:5,
9,12,15;83:8,8,21,23,23;
84:22;99:13;103:19,20;
104:8,10;105:1,9,20;106:17;
107:20,21;108:3,20,24;
111:14;112:8;115:2;116:23;
117:5;118:21,22,23;119:5,7;
120:13,15,17,21;122:1;
125:5,20;126:10,12,20;
127:8;128:8,10,21;129:5,9,
14;130:9;134:25;135:16;
136:3,4,15;138:17,24;139:1,
19,20,23,24;141:6,8,20;
142:22;144:1,4,6,21;152:25;
156:20;157:16;162:16,21,
21,23
**Tammie's (9)**
46:2;53:17;56:23;61:4;
64:25;72:18;81:6;107:13;
129:12
**tarp (1)**
102:22
**tasks (2)**
44:6;152:7
**taught (2)**
35:25;106:9
**tax (9)**
27:8;94:8;95:13;96:8;
97:12;98:13;131:16,19;
132:8
**Taxation (1)**
168:2
**taxes (4)**
69:12;93:20;152:21;
171:23
**team (1)**
171:6
**Tech (1)**
85:18
**technology (4)**
156:8;171:16,23;232:25
**telephone (1)**

62:9
**telling (12)**
25:22;30:13;39:23;49:16;
87:3;100:4;116:19;119:16;
125:19;128:10;159:7;
161:22
**temp (28)**
221:6,8;222:15,17,20,24;
223:7,16,24;224:5,18;226:9,
21;227:3,8,20,25;228:4,5,7,
13;229:2,4;232:7,8;234:4,
13;235:10
**temporary (1)**
23:25
**term (2)**
23:19;56:9
**terminate (1)**
84:22
**terms (6)**
14:1;42:5,7,10;114:16;
216:2
**Terri (4)**
29:3,6;163:16;218:23
**test (6)**
15:9,11,18;121:4,8;190:1
**testified (27)**
28:20;29:9;85:25;86:18;
88:9,19;99:15;113:1;127:7;
138:9;144:15;156:20;158:2,
5;162:10,11;163:19;166:24;
187:25;190:25;196:10;
201:15,20,25;214:7;219:1,7
**testify (8)**
17:11;22:10;23:2;87:1,22;
94:19;192:1;202:17
**testifying (2)**
30:19;167:10
**testimony (33)**
8:25;9:5;10:6;12:5;25:16;
88:20,22;89:5;92:11;
101:10;105:1;108:3;117:5;
125:14;135:8;138:5;161:6,
10;164:5,5,8,21;165:23;
166:1;167:7,15;191:1;
201:23;212:11;215:8,23;
216:6;233:10
**testing (1)**
170:19
**Texas (1)**
10:12
**texted (5)**
135:11,19,22;136:17;
220:10
**theory (1)**
171:17
**therefore (1)**
147:25
**therewith (1)**
38:5
**thinking (2)**
79:11;87:18
**third (5)**
8:24;9:2;19:1;102:20;

195:17
**Thomas (1)**
172:24
**though (5)**
61:23;97:12;122:23;
126:19;230:12
**thought (5)**
112:16;115:24;157:10;
201:14;230:12
**thousand (5)**
164:19,23;165:8,10;209:4
**thousands (3)**
14:11;24:20,20
**threat (1)**
229:2
**threaten (2)**
228:23,24
**threats (1)**
170:25
**three (9)**
8:16;14:16;68:1;94:21;
132:21;171:14;190:17;
195:22;208:13
**throughout (3)**
16:17;171:7;204:7
**thumb (1)**
165:13
**Thursday (3)**
193:24;204:9;209:19
**Thus (1)**
21:10
**ticket (1)**
123:17
**times (26)**
23:25;40:6;46:10;47:8;
48:15,20,20;53:16,16;63:18;
64:19;65:2,4;68:1;119:9,10;
135:9,13,16;142:23;161:4;
188:19;194:16;196:15;
199:4;233:7
**timezone (1)**
155:17
**timing (1)**
12:11
**Tire (1)**
61:18
**tired (2)**
87:23,24
**tires (4)**
61:17,18,19,19
**today (20)**
8:13,14,16;10:6,19,20;
11:4;12:5;14:9;49:2;79:16;
83:8;125:14;164:1;186:13;
201:14;203:25;206:4;219:7,
13
**toes (1)**
148:3
**together (6)**
20:23;26:22;75:10;
198:23;203:1;214:13
**told (133)**
17:12;19:23;20:1;24:24;

25:6;26:4,11,12,15;28:15;
30:15;31:4,6,23;33:9,20;
35:3,5,5;36:2,3,5,6,19;
37:11;38:25;39:18;40:1;
41:3;42:24;43:7;44:11,16;
45:4;48:2;49:1,3,9,19;
51:21;53:25;54:24;55:19,
23;56:6,18,21;57:13;61:16;
62:4;63:9;72:24;76:18;
81:18,19;82:8;83:11,21;
84:14,18;86:15,22,24;88:12,
13;91:2,11,25;92:3,12;93:2;
103:20,25;104:8,10,17;
105:1;106:3,6,8;111:5,24;
112:2,11,17;113:4,17;115:2;
117:5,24;118:22;119:6,7,19;
123:5;125:19;126:1;127:24;
128:18,20;129:9;143:23;
144:9,11,12,19,22;145:21;
150:15;154:10;163:7;166:6;
185:23;187:7;192:15;
193:14;194:14;195:7;204:2;
211:23;213:17;222:1;223:1,
10,19;224:2;225:7,10;226:2,
4,6,14;230:7

**tomorrow (2)**
10:24;11:4

**took (30)**
25:21;36:22;38:15;47:8,
17;52:22;61:24;64:2;80:12,
14;87:19;89:21;90:12;
96:13;100:19;105:8;108:9,
9;111:19;123:1;129:24;
131:5;139:5;160:19;162:21,
21;173:1;176:7;205:8;
224:10

**tools (1)**
102:22

**topics (1)**
48:21

**tortfeasors (1)**
217:2

**total (27)**
22:15;57:13;65:19;
172:19,20;173:17,18;
174:11,15,24;195:10,13;
196:8;197:13,14;199:5,8,11,
12,24,25;200:2,4;205:13;
214:7;215:2,3

**towards (1)**
139:8

**track (2)**
52:24;64:20

**tracking (4)**
134:20;170:24,24;171:6

**train (2)**
35:16;103:20

**trained (11)**
16:19;19:8;51:7,11,16;
54:7;55:6;57:6;59:15;104:5,
13

**training (13)**
34:17;35:4,19,21;36:1;

49:15;55:8;103:12,24;
152:13;169:22;170:16,18

**transcript (12)**
12:23,25,25;13:1,5,9;
140:8;147:4;216:10,14;
218:3,14

**transferred (1)**
171:4

**transportation (1)**
169:3

**traveled (2)**
124:20,24

**treat (5)**
35:6;36:12;122:1;163:4;
232:16

**treated (6)**
122:2,3;151:24,25;
232:10,12

**treating (1)**
125:20

**treatment (2)**
77:18;217:4

**treats (1)**
219:15

**tremendous (1)**
173:3

**Trial (11)**
172:19,21;173:17,18;
174:11,12,15,24;214:8;
215:2,3

**tried (3)**
117:21;119:10,12

**trip (5)**
185:24,25;186:1,12;
189:16

**trips (1)**
186:20

**trouble (2)**
97:24;224:15

**truck (3)**
102:22;122:25;123:2

**trucks (1)**
157:14

**true (23)**
19:17;22:25;24:6;27:17;
38:7;39:10;40:11;42:20;
44:5;86:2;99:1;103:14;
122:14,23;140:15,16,18;
196:7;200:20;220:22;223:7,
16,24

**truly (1)**
15:10

**truncated (1)**
102:1

**truth (3)**
219:14,20,22

**try (11)**
57:8,19;59:5;72:12;75:24;
76:3,20;86:11;118:7;
152:19;228:16

**trying (10)**
25:2;41:10;100:12;118:5;
125:12;149:20;158:20;

161:3,9,11

**Tuesday (4)**
193:22;194:2;204:8;210:7

**turn (22)**
32:10;34:14;36:24;38:7;
39:10;40:11,21;42:13,20;
43:19;44:5;45:13;59:23;
67:3;70:16;104:21;105:2,
11;108:5,6,15;165:3

**turning (2)**
70:12,12

**TV (1)**
140:11

**Twice (3)**
64:19;130:4;222:9

**two (34)**
22:9,18;25:3;35:3,5,16,
18;48:20;49:5,15;63:18;
64:19;68:1;75:10;77:23;
78:5;89:9;122:24;124:10;
148:8;154:8;158:8;170:19;
183:18;185:25;186:2;
188:12,15;193:24;195:16;
204:5,6;213:2;222:24

**Two-minute (2)**
151:2,13

**type (6)**
43:24;60:8;124:11;
171:17;174:20,21

**typically (5)**
15:16;45:1,15,16;63:16

**typing (1)**
183:24

---

## U

**Uber (1)**
111:25

**ultimate (1)**
15:11

**ultimately (5)**
170:14;171:12,25;172:13;
185:11

**unavailing (1)**
21:4

**under (15)**
14:19;15:11;21:4,8;27:17,
18,20;28:15;125:18;166:17;
189:12;195:4;198:14;217:2;
231:19

**undercounts (1)**
22:17

**undergraduate (1)**
172:23

**underlying (1)**
214:19

**undermine (1)**
147:15

**underpaid (3)**
200:1,6;219:16

**underpayment (1)**
199:23

**underreported (1)**

96:24

**understands (1)**
171:22

**understood (3)**
93:7;113:6;142:4

**undo (1)**
204:25

**unfair (1)**
88:2

**uniform (7)**
16:21;76:13;77:2;227:6,9;
235:10,11

**unit (1)**
169:19

**United (7)**
124:8,15;169:8,14;
172:17;184:23;218:16

**University (1)**
168:2

**unlawful (1)**
24:4

**unless (2)**
23:10;131:25

**unlikely (1)**
22:20;209:23

**unpaid (1)**
229:22

**unquote (1)**
234:24

**unsatisfied (1)**
234:21

**up (55)**
25:20;31:7;35:4;37:20;
41:12;47:3,5;49:5;62:14;
64:8;66:15;79:3,5,17;80:22;
86:22,24;99:8;100:12,14;
102:9,15;106:25;110:18,19,
22;126:6;133:15;134:1,23;
137:15,23,25;153:22;
157:12,16;158:13,16;170:1;
173:15;176:13;177:4;179:8;
186:6;187:3;188:9;192:15;
196:7;200:20;202:14;
210:21,25;224:12;227:1;
235:22

**upload (1)**
178:12

**uploaded (1)**
178:13

**upon (1)**
96:13

**upstate (1)**
169:23

**URL (2)**
183:15,20

**use (28)**
12:16;37:24;43:25;51:18;
62:2,4;65:12;69:13;70:14;
82:18,23;90:10;103:25;
104:3;138:24;165:11;181:9;
184:23;185:2;186:3;205:2;
207:5;208:5;209:6,11;
222:22,25;223:1

**used (27)**
15:8;17:23;23:25;32:5;
36:9;64:8;66:20;79:5;123:2;
126:2,3;144:7;173:10;
176:9,11;183:5,14;186:4;
191:16;192:21;194:3;
208:11;209:2,15;210:20;
213:5;219:25

**using (8)**
122:18;173:10;180:8;
197:4,13;200:25;212:20;
213:1

**usual (2)**
12:9;81:1

**usually (11)**
46:9,14;64:10;79:2,3;
80:12;108:9;136:16;174:19,
21;175:8

**U-turn (2)**
47:19;108:14

## V

**value (10)**
69:20;176:23;186:6;
196:13,14,16;197:7,18,22;
198:22

**van (4)**
39:15;66:14;122:18;123:6

**variance (3)**
188:7;199:14;200:2

**variances (1)**
216:5

**variants (1)**
188:6

**various (1)**
27:11

**vast (1)**
21:6

**vehicle (13)**
56:1;65:12,14;66:10;67:4,
13;69:5,9,13;103:1;122:4;
136:22,25

**vehicles (2)**
69:9;78:10

**verbal (1)**
43:22

**verified (1)**
51:23

**verify (10)**
50:5;51:5;59:12,12;179:4,
6,9;212:13,15,24

**version (1)**
185:10

**versus (6)**
7:4;89:17;146:25;158:1;
210:7,7

**via (1)**
163:18

**video (3)**
174:13;202:14,24

**videotape (1)**
163:19

**violating (1)**
24:2

**violations (1)**
21:10

**vision (1)**
89:15

**visit (1)**
92:13

**volume (1)**
177:19

**voluminous (4)**
166:18,20,24;167:2

**voluntary (1)**
115:9

**vulnerable (2)**
14:3;23:18

## W

**W2 (27)**
16:5;19:20;24:9;77:20;
93:14;221:6;222:17,19;
223:8,17,25;226:15,20,22,
24,25;227:3,5,23;228:2,4,
10,18;229:3,4;230:5;235:7

**W4 (1)**
124:17

**Waffle (4)**
134:3,8,12,24

**wage (26)**
13:23;14:8,11;17:20,22,
25;20:20;24:3,9;27:23;
167:13;194:9,12;197:10;
198:9,21;199:4,6,8,13,16,18,
24;200:18;226:25;229:23

**wages (7)**
17:17,18;27:22;72:5;
75:20,22;96:4

**wait (10)**
61:19;118:3;130:5;138:1;
189:19;201:9,11;229:9;
232:17,20

**waiting (7)**
107:25;137:3;138:8,13,
14,21;215:14

**walk (1)**
177:24

**walking (2)**
134:6;168:14

**Walter (2)**
170:1,3

**wants (1)**
132:3

**warehouse (29)**
32:5;35:14;44:16,18,19,
20;46:4;54:4,5;80:15,25;
81:17,22;82:4,19;84:15,15;
106:17,18,24;134:14;
137:13,14,17,22,23;157:17;
222:12;228:8

**Washington (2)**
169:2,6

**waste (1)**

88:24

**wasting (1)**
190:23

**way (41)**
35:6;36:4,12;38:13,21;
49:20;51:23;55:19;56:7;
66:14;77:22;87:19;89:7,8;
102:13;105:18;108:17;
120:18;151:24,24;153:6;
157:9;163:5;173:25;174:4;
177:2;179:19,22;185:17,19,
22;190:8,22;204:20;205:25;
208:17;210:12;215:16;
216:25;227:13,16

**wear (8)**
16:20;76:13,18,20;77:1;
127:8;227:5,8

**web-based (2)**
176:9;178:11

**Wednesday (4)**
193:24;204:8;209:20;
210:7

**week (49)**
18:17;19:18;20:7;45:14,
21;53:19;63:16;64:19;68:1;
130:4;160:2;172:3;187:5,5,
6,6,6,9,10,10,11;191:7,7;
193:15,18,23;194:4;195:13,
14,15,17,22;196:8;197:7;
198:3,17;199:1,7;200:1;
204:3,7,21,24;206:19;
209:12,19;213:19;222:9;
225:3

**weekdays (1)**
44:25

**weekends (1)**
80:12

**week-over-week (1)**
191:12

**weeks (5)**
45:18;192:13;195:16;
200:6;206:18

**weight (1)**
218:4

**welcome (1)**
235:19

**weren't (8)**
22:1;25:5;92:5;111:20;
120:19;138:15;210:1;
221:23

**west (1)**
106:1

**What's (12)**
112:15;114:4;160:17;
178:3;187:21;191:25;
196:20;197:2,10;200:2;
219:10,23

**whenever (1)**
109:6

**wherein (1)**
216:14

**wherever (1)**
156:1

**WHITE (26)**
7:20,21;163:24;164:9,16;
165:3,15;166:13;167:21;
177:7;180:12,14,17;182:3,8;
184:5;185:4;189:4,11;
191:4,9;201:5,22;214:6,18;
215:21

**whole (11)**
49:4;99:25;100:5;101:12,
13;168:16;171:23;205:6,7,8,
14

**Whose (6)**
44:18;53:16;65:14;78:10;
111:10,12

**wife (1)**
225:25

**willing (2)**
11:3;169:13

**window (1)**
212:8

**wish (1)**
12:19

**wishes (1)**
13:4

**withdraw (3)**
150:16;192:2;231:9

**withholdings (1)**
160:22

**within (3)**
19:9;175:18;201:1

**without (5)**
14:3,7;20:19;135:2;
161:23

**witness (26)**
8:22;9:2,3,16;12:1;24:20;
132:6;147:13,20;149:13;
151:4;163:15;164:5,6,8,11;
165:21;166:14,19;167:1;
173:9;175:23;201:10,12;
202:11;218:22

**witness' (1)**
12:14

**witnesses (7)**
8:14,16;9:17,22;10:2;
166:16;167:4

**woman (1)**
80:13

**wonder (1)**
173:3

**Woodstock (3)**
225:19,20;233:14

**words (3)**
7:11;15:3;144:8

**wore (3)**
77:14;127:12;235:10

**work (125)**
16:17;17:25;18:13,20;
20:7,13;22:1;25:23;29:21;
30:11;31:7,24;37:15;41:21;
42:7,11,19,21;43:3,9,11,13;
44:4;45:1,3,6,9,10,12,13;
48:4;49:3;52:4;53:20;54:20;
60:13;61:13;63:11,20;64:4,

Case 1:16-cv-06852-DLI-RML   Document 52-6   Filed 09/22/20   Page 263 of 372 PageID #:
1473

Lucio v.
Parts Authority

ARBITRATION
January 15, 2019

15,18;72:13;73:2,21;76:6,
21;80:4,7;81:3,11,22;83:8;
91:25;100:12;102:15;107:2;
111:6;112:12;117:6;118:13,
14;120:18;123:1;124:5,9,
15;131:4;143:6,8;151:19,
20;156:20;158:17;161:11,
23;162:9;168:4;172:20;
173:25;174:4,20,22;175:4,5,
12;177:2;192:13;194:4;
195:24;201:18;202:23;
206:3,9,10,12,14;207:1,8,10,
17;209:12,19;214:20;
218:11;219:25;220:2,20,23;
224:8,9,11,12,14,22;225:1,
14,18;226:10;228:6,25;
230:8;234:17,21;235:7
**workday (1)**
18:6
**worked (54)**
18:16;19:25;45:4,19;46:6;
48:14,17;60:3;68:11,14;
71:12;72:2,6,8;75:11,15;
77:20;78:3,4,6,8,21;80:23;
94:20,21;99:17,20;143:2,5;
144:13;153:20;160:2;
161:16;167:18;168:12;
192:25;193:7,16;195:11,14,
18;197:14,15;198:15,18;
201:15;204:2;207:17;
213:18;218:10;224:17;
225:16,17;233:14
**worker (8)**
14:20;15:10;221:6,7,8;
227:3;232:7,8
**workers (8)**
14:2,3;15:13;17:22;24:9,
9;220:19,23
**working (55)**
14:24;33:6;34:19;38:8;
39:9;40:12;42:25;44:17;
45:15,16,20;47:24;75:21;
76:7;79:8;80:9,11,14;81:24;
83:13;84:23;97:9,11,20;
99:14;109:23;110:9;111:21;
112:3,5;120:5;127:18;
142:1;152:5;153:23;157:25;
158:1;159:15;161:22;162:5;
168:11;170:22;175:9;
186:14;212:25;220:5;221:1,
3;222:20;225:2,6,11,23;
230:18;233:13
**workplace (4)**
82:23;153:8,19,24
**workweek (3)**
187:2,8,13
**WORLDPAC (1)**
109:25
**worth (2)**
21:22;216:4
**write (2)**
33:20;86:15
**writing (3)**

53:5;67:22;128:15
**written (7)**
28:9;33:16;43:21;53:10;
116:18;128:17;235:11
**wrong (9)**
44:12;58:15;62:20;
107:17;137:7;138:4;213:24,
25;217:22
**wrote (2)**
21:25;33:16

**Y**

**yards (1)**
108:6
**Yaron (3)**
7:24;145:19;149:22
**year (8)**
85:21,22;168:10;169:10;
170:12;171:18;172:2;181:3
**years (4)**
78:22;168:12;169:5;
171:14
**yellow (1)**
180:24
**York (6)**
29:8;155:15;163:18;
169:23,24;218:25
**younger (2)**
169:9,13
**youngest (1)**
89:14

**Z**

**zero (1)**
218:4
**zone (1)**
155:12

**1**

**1 (11)**
13:8;59:24;102:5,5,6;
132:14;147:16;149:4;177:8;
187:6,11
**1,150 (1)**
86:12
**1:30 (4)**
9:15;133:17,18,20
**10 (10)**
11:9;42:13;57:13;66:14;
133:13;134:5,16;138:7;
163:12;193:10
**10.25 (1)**
194:1
**10.5 (1)**
194:2
**10.875 (1)**
199:4
**1006 (1)**
166:17
**104 (1)**

116:25
**1099 (5)**
93:17,22;95:7;132:22,25
**10-hour (1)**
112:4
**10-minute (1)**
12:3
**11 (7)**
29:25;33:4;37:13;41:15;
99:22;160:5;169:10
**11/05 (2)**
178:20;181:16
**113 (2)**
125:7,9
**11th (4)**
29:20;85:23;99:14;169:6
**12,000 (1)**
65:21
**120 (2)**
122:14,16
**124 (1)**
207:17
**13 (4)**
43:20;140:8,10;224:24
**14 (2)**
211:4;212:2
**14th (4)**
210:22;211:13;213:8,9
**15 (12)**
123:20,20;134:10,16,16;
135:15,16;154:3,5;173:1;
211:4;225:22
**15th (5)**
192:10;211:8,10,16,21
**16 (2)**
78:22;125:7
**16:59 (1)**
155:1
**18 (1)**
116:25
**19 (2)**
111:1;140:24
**1st (1)**
213:8

**2**

**2 (6)**
36:25;133:20;147:17;
149:5;187:6,11
**2:00 (1)**
9:15
**20 (5)**
32:19;71:15;98:22;
116:25;172:3
**200 (2)**
44:24;183:6
**2009 (1)**
219:11
**2010 (2)**
65:18,20
**2012 (1)**
171:9

**2013 (2)**
171:13,13
**2014 (4)**
93:20;94:8;131:16;132:8
**2015 (25)**
29:25;30:3;33:4;37:13;
41:15;78:17;85:20,23;95:5,
8,12;96:8;199:7;3,14;99:22;
152:21;160:5;181:3;194:14;
220:4;221:5;224:23;234:17,
18
**2017 (4)**
181:4;226:18;230:17;
235:8
**2018 (4)**
87:20;178:20;181:4,12
**20s (1)**
169:12
**20th (1)**
160:8
**21 (2)**
100:19;111:2
**22 (3)**
30:3;78:17;111:2
**23 (1)**
87:20
**24 (4)**
89:22;111:2;200:6;206:18
**25 (1)**
9:1
**28 (4)**
40:22;116:5;132:16;180:8
**28th (1)**
180:8
**29 (2)**
43:20;116:6

**3**

**3 (7)**
38:2;42:2;45:11;114:12;
187:6;201:15,25
**3:35 (1)**
203:3
**3:45 (1)**
202:16
**30 (1)**
45:20
**30-minute (7)**
128:16,19,21;152:25;
193:18,25;204:7
**31 (2)**
198:16;212:2
**31st (1)**
213:8
**33 (1)**
207:13
**35 (1)**
88:18
**38.36 (3)**
188:10,12,19
**3A (2)**
114:11;115:3

**3D (2)**
  38:1;39:5

## 4

**4 (6)**
  9:12;40:8;83:6;101:19;
  114:12;202:17
**4:59 (4)**
  154:21,24;155:2,22
**40 (10)**
  45:20;188:22;197:16;
  198:13,15,18,20;199:1;
  207:9,11
**402 (1)**
  105:11
**42 (1)**
  108:5
**45 (6)**
  9:6;193:17,23;204:4,5,23

## 5

**5 (12)**
  45:12,13;68:17;137:2,11,
  15;193:9;201:16,18;203:13;
  213:6;221:12
**5/11 (1)**
  187:9
**5/11/15 (1)**
  187:3
**5/12/15 (2)**
  188:11,14
**5/14 (1)**
  192:18
**5/15/15 (1)**
  192:18
**5/26/15 (1)**
  195:22
**5:15 (1)**
  235:25
**5:30 (1)**
  221:12
**5:58 (4)**
  154:10,11,25;155:3
**50 (6)**
  18:17;20:7;45:16,19;
  225:3;230:18
**575 (1)**
  195:6
**59 (1)**
  88:17
**5C (1)**
  40:7
**5th (3)**
  71:15;109:10;160:6

## 6

**6 (33)**
  26:7;43:10,13;45:3;47:14;
  54:11,15,16;57:20,25;76:11;
  89:22;102:5,5,6;104:17,24,

25;105:18,22;114:25;129:2;
  137:5;143:6;154:11;155:1;
  161:16;193:8,16;203:12;
  204:3;213:19;221:13
**6:45 (1)**
  43:12
**60 (6)**
  18:17;20:7;45:16;101:18;
  102:5;195:19
**60.5 (2)**
  195:15,16
**61 (1)**
  100:19
**6th (1)**
  112:22

## 7

**7 (11)**
  32:11,20;36:25;40:22;
  43:12;89:22;98:20;114:11;
  116:4,5,7

## 8

**8 (30)**
  11:8;26:7;42:25;43:2;
  45:3,10;52:4,5;70:16;76:11;
  83:7;104:16,24;114:25;
  127:25;128:2,11;129:2;
  137:5;142:10,18;143:6;
  159:24;161:16;193:7,8;
  203:12,13;213:6;221:12
**8:05 (1)**
  142:21
**8:10 (1)**
  142:21
**8:30 (1)**
  221:12
**85 (2)**
  136:24;137:8
**86 (1)**
  140:7
**87 (1)**
  194:17

## 9

**9 (3)**
  201:15,18,25
**9.59 (6)**
  186:15,17;188:18,19;
  189:1,2
**9.69 (1)**
  188:25
**9:00 (1)**
  11:10
**90 (1)**
  140:24
**90s (1)**
  169:1
**95 (7)**
  68:16;137:1,2,8,9,14,16

**990 (3)**
  179:20;180:3;182:18

264

1               AMERICAN  ARBITRATION  ASSOCIATION
                  CASE NO. 01-18-0000-6169
2    ------------------------------------------x

3    SUSANA LUCIO,

4                        Claimant,
            vs.
5
     PARTS AUTHORITY, LLC; PARTS
6    AUTHORITY, INC.; PARTS
     AUTHORITY LAUREL AVENUE, LLC,
7    PARTS AUTHORITY PARTNERS
     FRANKLIN AVE, LLC, PARTS
8    AUTHORITY SOUTHERN, LLC, PARTS
     AUTHORITY-WAW, LLC, PA AUSTIN,
9    LLC, PARTS AUTHORITY GEORGIA,
     LLC, and YARON ROSENTHAL,
10
                        Respondents.
11
     ------------------------------------------x
12

13

14

15                   JANUARY 16, 2019

16                     9:57 A.M.

