# EXHIBIT F

# AMERICAN ARBITRATION ASSOCIATION

SUSANA LUCIO,

        Claimant,

v.                                  **AAA CASE NO. 01-18-0006-6169**

PARTS AUTHORITY, LLC,

        Respondent.

## CLAIMANT'S POST-HEARING BRIEF

{00299366 }

# TABLE OF CONTENTS

Table Of Authorities ....................................................................................................................ii

I. Introduction ........................................................................................................................1

II. The Economic Reality Test Shows That Ms. Lucio Was PA's Employee ..........................3

    A. PA Exercised Substantial Control Over Ms. Lucio ................................................3

        1. Ms. Lucio's Testimony Demonstrates PA's Substantial Control .................3

        2. Mr. Oliveira's Testimony Demonstrates PA's Substantial Control..............6

        3. Mr. Rosenthal Corroborates PA's Control ......................................................7

        4. Mr. Rosenau Also Corroborated PA's Control ..............................................7

    B. Ms. Lucio Had No Opportunity For Profit Or Loss ...................................................8

    C. The Relative Investment In The Business Favors Employee Status..........................8

    D. The Degree Of Skill And Independent
        Initiative Required Favors Employee Status .............................................................8

    E. The Duration Of The Working Relationship Favors Employee Status......................9

    F. The Work Is An Integral Part of PA's
        Business, Which Favors Employee Status ................................................................9

III. An Analysis Of The Conflicting Evidence Favors Claimant's Position ...............................9

IV. Conclusion.........................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Antenor v. D&S Farms,*
 88 F.3d 925 (11th Cir. 1996)..................................................................................................8

*Lynch v. City of N.Y.,*
 291 F. Supp. 3d 537 (S.D.N.Y. 2018)......................................................................................3

*Smith v. Pizza Hut, Inc.,*
 No. 09-1632, 2011 WL 2791331 (D. Colo. July 14, 2011) ......................................................3

## I. Introduction

The evidence demonstrates that Claimant Susana Lucio was not a true independent contractor, but functioned as a Parts Authority ("PA") employee. As set forth below, Ms. Lucio and Renan Oliveira provided first-hand accounts of PA's control over working conditions. Their testimony, corroborated by text messages from a PA dispatcher and admissions by Yaron Rosenthal, a PA owner, and Fred Rosenau of Diligent, establishes that:

- PA set Ms. Lucio hours, with her supervisor, Tammy Turner, and the dispatcher, Monica Carter, telling her when she could leave and dictating her breaks.

- Ms. Turner acted as Ms. Lucio's supervisor and called Ms. Lucio throughout the day to monitor, and rush, her work.

- PA managers had the right to hire and fire Ms. Lucio, and Ms. Turner effectively fired Ms. Lucio by making her decide between her job and her sick child.

- Diligent, acting as PA's agent, set Ms. Lucio's pay rate. Ms. Lucio had no true opportunity to negotiate her rate; she earned a flat amount per day regardless of initiative, efficiency, or the amount of work performed.

- Ms. Lucio could not refuse assignments and was often required to work beyond her scheduled hours.

- PA forbid temporary drivers[1] from hiring others and Ms. Lucio had no ability to do so.

- Using temp delivery drivers is an essential and necessary part of PA's business.

- Ms. Lucio's work did not require any special skill or specialized equipment.

- Ms. Lucio was hired for an indeterminate length of time that could have continued indefinitely had PA not forced her to choose between her job and her family.

- Ms. Lucio's work was virtually identical to work performed by W-2 hourly drivers, but, unlike those drivers, she was not paid overtime or reimbursed for her vehicle costs.

The relevant analysis turns on how Ms. Lucio was <u>actually treated</u> while performing her work; yet PA has offered no evidence to directly contradict her and Mr. Oliveira's first-hand accounts that show temp drivers, including Ms. Lucio, were treated as employees. Instead, in the face of Claimant's overwhelming evidence, PA offered testimony from Mr. Rosenau, Paul Spicker, and Glenn Parrish, none of whom directly observed her treatment on the job or the work she performed.

