# **EXHIBIT G**

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| SUSAN LUCIO,<br><br>Claimant<br><br>v.<br><br>PARTS AUTHORITY, LLC and PARTS AUTHORITY INC.,<br><br>Respondents. | Case No. 01-18-0000-6169 |

**RESPONDENTS' POST-HEARING BRIEF**

                      Abrams, Fensterman, Fensterman, Eisman,
                      Formato, Ferrara, Wolf & Cerone, LLP
                      150 Linden Oaks
                      Rochester New York 14625

                      Dorf & Nelson, LLP
                      555 Theodore Fremd Ave.
                      Rye, New York 10580

                      Counsel for Respondents

Of Counsel:
      Sharon Stiller
      Andrew P. Marks

Claimant Susana Lucio ("Lucio") cannot recover against Parts Authority, Inc. ("PA") for violation of the Fair Labor Standards Act ("FLSA") because PA was not Lucio's employer.

To determine FLSA coverage courts look to the "economic reality" of the relationship between the worker and the alleged employer and whether that relationship demonstrates dependence. Delivery drivers contracted through an independent logistics company, are not dependent on, and therefore not employees of, the logistics company's customer.

In *Layton v. DHL Express (USA) Inc.*, 686 F. 3d 1172 (11th Cir. 2012), DHL contracted with Sky Land for drivers to supplement DHL's employee driver compliment. DHL inspected the drivers' vehicles and uniforms, subjected them to background checks, and communicated directly with them about customer complaints, requests for re-deliveries and other non-routine matters. Despite DHL's close working relationship with the Sky Land drivers, DHL was not an employer of the drivers for purposes of the FLSA:

> Our undertaking is oriented by the desire to discover the economic reality of the total circumstances … DHL bore no financial or managerial responsibility for Drivers. For the most part, DHL simply tasked Sky Land, and thus Drivers, with macro-level goals—deliver the packages, respond to customer complaints—and provided little guidance regarding the manner by which to execute daily tasks. Sky Land alone held the power to hire, fire, and pay Drivers. Sky Land alone owned the vans that allowed Drivers to complete their essential job function, and because Sky Land's contract with DHL was not exclusive, Sky Land could have served other companies using those vehicles. We find that the totality of the economic circumstances indicates that Drivers were not economically dependent upon DHL.

*Accord, Bonet v. Now Courier Inc.*, 203 F. Supp. 3d 1195, 1208 (S.D. Fla. 2016)(although driver had to work the hours required by the customer, could not have another job and could not work for others, he failed to prove he was employee of customer because he signed an independent contactor agreement, paid income taxes as an independent contractor, provided his own vehicle and paid his own expenses).

The economic reality of the relationship between Lucio and PA leads definitively to the conclusion that Lucio was not a PA employee. PA bore no financial or managerial responsibility for Lucio; PA contracted with BBB Logistics Inc. d/b/a Diligent, an independently owned and operated company, to provide delivery coverage to meet PA's demands. Diligent alone decided how to offer the opportunities, *e.g.* by referring a single driver or multiple drivers. Diligent alone selected the independent owner-operators with whom it would contract and offer engagements. It was Diligent that contracted with Lucio, an established owner-operator. It was Diligent that prepared the owner-operator agreement and negotiated Lucio's compensation. And it was Diligent that paid Lucio when she completed her engagement (or paid someone else when she chose not to do so). Diligent's contract with PA was not exclusive and Diligent contracted with PA's competitors. If Diligent's contract with PA ended, Lucio would not continue delivering for PA; she remained contracted with Diligent available to accept engagements with other Diligent clients.