17

18                 CONTINUED ARBITRATION

19       HELD BEFORE ARBITRATOR DEBORAH MASUCCI

20

21

22

23

24
     Terri Fudens
25   Court Reporter

265

1           AMERICAN ARBITRATION ASSOCIATION
                CASE NO. 01-18-0000-6169
2   ------------------------------------------x

3   SUSANA LUCIO,

4                       Claimant,

5        vs.

6   PARTS AUTHORITY, LLC, et al.,

7                       Respondent.

8   ------------------------------------------x
                              January 16, 2019
9                             9:57 a.m.

10

11

12

13           CONTINUED ARBITRATION taken in the

14   above titled actions held at the Offices of

15   Abrams Fensterman, 3 Dakota Drive, Suite 300,

16   New Hyde Park, New York, before Terri Fudens,

17   a Certified Shorthand Reporter and Notary Pubic

18   within and for the State of New York.

19

20

21

22

23

24

25

266

1    APPEARANCES:

2

3          WEINHAUS & POTASHNICK
           Attorneys for Claimant
4                11500 Olive Boulevard
                 Suite 133
5                St. Louis, Missouri  63141
                 314.997.9150
6
           BY:  MARK POTASHNICK, ESQ.
7               markp@wp-attorneys.com

8

9          FINKELSTEIN, BLANKINSHIP, FREI-PEARSON &
           GARBER, LLP
10         Attorneys for Claimant
           445 Hamilton Avenue
11         Suite 605
           White Plains, New York  10601
12         914.298.3284

13         BY:  JEREMIAH FREI-PEARSON, ESQ.
                jfrei-pearson@fbfglaw.co.
14                   -and-
                ANDREW WHITE, ESQ.
15              awhite@fbfglaw.com

16

17         DORF & NELSON LLP
           Attorney for Respondents
18               The International Corporate Center
                 555 Theodore Fremd Avenue
19               Rye, New York  10580
                 914.381.7600
20
           BY:  ANDREW P. MARKS, ESQ.
21              amarks@dorflaw.com

22

23

24

25

1    APPEARANCES CONTINUED:

2

3         ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN
          FORMATO, FERRARA & WOLF
4         Attorneys for Respondents
                3 Dakota Drive
5               Suite 300
                Lake Success, New York 11042
6               (516) 328-2300

7         BY:  SHARON P. STILLER, ESQ.

8

9

10   ALSO PRESENT:

11        Alexander Buller, Esq.
          General Counsel
12        Parts Authority Auto Parts Super Stores
                3 Dakota Drive
13              New Hyde Park, New York  11042
                516.300.1265
14              Abuller@partsauthority.com

15

16

17

18

19

20

21

22

23

24

25

268

ARBITRATION                          JANUARY 16, 2019

C O N T E N T S

Appearances                                  Page 266-267


Examination of Glenn Parrish:

     Direct by Mr. Marks              Page 273

     Cross by Mr. Frei-Pearson        Page 294


Examination of Fred Rosenao:

     Direct by Mr. Marks              Page 304

     Cross by Mr. Potashnick          Page 318

     Further by Mr. Marks             Page 326


Examination of Paul Spicker:

     Direct by Mr. Marks              Page 331

     Cross by Mr. Frei-Pearson        Page 334


Certification                                Page 357


Word Index                                   Page 358

**ARBITRATION -DAY TWO**

269

1           ARBITRATOR MASUCCI:  Good morning

2     everybody.  We are here on the second day of the

3     arbitration.  I guess the first question I have

4     is did counsel get together regarding the

5     caption of the case?

6           MS. STILLER:  We received a proposed

7     stipulation, which is fine with us, with respect

8     to -- and I can read it into the record if you

9     want to do that, or if you have it handy,

10    Andrew, you can do it.

11          MR. WHITE:  It's just in the same

12    E-mail you have.  I'm booting up my computer.

13          MS. STILLER:  It's my understanding

14    that claimant is willing to stipulate that she

15    will withdraw, without prejudice, her claims

16    against all respondents except for Parts

17    Authority Inc.  And I just lost the E-mail.  And

18    Parts Authority, LLC provided that respondents

19    will stipulate to the following:  That the

20    remaining respondent Parts Authority Inc. and

21    Parts Authority, LLC have adequate resources to

22    fully satisfy a judgment against them in this

23    arbitration.

24          Respondents will not argue that any of

25    the released respondents are more proper

**ARBITRATION -DAY TWO**

1    respondents than Parts Authority Inc. and Parts

2    Authority, LLC.  And respondents have not

3    withheld any discovery relevant to claimant's

4    claims that otherwise would have been produced

5    absent the dismissal.

6             And should further discovery be deemed

7    necessary by the Arbitrator, respondents will

8    not withhold any future discovery on that basis.

9             We're fine with stipulating to the

10   respondent's portion and, therefore, I

11   understand that the claimant will withdraw the

12   claims against the respondents except for Parts

13   Authority, Inc. and Parts Authority, LLC.

14             ARBITRATOR MASUCCI:  Okay.

15             So this is a question that I have in

16   terms of housekeeping for me.

17             Do you intend to get a copy of the

18   transcript?

19             MR. FREI-PEARSON:  We likely do.  If

20   your Honor would like post-hearing briefs, we

21   think that makes sense, so perhaps a little bit

22   of guidance.

23             ARBITRATOR MASUCCI:  We'll wait until

24   the end of the day to figure out whether it

25   makes sense to have post-hearing briefs.

**ARBITRATION -DAY TWO**

1              You did submit pre-hearing briefs, and

2     I'm not sure what more you would cover.  But

3     that's why I think that we'll wait until the end

4     of the day.

5              The reason I ask that question is that

6     any award really should reflect that

7     stipulation.  And if there is no transcript that

8     I can follow or use as guidance, I'm going to

9     need something in writing.

10             MS. STILLER:  I think we had

11    previously -- we can just submit --

12             ARBITRATOR MASUCCI:  Just submit that

13    statement, and I'll incorporate it in any

14    decision.

15             MS. STILLER:  We have previously, I

16    believe, just forwarded E-mail directly to you

17    copying in --

18             ARBITRATOR MASUCCI:  Copying the AAA,

19    yes.

20             MS. STILLER:  So, Andrew, we can just

21    forward that and say the parties have stipulated

22    to this and copy everybody in.

23             MR. WHITE:  I think that will be fine.

24             MS. STILLER:  Thank you.

25             ARBITRATOR MASUCCI:  As to today, first

**ARBITRATION -DAY TWO**

1    of all, my understanding is that you've rested;

2    right.

3              MR. FREI-PEARSON:  Reserving rebuttal,

4    yes.

5              ARBITRATOR MASUCCI:  So in terms of

6    witnesses today, Mr. Marks.

7              MR. MARKS:  I have Mr. Glenn Parrish,

8    who is Assistant General Manager of Parts

9    Authority, Georgia.  I have Mr. Fred Rosenau by

10   video conference, and if necessary, because

11   they're unable to testify to certain matters, if

12   we feel it's necessary we have Paul Spicker who

13   is General Counsel, Human Resources director for

14   Diligent.  And if necessary, we have

15   Mr. Rosenthal.

16             ARBITRATOR MASUCCI:  Parrish,

17   Rosenthal, Spicker.

18             MR. MARKS:  No.  Rosenau.

19             ARBITRATOR MASUCCI:  What was his first

20   name again?

21             MR. MARKS:  Fred.

22             ARBITRATOR MASUCCI:  He will be here on

23   video?

24             MR. MARKS:  Video.

25             ARBITRATOR MASUCCI:  Okay.  Why don't

**ARBITRATION -DAY TWO**

273

1          we just get to it.

2                    MR. MARKS:  Sure.

3     G L E N N    P A R R I S H, a Witness herein,

4                    having been first duly sworn by Terri

5                    Fudens, a Notary Public of the State

6                    of New York, was examined and

7                    testified as follows:

8                    DIRECT EXAMINATION

9     BY MR. MARKS:

10          Q.    All right, Mr. Parrish, a little

11    background.  Where do you work?

12          A.    Parts Authority, Georgia.

13          Q.    What is your job there?

14          A.    Assistant General Manager.

15          Q.    How long have you worked for Parts

16    Authority, George?

17          A.    Since November of 2014.

18          Q.    Are you familiar with Parts Authority's

19    facility in Roswell, Georgia?

20          A.    Yes, I am.

21          Q.    When did Parts Authority begin

22    operating a facility in Roswell, Georgia?

23          A.    I don't remember the exact date.

24          Q.    What year?

25          A.    I don't know that I remember the exact

**ARBITRATION -DAY TWO**

274

1  year we took the store in Roswell.

2          Q.    You don't remember the year?

3          A.    No, sir.

4          Q.    Well, you started with Parts Authority

5  in 2014; correct?

6          A.    Parts Authority, yes, 2014.

7          Q.    That's my question.  When did Parts

8  Authority begin operating that store in Roswell,

9  Georgia?

10          A.    November, 2014.

11          Q.    Prior to November, 2014, there was a

12  store, auto parts store in Roswell, George?

13          A.    Yes.

14          Q.    Who operated that?

15          A.    Miller Automotive.

16          Q.    Did you work with Miller Automotive?

17          A.    Yes, I did.

18          Q.    Did you have responsibility for that

19  store in Roswell, Georgia.

20          A.    Yes, I did.

21          Q.    And prior to Miller Automotive, did

22  someone operate a store in Roswell, Georgia in that

23  location?

24          A.    Yes.

25          Q.    Who was that?

**ARBITRATION -DAY TWO**

275

1          A.     Genuine Parts Company.

2          Q.     Did you work with them?

3          A.     Yes, I did.

4          Q.     What year did you start being

5    associated with a parts delivery store in Roswell,

6    George?

7          A.     That would have been 1989.

8          Q.     How, if you know, did Parts Authority

9    come to take over that location?

10         A.     Miller Automotive was in bankruptcy,

11   and Parts Authority bought the company out of

12   bankruptcy.

13         Q.     Was there a period of interrupted

14   service, or did it --

15         A.     No, there was not.

16         Q.     So Miller was operating in bankruptcy,

17   and then Parts Authority acquired that?

18         A.     Correct.

19         Q.     Can you tell me how many Parts

20   Authority employees work in the Roswell store?

21         A.     Parts Authority employees would be

22   five.

23         Q.     And who would they be?

24                ARBITRATOR MASUCCI:  What period of

25        time?

**ARBITRATION -DAY TWO**

1           MR. MARKS:  I think it's the same, but

2      let's focus on 2015.

3           A.    2015 would have been five.  It would be

4  a store manager, a dispatcher, a stock manager and

5  two Parts Authority drivers.

6           Q.    Was that the same sort of staffing that

7  Miller had had?

8           A.    Yes, it was.

9           Q.    In 2015, who was the manager of the --

10  who was the store manager in Roswell George?

11           A.    Tammie Turner.

12           Q.    Did she subsequently change her name?

13           A.    She got married and became Tammie

14  Jaswa.

15           Q.    Had Tammie worked for Miller

16  Automotive?

17           A.    Yes, she had.

18           Q.    In 2015 when Parts Authority took over

19  the location, who was the dispatcher?

20           A.    Monica Carter.

21           Q.    Did Monica Carter work for the

22  predecessor entity?

23           A.    Yes, she did.

24           Q.    Did Tammie continue in employment with

25  Parts Authority after 2015?

ARBITRATION -DAY TWO

277

```
 1          A.     Yes, she did.
 2          Q.     And did Monica continue after 2015?
 3          A.     Yes, she did.
 4          Q.     Is Tammie employed by Parts Authority
 5   today?
 6          A.     No, she is not.
 7          Q.     When did she stop working at Parts
 8   Authority?
 9          A.     2016, but I don't remember the month.
10          Q.     Do you know where she is today?
11          A.     I do not.  She got married and moved
12   out of the country the last I had heard.
13          Q.     Did Miller Automotive have a
14   relationship with Diligent Delivery?
15          A.     We did.
16          Q.     What was that relationship?
17          A.     We would use them to make occasional
18   deliveries.
19          Q.     What does that mean, you call them when
20   you needed them?
21          A.     We would call them when we needed them.
22          Q.     Does Parts Authority in Roswell,
23   Georgia have a relationship with Diligent Delivery?
24          A.     Yes.
25          Q.     What is that relationship?
```

**ARBITRATION -DAY TWO**

278

1          A.     We use them as an independent delivery
2     contractor.
3          Q.     Do you call them when needed, or do
4     they provide a different service to Parts Authority?
5          A.     We call them.  We call them if we need
6     a driver, and then we have regular service from them.
7          Q.     What is the regular service comprised
8     of?
9          A.     The regular service is drivers from 8
10    to 6 depending on the seasonality and how many
11    drivers we need.
12         Q.     How many drivers do you need in the
13    busy season?
14         A.     The busy season we would use three.
15         Q.     So you would have coverage from 8 to 6
16    by three delivery drivers through Diligent?
17         A.     Correct.
18         Q.     And in the not busy season?
19         A.     We would have two.
20         Q.     So the record is complete, could you
21    identify the busy season?
22         A.     The busy season would be April through
23    the end of August.
24         Q.     When Parts Authority started operating
25    the facility in November, 2014, was there any

**ARBITRATION -DAY TWO**

279

1    training provided to the former Miller staff?

2              A.    Yes, there was.

3              Q.    Could you describe that for us, please?

4              A.    They brought in a team to train our

5    employees on the different job they would perform as

6    well as policy and procedures regarding how Parts

7    Authority operates.

8              Q.    Was there any discussion by Parts

9    Authority among the managers and dispatchers of their

10   interaction with Diligent Delivery?

11             A.    There was.

12             Q.    Can you tell us what you were advised?

13             A.    We were advised that they were an

14   independent contractor and that our communication was

15   to go through Diligent, that we were not the employer

16   of the contract drivers.  We were contracting service

17   from Diligent.

18                   ARBITRATOR MASUCCI:  Can I just go

19        back.  You said that the hours are 8 to 6.  What

20        days of the week?

21                   MR. PARRISH:  That would be Monday

22        through Friday.

23                   ARBITRATOR MASUCCI:  Any work on

24        Saturday?

25                   MR. PARRISH:  Saturday would be 8 to 3.

**ARBITRATION -DAY TWO**

280

1              ARBITRATOR MASUCCI:  Thank you.

2          Q.    What were the duties and

3    responsibilities  of the manager Tammie at the

4    Roswell location?

5          A.    Responsible for running the store which

6    included processing and issuing credits, helping

7    check in, stock, put away stock, inventory control,

8    daily reporting.

9          Q.    What were the dispatcher's duties,

10   Monica's duties?

11         A.    The dispatcher's responsibility is to

12   to process the order as they got to the desk and then

13   give them to the first available driver to go out.

14         Q.    Would a store manager under ordinary

15   circumstances on a daily basis do dispatching?

16         A.    They would not dispatch except for to

17   cover for the dispatcher to get lunch.

18         Q.    Explain to me the dispatch process at

19   the Roswell store; how did that work?

20         A.    An order would print off on our invoice

21   printer.  The store manager, stock manager, a Parts

22   Authority driver would go pull the order and bring it

23   back up to the counter.

24              The orders were grouped by the

25   dispatcher's knowledge of the area to put the

**ARBITRATION -DAY TWO**

1    deliveries as close as possible together if they were

2    going to carry more than one delivery.  Then when a

3    driver was available, they would dispatch him.

4            Q.    Did dispatch advise the driver of what

5    roads they had to take where they were going?

6            A.    No, sir.

7            Q.    Did Parts Authority drivers advise the

8    Diligent Delivery driver which one had to go first if

9    they were grouped?

10           A.    No, sir.

11           Q.    Were dispatchers -- let's deal with

12   Monica.  She was the dispatcher the whole entire

13   time.

14                 Monica, was she paid hourly or salary?

15           A.    Hourly.

16           Q.    Did Monica have any supervisory

17   authority over Parts Authority employees?

18           A.    She did not.

19           Q.    Did Monica supervise authority over

20   Diligent Delivery drivers?

21           A.    She did not.

22           Q.    Did Tammie have the authority to

23   terminate a Parts Authority employee?

24           A.    She would have to contact our HR

25   department and go through them to determine a Parts

ARBITRATION -DAY TWO

1    Authority employee.

2            Q.    Did Tammie have any authority to

3    terminate a Diligent Delivery driver?

4            A.    She did not.

5            Q.    Could Tammie report a Diligent

6    Delivery driver up through the Parts Authority Human

7    Resources Department?

8            A.    She could not.

9            Q.    What would she do if she had some

10   problem?

11           A.    She would contact Fred Rosenau at

12   Diligent.

13           Q.    I think you testified that Diligent --

14   the Parts Authority contracted with Diligent; is that

15   correct?

16           A.    Right.

17           Q.    And they contacted for a coverage of 8

18   to 6 Monday to Friday and 8 to 3 on Saturday?

19           A.    That is correct.

20           Q.    Did Parts Authority's contract with

21   Diligent provide that service in any particular

22   format?

23           A.    There was no format.

24           Q.    Did you require one driver perform all

25   those hours?

**ARBITRATION -DAY TWO**

283

1          A.     No, we did not.

2          Q.     Was there any prohibition of three

3    drivers providing covering that coverage?

4          A.     There was none.

5          Q.     If a driver for Diligent Delivery went

6    out on a run and didn't come back, what would happen?

7          A.     We would contact Diligent to let them

8    know that we didn't have the coverage for the time

9    slot.

10         Q.     Was it a policy or procedure at the

11   Parts Authority Roswell store for the dispatcher

12   and/or the manager to communicate with the Diligent

13   Delivery drivers?

14         A.     No, sir.

15         Q.     So when you're out on a run, they're

16   not calling them?

17         A.     No, sir.

18         Q.     If out on the road a Diligent Delivery

19   driver had an issue with a customer, what would

20   happen?

21         A.     If they contacted the store, they could

22   contact to ask for help.  Other than that, I don't

23   know.

24         Q.     Let's say a customer had a question.

25   Could the Diligent Delivery driver out there on the

**ARBITRATION -DAY TWO**

284

1   road answer that question?

2          A.     I don't think they would be able to.

3          Q.     So what would they do?

4          A.     They would not have to do anything.

5   The customer would have to contact us directly.

6          Q.     For the services provided by Diligent

7   Delivery, who did Parts Authority pay?

8          A.     Diligent.

9          Q.     Did Parts Authority pay any of the

10   Diligent Delivery drivers directly?

11          A.     No, sir.

12          Q.     Are you aware of any tips given to the

13   Diligent Delivery drivers?

14          A.     No, sir.

15          Q.     Did Parts Authority reimburse the

16   Diligent Delivery drivers for expenses?

17          A.     No, sir.

18          Q.     Did Parts Authority provide any

19   equipment used by the Diligent Delivery drivers?

20          A.     No, sir.

21          Q.     Do you know how the Diligent Delivery

22   drivers were compensated, if at all?

23          A.     I do not.

24          Q.     Did you ever discuss with anyone at

25   Diligent how they were paid?

**ARBITRATION -DAY TWO**

285

1          A.      I have not.

2          Q.      Does it matter to you?

3          A.      It does not.

4          Q.      Did Parts Authority keep track of the

5   days that a Diligent Delivery driver appeared for an

6   engagement?

7          A.      No, sir.

8          Q.      Did Parts Authority track the hours

9   worked by the Diligent Delivery drivers?

10         A.      No, sir.

11         Q.      Did Parts Authority conduct any

12  background check on the Diligent Delivery drivers?

13         A.      No, sir.

14         Q.      Did Parts Authority give a driving test

15  to the Diligent Delivery drivers?

16         A.      No.

17         Q.      Did Parts Authority maintain personnel

18  files on the Diligent Delivery drivers?

19         A.      No.

20         Q.      Did Parts Authority monitor how many

21  miles the Diligent Delivery drivers were driving?

22         A.      No.

23         Q.      There's been testimony by Miss Lucio

24  that when she told Tammie that she had driven

25  120 miles, Tammie inspected her mileage.  It's also

**ARBITRATION -DAY TWO**

286

1    listed in the Statement of Claim that Tammie would

2    check her mileage every day.  Is that conceivable?

3             A.    I see no reason why she would.

4             Q.    Does it matter how many miles the

5    Diligent Delivery driver was driving on a given day

6    or week?

7             A.    No, sir.

8             Q.    Did Parts Authority ever call any of

9    its customers to see how the Diligent Delivery

10   drivers were performing?

11            A.    No, sir.

12            Q.    Did it send any supervisors to ride

13   along with the Diligent Delivery drivers?

14            A.    No, sir.

15            Q.    Did Parts Authority provide any

16   training to the Diligent Delivery drivers?

17            A.    No, sir.

18            Q.    There's been testimony in this case by

19   Miss Lucio that Tammie assigned her to drive with CJ

20   for two days.  Is that reasonable?

21            A.    I don't think so.  I don't know CJ.  I

22   don't know that we ever had anybody train a Diligent

23   driver.

24            Q.    Did Parts Authority distribute any work

25   rules to the Diligent Delivery drivers?