---

[1] PA considers Diligent drivers to be temporary drivers ("temp drivers"). *See* Jt. Ex. 17, 22:20-24.

{00299366 } 1

Mr. Rosenau had virtually no memory of his interaction with Ms. Lucio and never observed any of her interactions with Ms. Turner or Ms. Carter. Tr., 324:3-17. Mr. Spicker and Mr. Parrish had no first-hand knowledge of Ms. Lucio or her treatment by PA. Thus, even if their testimony is credited, it would have little relevance. Mr. Parrish's testimony includes material factual discrepancies and deserves little weight. For example, he testified that PA did not record Ms. Lucio's work time, but later admitted he does not know if such timekeeping occurred. Further, he testified that PA workers did not care when Ms. Lucio or other temp drivers worked, which is impossible to square with Ms. Carter's text messages chastising Ms. Lucio for leaving work two minutes early.

Tellingly, PA failed to call any witness with first-hand knowledge of Ms. Lucio's working conditions or treatment. It could have called Ms. Carter (who is still employed by PA), Ms. Turner, or any other coworker, but it strategically refused. PA should not be rewarded for declining to call witnesses with actual personal knowledge while, instead, relying on persons admittedly lacking it. Thus, to find in PA's favor, the Tribunal would have to afford no credit to Ms. Lucio and Mr. Oliveira, disregard PA's admissions, disregard written evidence, and hold Mr. Parrish's testimony dispositive, despite his lack of first-hand knowledge and contradictory testimony.

PA will try to win by pointing to inconsistencies by Ms. Lucio. These inconsistencies, which are far less substantial than inconsistencies in the testimony of PA's witnesses (see below), are largely about relatively immaterial subjects, such as the length of Ms. Lucio's meeting with Mr. Rosenau. Even if every purported factual inconsistency is resolved in PA's favor, Ms. Lucio should still prevail. The discrepancies reflect the fact that Ms. Lucio is an immigrant who speaks English as a second language, she lacks a high school diploma, and she becomes confused during questioning. Indeed, it is not surprising that PA was not able to find a single factual inconsistency by Mr. Oliveira because, unlike Ms. Lucio, he is a college-educated native speaker, and is better able to understand questioning. And his testimony, like Ms. Lucio's, establishes that PA violated the FLSA by misclassifying drivers.

The record is clear: to save money, PA hires "temporary drivers" like Ms. Lucio to perform the bulk of its deliveries – and refuses to pay them overtime and vehicle reimbursements required by law. Based on the factual record and the relevant law, Claimant respectfully requests that Ms. Lucio be awarded $11,731.08,[2] plus reasonable attorneys' fees and costs for PA's willful FLSA violations.[3]

## II. The Economic Reality Test Shows That Ms. Lucio Was PA's Employee

### A. PA Exercised Substantial Control Over Ms. Lucio

#### 1. Ms. Lucio's Testimony Demonstrates PA's Substantial Control

Ms. Lucio's supervisor, Ms. Turner, instructed her that she must work from 8:00 a.m. to 6:00 p.m. Monday through Friday and 8:00 a.m. to 3:00 or 5:00 p.m. on Saturdays. *Id.*, 44:25-45:13, 114:23-115:2. Ms. Lucio regularly continued working to about 6:45 or 7:00 p.m. because Ms. Turner required her to take late deliveries, sometimes by threatening termination. *Id.*, 43:13-18, 45:4-7. Ms. Lucio could not determine her own work time. *Id.*, 54:20-55:3. Ms. Turner called Ms. Lucio to criticize and rush her if she was late for her shift. *Id.*, 52:4-15, 63:2-15. After completing deliveries, Ms. Lucio had to return to PA to pick up more deliveries. *Id.*, 54:2-9. She needed Ms. Turner's approval to end her shift early. *Id.*, 54:10-19. Text messages from Ms. Carter sternly reprimand Ms. Lucio for leaving two minutes before her shift ended: "It is 5:58 not 6 pm, I did not dismiss you!!!" Jt. Ex. 15; Tr., 154:1-13. Due to these requirements, Ms. Lucio could not work for anyone else. Tr., 76:6-12, 110:6-9.