**MATERIAL UNDISPUTED EVIDENCE:** Lucio failed to meet her burden to prove she was an employee of PA under the FLSA. *Bonet, supra*, 203 F. Supp. 3d at 1207. PA is a wholesale automotive parts distributor. (Jt. Ex. 16 at 18:13-16). Diligent provides delivery logistics to customers, including PA. (Tr. 305:2-9) PA and Diligent are independently owned and operated companies (332:17-22) PA contracted with Diligent for delivery coverage daily at PA's Roswell facility. (277:22-278:2) It was immaterial to PA how Diligent offered client engagements and PA was not involved in setting the terms of the relationship between Diligent and its owner operators. (282:20-283:4; 291:13-22) Diligent's Operations Manager, Fred Rosenau ("Fred"), contracted with owner-operators to complete delivery engagements for Diligent's clients. (302:15-1) Fred was not an agent or employee of PA. (143:19-25; 316:10-15) Plaintiff disclaimed any relationship between PA and Diligent. (Jt. Ex. 4 at 2)

On May 11, 2015, Lucio met with Fred for close to an hour, during which time she reviewed and signed a Diligent owner-operator agreement, frequently asked questions, and an operator proposal. (306:14-308:4 and Jt. Ex. 7) Lucio was an experienced independent owner-operator who was then providing delivery services to ATS, and she fully understood that she was signing on with Diligent to serve its clients as an independent owner-operator. (85:10-24; 93:7-10; 344:20-25). Fred advised Lucio of an opportunity to provide delivery services at PA's Roswell facility, including the parameters of that engagement (*i.e.,* 8:00 a.m. to 6:00 p.m. Monday to Friday and 8:00 a.m. to 3:00 p.m. or 10:00 a.m. to 5:00 p.m. on Saturday). (311:19-23) Lucio accepted the engagement and reported to the PA facility for the purpose of making deliveries of automotive parts to PA's customers. (315:24-316:9) PA did not interview Lucio or review her qualifications and Lucio did not submit any application or other paperwork to PA. (124:2-13) The procedures Lucio followed when delivering for PA were the same procedures she followed as an owner operator for ATS (158:20-159:2) and she did not receive instructions from PA beyond communications about the times she was expected to make herself available for deliveries. (345:20-25) At least 90% of Lucio's working time was spent away from PA's facility without supervision. (124:23-125:1; 136:24-138:7)

Lucio received payment for her services exclusively from Diligent. (113:18-20; 121:20-25) She addressed concerns about her pay or "breaks" with Fred because she understood that it was Diligent, not PA, that controlled her payments. (141:9-142:7) If Lucio was unable to provide services on a given day, she alerted Fred. (141:4-8) Lucio's responsibilities were different from those of PA's employee drivers. Lucio wore a polo shirt bearing the Diligent logo. (77:4) PA employees wore different uniforms, worked different hours, performed tasks besides delivering (e.g., cleaning, stocking, pulling parts), had access to different areas of the PA facility, were

subjected to different supervision and were not paid by Diligent. (287:11-288:17; 289:11-291:1) PA had no authority to terminate Lucio's services. (282:2-4) Lucio continued in her engagement until October 2015 when she advised Fred that she was terminating her owner operator agreement. (314:21-315:1)[1]

**LUCIO'S TESTIMONY SHOULD BE DISREGARDED:** Seeking to cloak herself with PA "employee" status, Lucio trivializes Diligent as a payroll company and claims that PA, through its warehouse manager Tammie, was "controlling everything." (39:14) But Lucio's testimony about alleged control was contradictory, evasive and at times intentionally misleading. And when a witness gives testimony that is demonstrably false, the fact finder "may, in accordance with the maxim *falsus in uno falsus in omnibus*, choose to discredit or disbelieve other testimony given by that witness." *Washington Mut. Bank v. Holt*, 113 A.D.3d 755, 756–757 (2nd Dept. 2014).

For example, Lucio claimed she contacted Diligent because "I needed a job." (30:12) In truth, when she contracted Fred, Lucio had a job delivering for ATS. (85:25-86:6) Lucio claimed that she did not read the Diligent contract because Fred told her "to hurry up and sign" (37:20-21; 41:12-13; 100:14-17). In truth, Lucio met with Fred for nearly an hour (she initially lied and testified that the meeting lasted only 35 minutes (88:18)); she had the chance to review all the documents she signed (89:23-24); and Fred never told her to hurry up (102:8-11). Lucio