ARBITRATION -DAY TWO

287

1          A.    No, sir.

2          Q.    Did Parts Authority require the

3  Diligent Delivery drivers to wear any particular

4  article of clothing?

5          A.    No, sir.

6          Q.    Do you know if the Diligent Delivery

7  drivers did wear any kind of clothing?

8          A.    I do not know.

9          Q.    How did Parts Authority treat its own

10  employee drivers?

11          A.    We require them to wear a shirt that

12  says Parts Authority on it, we require them to help

13  out in the store when they're there if they're not

14  making deliveries.

15          Q.    Do they do tasks, any other tasks that

16  the Diligent Delivery driver does not do?

17          A.    Checking in or helping put up stock,

18  pulling orders, cleaning bathrooms.  Whatever they

19  did in the store.

20          Q.    Are there some delivery routes that

21  only Parts Authority employee drivers could do?

22          A.    Regarding plate companies that we have

23  to have special prior authorization to get onto their

24  grounds, we cannot use Diligent Delivery to make

25  those delivers.

**ARBITRATION -DAY TWO**

288

1        Q.    Why couldn't you use a Diligent
2   Delivery driver?
3        A.    I was never sure which Diligent driver
4   was showing up, and we had to pre-notify with contact
5   information and driver information for them to be
6   able to verify it.
7        Q.    Are there any other tasks that only a
8   Diligent Delivery driver would do?
9        A.    Only a Diligent Delivery driver?
10        Q.    I'm sorry.  That only a Parts Authority
11   driver would do.
12        A.    No, sir.
13        Q.    What about picking up money?
14        A.    If there was cash to be picked up, we
15   would try to use a Parts Authority driver to pick it
16   up because we were not sure if the Diligent driver
17   was coming back to our location or not.
18        Q.    Did Parts Authority track the identity
19   of the Diligent Delivery driver?
20        A.    No, sir.
21        Q.    Were Diligent Delivery drivers required
22   to perform the service personally, or could they send
23   somebody else?
24        A.    We did not keep track if they were
25   performing or somebody else was performing it.

**ARBITRATION -DAY TWO**

289

1          Q.     Were Diligent Delivery drivers required
2     to ask Tammie if they wanted to have time off from
3     work?
4          A.     No, sir.
5          Q.     Does that make sense that they would
6     ask Tammie?
7          A.     No, sir.
8          Q.     Who would they ask, if you know?
9          A.     I believe it would be Fred Rosenau at
10    Diligent.
11         Q.     To whom did the Parts Authority
12    employee drivers report; who was their supervisor?
13         A.     Their supervisor was Tammie.
14         Q.     How were Parts Authority employee
15    drivers paid, if you know?
16         A.     Paid by the hour.
17         Q.     What is the Parts Authority employee
18    delivery driver's schedule?
19         A.     They would cover the same amount of
20    hours, 8 to 5, 5:30 , 8:30 to 6 depending on what
21    shift we needed them for.
22         Q.     Did they get a break?
23         A.     They were required to take a 30-minute
24    break.
25         Q.     Were Diligent Delivery drivers required

**ARBITRATION -DAY TWO**

290

1    to take a 30-minute break?

2            A.    We did not track Diligent drivers for

3    breaks.

4            Q.    Did Parts Authority employee drivers

5    receive an employee handbook?

6            A.    Yes, they did.

7            Q.    Did Diligent Delivery drivers receive

8    an employee handbook?

9            A.    No, they did not.

10            Q.    Was Tammie authorized to coach or

11    discipline a Diligent driver?

12            A.    No, she was not.

13            Q.    Could a Parts Authority employee send a

14    substitute to do their work?

15            A.    No, sir.

16            Q.    Could a dispatcher or anyone else at

17    Parts Authority set the work schedule of a Diligent

18    Delivery driver?

19            A.    No, sir.

20            Q.    Were Diligent Delivery drivers

21    permitted access to the warehouse areas of the

22    Roswell facility?

23            A.    No, sir.

24            Q.    Where did they have to stay?

25            A.    They were either sitting in vehicles,

**ARBITRATION -DAY TWO**

291

1    or they could be in our break room.

2            Q.    Miss Lucio has testified that she

3    arrived late from time to time, and on those

4    occasions Tammie would deny her a break.

5                    First, does Parts Authority's agreement

6    with Diligent require Parts Authority to give

7    Diligent drivers a break?

8            A.    No, sir.

9            Q.    Would there be any occasion where

10   Tammie would deny a break; any reason for that?

11           A.    We have no control of their breaks.

12   They can take them whenever they wanted to.

13           Q.    Are you familiar with the

14   owner/operator agreement between Diligent Delivery

15   and the owner operators?

16           A.    No, sir.

17           Q.    You didn't negotiate, or didn't have

18   any input into how that contract was made?

19           A.    No, sir.

20           Q.    Do you know anyone else at Parts

21   Authority who had any input into that?

22           A.    No, sir.

23           Q.    Does Parts Authority have any other

24   customers in Georgia?

25           A.    Yes.

**ARBITRATION -DAY TWO**

1        Q.     I'm sorry.  Does Diligent Delivery have

2    other customers in Georgia?

3        A.     Yes.

4        Q.     Can you name some?

5        A.     I don't know who they are.

6        Q.     Other than supplying dedicated drivers,

7    are you aware of any other business that Diligent

8    does in Georgia?

9        A.     They provide a co-op delivery service

10   to all their customers.

11       Q.     What does that mean?

12       A.     They pick up parts from those

13   customers' locations, take them back to their

14   warehouse, sort them by the cities they deliver to,

15   and then they deliver all the customers' packages on

16   that route.

17            ARBITRATOR MASUCCI:  Could you explain

18       that again.  I'm not understanding.

19            MR. PARRISH:  Diligent would send their

20       drivers to their customers' locations, pick up

21       the parts they wanted them to deliver.  Then

22       they would bring them back to their warehouse

23       and sort them by city, ZIP code for the drivers

24       to go out on route to deliver to all their

25       customers' customers.

**ARBITRATION -DAY TWO**

293

1           ARBITRATOR MASUCCI:  This is not Parts

2       Authority, it's the other customers they have?

3           MR. POTASHNICK:  That's correct. Parts

4       Authority does use that service as well.  Yes,

5       ma'am.

6       Q.    In 2015 at least in Georgia, did Parts

7    Authority have any computerized route making

8    software?

9       A.    No, sir.

10      Q.    Did it ever create any specific routes

11   that had to be followed?

12      A.    No, sir.

13      Q.    How would it be decided if one or more

14   than one delivery went out at the same time?

15      A.    The dispatcher would group ones that

16   were close together to give to one driver.

17      Q.    Can you estimate for me how many of the

18   deliveries were grouped as opposed to single

19   deliveries from the Roswell store in 2015?

20      A.    I would say probably 75/25.  75 percent

21   were grouped, and 25 percent were not.

22      Q.    Did Tammie have an office in the

23   Roswell facility?

24      A.    Yes, she did.

25      Q.    Where was that located?

**ARBITRATION -DAY TWO**

1          A.     It was located out beside the break

2     room.

3          Q.     What would she do in her office as

4     opposed to being outside the office?

5          A.     Processing credits to customers was the

6     primary.

7          Q.     What percentage of her time was spent

8     doing that?

9          A.     Probably 70 percent.

10          Q.     So 70 percent of her time she's in her

11     office?

12          A.     Yes.

13               MR. MARKS:  Can we have three minutes?

14               ARBITRATOR MASUCCI:  Yes.

15               (At this time, a brief recess was

16          taken.)

17               ARBITRATOR MASUCCI:  Cross examination.

18                    CROSS EXAMINATION

19     BY MR. FREI-PEARSON:

20          Q.     Good morning, Mr. Parrish.

21          A.     Good morning.

22          Q.     What did you do to prepare for today's

23     testimony?

24          A.     Reviewed questions I might be asked

25     with the Parts Authority lawyers.

**ARBITRATION -DAY TWO**

295

```
 1          Q.    How long did you spend there?

 2          A.    Hour, hour and a half.

 3          Q.    Do you know Miss Lucio?

 4          A.    No, I do not.

 5          Q.    Have you ever spoken to her?

 6          A.    Not to my knowledge.

 7          Q.    Have you ever seen her?

 8          A.    Not my knowledge.

 9          Q.    I'm going to call her Tammie?

10                Do you know Tammie?

11          A.    I did know Tammie.

12          Q.    How many times have you spoken with

13   Tammie?

14          A.    Several.  I mean she reported to me.

15          Q.    Was she an honest person?

16                MR. MARKS:  Objection.

17                ARBITRATOR MASUCCI:  Answer the

18      question.

19          A.    To my knowledge, yes.

20          Q.    Are you aware of any communications or

21   interactions between Tammie and Miss Lucio?

22          A.    I was not involved in any and never

23   heard of any.

24          Q.    Are you aware of any communications or

25   interactions between Monica and Miss Lucio?
```

**ARBITRATION -DAY TWO**

1          A.    I was not aware until recently about a

2    text message that was sent.  That's the only

3    knowledge that I have.

4          Q.    I think you testified earlier that you

5    weren't certain as to who CJ was.  But just to be

6    clear, are you aware of any communications or

7    interactions between CJ and Miss Lucio?

8          A.    No, I'm not.

9          Q.    You testified earlier about Tammie

10   having an office.

11              Did Tammie move her office to the front

12   of the store?

13          A.    The office is where it's always been.

14   It was in the same location all the time.

15          Q.    Does Tammie have an office that's in

16   the front of the store with the glass covering so she

17   can observe people?

18          A.    There is a window that's 8 feet up on

19   the wall in the office, and it looks out towards the

20   warehouse that you can't see out of.

21          Q.    Is delivery of auto parts an important

22   part of Parts Authority's business?

23          A.    Yes, it is.

24          Q.    What job skills are needed by W2

25   delivery drivers that are not needed by temp delivery

**ARBITRATION -DAY TWO**

297

1  drivers?

2          A.    I know for the W2 delivery drivers we

3  check MVR, that type of stuff.  But for the other

4  drivers, I do not know.

5                  ARBITRATOR MASUCCI:  You check who?

6                  MR. PARRISH:  The W2, the Parts

7      Authority delivery drivers.

8                  ARBITRATOR MASUCCI:  You check what?

9                  MR. PARRISH:  Their MVRs.

10          Q.    Motor vehicle records?

11          A.    Yes.

12          Q.    In terms of skills, you can't identify

13  any different skills?

14          A.    No.

15          Q.    What's a hot shot delivery?

16          A.    It's a delivery that's not run on a

17  scheduled route that we try to deliver as fast as we

18  can.

19          Q.    Do temp drivers take hot shot

20  deliveries?

21          A.    What is a temp driver?

22          Q.    A driver procured through Diligent.

23          A.    Yes, they do.

24          Q.    Speaking a moment ago about Tammie, do

25  you know whether or not Tammie recorded Miss Lucio's

**ARBITRATION -DAY TWO**

298

1    hours?

2          A.    I do not.

3          Q.    Did Tammie ever tell you whether or not

4    she recorded any temp driver's hours?

5          A.    She did not.

6          Q.    Did Tammie ever tell you whether or not

7    she awarded or withheld breaks to any drivers?

8          A.    She did not.

9          Q.    So you don't have any personal

10   knowledge one way or the other as to whether or not

11   Tammie recorded temp drivers' hours or awarded

12   breaks?

13         A.    I do not.

14         Q.    You testified earlier that deliveries

15   were grouped; correct?

16         A.    Yes, sir.

17         Q.    Is there a record that would reflect

18   when deliveries were grouped?

19         A.    There is no specific tracking that

20   let's us know which ones are grouped.

21         Q.    Is there a record that reflects which

22   deliveries are done by which driver?

23         A.    There is a driver number that is

24   recorded.

25         Q.    Where is that recorded?

**ARBITRATION -DAY TWO**

1           A.     It's in our computer system.  DST, I
2    believe, is the software.
3           Q.     Do you know if records from that
4    computer system were produced in this litigation?
5           A.     I am not.
6           Q.     Were you involved in collecting
7    documents for this arbitration?
8           A.     I was not.
9           Q.     Did temp drivers have driver numbers?
10          A.     They do have a driver number because
11   our system requires us to put a number.
12          Q.     Going to the system, you can identify
13   all deliveries taken by Miss Lucio by driver number?
14          A.     No.  The driver numbers regarding
15   Diligent drivers are reused because we don't keep
16   track of the Diligent drivers' names.
17          Q.     Are you aware that Tammie was regularly
18   in the front of the store?
19               MR. MARKS:  Objection.
20               ARBITRATOR MASUCCI:  Answer the
21      question.
22          A.     I was not.
23          Q.     Did you testify earlier that the
24   dispatchers don't track or care when temp drivers go
25   on breaks or when they leave; correct?

**ARBITRATION -DAY TWO**

300

1          A.     Correct.

2          Q.     Would the dispatchers have any records

3    of the names that went with the driver numbers?

4          A.     Not to my knowledge.

5          Q.     So I would like to give to you Joint

6    Exhibit 15.

7          A.     Okay.

8          Q.     Can you tell me what that is?

9          A.     It looks like a text message.

10          Q.     The earlier testimony was that that was

11    a text message between Miss Lucio and Monica.  Would

12    you have any reason to believe that's not true?

13          A.     I don't think so.

14          Q.     Did the text message say Susana, I'm

15    calling you back.  Please call back.  It's 5:58, not

16    6 p.m.  I did not dismiss you.  Do not ask for any

17    favors.

18               MR. MARKS:  So the record is clear, it

19        doesn't say that, but go ahead.

20               MR. FREI-PEARSON:  Thank you for

21        interrupting my cross.

22          Q.     That's the second time you did that.

23    Is that what it says?  If I misread it, please

24    correct me.

25          A.     It says what it says.

**ARBITRATION -DAY TWO**

301

1      Q.    Can you square that with your earlier

2  testimony that dispatchers and managers don't care

3  about when drivers go on break or when they leave?

4      A.    They are not to worry about it.  This

5  is the first time I've ever seen or heard of it.

6      Q.    Thank you for your time.

7            ARBITRATOR MASUCCI:  Any redirect?

8            MR. MARKS:  Just a little bit.

9            Looking at the text message, do you

10      have any idea what the subject matter of this

11      is?

12            MR. PARRISH:  I do not.

13            MR. MARKS:  Do you know that they're

14      talking about work?

15            MR. PARRISH:  I do not.

16            MR. MARKS:  Nothing further.

17            ARBITRATOR MASUCCI:  Can you tell me

18      what your job responsibilities were?  I know you

19      were in charge.

20            MR. PARRISH:  Operations for stores.

21            ARBITRATOR MASUCCI:  What does that

22      entail?

23            MR. PARRISH:  Overseeing the inventory,

24      the drivers for Parts Authority, the

25      dispatchers, the floor managers, their

**ARBITRATION - DAY TWO**

302

 1       day-to-day duties.

 2               ARBITRATOR MASUCCI:  How did you do

 3       that?

 4               MR. PARRISH:  I talked to them on the

 5       phone and go to the stores in person.

 6               ARBITRATOR MASUCCI:  In order to do

 7       that, did you have regular conversations with

 8       Tammie and Monica too?

 9               MR. PARRISH:  I did have conversations

10       with Tammie and Monica.

11               ARBITRATOR MASUCCI:  And which drivers

12       did you actually talk to?

13               MR. PARRISH:  I did not talk to the

14       drivers.  I only talked directly to them.

15               ARBITRATOR MASUCCI:  To Tammie --

16               MR. PARRISH:  And Monica.

17               ARBITRATOR MASUCCI:  -- and Monica.

18               I think that you testified that Parts

19       Authority drivers were not permitted to have

20       somebody replace them if they weren't going to

21       be in on a particular day; correct?

22               MR. PARRISH:  Yes, ma'am.

23               ARBITRATOR MASUCCI:  Were you aware of

24       any instance where a Diligent driver was covered

25       by someone that they asked to replace them?

**ARBITRATION -DAY TWO**

```
 1              MR. PARRISH:  No, ma'am.
 2              ARBITRATOR MASUCCI:  Do you know of any
 3         instructions that Tammie might have given to a
 4         Diligent driver to advise them that they could
 5         not have somebody else cover their work?
 6              MR. PARRISH:  No, ma'am.
 7              ARBITRATOR MASUCCI:  That's all I have.
 8         Thank you.
 9              MR. FREI-PEARSON:  Thank you.
10              ARBITRATOR MASUCCI:  Thank you very
11         much.
12              MR. MARKS:  We will go right into Fred.
13              ARBITRATOR MASUCCI:  Mr. Rosenau, this
14         is an arbitration hearing between Susana Lucio
15         and Parts Authority.  I'm going to have the
16         court reporter administer the oath.
17              Will you raise your right hand, please.
18              MR. ROSENAU:  Yes.
19    F R E D    R O S E N A U, a witness appearing via
20              videotape herein, having been first
21              duly sworn by Terri Fudens, a Notary
22              Public of the State of New York, was
23              examined and testified as follows:
24              ARBITRATOR MASUCCI:  Mr. Marks, I'm
25         going to ask you again to slow down and wait
```

**ARBITRATION -DAY TWO**

                                                                304

1          until the person answers, because there will be

2          a delay.

3                          DIRECT EXAMINATION

4     BY MR. MARKS:

5             Q.     Good morning, Fred.  How are you?

6             A.     Good morning.  Fine, thank you.

7             Q.     I'm trying to get used to the delay or

8     lag, so I'm going to be slower than normal.

9                    Could you tell us, please, where you

10    are employed?

11            A.     I'm operations manager for Diligent

12    Delivery Systems in Atlanta, George.

13            Q.     How long have you had that role?

14            A.     February will be nine years.

15            Q.     What are your duties and

16    responsibilities, included in being an operations

17    manager?

18            A.     Contract engagements, things of that

19    nature.  Day-to-day operations.

20            Q.     To whom do you report?

21            A.     Tom Baker.

22            Q.     What's his job title?

23            A.     General manager.

24            Q.     Could you describe Diligent's business

25    in the Georgia area?

**ARBITRATION -DAY TWO**

305

1          A.     I'm sorry.  Repeat that.

2          Q.     Yes.  What does Diligent do in the

3    Georgia area?

4          A.     We provide delivery, we provide service

5    and logistics for different clients.

6          Q.     Could you tell me some of the clients

7    that you provide that service for?

8          A.     Parts Authority being one, World Pac,

9    IMC.

10         Q.     World Pac is W-O-R-L-D P-A-C?

11         A.     Correct.

12         Q.     Does Diligent provide a similar service

13   to World Pac and IMC that it provides to Parts

14   Authority in Georgia?

15         A.     That is correct.

16         Q.     Now a little more specifically, what

17   services does Diligent provide to Parts Authority?

18         A.     We service them with logistics,

19   delivery of parts to their clients or to their

20   customers.

21         Q.     Do you provide Parts Authority with

22   coverage for dedicated delivery?

23         A.     Correct.  Dedicated and some co-op.

24         Q.     What is co-op?

25         A.     Basically it's a division where drivers

**ARBITRATION -DAY TWO**

1  deliver for more than one customer in the Atlanta

2  area.

3         Q.    Are you familiar with claimant Susana

4  Lucio?

5         A.    Yes.

6         Q.    She's sitting here.  I don't know if

7  you can see her.  Do you recognize her?

8         A.    No, I can't recognize anybody.

9         Q.    When do you recall first meeting

10  Miss Lucio?

11         A.    Sometime I guess in May, like three

12  years ago maybe.

13         Q.    What was the nature of your meeting?

14         A.    She and I met to negotiate some of the

15  opportunities with Diligent.

16         Q.    So Miss Lucio was contracted with

17  Diligent as an owner/operator?

18         A.    Not at the time.

19         Q.    But that was the purpose of the

20  meeting?

21         A.    Correct.

22         Q.    Did you discuss with her the

23  opportunity to accept an engagement as a Diligent

24  Delivery driver?

25         A.    Yes.

**ARBITRATION -DAY TWO**

1      Q.    Did you provide her at that time with

2  documentation about becoming an owner/operator with

3  Diligent Delivery?

4      A.    Well, documentation is like the

5  contract?

6      Q.    Yes.

7      A.    Yes.

8      Q.    Go ahead.  Tell me how it went.

9      A.    Well, basically we sit down and talk

10  about the opportunities, and I kind of go over

11  everything, who we are, what we do.

12         Then she provides me with some

13  documents that I need for corporate purposes,

14  contract purposes.  And then we go into -- if she

15  agrees and she's interested, then we go into the

16  contract.

17      Q.    Now are there written documents that

18  you provided to Miss Lucio when you met with her?

19      A.    Yes.  The contract is a written

20  document.

21      Q.    There's also other documents, FAQs and

22  proposals and other things?

23      A.    That's all part of the contract.

24      Q.    At that meeting, did you allow

25  Miss Lucio time to review those materials?

**ARBITRATION -DAY TWO**

308

1          A.    Yes.  Absolutely.

2          Q.    Did you ever tell her that she had to

3     hurry up and couldn't read them?

4          A.    Absolutely not.

5          Q.    Were you staring at her making her feel

6     uncomfortable if she didn't sign right away?

7          A.    No.  As a matter of fact, I give

8     them -- after I give them the instructions, sometimes

9     I'll just leave the room and give them that time to

10    fill it out.  When that's completed, then I will come

11    in and we'll discuss certain things.  If she has any

12    questions, I go over and make sure that areas of the

13    documents are signed and that type of thing.

14         Q.    So did you pressure her in any way to

15    sign the contract?

16         A.    No, sir.

17         Q.    When you were meeting with Miss Lucio,

18    did she ask you any questions or express any concerns

19    about contracting with Diligent, but working for or

20    at Parts Authority?

21         A.    To be honest, it's been so long, I

22    can't -- I can't recall.

23         Q.    But Miss Lucio entered into a contract

24    with Diligent; correct?

25         A.    That is correct.

**ARBITRATION -DAY TWO**

309

1          Q.    So I think it's undisputed that she

2     agreed to and took an engagement at Parts Authority

3     for $2,300 a month.

4               Can you explain how the payments were

5     made to Diligent Delivery drivers who have accepted a

6     monthly engagement at Parts Authority?

7          A.    Yes.  We pay twice a month.  I want to

8     say that she was contracted with us.  Payouts or

9     settlement payouts were on the 20th and the 5th of

10    every month.  And basically the 2,300 is divided into

11    two settlements.

12              So, yes, she would get that divided

13    amount on the 20th and on the 5th of every month.

14         Q.    Would she get the same amount every

15    half month?

16         A.    If she worked the complete cycle, yes.

17         Q.    What is the complete cycle?

18         A.    Our cycles go from the 1st to the 15th.

19    That payout is on the 20th.  From the 16th to the end

20    of the month -- I say the end of the month because it

21    could be 28 days, 30 or 31, that payout would be on

22    the 5th.

23         Q.    What if she didn't work the complete

24    cycle?

25         A.    Then she would be deducted a day.

**ARBITRATION -DAY TWO**

1   Depending on how many days she did not work, that

2   amount would be deducted.

3   　　　　Q.　　Can you explain how that amount was

4   calculated, the deduction was calculated?

5   　　　　A.　　If you take the 2,300 and divide it

6   into two, because they paid twice a month, that gives

7   you a figure, I think, of $1,150.  Then depending on

8   how many days were in the cycle, that's divided into

9   that figure which would give you a daily rate.

10  　　　　　　　And that fluctuates.  Even though the

11  2,300 is still the same, that daily rate will

12  fluctuate based on the cycle.

13  　　　　Q.　　To give an example here, if there were

14  14 days in a cycle and one day was missed, how much

15  wages or pay would be deducted?

16  　　　　A.　　Take that 14 days -- you want me to do

17  the math?

18  　　　　Q.　　If you could tell me the fraction of

19  which you're computing it, that would work?

20  　　　　A.　　You divide the 14 days into the 1,150.

21  That would give you the daily rate.

22  　　　　Q.　　If a cycle had 12 days, what would be

23  the amount of a missed day?