Ms. Turner assigned Ms. Lucio to train for two days CJ, a delivery driver. *Id.*, 35:1-6, 35:15-17,

---

[2] Based on testimony, a modified, conservative calculation, reflecting work from 8:00 a.m. to 3:00 p.m. on Saturdays, is attached as "Ex. A." ($5,865.54 actual + $5,865.54 liquidated = $11,731.08 total)

[3] An "employer's burden [to avoid double damages] is a difficult one. . . . [D]ouble damages [are] the norm and single damages the exception." *Lynch v. City of N.Y.*, 291 F. Supp. 3d 537, 548 (S.D.N.Y. 2018). Willfulness can be shown by failure to remedy after complaints. *Smith v. Pizza Hut, Inc.*, No. 09-1632, 2011 WL 2791331, *6 (D. Colo. July 14, 2011). Diligent admits about 80 suits and arbitrations filed against it and its customers from 2015 to 2018 alleging misclassifying drivers as "independent contractors," and about 15 have settled. Tr., 335:15-336:5, 339:18-340:3. Mr. Rosenthal admitted "about a half a dozen" claims against PA alleging misclassifying drivers over the past 3 to 4 years. Jt. Ex. 17, 36:14-37:8.

103:11-23. Ms. Lucio then road along with CJ. *Id.*, 35:18-24. CJ trained Ms. Lucio on "how the delivery is supposed to be done," "which way to go to the customers," "what papers the customer needed to be signed," "how to do [her] job," "how to check the invoice," how to "check with the parts numbers," to call Ms. Turner with customer questions and concerns, to ask customers for returns and defects, which door to use, to return to PA's facility after deliveries, and generally "how Tammie wanted … the job done." *Id.*, 35:25-36:6, 49:15-24, 50:2-51:16, 51:17-24, 54:2-9, 102:24-103:13, *see also,* 49:22-50:19.

Ms. Turner instructed Ms. Lucio how to perform deliveries, to ensure customers signed invoices, and how quickly to complete deliveries. *Id.*, 36:7-23, 38:1-39:4, 59:8-16. Ms. Turner instructed her to check parts against invoices to ensure accurate delivery, was angered by Ms. Lucio's occasional failure to comply, and would require Ms. Lucio to re-do deliveries. *Id.*, 51:25-52:3, 58:5-25.

Ms. Turner determined the sequence and timing of Ms. Lucio's deliveries on a route. *Id.*, 38:20-39:4, 55:14-19, 105:9-22. She criticized Ms. Lucio for not performing routes as instructed. *Id.*, 48:1-3. Ms. Lucio could not decide when deliveries were performed. *Id.*, 55:14-19.

Ms. Turner assigned Ms. Lucio "hot shot deliveries" with instructions that they must be delivered "within an hour or so from the time the order is placed." *Id.*, 56:12-22; Jt. Ex. 16, 30:9-25. Generally, PA required Ms. Lucio to perform all deliveries the same day. Tr., 57:2-7.

Mr. Rosenau told Ms. Lucio that she must obtain Ms. Turner's permission to take days off from work. *Id.*, 72:12-25. Ms. Turner denied her a day off, which Ms. Lucio requested due to her son's illness. *Id.*, 73:1-14, 78:18-79:20. Ms. Turner explained that it is "not her problem" and "that she doesn't care." *Id.* Ms. Lucio heard Ms. Turner tell delivery drivers they could not send substitutes. *Id.*, 119:5-24. Furthermore, Ms. Lucio could not practically hire others because she was so underpaid she would be unable to pay any substitute driver the legally required minimum. *Id.*, 75:16-25.