---

[1] Claimant misrepresents PA's Vice President, Yaron Rosenthal, testimony that PA did not hire independent contractors as an admission that Lucio was an employee. Far from it. Rosenthal used "temp" as a term to distinguish between PA's employee drivers and drivers supplied through vendors, like Diligent, whose numbers fluctuated seasonally. He testified that PA did not retain independent contractors because PA did not directly retain Diligent contractors; rather, PA contracted with Diligent to provide deliveries. (Rosenthal Dep. pp. 19-22; 26-27; 32-33) Rosenthal's testimony is not an admission that Diligent owner-operators not independent contractors and/or were temp employees of PA.

ultimately admitted that she understood she was signing on with Diligent as an independent owner/operator. (93:7-10; 344:20-25)[2]

Lucio testified that when she first arrived at the PA location, Tammie assigned her to ride with Diligent driver CJ to train her. (35:1-6) It is doubtful that such a ride-along occurred (317:20-318:6), but if it did, it involved minor customer preferences and administrative procedures. (286:18-23) Lucio did not need anyone to tell her how to deliver auto parts. (103:14-17) Lucio testified that Tammie told her the days and times she needed to be available. (42:24; 53:21) In truth, Fred had advised Lucio of the days and times required by the engagement and she accepted those terms before Lucio even met Tammie. (104:14-18) Lucio initially claimed that Tammie told her what routes to take to make deliveries (36:20; 44:10-13; 105:1-4). Eventually Lucio admitted that Tammie gave no such direction and Lucio used her GPS for directions. (108:3-9; 125:10-13; 126:1-5; 281:7-10) Lucio repeatedly testified that Tammie would "take away her breaks" if she arrived after 8:00 a.m. In truth, neither Diligent's obligations to PA nor Lucio's contract with Diligent contemplated "breaks" during the delivery day. (128:23-129:2; 289:25-230:3; 291:5-8) If Tammie tolerated Lucio's mid-day unavailability it was out of empathy for Lucio's childcare concerns. Had Lucio raised the issue of breaks with Fred as she claims, it is not surprising he might say that if she wanted Tammie to let her interrupt deliveries to pick up her kids, Lucio should do those things that Tammie made a pre-condition of that interruption, *i.e.* arrive timely to start delivering at 8:00 a.m. per the contract.

---

[2] Lucio identified herself as an independent delivery driver on her tax returns during the period she was contracted with ATS and Diligent. The status a person claimed on her tax return is a significant factor to be considered in determining whether a worker was an independent contractor. *Deboisiere v. Am. Modification Agency*, 2010 WL 4340642 at *3 (E.D.N.Y. Oct. 22, 2010); *Gagen v. Kipany Prods. Ltd.*, 27 A.D.3d 1043, 1044 (3d Dept. 2006)("the manner in which the relationship is treated for income tax purposes is certainly a significant consideration" in distinguishing between an employee and an independent contractor).

Lucio testified that Tammie would go in her car to check her mileage two or three times per week. (67:24-68:1). In truth, there was no reason for Tammie to check Lucio's odometer because the mileage driven was immaterial to PA's contract with Diligent or its relationship with Lucio. (285:20-286:7) Asked to explain why Tammie would check mileage, Lucio gave the absurd response that if a driver claimed to have driven 120 miles, Tammie would say that's not true and would go check it out to see. (122:11-16) Observing an odometer reading even if Tammie wished to verify the driver's claim, is not any type of control.

Lucio testified circularly that if she wanted a day off she asked Tammie, Tammie told her to ask Fred, Fred told her to ask Tammie and Tammie denied her the day off. (72:15-73:14) But Lucio contradicted herself, testifying inconsistently that she never called Fred about taking a day off (120:22-24); she did call Fred and then she called Tammie (Tr. 139:15-20); and she told Fred and Fred told Tammie. (141:4-8) In truth, Lucio took many "days off" during her brief engagement at PA, and when she did so, she told – not asked - Fred. (289:1-10) If Lucio did not arrange for someone to fill the slot, Fred would send a replacement per the contract. (312:10-12)

Lucio initially claimed that she could not hire someone to complete her engagement because Tammie said she had to perform the services herself. (114:9-23) When pressed, Lucio admitted that neither Tammie nor anyone else ever said that. (113:1-5; 117:21-118:1; 119:15-23)[3] Lucio claimed that Tammie constantly called her and sent her text messages during the day.