24  　　　　A.　　The same math.

25  　　　　Q.　　12?  Are you doing calculations now?

**ARBITRATION -DAY TWO**

311

1        A.    Yes.

2        Q.    I don't think that's necessary.

3              Is the fraction 1 over 12?

4        A.    Yes.  It would be $95.83 per day.

5        Q.    In addition to missing days, was there

6    any administrative or other charges taken from the

7    payment to the owner operators?

8        A.    Yeah.  All the owner operators

9    understand during the contract procedure that there

10   would be a $2 a day administration fee.

11       Q.    That money is taken by whom, Diligent?

12       A.    Diligent.  That is correct.

13       Q.    So Miss Lucio accepted an engagement at

14   Parts Authority; is that right?

15       A.    That is correct.

16       Q.    And what time period did that

17   engagement encompass?  Like was there an hourly

18   schedule?

19       A.    Well, yes.  Miss Lucio understood that

20   it's from 8 to 6 Monday through Friday, and Saturday

21   would be either 8 to 3 or 10 to 5.

22       Q.    You told her that?

23       A.    Yes.

24       Q.    Was Miss Lucio required to personally

25   perform services during all of those hours?

**ARBITRATION -DAY TWO**

1          A.    Yes.  Yes.

2          Q.    So she could not send a substitute for

3    herself?

4          A.    Yes, she absolutely could send a

5    substitute.  I'm required to make sure that we have a

6    driver there from 8 to 6 Monday through Friday, 8 to

7    3 on Saturday, or 10 to 5 on Saturday.

8               If for any reason she could not perform

9    or be there, she has the right to do so.

10         Q.    If she didn't send a substitute for

11   herself, who would have to cover that?

12         A.    I would send one.

13         Q.    Now when you contracted with

14   Miss Lucio, did you tell her where to go?

15         A.    Yes.

16         Q.    Other than telling her where to go and

17   the hours that she had to do that for, did you give

18   her any other instructions about the specific

19   engagement?

20         A.    Other than she would be providing the

21   client, my client, Parts Authority with the service

22   of delivering parts, no.

23         Q.    In connection with this action, did I

24   ask you to review your cell phone to see if you had

25   any text messages with Miss Lucio?

**ARBITRATION -DAY TWO**

313

1          A.     I do not have any text messages.

2          Q.     There's a text message that Miss Lucio

3     produced from you.  We'll address that perhaps.

4                 Other than text messages, do you recall

5     speaking to Miss Lucio during the period of time that

6     she was engaged to provide delivery services at Parts

7     Authority?

8          A.     It's been so long.  I can't say yes or

9     no on that.  I don't recall.

10         Q.     If Miss Lucio was not going to provide

11    services on a given day, or half a day, or some other

12    point of time, was she supposed to advise anyone?

13         A.     Yes.  She was to advise me.

14         Q.     Was she required to advise the client,

15    Parts Authority?

16         A.     No.  No way.

17         Q.     Are there owner operators who are

18    contracted with Diligent who have subcontractors

19    working for them?

20         A.     Yes.  Actually, the contract states

21    that they can have subcontractors.

22         Q.     I know it states it, but in practice

23    does that happen?

24         A.     Absolutely.

25         Q.     Did Miss Lucio check in with you on a

1  daily basis?

2          A.    They're required to.  Whether she did

3  or not, I don't recall.

4          Q.    What are they required to do?

5          A.    If they're going to be going to their

6  dedicated location, the driver has to call and say

7  they're on their way, they're there or they're not

8  going to be there.

9          Q.    What about during the day, do they call

10 you if they're going to be late or have a problem

11 with a delivery?

12         A.    They can.  If they have some issues out

13 there, they can call me, yes.

14         Q.    If Miss Lucio had asked you for a time

15 off or told you she wasn't going to go to work, could

16 you deny that request?

17         A.    No.

18         Q.    Did you ever deny a request from

19 Miss Lucio for time off?

20         A.    No.

21         Q.    Do you recall how Miss Lucio's

22 engagement with Diligent came to an end?

23         A.    It's been so long.  I really don't

24 know.  I think she had an issue with a child, and I

25 think it was definitely something that she

**ARBITRATION -DAY TWO**

315

1    terminated.  We didn't terminate her.

2          Q.    Tammie, the Parts Authority store

3    manager, was she Miss Lucio's boss?

4          A.    Was she Miss Lucio's boss?

5          Q.    Yes.

6          A.    Absolutely not.

7          Q.    Did you ever tell Miss Lucio that

8    Tammie is your boss, you have to do what Tammie says?

9          A.    Absolutely not.

10         Q.    Do you recall Miss Lucio talking to you

11   or complaining to you about how she was being treated

12   by Parts Authority?

13         A.    No, I don't recall anything like that.

14         Q.    Do you recall anyone from Parts

15   Authority, Tammie, or Glen, or anybody else, talking

16   to you about Miss Lucio's performance or her

17   attendance or her timeliness; do you recall any of

18   that?

19         A.    No.

20         Q.    Did anyone at Parts Authority have the

21   authority to tell Miss Lucio how to perform her

22   delivery services?

23         A.    No, not that I'm aware of.

24         Q.    What was Parts Authority's role with

25   respect to Miss Lucio's engagement?

**ARBITRATION -DAY TWO**

316

1          A.    Really I don't -- there's really no

2     role whatsoever.  She was there to provide the

3     service for my client.  No one there with Parts

4     Authority had the right, or as far as I'm concerned

5     in the years that I've been here, that there's been a

6     time where they told the driver what to do or how to

7     do it.  The role really is the parts come off,

8     they're ordered, they're given to the drivers and

9     they go out and deliver.

10          Q.    Are you paid any money by Parts

11     Authority?

12          A.    Me myself?

13          Q.    Yes.

14          A.    No.  I have not been paid by Parts

15     Authority, not at all.

16          Q.    Do you discuss with Parts Authority how

17     owner operators are performing?

18          A.    Have I ever?

19          Q.    Yes.

20          A.    I don't know.  I think occasionally I

21     would ask if everything was fine.  That's part of the

22     client relationship.

23               MR. MARKS:  I don't have anything

24        further at this moment.

25               MR. FREI-PEARSON:  Can we have a

**ARBITRATION -DAY TWO**

317

1          10-minute break?

2                    ARBITRATOR MASUCCI:  We're going to

3          take a 10-minute break.  Don't go anyplace.

4                    (At this time, a brief recess was

5          taken.)

6                    MR. MARKS:  I have one more question.

7          Q.    Just one other question, Fred.  I

8     wanted to ask you about a driver named CJ.  Do you

9     know who that is?

10         A.    It's been a long time.  CJ, I don't

11    recall.

12         Q.    Miss Lucio testified that when she

13    started at Parts Authority, she drove for two days

14    with a driver named CJ.

15                Do you know a Diligent employee named

16    CJ?

17         A.    I do not have an employee named CJ and

18    I don't recall.  It might be a nickname or something.

19    I don't recall.

20         Q.    Would Tammie have the authority to

21    assign Miss Lucio to drive with some other driver for

22    training purposes?

23         A.    No, she would not.

24         Q.    Did you assign Miss Lucio to train with

25    some other Diligent Delivery driver?

**ARBITRATION -DAY TWO**

318

1          A.    Well, I don't recall, but it's not

2    considered training.  It's considered more of like an

3    orientation.

4          Q.    What would they orient to?

5          A.    Probably just the SOPs and maybe get

6    familiar with how things are done.

7                MR. MARKS:  Okay.  Thanks.  Now we'll

8        be subject to cross-examination by plaintiff's

9        counsel.

10                   CROSS EXAMINATION

11   BY MR. POTASHNICK:

12         Q.    Mr. Rosenau, my name is Mark

13   Potashnick.  Can you hear me?

14         A.    Yes, sir.

15         Q.    I'm one of the attorneys representing

16   the claimant in this arbitration case.

17                ARBITRATOR MASUCCI:  Mr. Potashnick,

18        I'm going to ask you the same thing.  Slow down.

19                MR. POTASHNICK:  I will try my best.

20                ARBITRATOR MASUCCI:  Thank you.

21         Q.    You said that there's orientation

22   towards SOP.  What is an SOP?

23         A.    Like a standard operating procedure,

24   like maybe like an area of knowledge or just how

25   invoices look and things that they need to really

**ARBITRATION -DAY TWO**

319

1  kind of remember what's going on out there on the

2  road that they're doing deliveries.

3          Q.    Is one of the SOPs for Parts Authority

4  to bring invoices with the delivery drivers to their

5  deliveries?

6          A.    Correct.

7          Q.    Is one of the SOPs for Diligent

8  Delivery drivers working at Parts Authority to obtain

9  the Parts Authority customer signature to verify that

10  the delivery was completed?

11          A.    Yes.  A POD.  Yes, Proof of Delivery,

12  that is correct.

13          Q.    Is one of the SOPs for Diligent

14  Delivery drivers working at Parts Authority to call

15  Parts Authority's supervisor if they're asked

16  questions or provided comments or criticisms by Parts

17  Authority's customers on deliveries?

18                  MR. MARKS:  Compound.  I object.

19                  ARBITRATOR MASUCCI:  Just break it

20      down.

21          Q.    Is one of the SOPs for Diligent

22  Delivery drivers working at Parts Authority to call

23  Parts Authority's manager if the customer has

24  questions?

25          A.    Yes, they can.  They can call me or

1    Parts Authority.

2              Q.    Is one of the SOPs at Parts Authority

3    for the Diligent drivers to call Parts Authority's

4    supervisor if the customer of Parts Authority has

5    complaints while the driver is at the delivery

6    location?

7              A.    No.  Not that I'm aware of.

8              Q.    What is the SOP or stand operating

9    procedure for a Diligent Delivery driver working at

10   Parts Authority who encounters a complaint by a

11   customer at a delivery?

12             A.    Well, usually the customer would make

13   that call to the supervisor.

14             Q.    Is one of the SOPs for a Diligent

15   Delivery driver working at Parts Authority to write

16   down the time a delivery is made on an invoice or a

17   bill?

18             A.    I'm not sure.  Some of them have that,

19   but I'm not clear on the Parts Authority one, if

20   their invoice showed that.

21             Q.    Okay.  Is one of the SOPs for a

22   Diligent Delivery driver working at Parts Authority

23   to ask a Parts Authority customer if they have any

24   returns?

25             A.    Yes.

**ARBITRATION -DAY TWO**

1        Q.     Is one of the SOPs for a Diligent

2   Delivery driver working at Parts Authority to ask a

3   customer if they have any defective products?

4        A.     That usually falls under the returns.

5   I don't know specifically.

6        Q.     I'm sorry.  Do you know what a core is

7   at Parts Authority?

8        A.     Sure.

9        Q.     Is one of the SOPs at Parts Authority

10  for Diligent Delivery drivers working at Parts

11  Authority to ask if the customer has any cores to be

12  returned to Parts Authority?

13       A.     I believe it's one of those things

14  where if they're delivering a package or a product

15  that requires a core, I think it's already listed in

16  a note to pick up a core.

17       Q.     Can you tell us what a core is, please?

18       A.     A core -- I believe a core is just a

19  product, like an alternator or something of that

20  nature that can be remanufactured.  So when they

21  deliver a new, let's say, alternator, then the

22  customer will provide them with an old same type

23  product to take back.

24       Q.     Is one of the SOPs for Diligent

25  Delivery drivers working at Parts Authority to bring

ARBITRATION -DAY TWO

322

1    back payment from the Parts Authority customer to

2    Parts Authority?

3            A.    Yes.

4            Q.    Is one of the SOPs for a Diligent

5    driver working at Parts Authority to only bring back

6    a cash payment if Parts Authority designates the

7    customer as to be paying their bills by c.o.d. or

8    cash on demand, cash on delivery?

9            A.    That might also be indicated on the

10   invoice, but they do bring back cash, and they do

11   bring back checks or credit cards.

12           Q.    Can a Diligent Delivery driver working

13   at Parts Authority bring back some form of pavement

14   other than cash if the customer is designated as a

15   c.o.d. payer?

16           A.    Yes.  Like a check or a credit card,

17   yes.

18           Q.    Can the Diligent Delivery driver

19   working at Parts Authority make the decision that the

20   customers can pay by a check or credit card when

21   Parts Authority specifies that the customer must pay

22   only by cash?

23           A.    Absolutely not.

24           Q.    You said during your direct testimony

25   that it's been so long that you don't remember most

ARBITRATION -DAY TWO

323

1    of your interactions with Miss Lucio.

2              Did I get that right?

3         A.   Well, tell me the questions that were

4    asked.  I don't remember.  If I said I didn't

5    remember, then I don't remember.

6         Q.   Do you have any specific recollection

7    of what was said during your initial meeting, your

8    first meeting with Miss Lucio?

9         A.   Well, during the negotiating process or

10   meeting, we -- I'm sure we went over the times, and

11   we went over what she would be doing and things like

12   that, but that's it.

13        Q.   Okay.  What times are you referring to

14   that you went over with Miss Lucio the first time you

15   met with her?

16        A.   Times of the assignment, which would be

17   8 to 6 Monday through Friday, or 8 to 3 or 10 to 5 on

18   Saturdays.

19        Q.   Do you have any specific recollection

20   of anything else that was discussed during that

21   meeting?

22        A.   No.

23        Q.   You said sometimes that you leave the

24   room to let a prospect read through the documents.

25              Do you have any specific recollection

**ARBITRATION -DAY TWO**

1   of whether or not you did that during your first

2   meeting with Miss Lucio?

3          A.    I do not.

4          Q.    Did you personally observe any

5   communications or interactions between Tammie and

6   Miss Lucio?

7          A.    No, sir.

8          Q.    Did you personally observe any

9   communications or interactions between Monica, the

10  dispatcher, at the Roswell Parts Authority and

11  Miss Lucio?

12         A.    No, sir.

13         Q.    Did you personally observe any

14  communications or interactions between any other

15  delivery driver at the Roswell Parts Authority and

16  Miss Lucio?

17         A.    Not that I recall, no.

18         Q.    Could Miss Lucio choose not to bring

19  back returned parts from Parts Authority customers?

20         A.    Yes, she could.  Yes, if she decided

21  to.  And then I guess we would figure another way of

22  getting it.

23              But It's part of the engagement, but,

24  you know, I don't have a right to tell them that they

25  can or can't do something that they refuse to do.

**ARBITRATION -DAY TWO**

1      Q.    Do you have any firsthand personal

2  knowledge or personal observance of whether or not

3  anybody at Parts Authority told Miss Lucio whether

4  she could choose to not bring back parts from Parts

5  Authority's customers?

6      A.    I do not.

7      Q.    Do you have any firsthand knowledge or

8  personal observation about whether anybody at Parts

9  Authority told Miss Lucio that she could choose not

10  to obtain the signatures to verify deliveries?

11      A.    I do not.

12      Q.    Do you have any firsthand knowledge

13  about whether or not anybody at Parts Authority told

14  Miss Lucio that she could choose not to write down

15  delivery times on Parts Authority's bills?

16      A.    I do not.

17      Q.    Do you have any firsthand knowledge

18  about whether or not anybody at Parts Authority told

19  Miss Lucio that she either had to bring back Parts

20  Authority's invoices or she didn't have to bring back

21  those invoices?

22      A.    I do not.

23      Q.    Do you have any firsthand knowledge

24  about whether or not anybody at Parts Authority told

25  Miss Lucio that she had to bring back Parts

ARBITRATION -DAY TWO

326

1    Authority's -- Parts Authority receipts, forms for

2    her deliveries or not bring back those receipt forms?

3              A.    I do not.

4              Q.    Do you have any firsthand knowledge or

5    personal observation about whether anybody at Parts

6    Authority gave any instructions to Miss Lucio about

7    how to perform her duties?

8              A.    I do not.

9              Q.    Isn't it true that delivery of auto

10   parts is an important part of Parts Authority's

11   business?

12             A.    Correct.

13                   MR. POTASHNICK:  That's all we have.

14                   ARBITRATOR MASUCCI:  Anything else.

15                     FURTHER EXAMINATION

16   BY MR. MARKS:

17             Q.    Is it consistent with the relationship

18   between Parts Authority and Diligent for Parts

19   Authority's supervisor to issue instructions to

20   delivery drivers?

21             A.    Can you repeat that?

22             Q.    Sure.  Is it consistent with the

23   relationship between Parts Authority and Diligent for

24   Parts Authority's supervisors to instruct or direct

25   Diligent Delivery drivers?

**ARBITRATION -DAY TWO**

327

1             A.     No.

2                    MR. MARKS:  I have nothing further.

3                    ARBITRATOR MASUCCI:  Mr. Rosenau, I'm

4       the arbitrator.  I have a few questions for you.

5       One preliminary one that I know the court

6       reporter wants to clean up.

7                    Is your name Fred or something else,

8       Frederick?

9                    MR. ROSENAU:  Fred.

10                   ARBITRATOR MASUCCI:  Okay.

11                   When Miss Lucio came to meet with you,

12       did she come specifically for a Parts Authority

13       engagement?

14                   MR. ROSENAU:  No.  Actually it was for

15       an opportunity, and the opportunity just

16       happened to be a Parts Authority engagement.

17                   ARBITRATOR MASUCCI:  Before she signed

18       the agreement, how many times did you meet with

19       her?

20                   MR. ROSENAU:  Just that day.

21                   ARBITRATOR MASUCCI:  How long was the

22       meeting?

23                   MR. ROSENAU:  I'm not sure.

24                   ARBITRATOR MASUCCI:  If you recall.

25                   MR. ROSENAU:  I do not recall.

**ARBITRATION -DAY TWO**

328

1           ARBITRATOR MASUCCI:  How many different

2      Diligent drivers do you work with in any given

3      month?

4           MR. ROSENAU:  I have 178, I believe.

5           ARBITRATOR MASUCCI:  How long does

6      someone generally stay on as a Diligent driver?

7           MR. ROSENAU:  I've had drivers that

8      have been with us for -- I've been with the

9      company nine years.  The drivers have been with

10      us for well over that, 13, 14, 15 years.

11           ARBITRATOR MASUCCI:  Do you have some

12      drivers who act as supervisors or managers of

13      their own group of drivers?

14           MR. ROSENAU:  Yes.  Those would be

15      considered master contractors.  We have

16      subcontractors that they employ.

17           ARBITRATOR MASUCCI:  Are there any

18      drivers that you have who advertise their

19      services to other clients while engaged with

20      Diligent?

21           MR. ROSENAU:  I'm not aware of that.

22           ARBITRATOR MASUCCI:  Is there any

23      prohibition for them doing that?

24           MR. ROSENAU:  They're owner operators.

25      They can pretty much do as they please.

**ARBITRATION -DAY TWO**

329

1            ARBITRATOR MASUCCI:  Just give me a
2      second, please.
3            MR. ROSENAU:  Yes, ma'am.
4            ARBITRATOR MASUCCI:  Do you recognize
5      the name of Mr. Oliveri?
6            MR. ROSENAU:  Renan?  Yes, I'm
7      familiar.
8            ARBITRATOR MASUCCI:  Was he in a
9      similar role to that of Miss Lucio?
10           MR. ROSENAU:  That's correct.  He was
11     an owner/operator for us.
12           ARBITRATOR MASUCCI:  Might he have
13     suggested to Miss Lucio to see you.
14           MR. ROSENAU:  I believe that is how we
15     became -- she found out about us.  I believe so.
16           ARBITRATOR MASUCCI:  I don't have any
17     other questions right now.  Thanks.
18           MR. POTASHNICK:  One quick question.
19           Was Miss Lucio a master contractor?
20           MR. ROSENAU:  Well, she didn't have --
21     as far as I remember, she didn't have anybody
22     that I'm familiar with that she worked under.
23     No, I'm not sure.
24           MR. POTASHNICK:  Mr. Rosenau, when you
25     responded to Mr. Marks' question about

**ARBITRATION -DAY TWO**

330

1          consistency with how Parts Authority treats

2          delivery drivers coming through Diligent.

3                    Was that based on any personal

4          observation of treatment of Miss Lucio within or

5          by Tammie around that store?

6                    MR. ROSENAU:  No.

7                    MR. POTASHNICK:  Okay.

8                    ARBITRATOR MASUCCI:  One other

9          question.  You may or may not recall.  It may be

10         an unfair question, but do you believe that

11         Miss Lucio understood the terms and conditions

12         of the agreement that you asked her to sign?

13                   MR. ROSENAU:  I do.  I don't really

14         recall.  They all get an opportunity to ask

15         questions, and I just don't recall if she asked

16         any specific questions.

17                   ARBITRATOR MASUCCI:  The people who

18         come to you, had they all been independent

19         operators elsewhere or have served in that

20         capacity?

21                   MR. ROSENAU:  Well some most definitely

22         are experienced owner operators, and a very

23         small amount are not.

24                   ARBITRATOR MASUCCI:  Okay.  Thank you.

25                   Mr. Marks, do you have anything else?

**ARBITRATION -DAY TWO**

331

1            MR. MARKS:  I don't.

2            MR. POTASHNICK:  No.

3            ARBITRATOR MASUCCI:  Thank you very

4       much.

5            MR. ROSENAU:  Am I good for the day?

6            ARBITRATOR MASUCCI:  You're good for

7       the day.

8            MR. ROSENAU:  Thank you everyone.

9            ARBITRATOR MASUCCI:  Mr. Spicker, I'm

10       the arbitrator, Deborah Masucci.  The court

11       reporter will administer the oath of office to

12       you.

13   P A U L    S P I C K E R, a witness herein

14            appearing via videotape, having been

15            first duly sworn by Terri Fudens, a

16            Notary Public of the State of New

17            York, was examined and testified as

18            follows:

19            ARBITRATOR MASUCCI:  Mr. Marks.

20                DIRECT EXAMINATION

21   BY MR. MARKS:

22       Q.   Allow me to ask you a few questions,

23   Paul.  Just tell us what your job is and where you

24   work.

25       A.   I work for Diligent Delivery Systems.

**ARBITRATION -DAY TWO**

1    I'm in Houston, Texas at the corporate office.  I am

2    general counsel and vice president of Human

3    Resources.

4            Q.    You don't know who Miss Lucio is; do

5    you?

6            A.    Not personally.  I do know that she's

7    an independent contractor for us.

8            Q.    Okay.  How long has Diligent been in

9    business?

10           A.    Diligent started I think in '94, so

11   about 24 years.

12           Q.    And when did it start doing business

13   with Parts Authority?

14           A.    I've been employed since 2016.  I know

15   it was prior to me.  I want to say that the

16   agreements I remember maybe started in 2010.

17           Q.    Does Diligent Delivery have any

18   ownership interest in Parts Authority?

19           A.    No, none whatsoever.

20           Q.    Does Parts Authority have any ownership

21   interest in Diligent Delivery?

22           A.    No, not at all.

23           Q.    Prior to Miss Lucio's claim, are you

24   aware of any owner/operator in Atlanta, Georgia, BBB,

25   making a claim for wages or FLSA violations?

**ARBITRATION -DAY TWO**

333

1          A.     No.   This is the first claim in that

2     regard from an independent contractor I'm aware of

3     for BBB Logistics.

4          Q.     Other than Parts Authority, does BBB

5     Logistics have any other customers?

6          A.     We do.   We have various other clients

7     and customers.

8          Q.     And Diligent generally has other

9     clients as well?

10          A.     Yes.   Lots of clients, otherwise we

11     couldn't stay in business.

12          Q.     Does Diligent provide services other

13     than the contracting with dedicated delivery drivers?

14          A.     We do.   We're a logistics company, so

15     we provide warehousing, route optimization, cross

16     docking, route creations, scanning.   So various

17     logistical services.

18               MR. MARKS:   That's all I have for

19          today.   Thank you.

20               MR. FREI-PEARSON:   If we could have

21          five or 10 minutes.

22               ARBITRATOR MASUCCI:   Can you just stay

23          on hold for five to 10 minutes?

24               MR. SPICKER:   Absolutely.

25               (At this time, a brief recess was

**ARBITRATION -DAY TWO**

334

1      taken.)