Ms. Turner recorded when Ms. Lucio and other delivery drivers began and ended shifts. *Id.*, 52:23-

53:21. She told Ms. Lucio that she would receive breaks, then either approved or denied those breaks. *Id.*, 128:14-22, 36:7-23, 38:1-39:4, 64:6-19. Breaks were denied about twice weekly. *Id.*, 64:6-19. Ms. Turner sometimes denied half-hour breaks to punish Ms. Lucio for tardiness, including for being only five minutes late. *Id.*, 48:23-49:11, 52:18-22, 63:2-15, 128:10-13; 152:24-153:1. When Ms. Lucio asked Mr. Rosenau about denied breaks, he told her "[y]ou have to listen to Tammie because Tammie is your boss. Whatever she say[s], that's what you have to do." *Id.*, 48:21-49:11, 129:1-11.

Ms. Turner closely supervised Ms. Lucio, regularly speaking to her several times a day, including calls during Ms. Lucio's deliveries to instruct and criticize her. *Id.*, 39:5-40:6, 46:5-20, 55:20-24. Sometimes, Ms. Turner called Ms. Lucio during delivering to ensure she followed orders or to reassign her to different tasks, such as picking up a check from another customer. *Id.*, 46:21-47:7. Ms. Turner supervised, and controlled the speed of, Ms. Lucio's loading of her vehicle. *Id.*, 39:5-19, 55:25-56:8. Ms. Lucio tried to refuse a large delivery of batteries because she thought it might damage her vehicle and tried to refuse another delivery assigned close to the end of her shift. *Id.*, 57:8-58:3. But Ms. Turner required her to perform those delivery, threatening her job. *Id.* Ms. Turner required Ms. Lucio to ask customers for returns and defects and sometimes criticized Ms. Lucio for failing to do that. *Id.*, 49:7-1. Ms. Turner instructed her not to talk on her phone at PA without permission, and when she asked permission, she was sometimes refused. *Id.*, 62:1-13.

Ms. Lucio asked Ms. Turner not to work Saturdays due to workplace drug use. *Id.*, 80:4-81:25. Ms. Turner denied her, and instructed Ms. Lucio to report the matter to PA's HR department. *Id.* HR then told Ms. Lucio they would "take care of everybody," including another temp driver. *Id.*, 82:3-17.

Ms. Turner misused her authority over Ms. Lucio to require her to pick up her lunch and mail personal letters. *Id.*, 60:12-61:3. Ms. Carter required Ms. Lucio to get her new tires. *Id.*, 61:6-21.

PA employed two W-2 delivery drivers at the Roswell store and five temp drivers. *Id.*, 78:2-9. All the delivery drivers drove their personal vehicles on the job. *Id.*, 78:10-16. The only differences in

treatment between PA drivers and temp drivers was different shirts, PA drivers shelved parts, and they did some cleaning. *Id.*, 77:8-21. Ms. Turner supervised both the PA and temp drivers. *Id.*, 77:22-78:1.

Ms. Lucio witnessed Ms. Turner terminate CJ, another temp driver. *Id.*, 84:22-85:1.

Ms. Lucio resigned because Ms. Turner provided her the choice of taking care of her sick daughter or keeping her job. *Id.*, 83:1-15. Mr. Rosenau reinforced that choice. *Id.*, 83:1-25.

### 2. Mr. Oliveira's Testimony Demonstrates PA's Substantial Control

Renan Oliveira corroborated Ms. Lucio's treatment. He worked for PA as a temporary delivery driver through Diligent from about January 2015 to about Spring 2016. Tr. 220:2-4, 224:22-24.

Kathy Bryan, PA's manager, supervised Mr. Oliveira, and he was required to report to her at the start and end of each shift. *Id.*, 224:17-21. Ms. Bryan dictated his work schedule and sometimes denied his requests for days off. *Id.*, 221:11-20. She threatened to "fire" Mr. Oliveira and other temp drivers. *Id.*, 228:23-229:5. Ms. Bryan required Mr. Oliveira to use PA paperwork (*id.*, 222:22-223:3), instructed him to obtain PA's customers' signatures for each delivery (*id.*, 223:4-12), instructed him to check the accuracy of parts for delivery (*id.*, 223:13-20), and instructed him to return with PA's paperwork (*id.*, 224:21-225:4). In a meeting, Ms. Bryan announced that temp drivers "cannot hire or have drivers replace [them]." *Id.*, 221:21-222:4. As a temp driver, Mr. Oliveira could not change the amount of any "profit or loss" because all work was assigned by PA. *Id.*, 224:7-12.