---

[3] PA did not track whether Lucio was making the deliveries or someone else was doing it. (288:21-25) Lucio may argue that she did not hire an assistant or subcontract her work. But the test is not what the "economic reality of the relationship was but rather at what the relationship could have been." *Freund v. Hi-Tech Satellite, Inc.*, 185 Fed Appx. 782 (11th Cir. 2006). Lucio's contract allowed her to subcontract her services and, as Fred testified, Diligent owner operators regularly did so. (312:2-9; 313:7-24; 328:11-16) Testimony by Lucio's brother-in-law Renan that PA said he could not subcontract concerned a different place and time and proves nothing. Here, we know that Lucio's contract specifically permitted her to do so. (Jt. Ex. 7 Agreement ¶ 1 and FAQ No. 7)

(135:15-23) Remarkably, Lucio had no call log from her cell phone or a single text from Tammie. Lucio claimed that Tammie was her boss. Yet Tammie had no authority to discipline or terminate Lucio's services (282:2-5; 290:10-12) and Lucio acknowledged that Tammie never claimed otherwise. (144:7-11). Rather, Lucio said that she complained to Fred about not getting a break and Fred told her that Tammie was her boss (*id.*), a statement Fred found absurd (315:7-9). When Lucio disclosed the details of that complaint to Fred, it became crystal clear that Fred did not say Tammie was her boss: "He said well, you have to listen to her. And that was the end of the conversation." (130:22-25) But even if Lucio genuinely believed Fred meant that Tammie was her boss, Fred worked for Diligent, not PA. (144:1-14) Fred had neither actual nor apparent authority to make PA Lucio's employer by telling her she had to listen to Tammie.

Even if it were believable that Tammie gave and withheld "breaks," that Fred told Lucio to listen to Tammie if Lucio wanted Tammie to give her a break, or that Tammie called or texted Lucio multiple times per day to determine where she was, those facts alone would not establish that Tammie controlled Lucio to such an extent that PA became her employer. "Control" is significant only when it is exercised over the manner in which the work is to be performed. In any event, Lucio's schedule was not controlled by PA. Lucio contracted with Diligent to provide coverage at PA from 8:00 a.m. to 6:00 p.m. Tammie's communication with Lucio to assess her ETA or divert her to another delivery was not to control the manner in which the work was to be performed, but simply to obtain information needed to best deploy the delivery resources PA had contracted for. Lucio acknowledged that she did not receive daily instructions on how to perform her deliveries, nor did she need any since she had been in the business of contracting delivery services for ATS for almost a year.

Furthermore, control over the manner of work is just one of multiple factors considered in determining the central question of the worker's economic dependence upon the business for which she is laboring. Other factors include: (i) who determines the rate and method of payment; (ii) who has the authority to hire or fire; (iii) who maintains employment records; (iv) the employee's opportunity for profit or loss depending upon his managerial skill; (v) the employee's investment in equipment or materials required for his task, or his employment of workers; (vi) whether the service rendered requires a special skill; (vii) the degree of permanency and duration of the working relationship; and (viii) the extent to which the service rendered is an integral part of the employer's business. *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997). Considering all these factors, Lucio was not economically dependent on PA: PA did not pay Lucio nor determine how much she would be paid; PA did not interview or hire her; PA did not requiher to work any particular day or week; PA did not require her to personally perform her services; Lucio provided her own equipment; Lucio controlled her expenses, including where she purchased gas and insurance, the type of vehicle she used, and routes she took to compete the deliveries; finally, Lucio provided delivery services for PA only for five months. In fact, Lucio's relationship with PA was a series of daily engagements; she was free to reject an engagement on any particular day and did so on numerous occasions. Finally, Lucio was not integral to PA's business. Lucio delivered some parts to local customers. Her services could be and were replaced by other owner operators or means of distribution. Therefore, whether delivery is integral to PA's business carries little weight with respect to a particular driver. *Arena v. Plandome Taxi, Inc.*, 2014 WL 1427907 (E.D.N.Y. April 14, 2014)("While Arena argues that … the operation of taxicabs was 'the most integral part of Defendants' business,' it is equally important that Arena was not an indispensable driver, since he was replaced by other drivers in his absence). In short and in sum, the "economic

reality" of the relationship between Lucio and PA does not demonstrate dependence. As such, the record does not support a finding that PA was Lucio's employer.[4]