2                  ARBITRATOR MASUCCI:  Mr. Spicker.

3                  MR. SPICKER:  Yes, ma'am.

4                  ARBITRATOR MASUCCI:  Thank you.

5                  CROSS EXAMINATION

6   BY MR. FREI-PEARSON:

7          Q.    Good morning, Mr. Spicker.  My name is

8   Jeremiah Frei-Pearson.  I'm claimant's counsel.

9          A.    Good morning.

10         Q.    I may have misunderstood your testimony

11  earlier.  How many times has Diligent and/or a

12  company that it contracts with been sued for

13  misclassifying delivery drivers either in court or in

14  arbitration?

15                 MR. MARKS:  It's a compound question,

16      and it's not the testimony earlier.

17         A.    Diligent has about 18 different

18  entities.  I would actually have to go back and look

19  at that.  I would not have an answer off the top of

20  my head.

21                 I do know that with BBB Logistics where

22  Susana Lucio worked, this is the first occurrence.

23         Q.    For Diligent, and I understand there's

24  different entities, but when we talk about different

25  lawsuits and different arbitrations, are we talking

**ARBITRATION -DAY TWO**

335

1   more than one?

2          A.     For arbitrations, yes.

3          Q.     Are we talking more than 10?

4          A.     What time period are you talking about?

5          Q.     2015 to the present, and I want to be

6   clear --

7                 ARBITRATOR MASUCCI:  Wait.

8                 MR. FREI-PEARSON:  My apologies.

9                 ARBITRATOR MASUCCI:  Just wait until

10       you hear the entire question please, and wait

11       until you hear the entire answer before you ask

12       another question.  So let Mr. Frei-Pearson

13       actually ask his question again.

14                MR. SPICKER:  Sure.

15         Q.     I want to be clear.  I'm talking about

16   lawsuits against Diligent and against the companies

17   which it contracts with for misclassifying the

18   drivers who Diligent claims are independent

19   contractors.

20                Do you understand that?

21         A.     I do.

22         Q.     Would you say from 2015 to 2018 there

23   have been more than 10 such lawsuits or arbitrations?

24         A.     Yes, I would.

25         Q.     Would you say there have been more than

**ARBITRATION -DAY TWO**

1    50?

2            A.    Yes, I would say there's more than 50.

3            Q.    Would you say there's more than 80?

4            A.    Probably right at about 80, if I had to

5    say.

6            Q.    The same question with relationship to

7    Diligent and/or the companies with whom it contracts

8    with, according to your testimony, to provide

9    independent driver operators.  How many Attorney

10   General investigations?

11           A.    I don't believe there's any AG

12   investigations that I'm aware of.

13               MR. FREI-PEARSON:  No further

14        questions.

15               MR. MARKS:  Paul, has there been any

16        finding by the arbitrator that any driver was

17        misclassified.

18               MR. SPICKER:  Could you repeat the

19        question.  You kind of broke up there.  Sorry.

20               MR. MARKS:  Yes.  In the arbitrations

21        where there's been a result, has there been a

22        finding that an independent contractor driver

23        was an employee?

24               MR. SPICKER:  I don't believe there has

25        been.

**ARBITRATION -DAY TWO**

337

1              MR. MARKS:  Has there been any finding

2       that the independent contractor was properly

3       classified?

4              MR. SPICKER:  Yes.

5              MR. MARKS:  I have nothing further.

6              MR. FREI-PEARSON:  In which arbitration

7       was there a finding that the employee was

8       properly classified?

9              MR. SPICKER:  There was two that I'm

10      aware of.  I can't remember the names off the

11      top of my head.  I think they were both out of

12      New York.

13             MR. FREI-PEARSON:  Were those in front

14      of Arbitrator Feliu?

15             MR. SPICKER:  I believe that's correct.

16             MR. FREI-PEARSON:  Did Arbitrator Feliu

17      hold that the arbitrators were properly

18      classified, or did he hold that Diligent was not

19      the proper defendant and that the party with

20      authority was Parts Authority?

21             MR. MARKS:  Why don't you offer the

22      decisions to the arbitrator?

23             MR. FREI-PEARSON:  I certainly will,

24      but I'm asking him a question.  Again please, if

25      you have an objection, make it, but please don't

**ARBITRATION -DAY TWO**

338

1            interrupt.

2                    MR. MARKS:  I object.  It's not the

3            best evidence to ask his opinion of what the

4            holding was.  We're all lawyers and we can make

5            our decision.

6                    ARBITRATOR MASUCCI:  Would you answer

7            the question please?

8                    MR. SPICKER:  Could you repeat the

9            question one more time?

10                   MR. FREI-PEARSON:  I will break it

11           down.  Did Arbitrator Feliu hold that the

12           drivers were properly classified?

13                   MR. SPICKER:  I believe that was the

14           finding based on the parties in the matter, yes.

15                   MR. FREI-PEARSON:  Exactly.

16                   Didn't Arbitrator Feliu hold that

17           control was exercised by Parts Authority, not

18           Diligent?

19                   MS. STILLER:  We have to object to

20           that, and that is misleading because Parts

21           Authority was not even a party to that case.

22                   ARBITRATOR MASUCCI:  If you want to

23           offer the arbitration award and put that in

24           evidence, that's the best evidence.

25                   I don't want his interpretation of what

**ARBITRATION - DAY TWO**

1          the arbitrator said.

2                    MR. FREI-PEARSON:  We'll submit it to

3          your Honor.

4                    ARBITRATOR MASUCCI:  My understanding

5          is that all of the employment decisions of the

6          AAA are publicly available documents.

7                    MR. FREI-PEARSON:  That's correct.  We

8          weren't counsel, so we have them and we can

9          share them with your Honor.

10                   MR. MARKS:  I don't think they were

11         publicly available documents unless we agree to

12         make them available.

13                   ARBITRATOR MASUCCI:  The parties can

14         have their names redacted, but all employment

15         case arbitration awards are publicly available.

16         And just employment cases, not labor.  Just

17         employment cases.

18                   MR. FREI-PEARSON:  I have one further

19         question.

20                   Of the approximately 80-ish

21         litigations/arbitrations that have been filed,

22         how many have been settled?

23                   MR. MARKS:  I object.

24                   MR. SPICKER:  I'm sorry?

25                   MR. FREI-PEARSON:  How many have been

ARBITRATION -DAY TWO

1        settled?

2                    MR. MARKS:  I object again.

3                    MR. SPICKER:  I would say roughly 15.

4                    ARBITRATOR MASUCCI:  So anything else?

5                    MR. FREI-PEARSON:  No, thank you.

6                    MR. MARKS:  No, nothing.

7                    ARBITRATOR MASUCCI:  Thank you very

8        much.  I hope you feel better.

9                    MR. SPICKER:  Thank you.  I appreciate

10       it.  You all have a good day.

11                   (At this time, a brief recess was

12       taken.)

13                   ARBITRATOR MASUCCI:  I just want to

14       make a comment as to the arbitration awards.  It

15       doesn't bind me to make the same decision in

16       this particular case.  I could take judicial

17       notice of it, but it doesn't have any

18       precedential value.

19                   You're going to have to make an

20       argument as to the relevance of that arbitration

21       award to this case.

22                   MR. FREI-PEARSON:  Certainly.  I'm

23       happy to speak on it further.

24                   I wasn't counsel.  I wasn't present.  I

25       don't know that it's particularly probative.  As

**ARBITRATION -DAY TWO**

1          your Honor said, it's not binding on your Honor

2          in any way.  It is significant as it was related

3          to as -- represented that it was a finding that

4          the drivers were properly classified.

5                    Whereas, in fact, my understanding of

6          the word is Arbitrator Feliu felt that control

7          was exercised by Parts Authority, not Diligent,

8          and the driver sued Diligent.  Maybe I'm

9          mistaken.

10                   MS. STILLER:  Parts Authority was not a

11         party to the case.  Parts Authority did not

12         participate in that litigation.

13                   He could have no holding that could

14         potentially be relevant to this case in relation

15         to Parts Authority.

16                   MR. FREI-PEARSON:  It's a written

17         decision.  We're happy to share it.

18                   MS. STILLER:  I just think that that's

19         misleading and disingenuous to suggest anything

20         where Parts Authority was not a party to the

21         case.

22                   MR. FREI-PEARSON:  Are you saying the

23         word Parts Authority doesn't appear in his

24         decision.

25                   MS. STILLER:  I don't know.  I was not

1          a party.  Parts Authority was not a party to

2          that case.  Are you suggesting that Parts

3          Authority was a party to the case?  You know

4          that they weren't.

5                    MR. FREI-PEARSON:  I literally said

6          they weren't party to the case.

7                    MS. STILLER:  Then I don't see how it

8          could potentially be relevant.

9                    MR. MARKS:  It's a different location.

10         It's a different manager.  It's a different set

11         of circumstances.  So you brought it up with

12         him.  That's why I asked the question.  That's

13         all.

14                    ARBITRATOR MASUCCI:  So housekeeping.

15         Did we admit all of these Joint exhibits?

16                    MR. MARKS:  No, but we can.

17                    MS. STILLER:  Actually, my recollection

18         is that we did admit the Joint exhibits, but if

19         we haven't, I don't think there's any issue with

20         admitting the Joint exhibits.

21                    ARBITRATOR MASUCCI:  Not every exhibit

22         was entered.  So the question is in my mind.

23                    MR. POTASHNICK:  If you call it a Joint

24         Exhibit, it's an automatic.  Is that different

25         then how things are done here?

```
 1                ARBITRATOR MASUCCI:  We have to offer

 2       them.

 3                MR. POTASHNICK:  We offer the Joint

 4       exhibits.

 5                ARBITRATOR MASUCCI:  Okay.

 6                MR. MARKS:  No objection.  I think

 7       that's the way we proceeded.

 8                MS. STILLER:  I thought there was a

 9       stipulation yesterday, but I could be wrong.

10                ARBITRATOR MASUCCI:  That was yesterday

11       morning early, so I wanted to tie it up.

12                First of all, you have an opportunity

13       to make a closing statement.

14                MR. MARKS:  I wasn't done.

15                ARBITRATOR MASUCCI:  I'm sorry.

16                MR. MARKS:  I want to read in portions

17       of Miss Lucio's deposition testimony.

18                ARBITRATOR MASUCCI:  Any objection to

19       that?  Let's see what portions you're talking

20       about.  Are they the portions that you referred

21       to in her testimony?

22                MR. MARKS:  Perhaps.  I don't recall

23       exactly.  If it's duplicative, I apologize, but

24       it's only 10 lines or so.

25                ARBITRATOR MASUCCI:  You did not offer
```

ARBITRATION -DAY TWO

344

1        those sections.

2                    MR. MARKS:  I'm offering them now.

3                    ARBITRATOR MASUCCI:  Okay.

4                    MR. MARKS:  I offer sections of the

5        deposition starting with line 71 -- page 71, 9

6        to 10.

7                    ARBITRATOR MASUCCI:  Since I don't have

8        a copy --

9                    MR. MARKS:  I will give you one.

10                    ARBITRATOR MASUCCI:  Do you have a copy

11        of the deposition?

12                    (Discussion held off the record.)

13                    MS. STILLER:  Page 71, lines 9 and 10.

14                    ARBITRATOR MASUCCI:  Was CJ a Diligent

15        driver, owner/operator?

16                    MR. MARKS:  Yes.  Page 58, lines 5 to

17        10.

18                    ARBITRATOR MASUCCI:  You said 5 to 10?

19                    MR. MARKS:  Page 58, lines 5 to 10.

20                    ARBITRATOR MASUCCI:  When you entered

21        into this agreement with Diligent, you

22        understood that you were doing so as an

23        independent owner/operator similar to the type

24        of relationship you had with ATS; correct?

25        Answer:  Yes.

**ARBITRATION -DAY TWO**

345

1              MR. MARKS:  Page 105, lines 17 to 22.

2              ARBITRATOR MASUCCI:  Paragraph N also

3       states that you only needed to follow Parts

4       Authority instructions.  Other than directing

5       you what time to come in, what time to come and

6       giving you a delivery or pickup, did you receive

7       any other instructions from Parts Authority?

8       Answer:  No.

9              MR. MARKS:  So the record is correct,

10      we were referring to a Statement of Claim, which

11      is a Joint exhibit.

12             ARBITRATOR MASUCCI:  Okay.

13             MR. FREI-PEARSON:  So claimant's

14      position would be that the entire deposition

15      transcript should come in because it provides

16      contents to these statements, and we actually

17      offered it as a Claimant's exhibit.

18             We have no objection to the entire

19      deposition transcript coming in.  If just

20      selected snippets are going to come in, we will

21      want to put in additional selected snippets.

22             MR. MARKS:  It's hearsay if they're

23      offering it.  There were portions of the

24      deposition testimony that were not relevant.

25      They didn't offer evidence of it in this case,

**ARBITRATION -DAY TWO**

1      and it's too late now.  They can designate

2      something responsive to clarify that portion.  I

3      don't object to that depending on what they try

4      to designate.  She testified to this before.

5      Take it.  That's not appropriate.

6                ARBITRATOR MASUCCI:  Would you identify

7      portions of it that are relevant that you want

8      to offer?

9                MR. FREI-PEARSON:  We can't.  Could  we

10     have a day to do that?

11               MR. MARKS:  If they're going to not be

12     here, will I have chance to respond?

13               ARBITRATOR MASUCCI:  Yes.

14               MR. MARKS:  Okay.  With that, I have

15     nothing further.

16               ARBITRATOR MASUCCI:  Thank you.

17               MR. POTASHNICK:  We may have some

18     rebuttal testimony.

19               MR. FREI-PEARSON:  We're trying to

20     figure out the ethics rules on it.

21               ARBITRATOR MASUCCI:  Do you want to

22     take 10 minutes to figure that out or 15

23     minutes?

24               MR. FREI-PEARSON:  Do you have another

25     witness, or are you done with witnesses?

**ARBITRATION -DAY TWO**

1          MR. MARKS:  I said I was done for the

2     record.

3          MR. FREI-PEARSON:  If we could have a

4     little bit of time.  We have people doing

5     research on it now.

6          ARBITRATOR MASUCCI:  It's noon.  How

7     much time do you need?

8          MR. FREI-PEARSON:  We're trying to

9     figure out a legal issue right now as to whether

10    or not an attorney can offer testimony.  So 15,

11    20 minutes I would say to get that nailed down.

12         ARBITRATOR MASUCCI:  All right.  While

13    you're doing that, let's talk about are you

14    prepared to do closing arguments?  Do you want

15    to file post-hearing-hearing briefs?  I'm not

16    suggesting that's needed.  I'm just asking the

17    question.

18         And are we going to get a copy of the

19    record?

20         MR. FREI-PEARSON:  So our answer to all

21    of those is whatever is most helpful to your

22    Honor.  I would probably prefer to have a

23    record, but if your Honor doesn't want one,

24    that's fine.  We're always happy to do

25    post-hearing-hearing briefs.

**ARBITRATION -DAY TWO**

1          Again, if it's not helpful, or if

2     there's a targeted issue you want us to address,

3     whatever is most helpful is what we're happy to

4     do.

5          MR. MARKS:  I would say that labor has

6     been done, and we should order a transcript, and

7     we should have post-hearing briefs of 10 pages.

8          ARBITRATOR MASUCCI:  On which issues

9     that are most relevant?  I can tell you what I

10    think.

11         MR. FREI-PEARSON:  I think what you

12    think is going to be the most informative for

13    us.

14         ARBITRATOR MASUCCI:  Let me articulate

15    it.  Let me think about how to articulate so

16    we're going to have the least amount of argument

17    between the parties.

18         How about closing arguments?  Part of

19    closing arguments, you can do it on the papers.

20    I just am not crazy about once side giving a

21    closed, and another rebutting and then having a

22    third rebut.  I just don't want to go back and

23    forth.

24         MR. MARKS:  I don't believe there's

25     really much a question of law.  I think we both

**ARBITRATION -DAY TWO**

349

1      agree on what the law is.  I think it's how the

2      facts fit the law.  We don't have record facts

3      at this point in time.  We make assumptions as

4      to what was testified to.  I don't see the need

5      for closing arguments if we're going to have the

6      post-hearing brief based on the record.

7               ARBITRATOR MASUCCI:  Okay.

8               MR. FREI-PEARSON:  That's fine with

9      claimant.

10              ARBITRATOR MASUCCI:  And limited to 10

11     pages.

12              MR. FREI-PEARSON:  That's more

13     difficult for claimant, but if that's what you

14     prefer, we can do that.

15              ARBITRATOR MASUCCI:  I think it will

16     focus everybody.  And it's limited to 10 pages.

17     Can be simultaneous?

18              MR. MARKS:  Simultaneous is

19     appropriate.

20              ARBITRATOR MASUCCI:  When will a record

21     be available?  They'll have it on the 28th.

22              MR. MARKS:  Target that.  If either

23     side needs some more time, I'm happy to discuss

24     that.

25              MR. FREI-PEARSON:  We're not going to

**ARBITRATION -DAY TWO**

1        jam you up if that's an issue.

2                ARBITRATOR MASUCCI:  The best option is

3        for the two of you to agree on any other date

4        and not get me involved in that.

5                MR. POTASHNICK:  Would the 18th work?

6                ARBITRATOR MASUCCI:  The 18th is

7        President's Day.

8                There is the legal issue of

9        misclassification.  But there's been a lot of

10       discrepancy in testimony.  So I would like some

11       guidance from you on those discrepancies.

12               ARBITRATOR MASUCCI:  Let's take an

13       hour.

14               MS. STILLER:  Can I ask a question

15       before we go.  If there is an ethical issue

16       involved with your -- whether you will present

17       somebody or not present somebody, then what will

18       wind up happening is whatever that issue is that

19       you're researching, we will probably want to

20       research also.

21               So to the extent that we have some

22       pre-guidance on it if you choose to go ahead

23       with it, I think that would help everybody,

24       otherwise we'll be here again with down time

25       with us taking a look at the issue.

**ARBITRATION -DAY TWO**

351

1          MR. FREI-PEARSON:  I'm happy to

2     articulate the issue.  While we were researching

3     the case, we learned about nine days ago that

4     Tammie is no longer with Parts Authority, which

5     made us free to contact her.  I spoke with her,

6     had a very good conversation, drafted up a

7     declaration based on that conversation that I

8     hoped to submit, sent it to her, and then she

9     ghosted on me, so I never got the signed

10     declaration.

11          She was very nice, very polite, but I

12     don't think she was super interested in talking

13     to a lawyer.  I just got her on the phone.

14          Relying on the substance of that

15     communication is something I would very much

16     like to do on Miss Lucio's behalf, and there's

17     contemporaneous written records that I would

18     like to share.  I'm not certain -- the reason I

19     bring that up is she said things that -- I don't

20     want to say.  But there's reasons I would like

21     to share it, and we're trying to figure out

22     right now if I can be sworn in and give a

23     five-minute recounting of that conversation.

24          MR. MARKS:  That's absurd.

25          ARBITRATOR MASUCCI:  So number 1, if

1          you were, your entire firm would have to be

2          disqualified because you're a witness putting

3          your credibility at issue.

4                    Number 2, there are, I believe,

5          discovery requests that would have required you

6          to reveal that information 10 days ago when you

7          ostensibly had the information.  So to surprise

8          us and to proffer that right now, we will do

9          other research, but there's a lot of issues that

10         I can -- that I envision right now off the top

11         of my head.

12                   MR. MARKS:  I might also add that the

13         fact that she's no longer employed by Parts

14         Authority does not make her not a representative

15         of Parts Authority for purposes of things she

16         did in the course of business authority, and I

17         think contacting her in that regard was totally

18         inappropriate, and unethical potentially.  I

19         don't know where she is.

20                   MR. FREI-PEARSON:  I don't want to

21         legally debate all of this, because we're trying

22         to figure out the ethics, but certainly I've

23         seen numerous ethics opinions that an

24         ex-employee is fair game to contact.

25                   MR. MARKS:  That's not correct.

**ARBITRATION -DAY TWO**

1              MS. STILLER:  No.  The New York law

2      depends on the role of the individual and

3      particularly if the individual is in a

4      management role.  I don't want to research your

5      issue.  So if you think that you are ethnically

6      permitted to proffer that testimony, which

7      should be inadmissible on about 15 grounds, then

8      let us know and we'll get you the case law that

9      says it is ethically improper to contact her

10     without us being notified and being present.

11             Beyond that, we need to go back and

12     take a look at the discovery requests which are

13     ongoing and need to be supplemented.

14             MR. MARKS:  It's the rankest of

15     hearsay.  I don't know how that could come in.

16             MS. STILLER:  It's double.  If it's an

17     admission against interest, then she's high

18     level and can't be contacted by you guys.  You

19     can't have it both ways.

20             MR. POTASHNICK:  They changed most of

21     those laws at least 10 years ago to say that we

22     can contact any former employee.

23             MS. STILLER:  That's not true.

24             MR. POTASHNICK:  I know it in Missouri,

25     I know it in Illinois, I know it in Georgia.

**ARBITRATION -DAY TWO**

354

1           MS. STILLER:  This is New York and he's

2     a member of the New York Bar.  It's the New York

3     ethics rule, and I believe it's Rule 1 and Rule

4     3 that will prohibit it.

5           MR. FREI-PEARSON:  We researched this

6     issue to ground.  I'm very confident that I can

7     have the conversation as to whether or not I can

8     testify about it while I represent Miss Lucio.

9     That's not an issue.  We searched around.  We

10    didn't really think about it until some things

11    were said that were contrary to that

12    conversation, and we're figuring it out.

13          I also don't think there was any

14    ongoing discovery obligation to produce those

15    notes.  But if you can point us to a specific

16    request, we're happy to look at it.

17          ARBITRATOR MASUCCI:  I think this is an

18    open issue in that it might clear up

19    discrepancies.  Don't look like that.

20          MS. STILLER:  I can't help it.  It's my

21    look.

22          ARBITRATOR MASUCCI:  Discrepancy in

23    testimony.  To me the best evidence is to have

24    her here.  If she's not here, even trusting what

25    you say, I'm not sure I want to hear it.

**ARBITRATION -DAY TWO**

355

1          MR. FREI-PEARSON:  We certainly

2     couldn't get her to testify.  She lives in

3     St. Thomas.  That was not a thing she was

4     prepared to do.

5          ARBITRATOR MASUCCI:  She could have

6     testified by video.

7          MR. FREI-PEARSON:  She could have and

8     she declined to do that.  I can try again to get

9     the thing signed.

10          ARBITRATOR MASUCCI:  But there's no

11     ability to cross-examine it.  There's no ability

12     to --

13          MS. STILLER:  And you closed your proof

14     already.

15          ARBITRATOR MASUCCI:  Could you --

16          MS. STILLER:  I'm sorry.

17          ARBITRATOR MASUCCI:  I'm just not

18     inclined to allow it.

19          (At this time, a brief recess was

20     taken.)

21          ARBITRATOR MASUCCI:  I just want to

22     state for the record that both of you have been

23     vigilant advocates for your side, and you

24     represented your side well, and you acted in

25     good faith.

**ARBITRATION -DAY TWO**

356

1          However the outcome, you did the best

2      you could.  So I just wanted to congratulate you

3      on concluding this quicker than I expected today

4      to go, but in a very professional way.