All the same instructions and rules applied to Mr. Oliveira when he was later hired by PA. *Id.*, 222:22-21, 224:21-225:4. The only differences between his treatment as a temp driver and as an admitted employee were (1) he was paid more as a direct hire, (2) he was reimbursed for vehicle costs, and (3) he had to clean bathrooms and re-shelve parts. *Id.*, 226:19-:227:4. Temp drivers, like PA drivers, could not deliver for others because they were required to return to PA's facility after completing deliveries. *Id.*, 228:5-12. Both positions entailed "set hours." *Id.*, 227:25-228:4.

### 3. Mr. Rosenthal Corroborates PA's Control

PA's Chairman, Mr. Rosenthal, admitted numerous facts showing PA treated Ms. Lucio as an employee. He admitted that (1) temp drivers have set work times (Jt. Ex. 16, 73:24-74:16), (2) PA tracks the times when temp drivers are on deliveries (*id.*, 18:10-23), (3) PA's dispatchers set routes that temp drivers perform (*id.*, 34:12-18), (4) PA may instruct temp drivers about rush deliveries (*id.*, 30:5-8), (5) PA assigns temp drivers "hot shot deliveries," to be delivered "within an hour or so" (*id.*, 30:9-25), (6) PA will terminate temp drivers for failing to prioritize "hot shot deliveries" (*id.*, 93:20-94:1), (7) PA expects temp drivers to complete all deliveries the same day and they cannot decide to perform a delivery on another day (*id.*, 92:18-93:2), (8) temp drivers must "[r]eview orders before and after delivery to ensure that orders are complete, the charges are correct, and the customer is satisfied" (*id.*, 45:3-12), (9) temp drivers should compare invoices to products before leaving PA's facility (*id.*, 46:6-9, 94:2-17), (10) temp drivers must obtain PA's customers' signatures (*id.*, 46:22-47:2), (11) temp drivers must "reconcile debt and credit and all monies collected related to deliveries" (*id.*, 51:15-23), (12) temp drivers are "absolutely not" permitted to divert customers away from PA (*id.*, 62:15-21), (13) temp drivers should not take anyone else's parts or bills into a customer's facility (*id.*, 94:18-25), (14) temp drivers are expected to return to PA to pick up more deliveries upon completing assigned deliveries (*id.*, 96:18-98:18), (15) PA's dispatchers should "ensure that all invoices from each run [by a temp driver] are collected" (Jt. Ex. 17, 14:1-17), and (16) PA maintains several written rules for temp drivers. Jt. Ex. 16 100:1-8, 101:4-20, 103:3-104:1.

### 4. Mr. Rosenau Also Corroborated PA's Control

Mr. Rosenau admitted PA provides "orientation" for Diligent drivers including training on PA's "SOPs" [standard operating procedures]. Tr., 317:24-318:3. Those "SOPs" require temp drivers to take PA invoices to deliveries, obtain customer signatures, record delivery times on PA's invoices, ask customers for returns, bring back payments, pick up "cores," and refuse credit cards and checks

when PA specifies payment by cash. *Id.*, 317:7-12, 320:14-20, 321:9-322:23.

Cumulatively, the evidence of control, including PA's admissions, shows employment.