**DAMAGES:** Claimant's damages testimony, premised on faulty assumptions, must be disregarded in its entirety. Therefore, she has failed to prove damages, an essential element of her claim. Moreover, if the Arbitrator finds that Lucio was a PA employee, the best evidence of damages are her pay records and tax returns. The records show that Lucio worked a total of 107 weekdays and 18 Saturdays. (Jt. Ex. 11) Her engagement was for ten hours per weekday and 7 hours on Saturdays, and she testified to taking a 30-minute break to transport her child from school to home.[5] Crediting her with 9.5 hours per weekday and 6.5 hours per Saturday, she worked a total of 1133.5 hours ((107 x 9.5) + (18 x 6.5)). Diligent paid Lucio $11,032 for her services. (Jt. Ex. 12) Dividing the amount paid by the hours worked yields an hourly rate of $9.73, and an overtime premium of $4.87 ($9.73 x .5). Plotting the paid days on a calendar, and using a payroll week of Sunday to Saturday, there were 4 weeks when Lucio drove fewer than 4 days, thus not exceeding 40 hours. In 11 weeks, Lucio drove 6 days, totaling 54 hours per week; in 3 weeks she didn't drive Saturdays, totaling 47.5 hours per week; and in 6 weeks she drove 4 weekdays plus Saturday totaling 44.5 hours per week. Totaling the hours in excess of 40 for those 20 weeks results in the sum of 203.5 overtime hours ((11 x 14 = 154) + (3 x 7.5 = 22.5) + (6 x 4.5 = 27)).

---

[4] Lucio cannot attribute Diligent's actions to PA, particularly since she denied any relationship between the two companies in the underlying litigation.

[5] Lucio claims she was denied a break on days she was tardy, but if she was late, she would not have "worked" ten hours. Further, although she claims she received delivery assignments that required her to work past 6:00 p.m., PA's delivery records (Jt. Ex. 1) show that it was extremely rare that Lucio was given a delivery after 5:30 p.m. Further, her working time would end when the delivery was completed because at that point she was released from work.

Multiplying the overtime hours by the overtime premium (203.5 x $4.87) yields unpaid overtime of $991.05.

With expenses, the best evidence is Lucio contemporaneous tax return. (98:9-11) In 2015, Lucio contracted with both Diligent and ATS and claimed expenses of $10,392 against income of $20,697. (Jt. Ex. 13) 53% of Lucio's 2015 income was attributable to Diligent. Proportioning 53% of her expenses to Diligent totals $5507.76. Under the FLSA, expenses are recoverable only to the extent they drive compensation below minimum wage. Using the federal minimum wage of $7.25, Lucio would have been paid $10,431.96 ((1133.5 hours @ 7.25) + (203.5 hours @ $10.88)). If Lucio is awarded $991.05 for overtime, she will be paid $1591.09 more than minimum wage. Subtracting that from her Diligent expenses leaves a remainder of $3916.67.

**CONCLUSION:** When the relationship between Lucio and PA is analyzed using the economic realities test, the outcome is that she was not an employee. As early as 2014, Lucio was an independent owner operator delivering auto parts. In May 2015, Lucio contracted with Diligent to provide delivery services for Diligent customers as an independent owner operator. Diligent alone held the power to enter into or terminate Lucio's contract; Diligent alone made payments to Lucio for services; Lucio owned the vehicle that allowed her to complete her deliveries and she could have, and did, serve other companies using that vehicle; and Lucio ended her engagement to deliver for PA by telling Diligent. Equally importantly, Lucio represented to the government that she was an independent contractor. Given these undisputed facts, the economic reality of the total circumstances clearly establishes that Lucio was not an employee of PA; she was an independent contractor once removed and the Arbitrator should so rule.