5               MR. MARKS:  Thank you.

6               MR. FREI-PEARSON:  Thank you.

7               (Time noted:  12:14 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

357

1              C E R T I F I C A T E

2

3          I, Terri Fudens, a Shorthand Reporter

4    And Notary Public within and for the State of New

5    York, do hereby certify:

6              I reported the proceedings in the

7    Within-entitled matter, and that the within

8    Transcript is a true record of such proceedings.

9              I further certify that I am not related

10   By blood or marriage and that I am in no way

11   Interested in the outcome of this matter.

12             IN WITNESS WHEREOF, I have hereunto set

13   My hand this 27th day of January, 2019.

14

15

16

17   _____
                    TERRI FUDENS
18        Registration No. 01FU6230430
          Notary Public for the State of New York
19        My commission expires:  November 1, 2022

20

21

22

23

24

25

**$**

**$1,150 (1)**
310:7
**$2 (1)**
311:10
**$2,300 (1)**
309:3
**$95.83 (1)**
311:4

**A**

**AAA (2)**
271:18;339:6
**ability (2)**
355:11,11
**able (2)**
284:2;288:6
**absent (1)**
270:5
**Absolutely (8)**
308:1,4;312:4;313:24;
315:6,9;322:23;333:24
**absurd (1)**
351:24
**accept (1)**
306:23
**accepted (2)**
309:5;311:13
**access (1)**
290:21
**according (1)**
336:8
**acquired (1)**
275:17
**act (1)**
328:12
**acted (1)**
355:24
**action (1)**
312:23
**actually (7)**
302:12;313:20;327:14;
334:18;335:13;342:17;
345:16
**add (1)**
352:12
**addition (1)**
311:5
**additional (1)**
345:21
**address (2)**
313:3;348:2
**adequate (1)**
269:21
**administer (2)**
303:16;331:11
**administration (1)**
311:10
**administrative (1)**
311:6

**admission (1)**
353:17
**admit (2)**
342:15,18
**admitting (1)**
342:20
**advertise (1)**
328:18
**advise (6)**
281:4,7;303:4;313:12,13,14
**advised (2)**
279:12,13
**advocates (1)**
355:23
**AG (1)**
336:11
**again (9)**
272:20;292:18;303:25;
335:13;337:24;340:2;348:1;
350:24;355:8
**against (6)**
269:16,22;270:12;335:16,16;353:17
**ago (5)**
297:24;306:12;351:3;
352:6;353:21
**agree (3)**
339:11;349:1;350:3
**agreed (1)**
309:2
**agreement (5)**
291:5,14;327:18;330:12;
344:21
**agreements (1)**
332:16
**agrees (1)**
307:15
**ahead (3)**
300:19;307:8;350:22
**allow (1)**
307:24;331:22;355:18
**along (1)**
286:13
**alternator (2)**
321:19,21
**always (2)**
296:13;347:24
**among (1)**
279:9
**amount (8)**
289:19;309:13,14;310:2,
3,23;330:23;348:16
**and/or (3)**
283:12;334:11;336:7
**Andrew (2)**
269:10;271:20
**anyplace (1)**
317:3
**apologies (1)**
335:8
**apologize (1)**
343:23

**appear (1)**
341:23
**appeared (1)**
285:5
**appearing (2)**
303:19;331:14
**appreciate (1)**
340:9
**appropriate (2)**
346:5;349:19
**approximately (1)**
339:20
**April (1)**
278:22
**arbitration (11)**
269:3,23;299:7;303:14;
318:16;334:14;337:6;
338:23;339:15;340:14,20
**arbitrations (4)**
334:25;335:2,23;336:20
**ARBITRATOR (126)**
269:1;270:7,14,23;
271:12,18,25;272:5,16,19,
22,25;275:24;279:18,23;
280:1;292:17;293:1;294:14,
17;295:17;297:5,8;299:20;
301:7,17,21;302:2,6,11,15,
17,23;303:2,7,10,13,24;
317:2;318:17,20;319:19;
326:14;327:3,4,10,17,21,24;
328:1,5,11,17,22;329:1,4,8,
12,16;330:8,17,24;331:3,6,
9,10,19;333:22;334:2,4;
335:7,9;336:16;337:14,16,
22;338:6,11,16,22;339:1,4,
13;340:4,7,13;341:6;342:14,
21;343:1,5,10,15,18,25;
344:3,7,10,14,18,20;345:2,
12;346:6,12;351:25;347:6,12;
348:8,14;349:7,10,15,20;
350:2,6,12;351:25;354:17,
22;355:5,10,15,17,21
**arbitrators (1)**
337:17
**area (5)**
280:25;304:25;305:3;
306:2;318:24
**areas (2)**
290:21;308:12
**argue (1)**
269:24
**argument (2)**
340:20;348:16
**arguments (4)**
347:14;348:18,19;349:5
**around (2)**
330:5;354:9
**arrived (1)**
291:3
**article (1)**
287:4
**articulate (3)**
348:14,15;351:2

**assign (2)**
317:21,24
**assigned (1)**
286:19
**assignment (1)**
323:16
**Assistant (2)**
272:8;273:14
**associated (1)**
275:5
**assumptions (1)**
349:3
**Atlanta (3)**
304:12;306:1;332:24
**ATS (1)**
344:24
**attendance (1)**
315:17
**Attorney (2)**
336:9;347:10
**attorneys (1)**
318:15
**August (1)**
278:23
**Authority (164)**
269:17,18,20,21;270:1,2,
13,13;272:9;273:12,16,21;
274:4,6,8;275:8,11,17,20,
21;276:5,18,25;277:4,8,22;
278:4,24;279:7,9;280:22;
281:7,17,17,19,22,23;282:1,
2,6,14;283:11;284:7,9,15,
18;285:4,8,11,14,17,20;
286:8,15,24;287:2,9,12,21;
288:10,15,18;289:11,14,17;
290:4,13,17;291:6,21,23;
293:2,4,7;294:25;297:7;
301:24;302:19;303:15;
305:8,14,17,21;308:20;
309:2,6;311:14;312:21;
313:7,15;315:2,12,15,20,21;
316:4,11,15,16;317:13,20;
319:3,8,9,14,22;320:1,2,4,
10,15,19,22,23;321:2,7,9,11,
12,25;322:1,2,5,6,13,19,21;
324:10,15,19;325:3,9,13,18,
24;326:1,6,18,23;327:12,16;
330:1;332:13,18,20;333:4;
337:20,20;338:17,21;341:7,
10,11,15,20,23;342:1,3;
345:4,7;351:4;352:14,15,16
**Authority's (16)**
273:18;282:20;291:5;
296:22;315:24;319:15,17,
23;320:3;325:5,15,20;326:1,
10,19,24
**authorization (1)**
287:23
**authorized (1)**
290:10
**auto (3)**
274:12;296:21;326:9
**automatic (1)**

342:24
**Automotive (6)**
274:15,16,21;275:10;
276:16;277:13
**available (7)**
280:13;281:3;339:6,11,
12,15;349:21
**award (3)**
271:6;338:23;340:21
**awarded (2)**
298:7,11
**awards (2)**
339:15;340:14
**aware (15)**
284:12;292:7;295:20,24;
296:1,6;299:17;302:23;
315:23;320:7;328:21;
332:24;333:2;336:12;
337:10
**away (2)**
280:7;308:6

**B**

**back (23)**
279:19;280:23;283:6;
288:17;292:13,22;300:15,
15;321:23;322:1,5,10,11,13;
324:19;325:4,19,20,25;
326:2;334:18;348:22;
353:11
**background (2)**
273:11;285:12
**Baker (1)**
304:21
**bankruptcy (3)**
275:10,12,16
**Bar (1)**
354:2
**based (5)**
310:12;330:3;338:14;
349:6;351:7
**Basically (3)**
305:25;307:9;309:10
**basis (3)**
270:8;280:15;314:1
**bathrooms (1)**
287:18
**BBB (4)**
332:24;333:3,4;334:21
**became (2)**
276:13;329:15
**becoming (1)**
307:2
**begin (2)**
273:21;274:8
**behalf (1)**
351:16
**beside (1)**
294:1
**best (6)**
318:19;338:3,24;350:2;
354:23;356:1

**better (1)**
340:8
**Beyond (1)**
353:11
**bill (1)**
320:17
**bills (2)**
322:7;325:15
**bind (1)**
340:15
**binding (1)**
341:1
**bit (3)**
270:21;301:8;347:4
**booting (1)**
269:12
**boss (3)**
315:3,4,8
**both (4)**
337:11;348:25;353:19;
355:22
**bought (1)**
275:11
**break (13)**
289:22,24;290:1;291:1,4,
7,10;294:1;301:3;317:1,3;
319:19;338:10
**breaks (5)**
290:3;291:11;298:7,12;
299:25
**brief (6)**
294:15;317:4;333:25;
340:11;349:6;355:19
**briefs (6)**
270:20,25;271:1;347:15,
25;348:7
**bring (15)**
280:22;292:22;319:4;
321:25;322:5,10,11,13;
324:18;325:4,19,20,25;
326:2;351:19
**broke (1)**
336:19
**brought (2)**
279:4;342:11
**business (8)**
292:7;296:22;304:24;
326:11;332:9,12;333:11;
352:16
**busy (5)**
278:13,14,18,21,22

**C**

**calculated (2)**
310:4,4
**calculations (1)**
310:25
**call (17)**
277:19,21;278:3,5,5;
286:8;295:9;300:15;314:6,
9,13;319:14,22,25;320:3,13;
342:23

**calling (2)**
283:16;300:15
**came (2)**
314:22;327:11
**can (55)**
269:8,10;271:8,11,20;
275:19;279:12,18;291:12;
292:4;293:17;294:13;
296:17;297:18;299:12;
300:8;301:1,17;306:7;
309:4;310:3;313:21;314:12,
13;316:25;318:13;319:25,
25;321:17,20;322:12,18,20;
324:25;326:21;328:25;
333:22;338:4;339:8,13;
342:16;346:1;347:10;348:9,
19;349:14,17;350:14;
351:22;352:10;353:22;
354:6,7,15;355:8
**capacity (1)**
330:20
**caption (1)**
269:5
**card (1)**
322:16,20
**cards (1)**
322:11
**care (2)**
299:24;301:2
**carry (1)**
281:2
**Carter (1)**
276:20,21
**case (16)**
269:5;286:18;318:16;
338:21;339:15;340:16,21;
341:11,14,21;342:2,3,6;
345:25;351:3;353:8
**cases (2)**
339:16,17
**cash (7)**
288:14;322:6,8,8,10,14,22
**cell (1)**
312:24
**certain (4)**
272:11;296:5;308:11;
351:18
**certainly (4)**
337:23;340:22;352:22;
355:1
**chance (1)**
346:12
**change (1)**
276:12
**changed (1)**
353:20
**charge (1)**
301:19
**charges (1)**
311:6
**check (7)**
280:7;285:12;286:2;
297:3,5,8;313:25;322:16,20

**Checking (1)**
287:17
**checks (1)**
322:11
**child (1)**
314:24
**choose (5)**
324:18;325:4,9,14;350:22
**circumstances (2)**
280:15;342:11
**cities (1)**
292:14
**city (1)**
292:23
**CJ (10)**
286:19,21;296:5,7;317:8,
10,14,16,17;344:14
**Claim (5)**
286:1;332:23,25;333:1;
345:10
**claimant (6)**
269:14;270:11;306:3;
318:16;349:9,13
**claimant's (4)**
270:3;334:8;345:13,17
**claims (2)**
269:15;270:4,12;335:18
**clarify (1)**
346:2
**classified (5)**
337:3,8,18;338:12;341:4
**clean (1)**
327:6
**cleaning (1)**
287:18
**clear (6)**
296:6;300:18;320:19;
335:6,15;354:18
**client (5)**
312:21,21;313:14;316:3,
22
**clients (7)**
305:5,6,19;328:19;333:6,
9,10
**close (2)**
281:1;293:16
**closed (2)**
348:21;355:13
**closing (5)**
343:13;347:14;348:18,19;
349:5
**clothing (2)**
287:4,7
**coach (1)**
290:10
**cod (2)**
322:7,15
**code (1)**
292:23
**collecting (1)**
299:6
**coming (3)**
288:17;330:2;345:19

**comment (1)**
340:14
**comments (1)**
319:16
**communicate (1)**
283:12
**communication (2)**
279:14;351:15
**communications (6)**
295:20,24;296:6;324:5,9,
14
**companies (3)**
287:22;335:16;336:7
**Company (5)**
275:1,11;328:9;333:14;
334:12
**compensated (1)**
284:22
**complaining (1)**
315:11
**complaint (1)**
320:10
**complaints (1)**
320:5
**complete (4)**
278:20;309:16,17,23
**completed (2)**
308:10;319:10
**Compound (2)**
319:18;334:15
**comprised (1)**
278:7
**computer (3)**
269:12;299:1,4
**computerized (1)**
293:7
**computing (1)**
310:19
**conceivable (1)**
286:2
**concerned (1)**
316:4
**concerns (1)**
308:18
**concluding (1)**
356:3
**conditions (1)**
330:11
**conduct (1)**
285:11
**conference (1)**
272:10
**confident (1)**
354:6
**congratulate (1)**
356:2
**connection (1)**
312:23
**considered (3)**
318:2,2;328:15
**consistency (1)**
330:1
**consistent (2)**

**contact (10)**
281:24;282:11;283:7,22;
284:5;288:4;351:5;352:24;
353:9,22
**contacted (3)**
282:17;283:21;353:18
**contacting (1)**
352:17
**contemporaneous (1)**
351:17
**contents (1)**
345:16
**continue (2)**
276:24;277:2
**contract (13)**
279:16;282:20;291:18;
304:18;307:5,14,16,19,23;
308:15,23;311:9;313:20
**contracted (5)**
282:14;306:16;309:8;
312:13;313:18
**contracting (3)**
279:16;308:19;333:13
**contractor (7)**
278:2;279:14;329:19;
332:7;333:2;336:22;337:2
**contractors (2)**
328:15;335:19
**contracts (3)**
334:12;335:17;336:7
**contrary (1)**
354:11
**control (4)**
280:7;291:11;338:17;
341:6
**conversation (5)**
351:6,7,23;354:7,12
**conversations (2)**
302:7,9
**co-op (3)**
292:9;305:23,24
**copy (5)**
270:17;271:22;344:8,10;
347:18
**copying (2)**
271:17,18
**core (6)**
321:6,15,16,17,18,18
**cores (1)**
321:11
**corporate (2)**
307:13;332:1
**counsel (7)**
269:4;272:13;318:9;
332:2;334:8;339:8;340:24
**counter (1)**
280:23
**country (1)**
277:12
**course (1)**
352:16
**court (4)**

303:16;327:5;331:10;
334:13
**cover (5)**
271:2;280:17;289:19;
303:5;312:11
**coverage (5)**
278:15;282:17;283:3,8;
305:22
**covered (1)**
302:24
**covering (2)**
283:3;296:16
**crazy (1)**
348:20
**create (1)**
293:10
**creations (1)**
333:16
**credibility (1)**
352:3
**credit (3)**
322:11,16,20
**credits (2)**
280:6;294:5
**criticisms (1)**
319:16
**Cross (6)**
294:17,18;300:21;318:10;
333:15;334:5
**cross-examination (1)**
318:8
**cross-examine (1)**
355:11
**customer (17)**
283:19,24;284:5;306:1;
319:9,23;320:4,11,12,23;
321:3,11,22;322:1,7,14,21
**customers (14)**
286:9;291:24;292:2,10,
25;293:2;294:5;305:20;
319:17;322:20;324:19;
325:5;333:5,7
**customers' (4)**
292:13,15,20,25
**cycle (7)**
309:16,17,24;310:8,12,14,
22
**cycles (1)**
309:18

# D

**daily (6)**
280:8,15;310:9,11,21;
314:1
**date (2)**
273:23;350:3
**day (20)**
269:2;270:24;271:4;
286:2,5;302:21;309:25;
310:14,23;311:4,10;313:11,
11;314:9;327:20;331:5,7;
340:10;346:10;350:7

**days (14)**
279:20;285:5;286:20;
309:21;310:1,8,14,16,20,22;
311:5;317:13;351:3;352:6
**day-to-day (2)**
302:1;304:19
**deal (1)**
281:11
**debate (1)**
352:21
**Deborah (1)**
331:10
**decided (2)**
293:13;324:20
**decision (6)**
271:14;322:19;338:5;
340:15;341:17,24
**decisions (2)**
337:22;339:5
**declaration (2)**
351:7,10
**declined (1)**
355:8
**dedicated (5)**
292:6;305:22,23;314:6;
333:13
**deducted (3)**
309:25;310:2,15
**deduction (1)**
310:4
**deemed (1)**
270:6
**defective (1)**
321:3
**defendant (1)**
337:19
**definitely (2)**
314:25;330:21
**delay (2)**
304:2,7
**deliver (5)**
292:14,15,21,24;297:17;
306:1;316:9;321:21
**deliveries (5)**
277:18;281:1;287:14;
293:18,19;297:20;298:14,
18,22;299:13;319:2,5,17;
325:10;326:2
**delivering (2)**
312:22;321:14
**delivers (1)**
287:25
**delivery (100)**
275:5;277:14,23;278:1,
16;279:10;281:2,8,20;282:3,
6;283:5,13,18,25;284:7,10,
13,16,19,21;285:5,9,12,15,
18,21;286:5,9,13,16,25;
287:3,6,16,20,24;288:2,8,9,
19,21;289:1,18,25;290:7,18,
20;291:14;292:1,9;293:14;
296:21,25,25;297:2,7,15,16;
304:12;305:4,19,22;306:24;

307:3;309:5;313:6;314:11;
315:22;317:25;319:4,8,10,
11,14,22;320:5,9,11,15,16,
22;321:2,10,25;322:8,12,18;
324:15;325:15;326:9,20,25;
330:2;331:25;332:17,21;
333:13;334:13;345:6
**demand (1)**
　322:8
**deny (4)**
　291:4,10;314:16,18
**department (2)**
　281:25;282:7
**depending (5)**
　278:10;289:20;310:1,7;
　346:3
**depends (1)**
　353:2
**deposition (6)**
　343:17;344:5,11;345:14,
　19,24
**describe (2)**
　279:3;304:24
**designate (2)**
　346:1,4
**designated (1)**
　322:14
**designates (1)**
　322:6
**desk (1)**
　280:12
**determine (1)**
　281:25
**different (13)**
　278:4;279:5;297:13;
　305:5;328:1;334:17,24,24,
　25;342:9,10,10,24
**difficult (1)**
　349:13
**Diligent (126)**
　272:14;277:14,23;278:16;
　279:10,15,17;281:8,20;
　282:3,5,12,13,14,21;283:5,7,
　12,18,25;284:6,8,10,13,16,
　19,21,25;285:5,9,12,15,18,
　21;286:5,9,13,16,22,25;
　287:3,6,16,24;288:1,3,8,9,
　16,19,21;289:1,10,25;290:2,
　7,11,17,20;291:6,7,14;
　292:1,7,19;297:22;299:15,
　16;302:24;303:4;304:11;
　305:2,12,17;306:15,17,23;
　307:3;308:19,24;309:5;
　311:11,12;313:18;314:22;
　317:15,25;319:7,13,21;
　320:3,9,14,22;321:1,10,24;
　322:4,12,18;326:18,23,25;
　328:2,6,20;330:2;331:25;
　332:8,10,17,21;333:8,12;
　334:11,17,23;335:16,18;
　336:7;337:18;338:18;341:7,
　8;344:14,21
**Diligent's (1)**

304:24
**DIRECT (5)**
　273:8;304:3;322:24;
　326:24;331:20
**directing (1)**
　345:4
**directly (4)**
　271:16;284:5,10;302:14
**director (1)**
　272:13
**discipline (1)**
　290:11
**discovery (6)**
　270:3,6,8;352:5;353:12;
　354:14
**discrepancies (2)**
　350:11;354:19
**discrepancy (2)**
　350:10;354:22
**discuss (5)**
　284:24;306:22;308:11;
　316:16;349:23
**discussed (1)**
　323:20
**discussion (2)**
　279:8;344:12
**disingenuous (1)**
　341:19
**dismiss (1)**
　300:16
**dismissal (1)**
　270:5
**dispatch (4)**
　280:16,18;281:3,4
**dispatcher (8)**
　276:4,19;280:17;281:12;
　283:11;290:16;293:15;
　324:10
**dispatchers (6)**
　279:9;281:11;299:24;
　300:2;301:2,25
**dispatcher's (3)**
　280:9,11,25
**dispatching (1)**
　280:15
**disqualified (1)**
　352:2
**distribute (1)**
　286:24
**divide (2)**
　310:5,20
**divided (3)**
　309:10,12;310:8
**division (1)**
　305:25
**docking (1)**
　333:16
**document (1)**
　307:20
**documentation (2)**
　307:2,4
**documents (8)**
　299:7;307:13,17,21;

308:13;323:24;339:6,11
**done (7)**
　298:22;318:6;342:25;
　343:14;346:25;347:1;348:6
**double (1)**
　353:16
**down (9)**
　303:25;307:9;318:18;
　319:20;320:16;325:14;
　338:11;347:11;350:24
**drafted (1)**
　351:6
**drive (2)**
　286:19;317:21
**driven (1)**
　285:24
**driver (62)**
　278:6;280:13,22;281:3,4,
　8;282:3,6,24;283:5,19,25;
　285:5;286:5,23;287:16;
　288:2,3,5,8,9,11,15,16,19;
　290:11,18;293:16;297:21,
　22;298:22,23;299:9,10,13,
　14;300:3;302:24;303:4;
　306:24;312:6;314:6;316:6;
　317:8,14,21,25;320:5,9,15,
　22;321:2;322:5,12,18;
　324:15;328:6;336:9,16,22;
　341:8;344:15
**drivers (80)**
　276:5;278:9,11,12,16;
　279:16;281:7,20;283:3,13;
　284:10,13,16,19,22;285:9,
　12,15,18,21;286:10,13,16,
　25;287:3,7,10,21;288:21;
　289:1,12,15,25;290:2,4,7,
　20;291:7;292:6,20,23;
　296:25;297:1,2,4,7,19;
　298:7;299:9,15,24;301:3,24;
　302:11,14,19;305:25;309:5;
　316:8;319:4,8,14,22;320:3;
　321:10,25;326:20,25;328:2,
　7,9,12,13,18;330:2;333:13;
　334:13;335:18;338:12;
　341:4
**drivers' (2)**
　298:11;299:16
**driver's (2)**
　289:18;298:4
**driving (3)**
　285:14,21;286:5
**drove (1)**
　317:13
**DST (1)**
　299:1
**duly (3)**
　273:4;303:21;331:15
**duplicative (1)**
　343:23
**during (9)**
　311:9,25;313:5;314:9;
　322:24;323:7,9,20;324:1
**duties (6)**

280:2,9,10;302:1;304:15;
　326:7

# E

**earlier (8)**
　296:4,9;298:14;299:23;
　300:10;301:1;334:11,16
**early (1)**
　343:11
**either (5)**
　290:25;311:21;325:19;
　334:13;349:22
**else (11)**
　288:23,25;290:16;291:20;
　303:5;315:15;323:20;
　326:14;327:7;330:25;340:4
**elsewhere (1)**
　330:19
**E-mail (3)**
　269:12,17;271:16
**employ (1)**
　328:16
**employed (4)**
　277:4;304:10;332:14;
　352:13
**employee (16)**
　281:23;282:1;287:10,21;
　289:12,14,17;290:4,5,8,13;
　317:15,17;336:23;337:7;
　353:22
**employees (4)**
　275:20,21;279:5;281:17
**employer (1)**
　279:15
**employment (5)**
　276:24;339:5,14,16,17
**encompass (1)**
　311:17
**encounters (1)**
　320:10
**end (6)**
　270:24;271:3;278:23;
　309:19,20;314:22
**engaged (2)**
　313:6;328:19
**engagement (12)**
　285:6;306:23;309:2,6;
　311:13,17;312:19;314:22;
　315:25;324:23;327:13,16
**engagements (1)**
　304:18
**entail (1)**
　301:22
**entered (3)**
　308:23;342:22;344:20
**entire (6)**
　281:12;335:10,11;345:14,
　18;352:1
**entities (2)**
　334:18,24
**entity (1)**
　276:22