### B. Ms. Lucio Had No Opportunity For Profit Or Loss

Ms. Lucio received wages for working at PA, not profits. *Id.,* 75:20-22. Mr. Rosenthal admits he does not know if temp drivers can earn profits or do anything to increase their earnings. Jt. Ex. 16, 47:23-25, 58:5-10. Indeed, Ms. Lucio never had the opportunity to negotiate her pay rate. Tr., 42:2-12. Neither Ms. Lucio nor any other Roswell driver supervised others. *Id.*, 75:11-17. PA argues that workers can earn profits by hiring others, but Mr. Rosenthal is unaware of any temp driver hiring anyone, managing others, or using any managerial skill. Jt. Ex. 16, 58:21-24, 59:12-15, 59:19-22. Mr. Parrish is unaware of anyone working in place of a temp driver. Tr., 302:23-303:1. Mr. Rosenau states that "master contractors" have hired others, but he does not know if Ms. Lucio was a "master contractor." *Id.*, 328:11-16, 329:18-23. Common sense indicates she was not a "master contractor" and PA offers no contrary evidence. PA's manager explicitly told Mr. Oliveira and other drivers they could not hire others. *Id.*, 221:21-22:2. Thus, this factor heavily favors a finding of employment.

### C. The Relative Investment In The Business Favors Employee Status

The relevant issue is the comparative amount of each party's investment. *Antenor v. D&S Farms,* 88 F.3d 925, 937 (11th Cir. 1996). PA operates about 100 facilities in seven states, including retail stores and warehouses. Jt. Ex. 16, 64:23-65:22. Thus, PA's investment in its large business enterprise clearly dwarfs Ms. Lucio's investment in her vehicle and this factor favors a finding of employment.

### D. The Degree Of Skill And Independent Initiative Required Favors Employee Status

Working as a delivery driver for PA does not require any particular skill. Tr., 49:12-14. Mr. Rosenthal signed written discovery responses identifying the only skills needed to work as a temp driver for PA as "managerial skills." Jt. Ex.15, Responses 5-6. But, he testified that he is unaware of whether temp drivers use any managerial skill or of any temp driver using such skills. Jt. Ex. 16, 59:16-

22.[4] Mr. Parrish cannot identify any different skill needed between PA's W-2 drivers and temp drivers. Tr., 296:24-297:14. Mr. Rosenau admitted that some workers are hired without being experienced delivery drivers. *Id.*, 330:17-23. Both Mr. Oliveira and Ms. Lucio testified that PA drivers and temp drivers performed the same job. Thus, this factor weighs heavily in favor of finding employment.

### E. The Duration Of The Working Relationship Favors Employee Status

Some delivery drivers have been with Diligent 13 to 15 years. *Id.*, 328:5-10. Mr. Oliveira worked as a PA temp driver for longer than a year. *Id.,* 220:2-4, 224:22-24. Ms. Lucio may worked for PA indefinitely had Ms. Turner not forced her to decide between PA and her family. This supports a finding of employment.

### F. The Work Is An Integral Part of PA's Business, Which Favors Employee Status

Mssrs. Rosenthal, Parrish, and Rosenau all testified that delivery is "an important part" of PA's business. Jt. Ex. 16, 42:11-13; Tr., 296:21-23, 326:9-12. Mr. Rosenthal estimated that 90% of PA sales are delivered, with about 60% delivered by drivers. Jt. Ex. 16, 42:17-43:10. This factor heavily supports a finding of employment.[5]

## III. An Analysis Of The Conflicting Evidence Favors Claimant's Position

Ms. Lucio's testimony is supported by that of Mr. Olivera and admissions by PA and Diligent.

Ms. Turner's treatment of Ms. Lucio is important. All PA's witnesses denied that Ms. Turner

---

[4] PA also misidentifies "managerial skills" as maintaining a vehicle, finding efficient routes, and "driving skills."

[5] Just as each of the relevant factors favors employee status, other *indicia* of employment that courts sometimes consider also favor employee status. Ms. Lucio never formed a business entity; advertised; acquired, maintained or managed inventory; or rented space. Tr., 73:14-74:15. Contrary to Diligent's forms, Ms. Lucio did not have to submit invoices to be paid, and she never did. *Id.*, 34:1-13, 40:7-16. She had regular paydays. *Id.*, 71:10-16. She considered PA's facility as her workplace. *Id.*, 153:19-25. Ms. Turner required Ms. Lucio to wear a uniform shirt. *Id.*, 76:13-77:2. There was no difference in customers' experience if a delivery was performed by a PA or temp driver. Jt. Ex. 16, 38:5-21. Significant uncontested evidence detailed above shows PA treated its W-2 drivers, admitted employees, substantially the same as temp drivers.

supervised Ms. Lucio, but they all later admitted lack of first-hand knowledge and observation of Ms. Lucio's treatment. Tr., 295:3-8, 295:20-296:8, 324:4-17, 326:4-8, 329:24-330, 332:4-7; *see also* Jt. Ex. 16, 20:1-2. Glaringly, PA chose not to call any witness with actual personal knowledge.