**envision (1)**
352:10
**equipment (1)**
284:19
**estimate (1)**
293:17
**ethical (1)**
350:15
**ethically (1)**
353:9
**ethics (4)**
346:20;352:22,23;354:3
**ethnically (1)**
353:5
**Even (3)**
310:10;338:21;354:24
**everybody (4)**
269:2;271:22;349:16;
350:23
**everyone (1)**
331:8
**evidence (5)**
338:3,24,24;345:25;
354:23
**exact (2)**
273:23,25
**Exactly (2)**
338:15;343:23
**EXAMINATION (8)**
273:8;294:17,18;304:3;
318:10;326:15;331:20;
334:5
**examined (3)**
273:6;303:23;331:17
**example (1)**
310:13
**except (3)**
269:16;270:12;280:16
**ex-employee (1)**
352:24
**exercised (2)**
338:17;341:7
**Exhibit (5)**
300:6;342:21,24;345:11,
17
**exhibits (4)**
342:15,18,20;343:4
**expected (1)**
356:3
**expenses (1)**
284:16
**experienced (1)**
330:22
**Explain (4)**
280:18;292:17;309:4;
310:3
**express (1)**
308:18
**extent (1)**
350:21

---

**F**

**facility (5)**
273:19,22;278:25;290:22;
293:23
**fact (3)**
308:7;341:5;352:13
**facts (2)**
349:2,2
**fair (1)**
352:24
**faith (1)**
355:25
**falls (1)**
321:4
**familiar (6)**
273:18;291:13;306:3;
318:6;329:7,22
**FAQs (1)**
307:21
**far (2)**
316:4;329:21
**fast (1)**
297:17
**favors (1)**
300:17
**February (1)**
304:14
**fee (1)**
311:10
**feel (3)**
272:12;308:5;340:8
**feet (1)**
296:18
**Feliu (5)**
337:14,16;338:11,16;
341:6
**felt (1)**
341:6
**few (2)**
327:4;331:22
**figure (9)**
270:24;310:7,9;324:21;
346:20,22;347:9;351:21;
352:22
**figuring (1)**
354:12
**file (1)**
347:15
**filed (1)**
339:21
**files (1)**
285:18
**fill (1)**
308:10
**finding (6)**
336:16,22;337:1,7;
338:14;341:3
**fine (7)**
269:7;270:9;271:23;
304:6;316:21;347:24;349:8
**firm (1)**
352:1
**first (17)**
269:3;271:25;272:19;

---

273:4;280:13;281:8;291:5;
301:5;303:20;306:9;323:8,
14;324:1;331:15;333:1;
334:22;343:12
**firsthand (6)**
325:1,7,12,17,23;326:4
**fit (1)**
349:2
**five (4)**
275:22;276:3;333:21,23
**five-minute (1)**
351:23
**floor (1)**
301:25
**FLSA (1)**
332:25
**fluctuate (1)**
310:12
**fluctuates (1)**
310:10
**focus (2)**
276:2;349:16
**follow (2)**
271:8;345:3
**followed (1)**
293:11
**following (1)**
269:19
**follows (3)**
273:7;303:23;331:18
**form (1)**
322:13
**format (2)**
282:22,23
**former (2)**
279:1;353:22
**forms (2)**
326:1,2
**forth (1)**
348:23
**forward (1)**
271:21
**forwarded (1)**
271:16
**found (1)**
329:15
**fraction (2)**
310:18;311:3
**Fred (9)**
272:9,21;282:11;289:9;
303:12;304:5;317:7;327:7,9
**Frederick (1)**
327:8
**free (1)**
351:5
**FREI-PEARSON (44)**
270:19;272:3;294:19;
300:20;303:9;316:25;
333:20;334:6,8;335:8,12;
336:13;337:6,13,16,23;
338:10,15;339:2,7,18,25;
340:5,22;341:16,22;342:5;
345:13;346:9,19,24;347:3,8,

---

20;348:11;349:8,12,25;
351:1;352:20;354:5;355:1,
7;356:6
**Friday (5)**
279:22;282:18;311:20;
312:6;323:17
**front (4)**
296:11,16;299:18;337:13
**Fudens (3)**
273:5;303:21;331:15
**fully (1)**
269:22
**further (10)**
270:6;301:16;316:24;
326:15;327:2;336:13;337:5;
339:18;340:23;346:15
**future (1)**
270:8

---

**G**

**game (1)**
352:24
**gave (1)**
326:6
**General (6)**
272:8,13;273:14;304:23;
332:2;336:10
**generally (2)**
328:6;333:8
**Genuine (1)**
275:1
**George (5)**
273:16;274:12;275:6;
276:10;304:12
**Georgia (17)**
272:9;273:12,19,22;
274:9,19,22;277:23;291:24;
292:2,8;293:6;304:25;
305:3,14;332:24;353:25
**ghosted (1)**
351:9
**given (6)**
284:12;286:5;303:3;
313:11;316:8;328:2
**gives (1)**
310:6
**giving (2)**
345:6;348:20
**glass (1)**
296:16
**Glen (1)**
315:15
**Glenn (1)**
272:7
**Good (12)**
269:1;294:20,21;304:5,6;
331:5,6;334:7,9;340:10;
351:6;355:25
**ground (1)**
354:6
**grounds (2)**
287:24;353:7

**group (2)**
293:15;328:13
**grouped (7)**
280:24;281:9;293:18,21;
298:15,18,20
**guess (3)**
269:3;306:11;324:21
**guidance (3)**
270:22;271:8;350:11
**guys (1)**
353:18

## H

**half (3)**
295:2;309:15;313:11
**hand (1)**
303:17
**handbook (2)**
290:5,8
**handy (1)**
269:9
**happen (3)**
283:6,20;313:23
**happened (1)**
327:16
**happening (1)**
350:18
**happy (7)**
340:23;341:17;347:24;
348:3;349:23;351:1;354:16
**head (3)**
334:20;337:11;352:11
**hear (4)**
318:13;335:10,11;354:25
**heard (3)**
277:12;295:23;301:5
**hearing (1)**
303:14
**hearsay (2)**
345:22;353:15
**held (1)**
344:12
**help (4)**
283:22;287:12;350:23;
354:20
**helpful (3)**
347:21;348:1,3
**helping (2)**
280:6;287:17
**herein (3)**
273:3;303:20;331:13
**herself (2)**
312:3,11
**high (1)**
353:17
**hold (5)**
333:23;337:17,18;338:11,
16
**holding (2)**
338:4;341:13
**honest (2)**
295:15;308:21

**Honor (7)**
270:20;339:3,9;341:1,1;
347:22,23
**hope (1)**
340:8
**hoped (1)**
351:8
**hot (2)**
297:15,19
**hour (4)**
289:16;295:2,2;350:13
**hourly (3)**
281:14,15;311:17
**hours (9)**
279:19;282:25;285:8;
289:20;298:1,4,11;311:25;
312:17
**housekeeping (2)**
270:16;342:14
**Houston (1)**
332:1
**HR (1)**
281:24
**Human (3)**
272:13;282:6;332:2
**hurry (1)**
308:3

## I

**idea (1)**
301:10
**identify (4)**
278:21;297:12;299:12;
346:6
**identity (1)**
288:18
**Illinois (1)**
353:25
**IMC (2)**
305:9,13
**important (2)**
296:21;326:10
**improper (1)**
353:9
**inadmissible (1)**
353:7
**inappropriate (1)**
352:18
**Inc (4)**
269:17,20;270:1,13
**inclined (1)**
355:18
**included (2)**
280:6;304:16
**incorporate (1)**
271:13
**independent (10)**
278:1;279:14;330:18;
332:7;333:2;335:18;336:9,
22;337:2;344:23
**indicated (1)**
322:9

**individual (2)**
353:2,3
**information (4)**
288:5,5;352:6,7
**informative (1)**
348:12
**initial (1)**
323:7
**input (2)**
291:18,21
**inspected (1)**
285:25
**instance (1)**
302:24
**instruct (1)**
326:24
**instructions (7)**
303:3;308:8;312:18;
326:6,19;345:4,7
**intend (1)**
270:17
**interaction (1)**
279:10
**interactions (7)**
295:21,25;296:7;323:1;
324:5,9,14
**interest (3)**
332:18,21;353:17
**interested (1)**
307:15;351:12
**interpretation (1)**
338:25
**interrupt (1)**
338:1
**interrupted (1)**
275:13
**interrupting (1)**
300:21
**into (12)**
269:8;291:18,21;303:12;
307:14,15;308:23;309:10;
310:6,8,20;344:21
**inventory (2)**
280:7;301:23
**investigations (2)**
336:10,12
**invoice (4)**
280:20;320:16,20;322:10
**invoices (4)**
318:25;319:4;325:20,21
**involved (4)**
295:22;299:6;350:4,16
**issue (17)**
283:19;314:24;326:19;
342:19;347:9;348:2;350:1,
8,15,18,25;351:2;352:3;
353:5;354:6,9,18
**issues (3)**
314:12;348:8;352:9
**issuing (1)**
280:6

## J

**jam (1)**
350:1
**Jaswa (1)**
276:14
**Jeremiah (1)**
334:8
**job (6)**
273:13;279:5;296:24;
301:18;304:22;331:23
**Joint (7)**
300:5;342:15,18,20,23;
343:3;345:11
**judgment (1)**
269:22
**judicial (1)**
340:16

## K

**keep (3)**
285:4;288:24;299:15
**kind (4)**
287:7;307:10;319:1;
336:19
**knowledge (14)**
280:25;295:6,8,19;296:3;
298:10;300:4;318:24;325:2,
7,12,17,23;326:4

## L

**labor (2)**
339:16;348:5
**lag (1)**
304:8
**last (1)**
277:12
**late (3)**
291:3;314:10;346:1
**law (5)**
348:25;349:1,2;353:1,8
**laws (1)**
353:21
**lawsuits (3)**
334:25;335:16,23
**lawyer (1)**
351:13
**lawyers (2)**
294:25;338:4
**learned (1)**
351:3
**least (3)**
293:6;348:16;353:21
**leave (4)**
299:25;301:3;308:9;
323:23
**legal (2)**
347:9;350:8
**legally (1)**
352:21

**level (1)**
353:18
**likely (1)**
270:19
**limited (2)**
349:10,16
**line (1)**
344:5
**lines (5)**
343:24;344:13,16,19;
345:1
**listed (2)**
286:1;321:15
**literally (1)**
342:5
**litigation (2)**
299:4;341:12
**litigations/arbitrations (1)**
339:21
**little (5)**
270:21;273:10;301:8;
305:16;347:4
**lives (1)**
355:2
**LLC (4)**
269:18,21;270:2,13
**located (2)**
293:25;294:1
**location (9)**
274:23;275:9;276:19;
280:4;288:17;296:14;314:6;
320:6;342:9
**locations (2)**
292:13,20
**logistical (1)**
333:17
**logistics (6)**
305:5,18;333:3,5,14;
334:21
**long (11)**
273:15;295:1;304:13;
308:21;313:8;314:23;
317:10;322:25;327:21;
328:5;332:8
**longer (2)**
351:4;352:13
**look (7)**
318:25;334:18;350:25;
353:12;354:16,19,21
**Looking (1)**
301:9
**looks (2)**
296:19;300:9
**lost (1)**
269:17
**lot (2)**
350:9;352:9
**Lots (1)**
333:10
**Lucio (57)**
285:23;286:19;291:2;
295:3,21,25;296:7;299:13;
300:11;303:14;306:4,10,16;

307:18,25;308:17,23;
311:13,19,24;312:14,25;
313:2,5,10,25;314:14,19;
315:7,10,21;317:12,21,24;
323:1,8,14;324:2,6,11,16,
18;325:3,9,14,19,25;326:6;
327:11;329:9,13,19;330:4,
11;332:4;334:22;354:8
**Lucio's (9)**
297:25;314:21;315:3,4,
16,25;332:23;343:17;
351:16
**lunch (1)**
280:17

**M**

**ma'am (6)**
293:5;302:22;303:1,6;
329:3;334:3
**maintain (1)**
285:17
**makes (2)**
270:21,25
**making (4)**
287:14;293:7;308:5;
332:25
**management (1)**
353:4
**Manager (17)**
272:8;273:14;276:4,4,9,
10;280:3,14,21,21;283:12;
304:11,17,23;315:3;319:23;
342:10
**managers (4)**
279:9;301:2,25;328:12
**many (15)**
275:19;278:10,12;285:20;
286:4;293:17;295:12;310:1,
8;327:18;328:1;334:11;
336:9;339:22,25
**Mark (1)**
318:12
**Marks (66)**
272:6,7,18,21,24;273:2,9;
276:1;294:13;295:16;
299:19;300:18;301:8,13,16;
303:12,24;304:4;316:23;
317:6;318:7;319:18;326:16;
327:2;330:25;331:1,19,21;
333:18;334:15;336:15,20;
337:1,5,21;338:2;339:10,23;
340:2,6;342:9,16;343:6,14,
16,22;344:2,4,9,16,19;
345:1,9,22;346:11,14;347:1;
348:5,24;349:18,22;351:24;
352:12,25;353:14;356:5
**Marks' (1)**
329:25
**married (2)**
276:13;277:11
**master (2)**
328:15;329:19

**MASUCCI (116)**
269:1;270:14,23;271:12,
18,25;272:5,16,19,22,25;
275:24;279:18,23;280:1;
292:17;293:1;294:14,17;
295:17;297:5,8;299:20;
301:7,17,21;302:2,6,11,15,
17,23;303:2,7,10,13,24;
317:2;318:17,20;319:19;
326:14;327:3,10,17,21,24;
328:1,5,11,17,22;329:1,4,8,
12,16;330:8,17,24;331:3,6,
9,10,19;333:22;334:2,4;
335:7,9;338:6,22;339:4,13;
340:4,7,13;342:14,21;343:1,
5,10,15,18,25;344:3,7,10,14,
18,20;345:2,12;346:6,13,16,
21;347:6,12;348:8,14;349:7,
10,15,20;350:2,6,12;351:25;
354:17,22;355:5,10,15,17,
21
**materials (1)**
307:25
**math (2)**
310:17,24
**matter (5)**
285:2;286:4;301:10;
308:7;338:14
**matters (1)**
272:11
**May (6)**
306:11;330:9,9,9;334:10;
346:17
**maybe (5)**
306:12;318:5,24;332:16;
341:8
**mean (3)**
277:19;292:11;295:14
**meet (2)**
327:11,18
**meeting (11)**
306:9,13,20;307:24;
308:17;323:7,8,10,21;324:2;
327:22
**member (1)**
354:2
**message (6)**
296:2;300:9,11,14;301:9;
313:2
**messages (3)**
312:25;313:1,4
**met (3)**
306:14;307:18;323:15
**might (7)**
294:24;303:3;317:18;
322:9;329:12;352:12;
354:18
**mileage (2)**
285:25;286:2
**miles (3)**
285:21,25;286:4
**Miller (9)**
274:15,16,21;275:10,16;

276:7,15;277:13;279:1
**mind (1)**
342:22
**minutes (6)**
294:13;333:21,23;346:22,
23;347:11
**misclassification (1)**
350:9
**misclassified (1)**
336:17
**misclassifying (2)**
334:13;335:17
**misleading (2)**
338:20;341:19
**misread (1)**
300:23
**Miss (63)**
285:23;286:19;291:2;
295:3,21,25;296:7;297:25;
299:13;300:11;306:10,16;
307:18,25;308:17,23;
311:13,19,24;312:14,25;
313:2,5,10,25;314:14,19,21;
315:3,4,7,10,16,21,25;
317:12,21,24;323:1,8,14;
324:2,6,11,16,18;325:3,9,14,
19,25;326:6;327:11;329:9,
13,19;330:4,11;332:4,23;
343:17;351:16;354:8
**missed (2)**
310:14,23
**missing (1)**
311:5
**Missouri (1)**
353:24
**mistaken (1)**
341:9
**misunderstood (1)**
334:10
**moment (2)**
297:24;316:24
**Monday (5)**
279:21;282:18;311:20;
312:6;323:17
**money (3)**
288:13;311:11;316:10
**Monica (14)**
276:20,21;277:2;281:12,
14,16,19;295:25;300:11;
302:8,10,16,17;324:9
**Monica's (1)**
280:10
**monitor (1)**
285:20
**month (10)**
277:9;309:3,7,10,13,15,
20,20;310:6;328:3
**monthly (1)**
309:6
**more (17)**
269:25;271:2;281:2;
293:13;305:16;306:1;317:6;
318:2;335:1,3,23,25;336:2,

3;338:9;349:12,23

**morning (8)**
269:1;294:20,21;304:5,6;
334:7,9;343:11

**most (7)**
322:25;330:21;347:21;
348:3,9,12;353:20

**Motor (1)**
297:10

**move (1)**
296:11

**moved (1)**
277:11

**much (8)**
303:11;310:14;328:25;
331:4;340:8;347:7;348:25;
351:15

**must (1)**
322:21

**MVR (1)**
297:3

**MVRs (1)**
297:9

**myself (1)**
316:12

## N

**nailed (1)**
347:11

**name (7)**
272:20;276:12;292:4;
318:12;327:7;329:5;334:7

**named (4)**
317:8,14,15,17

**names (4)**
299:16;300:3;337:10;
339:14

**nature (1)**
304:19;306:13;321:20

**necessary (5)**
270:7;272:10,12,14;311:2

**need (10)**
271:9;278:5,11,12;
307:13;318:25;347:7;349:4;
353:11,13

**needed (8)**
277:20,21;278:3;289:21;
296:24,25;345:3;347:16

**needs (1)**
349:23

**negotiate (2)**
291:17;306:14

**negotiating (1)**
323:9

**New (9)**
273:6;303:22;321:21;
331:16;337:12;353:1;354:1,
2,2

**nice (1)**
351:11

**nickname (1)**
317:18

**nine (3)**
304:14;328:9;351:3

**none (2)**
283:4;332:19

**noon (1)**
347:6

**normal (1)**
304:8

**Notary (3)**
273:5;303:21;331:16

**note (1)**
321:16

**noted (1)**
356:7

**notes (1)**
354:15

**notice (1)**
340:17

**notified (1)**
353:10

**November (4)**
273:17;274:10,11;278:25

**number (6)**
298:23;299:10,11,13;
351:25;352:4

**numbers (3)**
299:9,14;300:3

**numerous (1)**
352:23

## O

**oath (2)**
303:16;331:11

**object (6)**
319:18;338:2,19;339:23;
340:2;346:3

**Objection (6)**
295:16;299:19;337:25;
343:6,18;345:18

**obligation (1)**
354:14

**observance (1)**
325:2

**observation (3)**
325:8;326:5;330:4

**observe (4)**
296:17;324:4,8,13

**obtain (2)**
319:8;325:10

**occasion (1)**
291:9

**occasional (1)**
277:17

**occasionally (1)**
316:20

**occasions (1)**
291:4

**occurrence (1)**
334:22

**off (9)**
280:20;289:2;314:15,19;
316:7;334:19;337:10;

344:12;352:10

**offer (9)**
337:21;338:23;343:1,3,
25;344:4;345:25;346:8;
347:10

**offered (1)**
345:17

**offering (2)**
344:2;345:23

**office (11)**
293:22;294:3,4,11;
296:10,11,13,15,19;331:11;
332:1

**old (1)**
321:22

**Oliveri (1)**
329:5

**once (1)**
348:20

**one (37)**
281:2,8;282:24;293:13,
14,16;298:10;305:8;306:1;
310:14;312:12;316:3;317:6,
7;318:15;319:3,7,13,21;
320:2,14,19,21;321:1,9,13,
24;322:4;327:5,5;329:18;
330:8;335:1;338:9;339:18;
344:9;347:23

**ones (2)**
293:15;298:20

**ongoing (2)**
353:13;354:14

**only (10)**
287:21;288:7,9,10;296:2;
302:14;322:5,22;343:24;
345:3

**onto (1)**
287:23

**open (1)**
354:18

**operate (1)**
274:22

**operated (1)**
274:14

**operates (1)**
279:7

**operating (6)**
273:22;274:8;275:16;
278:24;318:23;320:8

**Operations (4)**
301:20;304:11,16,19

**operators (9)**
291:15;311:7,8;313:17;
316:17;328:24;330:19,22;
336:9

**opinion (1)**
338:3

**opinions (1)**
352:23

**opportunities (2)**
306:15;307:10

**opportunity (5)**
306:23;327:15,15;330:14;

343:12

**opposed (2)**
293:18;294:4

**optimization (1)**
333:15

**option (1)**
350:2

**order (5)**
280:12,20,22;302:6;348:6

**ordered (1)**
316:8

**orders (2)**
280:24;287:18

**ordinary (1)**
280:14

**orient (1)**
318:4

**orientation (2)**
318:3,21

**ostensibly (1)**
352:7

**otherwise (3)**
270:4;333:10;350:24

**out (26)**
270:24;275:11;277:12;
280:13;283:6,15,18,25;
287:13;292:24;293:14;
294:1;296:19,20;308:10;
314:12;316:9;319:1;329:15;
337:11;346:20,22;347:9;
351:21;352:22;354:12

**outcome (1)**
356:1

**outside (1)**
294:4

**over (11)**
275:9;276:18;281:17,19;
307:10;308:12;311:3;
323:10,11,14;328:10

**Overseeing (1)**
301:23

**own (2)**
287:9;328:13

**owner (7)**
291:15;311:7,8;313:17;
316:17;328:24;330:22

**owner/operator (7)**
291:14;306:17;307:2;
329:11;332:24;344:15,23

**ownership (1)**
332:18,20

## P

**Pac (3)**
305:8,10,13

**P-A-C (1)**
305:10

**package (1)**
321:14

**packages (1)**
292:15

**page (5)**

344:5,13,16,19;345:1
**pages (3)**
348:7;349:11,16
**paid (7)**
281:14;284:25;289:15,16;
310:6;316:10,14
**papers (1)**
348:19
**Paragraph (1)**
345:2
**Parrish (20)**
272:7,16;273:10;279:21,
25;292:19;294:20;297:6,9;
301:12,15,20,23;302:4,9,13,
16,22;303:1,6
**part (6)**
296:22;307:23;316:21;
324:23;326:10;348:18
**participate (1)**
341:12
**particular (4)**
282:21;287:3;302:21;
340:16
**particularly (2)**
340:25;353:3
**parties (4)**
271:21;338:14;339:13;
348:17
**Parts (184)**
269:16,18,20,21;270:1,1,
12,13;272:8;273:12,15,18,
21;274:4,6,7,12;275:1,5,8,
11,17,19,21;276:5,18,25;
277:4,7,22;278:4,24;279:6,
8;280:21;281:7,17,23,25;
282:6,14,20;283:11;284:7,9,
15,18;285:4,8,11,14,17,20;
286:8,15,24;287:2,9,12,21;
288:10,15,18;289:11,14,17;
290:4,13,17;291:5,6,20,23;
292:12,21;293:1,3,6;294:25;
296:21,22;297:6;301:24;
302:18;303:15;305:8,13,17,
19,21;308:20;309:2,6;
311:14;312:21,22;313:6,15;
315:2,12,14,20,24;316:3,7,
10,14,16;317:13;319:3,8,9,
14,15,16,22,23;320:1,2,3,4,
10,15,19,22,23;321:2,7,9,10,
12,25;322:1,2,5,6,13,19,21;
324:10,15,19,19;325:3,4,4,8,
13,15,18,19,24,25;326:1,5,
10,10,18,18,23,24;327:12,
16;330:1;332:13,18,20;
333:4;337:20;338:17,20;
341:7,10,11,15,20,23;342:1,
2;345:3,7;351:4;352:13,15
**party (8)**
337:19;338:21;341:11,20;
342:1,1,3,6
**Paul (3)**
272:12;331:23;336:15
**pavement (1)**
322:13
**pay (6)**
284:7,9;309:7;310:15;
322:20,21
**payer (1)**
322:15
**paying (1)**
322:7
**payment (3)**
311:7;322:1,6
**payments (1)**
309:4
**payout (2)**
309:19,21
**Payouts (2)**
309:8,9
**people (3)**
296:17;330:17;347:4
**per (1)**
311:4
**percent (4)**
293:20,21;294:9,10
**percentage (1)**
294:7
**perform (7)**
279:5;282:24;288:22;
311:25;312:8;315:21;326:7
**performance (1)**
315:16
**performing (4)**
286:10;288:25,25;316:17
**perhaps (3)**
270:21;313:3;343:22
**period (5)**
275:13,24;311:16;313:5;
335:4
**permitted (3)**
290:21;302:19;353:6
**person (3)**
295:15;302:5;304:1
**personal (6)**
298:9;325:1,2,8;326:5;
330:3
**personally (6)**
288:22;311:24;324:4,8,
13;332:6
**personnel (1)**
285:17
**phone (3)**
302:5;312:24;351:13
**pick (4)**
288:15;292:12,20;321:16
**picked (1)**
288:14
**picking (1)**
288:13
**pickup (1)**
345:6
**plaintiff's (1)**
318:8
**plate (1)**
287:22
**please (12)**
279:3;300:15,23;303:17;
304:9;321:17;328:25;329:2;
335:10;337:24,25;338:7
**pm (2)**
300:16;356:7
**POD (1)**
319:11
**point (3)**
313:12;349:3;354:15
**policy (2)**
279:6;283:10
**polite (1)**
351:11
**portion (2)**
270:10;346:2
**portions (5)**
343:16,19,20;345:23;
346:7
**position (1)**
345:14
**possible (1)**
281:1
**post-hearing (4)**
270:20,25;348:7;349:6
**post-hearing-hearing (2)**
347:15,25
**POTASHNICK (16)**
293:3;318:11,13,17,19;
326:13;329:18,24;330:7;
331:2;342:23;343:3;346:17;
350:5;353:20,24
**potentially (3)**
341:14;342:8;352:18
**practice (1)**
313:22
**precedential (1)**
340:18
**predecessor (1)**
276:22
**prefer (2)**
347:22;349:14
**pre-guidance (1)**
350:22
**pre-hearing (1)**
271:1
**prejudice (1)**
269:15
**preliminary (1)**
327:5
**pre-notify (1)**
288:4
**prepare (1)**
294:22
**prepared (2)**
347:14;355:4
**present (5)**
335:5;340:24;350:16,17;
353:10
**president (1)**
332:2
**President's (1)**
350:7
**pressure (1)**
308:14
**pretty (1)**
328:25
**previously (2)**
271:11,15
**primary (1)**
294:6
**print (1)**
280:20
**printer (1)**
280:21
**Prior (5)**
274:11,21;287:23;332:15,
23
**probably (6)**
293:20;294:9;318:5;
336:4;347:22;350:19
**probative (1)**
340:25
**problem (2)**
282:10;314:10
**procedure (4)**
283:10;311:9;318:23;
320:9
**procedures (1)**
279:6
**proceeded (1)**
343:7
**process (3)**
280:12,18;323:9
**processing (2)**
280:6;294:5
**procured (1)**
297:22
**produce (1)**
354:14
**produced (3)**
270:4;299:4;313:3
**product (3)**
321:14,19,23
**products (1)**
321:3
**professional (1)**
356:4
**proffer (2)**
352:8;353:6
**prohibit (1)**
354:4
**prohibition (2)**
283:2;328:23
**Proof (2)**
319:11;355:13
**proper (2)**
269:25;337:19
**properly (5)**
337:2,8,17;338:12;341:4
**proposals (1)**
307:22
**proposed (1)**
269:6
**prospect (1)**
323:24
**provide (19)**