Mr. Parrish testified that dispatchers do not track or care when temp drivers take breaks or leave work. Tr., 299:23-300:1. When confronted with Ms. Carter's text message to Ms. Lucio stating "[i]t is 5:58 not 6 pm, I did not dismiss you!!!" (Jt. Ex. 15), he was unable to explain the conflict between his testimony and that text message (Tr., 301:1-5). Nor could he, because Mr. Parrish admitted no first-hand knowledge. Thus, Mr. Parrish lacks credibility.[6]

Mr. Parrish denied "ride alongs," but they are part of orientation, as Mr. Rosenau admits. *Id.*, 286:18-23. He also denied PA tracked work time by temp drivers (*id.*, 285:8-10) but then admitted he did not know whether Ms. Turner tracked Ms. Lucio's time. Tr., 297:24-298:2. Mr. Parrish's denial conflicts with Mr. Rosenthal admission that PA tracks hours worked by temp drivers. Jt. Ex. 16, 74:19-75:5 (set work times and monitored lateness), *see also id.* 18:10-23 (tracking time spent on deliveries).

PA's counsel emphasized some inconsistencies in Ms. Lucio's testimony. But they pertain to trivial matters and largely reflect Ms. Lucio's lack of understanding. Significantly, PA identified no inconsistencies in Mr. Oliveira's testimony, which reflects his education and familiarity with English.

## IV. Conclusion

Based on overwhelming evidence detailed above, showing all six factors indicate employment, the hearing testimony, and her pre-hearing brief, Ms. Lucio requests an interim award of $11,731.08.

---

[6] All of PA's witnesses lack credibility. Mr. Rosenthal, who PA declined to present at arbitration, signed sworn discovery responses verifying that Ms. Lucio can earn profits by using "managerial skills," but he later testified that he does not know if temp drivers can earn profits and he denied they use "managerial skills." (*Compare* Jt. Ex. 14, at 3 *with* Jt. Ex. 16, 57:23-25, 59:16-22). Similarly, Mr. Rosenau first testified that "[n]o one there with [PA] had the right [to tell] drivers what to do or how to do it." *Id.*, 315:24-316:9. Then, he extensively admitted that PA provides an "orientation process," including training temp drivers on several "SOPs." *Id.*, 317:7-12, 317:24-:18:6, 319:3-12, 320:14-20, 321:21-322:3. He, too, had no direct knowledge of how Ms. Lucio, personally, was supervised.

Dated: February 19, 2019	Respectfully Submitted,

**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**

By: */s/Jeremiah Frei-Pearson*
Jeremiah Frei-Pearson
John Sardesai-Grant
Andrew C. White
445 Hamilton Avenue, Suite 605
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 824-1561
jfrei-pearson@fbfglaw.com
jsardesdai-grant@fbfglaw.com
awhite@fbfglaw.com

**WEINHAUS & POTASHNICK**
Mark Potashnick, MO Bar # 41315
11500 Olive Boulevard, Suite 133
St. Louis, Missouri 63141
Telephone: (314) 997-9150 ext. 2
Facsimile: (314) 997-9170
markp@wp-attorneys.com

**LIBERMAN, GOLDSTEIN & KARSH**
Eli Karsh, MO Bar # 43061
230 South Bemiston Avenue, Suite 1200
Clayton, Missouri 63105
Telephone: (314) 862-3333 ext. 13
Facsimile: (314) 863-0605
elikarsh@aol.com

*Attorneys for Claimant*