278:4;282:21;284:18;
286:15;292:9;305:4,4,7,12,
17,21;307:1;313:6,10;
316:2;321:22;333:12,15;
336:8
**provided (5)**
    269:18;279:1;284:6;
    307:18;319:16
**provides (3)**
    305:13;307:12;345:15
**providing (2)**
    283:3;312:20
**Public (3)**
    273:5;303:22;331:16
**publicly (3)**
    339:6,11,15
**pull (1)**
    280:22
**pulling (1)**
    287:18
**purpose (1)**
    306:19
**purposes (4)**
    307:13,14;317:22;352:15
**put (6)**
    280:7,25;287:17;299:11;
    338:23;345:21
**putting (1)**
    352:2

**Q**

**quick (1)**
    329:18
**quicker (1)**
    356:3

**R**

**raise (1)**
    303:17
**rankest (1)**
    353:14
**rate (3)**
    310:9,11,21
**read (4)**
    269:8;308:3;323:24;
    343:16
**really (9)**
    271:6;314:23;316:1,1,7;
    318:25;330:13;348:25;
    354:10
**reason (6)**
    271:5;286:3;291:10;
    300:12;312:8;351:18
**reasonable (1)**
    286:20
**reasons (1)**
    351:20
**rebut (1)**
    348:22
**rebuttal (2)**
    272:3;346:18

**rebutting (1)**
    348:21
**recall (21)**
    306:9;308:22;313:4,9;
    314:3,21;315:10,13,14,17;
    317:11,18,19;318:1;324:17;
    327:24,25;330:9,14,15;
    343:22
**receipt (1)**
    326:2
**receipts (1)**
    326:1
**receive (3)**
    290:5,7;345:6
**received (1)**
    269:6
**recently (1)**
    296:1
**recess (5)**
    294:15;317:4;333:25;
    340:11;355:19
**recognize (3)**
    306:7,8;329:4
**recollection (4)**
    323:6,19,25;342:17
**record (14)**
    269:8;278:20;298:17,21;
    300:18;344:12;345:9;347:2,
    19,23;349:2,6,20;355:22
**recorded (5)**
    297:25;298:4,11,24,25
**records (4)**
    297:10;299:3;300:2;
    351:17
**recounting (1)**
    351:23
**redacted (1)**
    339:14
**redirect (1)**
    301:7
**referred (1)**
    343:20
**referring (2)**
    323:13;345:10
**reflect (2)**
    271:6;298:17
**reflects (1)**
    298:21
**refuse (1)**
    324:25
**regard (2)**
    333:2;352:17
**regarding (4)**
    269:4;279:6;287:22;
    299:14
**regular (4)**
    278:6,7,9;302:7
**regularly (1)**
    299:17
**reimburse (1)**
    284:15
**related (1)**
    341:2

**relation (1)**
    341:14
**relationship (9)**
    277:14,16,23,25;316:22;
    326:17,23;336:6;344:24
**released (1)**
    269:25
**relevance (1)**
    340:20
**relevant (6)**
    270:3;341:14;342:8;
    345:24;346:7;348:9
**Relying (1)**
    351:14
**remaining (1)**
    269:20
**remanufactured (1)**
    321:20
**remember (12)**
    273:23,25;274:2;277:9;
    319:1;322:25;323:4,5,5;
    329:21;332:16;337:10
**Renan (1)**
    329:6
**Repeat (4)**
    305:1;326:21;336:18;
    338:8
**replace (2)**
    302:20,25
**report (3)**
    282:5;289:12;304:20
**reported (1)**
    295:14
**reporter (3)**
    303:16;327:6;331:11
**reporting (1)**
    280:8
**represent (1)**
    354:8
**representative (1)**
    352:14
**represented (2)**
    341:3;355:24
**representing (1)**
    318:15
**request (3)**
    314:16,18;354:16
**requests (2)**
    352:5;353:12
**require (5)**
    282:24;287:2,11,12;291:6
**required (10)**
    288:21;289:1,23,25;
    311:24;312:5;313:14;314:2,
    4;352:5
**requires (2)**
    299:11;321:15
**research (4)**
    347:5;350:20;352:9;353:4
**researched (1)**
    354:5
**researching (2)**
    350:19;351:2

**Reserving (1)**
    272:3
**resources (4)**
    269:21;272:13;282:7;
    332:3
**respect (2)**
    269:7;315:25
**respond (1)**
    346:12
**responded (1)**
    329:25
**respondent (1)**
    269:20
**respondents (8)**
    269:16,18,24,25;270:1,2,
    7,12
**respondent's (1)**
    270:10
**responsibilities (3)**
    280:3;301:18;304:16
**responsibility (2)**
    274:18;280:11
**Responsible (1)**
    280:5
**responsive (1)**
    346:2
**rested (1)**
    272:1
**result (1)**
    336:21
**returned (2)**
    321:12;324:19
**returns (2)**
    320:24;321:4
**reused (1)**
    299:15
**reveal (1)**
    352:6
**review (2)**
    307:25;312:24
**Reviewed (1)**
    294:24
**ride (1)**
    286:12
**right (18)**
    272:2;273:10;282:16;
    303:12,17;308:6;311:14;
    312:9;316:4;323:2;324:24;
    329:17;336:4;347:9,12;
    351:22;352:8,10
**road (3)**
    283:18;284:1;319:2
**roads (1)**
    281:5
**role (7)**
    304:13;315:24;316:2,7;
    329:9;353:2,4
**room (4)**
    291:1;294:2;308:9;323:24
**Rosenau (29)**
    272:9,18;282:11;289:9;
    303:13,18;318:12;327:3,9,
    14,20,23,25;328:4,7,14,21,

24;329:3,6,10,14,20,24;
330:6,13,21;331:5,8
**Rosenthal (2)**
272:15,17
**Roswell (19)**
273:19,22;274:1,8,12,19,
22;275:5,20;276:10;277:22;
280:4,19;283:11;290:22;
293:19,23;324:10,15
**roughly (1)**
340:3
**route (6)**
292:16,24;293:7;297:17;
333:15,16
**routes (2)**
287:20;293:10
**Rule (3)**
354:3,3,3
**rules (2)**
286:25;346:20
**run (3)**
283:6,15;297:16
**running (1)**
280:5

**S**

**salary (1)**
281:14
**same (13)**
269:11;276:1,6;289:19;
293:14;296:14;309:14;
310:11,24;318:18;321:22;
336:6;340:15
**satisfy (1)**
269:22
**Saturday (6)**
279:24,25;282:18;311:20;
312:7,7
**Saturdays (1)**
323:18
**saying (1)**
341:22
**scanning (1)**
333:16
**schedule (3)**
289:18;290:17;311:18
**scheduled (1)**
297:17
**searched (1)**
354:9
**season (5)**
278:13,14,18,21,22
**seasonality (1)**
278:10
**second (3)**
269:2;300:22;329:2
**sections (2)**
344:1,4
**selected (2)**
345:20,21
**send (8)**
286:12;288:22;290:13;

292:19;312:2,4,10,12
**sense (3)**
270:21,25;289:5
**sent (2)**
296:2;351:8
**served (1)**
330:19
**service (16)**
275:14;278:4,6,7,9;
279:16;282:21;288:22;
292:9;293:4;305:4,7,12,18;
312:21;316:3
**services (9)**
284:6;305:17;311:25;
313:6,11;315:22;328:19;
333:12,17
**set (2)**
290:17;342:10
**settled (2)**
339:22;340:1
**settlement (1)**
309:9
**settlements (1)**
309:11
**Several (1)**
295:14
**share (4)**
339:9;341:17;351:18,21
**shift (1)**
289:21
**shirt (1)**
287:11
**shot (2)**
297:15,19
**showed (1)**
320:20
**showing (1)**
288:4
**side (4)**
348:20;349:23;355:23,24
**sign (2)**
308:6,15;330:12
**signature (1)**
319:9
**signatures (1)**
325:10
**signed (4)**
308:13;327:17;351:9;
355:9
**significant (1)**
341:2
**similar (3)**
305:12;329:9;344:23
**simultaneous (2)**
349:17,18
**single (1)**
293:18
**sit (1)**
307:9
**sitting (2)**
290:25;306:6
**skills (3)**
296:24;297:12,13

**slot (1)**
283:9
**slow (2)**
303:25;318:18
**slower (1)**
304:8
**small (1)**
330:23
**snippets (2)**
345:20,21
**software (2)**
293:8;299:2
**somebody (6)**
288:23,25;302:20;303:5;
350:17,17
**someone (3)**
274:22;302:25;328:6
**Sometime (1)**
306:11
**sometimes (2)**
308:8;323:23
**SOP (3)**
318:22,22;320:8
**SOPs (12)**
318:5;319:3,7,13,21;
320:2,14,21;321:1,9,24;
322:4
**sorry (8)**
288:10;292:1;305:1;
321:6;336:19;339:24;
343:15;355:16
**sort (3)**
276:6;292:14,23
**speak (1)**
340:23
**Speaking (2)**
297:24;313:5
**special (1)**
287:23
**specific (8)**
293:10;298:19;312:18;
323:6,19,25;330:16;354:15
**specifically (3)**
305:16;321:5;327:12
**specifies (1)**
322:21
**spend (1)**
295:1
**spent (1)**
294:7
**Spicker (18)**
272:12,17;331:9;333:24;
334:2,3,7;335:14;336:18,24;
337:4,9,15;338:8,13;339:24;
340:3,9
**spoke (1)**
351:5
**spoken (2)**
295:5,12
**square (1)**
301:1
**St (1)**
355:3

**staff (1)**
279:1
**staffing (1)**
276:6
**stand (1)**
320:8
**standard (1)**
318:23
**staring (1)**
308:5
**start (2)**
275:4;332:12
**started (5)**
274:4;278:24;317:13;
332:10,16
**starting (1)**
344:5
**State (4)**
273:5;303:22;331:16;
355:22
**statement (4)**
271:13;286:1;343:13;
345:10
**statements (1)**
345:16
**states (3)**
313:20,22;345:3
**stay (1)**
290:24;328:6;333:11,22
**still (1)**
310:11
**STILLER (22)**
269:6,13;271:10,15,20,24;
338:19;341:10,18,25;342:7,
17;343:8;344:13;350:14;
353:1,16,23;354:1,20;
355:13,16
**stipulate (2)**
269:14,19
**stipulated (1)**
271:21
**stipulating (1)**
270:9
**stipulation (3)**
269:7;271:7;343:9
**stock (5)**
276:4;280:7,7,21;287:17
**stop (1)**
277:7
**store (24)**
274:1,8,12,12,19,22;
275:5,20;276:4,10;280:5,14,
19,21;283:11,21;287:13,19;
293:19;296:12,16;299:18;
315:2;330:5
**stores (2)**
301:20;302:5
**stuff (1)**
297:3
**subcontractors (3)**
313:18,21;328:16
**subject (2)**
301:10;318:8

**submit (5)**
271:1,11,12;339:2;351:8
**subsequently (1)**
276:12
**substance (1)**
351:14
**substitute (4)**
290:14;312:2,5,10
**sued (2)**
334:12;341:8
**suggest (1)**
341:19
**suggested (1)**
329:13
**suggesting (2)**
342:2;347:16
**super (1)**
351:12
**supervise (1)**
281:19
**supervisor (6)**
289:12,13;319:15;320:4,
13;326:19
**supervisors (3)**
286:12;326:24;328:12
**supervisory (1)**
281:16
**supplemented (1)**
353:13
**supplying (1)**
292:6
**supposed (1)**
313:12
**sure (14)**
271:2;273:2;288:3,16;
308:12;312:5;320:18;321:8;
323:10;326:22;327:23;
329:23;335:14;354:25
**surprise (1)**
352:7
**Susana (4)**
300:14;303:14;306:3;
334:22
**sworn (4)**
273:4;303:21;331:15;
351:22
**system (4)**
299:1,4,11,12
**Systems (2)**
304:12;331:25

**T**

**talk (5)**
302:12,13;307:9;334:24;
347:13
**talked (2)**
302:4,14
**talking (9)**
301:14;315:10,15;334:25;
335:3,4,15;343:19;351:12
**Tammie (46)**
276:11,13,15,24;277:4;

280:3;281:22;282:2,5;
285:24,25;286:1,19;289:2,6,
13;290:10;291:4,10;293:22;
295:9,10,11,13,21;296:9,11,
15;297:24,25;298:3,6,11;
299:17;302:8,10,15;303:3;
315:2,8,8,15;317:20;324:5;
330:5;351:4
**Target (1)**
349:22
**targeted (1)**
348:2
**tasks (3)**
287:15,15;288:7
**team (1)**
279:4
**telling (1)**
312:16
**temp (7)**
296:25;297:19,21;298:4,
11;299:9,24
**terminate (3)**
281:23;282:3;315:1
**terminated (1)**
315:1
**terms (4)**
270:16;272:5;297:12;
330:11
**Terri (3)**
273:4;303:21;331:15
**test (1)**
285:14
**testified (13)**
273:7;282:13;291:2;
296:4,9;298:14;302:18;
303:23;317:12;331:17;
346:4;349:4;355:6
**testify (4)**
272:11;299:23;354:8;
355:2
**testimony (17)**
285:23;286:18;294:23;
300:10;301:2;322:24;
334:10,16;336:8;343:17,21;
345:24;346:18;347:10;
350:10;353:6;354:23
**Texas (1)**
332:1
**Thanks (2)**
318:7;329:17
**therefore (1)**
270:10
**third (1)**
348:22
**Thomas (1)**
355:3
**though (1)**
310:10
**thought (1)**
343:8
**three (5)**
278:14,16;283:2;294:13;
306:11

**tie (1)**
343:11
**timeliness (1)**
315:17
**times (7)**
295:12;323:10,13,16;
325:15;327:18;334:11
**tips (1)**
284:12
**title (1)**
304:22
**today (6)**
271:25;272:6;277:5,10;
333:19;356:3
**today's (1)**
294:22
**together (3)**
269:4;281:1;293:16
**told (9)**
285:24;311:22;314:15;
316:6;325:3,9,13,18,24
**Tom (1)**
304:21
**took (3)**
274:1;276:18;309:2
**top (3)**
334:19;337:11;352:10
**totally (1)**
352:17
**towards (2)**
296:19;318:22
**track (7)**
285:4,8;288:18,24;290:2;
299:16,24
**tracking (1)**
298:19
**train (3)**
279:4;286:22;317:24
**training (5)**
279:1;286:16;317:22;
318:2
**transcript (5)**
270:18;271:7;345:15,19;
348:6
**treat (1)**
287:9
**treated (1)**
315:11
**treatment (1)**
330:4
**treats (1)**
330:1
**true (3)**
300:12;326:9;353:23
**trusting (1)**
354:24
**try (5)**
288:15;297:17;318:19;
346:3;355:8
**trying (5)**
304:7;346:19;347:8;
351:21;352:21
**Turner (1)**

276:11
**twice (2)**
309:7;310:6
**two (8)**
276:5;278:19;286:20;
309:11;310:6;317:13;337:9;
350:3
**type (4)**
297:3;308:13;321:22;
344:23

**U**

**unable (1)**
272:11
**uncomfortable (1)**
308:6
**under (3)**
280:14;321:4;329:22
**understood (3)**
311:19;330:11;344:22
**undisputed (1)**
309:1
**unethical (1)**
352:18
**unfair (1)**
330:10
**unless (1)**
339:11
**up (22)**
269:12;280:23;282:6;
287:17;288:4,13,14,16;
292:12,20;296:18;308:3;
321:16;327:6;336:19;
342:11;343:11;350:1,18;
351:6,19;354:18
**use (8)**
271:8;277:17;278:1,14;
287:24;288:1,15;293:4
**used (2)**
284:19;304:7
**usually (2)**
320:12;321:4

**V**

**value (1)**
340:18
**various (2)**
333:6,16
**vehicle (1)**
297:10
**vehicles (1)**
290:25
**verify (3)**
288:6;319:9;325:10
**via (2)**
303:19;331:14
**vice (1)**
332:2
**video (4)**
272:10,23,24;355:6
**videotape (2)**

303:20;331:14
**vigilant (1)**
  355:23
**violations (1)**
  332:25

---

## W

**W2 (3)**
  296:24;297:2,6
**wages (2)**
  310:15;332:25
**wait (6)**
  270:23;271:3;303:25;
  335:7,9,10
**wall (1)**
  296:19
**wants (1)**
  327:6
**warehouse (4)**
  290:21;292:14,22;296:20
**warehousing (1)**
  333:15
**way (8)**
  298:10;308:14;313:16;
  314:7;324:21;341:2;343:7;
  356:4
**ways (1)**
  353:19
**wear (3)**
  287:3,7,11
**week (2)**
  279:20;286:6
**weren't (5)**
  296:5;302:20;339:8;
  342:4,6
**What's (3)**
  297:15;304:22;319:1
**whatsoever (2)**
  316:2;332:19
**whenever (1)**
  291:12
**Whereas (1)**
  341:5
**WHITE (2)**
  269:11;271:23
**whole (1)**
  281:12
**willing (1)**
  269:14
**wind (1)**
  350:18
**window (1)**
  296:18
**withdraw (2)**
  269:15;270:11
**withheld (2)**
  270:3;298:7
**withhold (1)**
  270:8
**within (1)**
  330:4
**without (2)**
  269:15;353:10
**Witness (5)**
  273:3;303:19;331:13;
  346:25;352:2
**witnesses (2)**
  272:6;346:25
**word (2)**
  341:6,23
**work (21)**
  273:11;274:16;275:2,20;
  276:21;279:23;280:19;
  286:24;289:3;290:14,17;
  301:14;303:5;309:23;310:1,
  19;314:15;328:2;331:24,25;
  350:5
**worked (6)**
  273:15;276:15;285:9;
  309:16;329:22;334:22
**working (15)**
  277:7;308:19;313:19;
  319:8,14,22;320:9,15,22;
  321:2,10,25;322:5,12,19
**World (3)**
  305:8,10,13
**W-O-R-L-D (1)**
  305:10
**worry (1)**
  301:4
**write (2)**
  320:15;325:14
**writing (1)**
  271:9
**written (4)**
  307:17,19;341:16;351:17
**wrong (1)**
  343:9

---

## Y

**year (4)**
  273:24;274:1,2;275:4
**years (7)**
  304:14;306:12;316:5;
  328:9,10;332:11;353:21
**yesterday (2)**
  343:9,10
**York (8)**
  273:6;303:22;331:17;
  337:12;353:1;354:1,2,2

---

## Z

**ZIP (1)**
  292:23

---

## 1

**1 (3)**
  311:3;351:25;354:3
**1,150 (1)**
  310:20
**10 (19)**
  311:21;312:7;323:17;

333:21,23;335:3,23;343:24;
  344:6,13,17,18,19;346:22;
  348:7;349:10,16;352:6;
  353:21
**105 (1)**
  345:1
**10-minute (2)**
  317:1,3
**12 (3)**
  310:22,25;311:3
**12:14 (1)**
  356:7
**120 (1)**
  285:25
**13 (1)**
  328:10
**14 (4)**
  310:14,16,20;328:10
**15 (6)**
  300:6;328:10;340:3;
  346:22;347:10;353:7
**15th (1)**
  309:18
**16th (1)**
  309:19
**17 (1)**
  345:1
**178 (1)**
  328:4
**18 (1)**
  334:17
**18th (2)**
  350:5,6
**1989 (1)**
  275:7
**1st (1)**
  309:18

---

## 2

**2 (1)**
  352:4
**2,300 (3)**
  309:10;310:5,11
**20 (1)**
  347:11
**2010 (1)**
  332:16
**2014 (6)**
  273:17;274:5,6,10,11;
  278:25
**2015 (10)**
  276:2,3,9,18,25;277:2;
  293:6,19;335:5,22
**2016 (2)**
  277:9;332:14
**2018 (1)**
  335:22
**20th (3)**
  309:9,13,19
**22 (1)**
  345:1
**24 (1)**

332:11
**25 (1)**
  293:21
**28 (1)**
  309:21
**28th (1)**
  349:21

---

## 3

**3 (6)**
  279:25;282:18;311:21;
  312:7;323:17;354:4
**30 (1)**
  309:21
**30-minute (2)**
  289:23;290:1
**31 (1)**
  309:21

---

## 5

**5 (7)**
  289:20;311:21;312:7;
  323:17;344:16,18,19
**5:30 (1)**
  289:20
**5:58 (1)**
  300:15
**50 (2)**
  336:1,2
**58 (2)**
  344:16,19
**5th (3)**
  309:9,13,22

---

## 6

**6 (9)**
  278:10,15;279:19;282:18;
  289:20;300:16;311:20;
  312:6;323:17

---

## 7

**70 (2)**
  294:9,10
**71 (3)**
  344:5,5,13
**75 (1)**
  293:20
**75/25 (1)**
  293:20

---

## 8

**8 (14)**
  278:9,15;279:19,25;
  282:17,18;289:20;296:18;
  311:20,21;312:6,6;323:17,
  17
**8:30 (1)**
  289:20

**80 (2)**
  336:3,4
**80-ish (1)**
  339:20

**9**

**9 (2)**
  344:5,13
**94 (1)**
  332:10